**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THOMAS WHITE, ET AL., | : | CIVIL ACTION NO. |
| *PLAINTIFFS* | | 3:02CV1589(WWE) |
| | : | |
| v. | : | |
| | : | |
| NORMAN NAULT, ET AL. | | |
| *DEFENDANTS* | : | May 27, 2004 |

**DEFENDANTS' MEMORANDUM IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants submit this memorandum in support of their motion for summary judgment

filed pursuant to Rule 56 of the Federal and Local Rules of Civil Procedure. Submitted herewith

are defendants' statement of material facts not in dispute and exhibits. This civil rights action

arises out of the arrests of the plaintiffs, the former sheriff of Windham County, Thomas White,

and two of his chief assistants, Gloria Marion and Henry Bourgeois. The defendants are current

and retired state police officials. Plaintiffs allege that the defendants falsified or omitted material

facts from affidavits submitted in support of the warrants for their arrest on a variety of charges

relating to witness tampering and obstruction of justice.

As discussed in more detail below, plaintiffs fail as a matter of law to state a claim for

violation of any state or federal constitutional right. In particular, none of the defendants knew at

the time the warrant affidavits were prepared that any information contained therein was false;

nor did any possess any information that was omitted from the warrants that would have

undermined a probable cause finding. Thus, none of the defendants possessed the requisite

mental state to state a claim against them based on the submission of a false or materially

incomplete warrant affidavit. Moreover, the defendants are clearly entitled to qualified immunity from an award of money damages.

## I.     MATERIAL FACTS NOT IN DISPUTE

The following recitation sets forth the facts relevant to the investigation and arrest of the plaintiffs for charges relating to witness tampering and obstruction of justices. Also set forth by way of background are facts relating to plaintiff White's arrest for larceny, embezzlement and corrupt election practices. Those charges are not challenged in this lawsuit, and in fact plaintiff White accepted accelerated rehabilitation in connection with misuse of campaign funds.

### A.     The Plaintiffs

Plaintiff Thomas White was hired as a deputy sheriff in Windham County in 1995. See Statement of Material Facts Not In Dispute ("SMFNID") at ¶ 1.[1] He was elected to the position of High Sheriff for Windham County in November of 1998, defeating incumbent James Kenney. See SMFNID at ¶ 2. Plaintiff White assumed his duties as High Sheriff on June 1, 1999, serving in that position until the sheriffs system was abolished on December 1, 1999 in favor of the current judicial marshal system. See SMFNID at ¶ 3. Plaintiff White did not lose his position as High Sheriff as a result of the criminal charges at issue in this case, but rather resigned when the sheriff's system was dismantled. See SMFNID at ¶ 4. He currently works as a representative for a public employees' union. See SMFNID at ¶ 5.

Plaintiff Gloria Marion was first employed as a deputy sheriff by the Sheriff's Department in September of 1997. See SMFNID at ¶6. She served in that capacity until promoted to Lieutenant by plaintiff White immediately after he became High Sheriff in June of 1999. See SMFNID at ¶ 7. Plaintiff Marion remained at that rank until the sheriff's system was

---

[1] Each paragraph of the SMFNID contains a citation to one or more exhibits supporting the truth of the statement. Those exhibits are attached to the SMFNID.

abolished.  <u>See</u> SMFNID at ¶ 8.  Plaintiff Marion's employment in the courts was not interrupted

as a result of either her arrest or the transition to the current marshal system.  <u>See</u> SMFNID at ¶

9.  She is currently employed by the Judicial Branch of the State of Connecticut as a Judicial

Marshall II in Windham County.  <u>See</u> SMFNID at ¶ 10.

Plaintiff Henry Bourgeois became employed as a full-time deputy sheriff in Windham

County in July of 1995, having previously worked at various times in the sheriff's office on a per

diem basis.  <u>See</u> SMFNID at ¶ 11.  He was promoted to captain – a supervisory position above

lieutenant in the chain of command – by plaintiff White in June of 1999.  <u>See</u> SMFNID at ¶ 12.

Like plaintiff Marion, Mr. Bourgeois' employment in the court system was not interrupted by his

arrest or the abolishment of the sheriff's system.  <u>See</u> SMFNID at ¶ 13.  He is currently

employed as a supervisory judicial marshal.  <u>See</u> SMFNID at ¶ 14.  Prior to his employment in

the sheriff's system, plaintiff Bourgeois served as an officer of the Connecticut State Police for

32 years, retiring in 1992.  <u>See</u> SMFNID at ¶ 15

B.    <u>The Defendants</u>

Defendant Norman Nault is employed by the Connecticut State Police as a detective,

having joined the State Police in 1988.  <u>See</u> SMFNID at ¶ 16.  At the time of the events at issue

in this matter, Detective Nault was assigned to the Eastern District Major Crime Squad, where he

specialized in the investigation of serious and/or complex crimes.  <u>See</u> SMFNID at ¶ 17.

Detective Nault lead the investigation into the charges at issue in this matter and prepared the

affidavit for the warrants for the arrest of defendants Marion and Bourgeois on those charges, as

well as the language incorporated into the affidavit supporting the warrant for the arrest of

plaintiff White that is challenged in this case.  <u>See</u> SMFNID at ¶18.

Defendant Karen O'Connor joined the state police in June of 1995. See SMFNID at ¶    .
During the relevant time period, Detective O'Connor was assigned to the Eastern District Major
Crime Squad as a Trooper.  Detective O'Connor was responsible for investigating Plaintiff
White's conduct relating to his handling of funds held by him in his capacity as a deputy sheriff.
See SMFNID at ¶ 21.  That investigation ultimately resulted in plaintiff White being placed on a
special form of probation known as accelerated rehabilitation in connection with criminal
charges of misuse of campaign contributions.  See SMFNID at ¶ 22.   Plaintiff White does not
challenge in any way in this case the investigation of, and his arrest and prosecution on, financial
and election practices charges.   See SMFNID at ¶ 23

In light of her investigation into possible financial and election practices crimes by
plaintiff White, Detective O'Conner also signed the warrant affidavit for his arrest on the charges
that are at issue in this matter.  See SMFNID at ¶ 24.   She did not, however, conduct the
investigation underlying those charges.  See SMFNID at ¶ 25.   The portions of Trooper
O'Connor's warrant affidavit relating to those charges was drafted by Detective Nault and
derived from Detective Nault's investigation.  See SMFNID at ¶ 26.  In fact, her affidavit states
explicitly that it is the result of "her own investigative efforts and those of fellow officers who
reported their findings to her."  See SMFNID at ¶ 27.

During all times relevant to this matter, defendant John Szamocki held the rank of
Sergeant in the Connecticut State Police, performing supervisory functions in the Eastern District
Major Crime Squad.  See SMFNID at ¶ 28.  Sergeant Szamocki did not participate in drafting or
approving the warrant affidavits at issue, making probable cause determinations or submitting
warrants to the court.  See SMFNID at ¶ 31.

4

who relayed complaints from creditors that plaintiff White had wrongfully withheld funds collected on judgment executions and wage garnishments. See SMFNID at ¶ 46.

At the time of the referral of the complaint, plaintiff White was challenging Sheriff Kenney for the democratic nomination for High Sheriff of Windham County. See SMFNID at ¶ 47. After receipt of the complaint, Trooper O'Connor was assigned to investigate whether plaintiff White had embezzled funds collected in his official capacity as a deputy sheriff. See SMFNID at ¶ 48. That investigation and the resulting charges of larceny and election misconduct are not challenged in this lawsuit. See SMFNID at ¶ 49. Trooper O'Connor's investigation, however, forms part of the backdrop for the investigation and charges of witness tampering and obstruction of justice that are challenged in this case. See SMFNID at ¶ 49.[2]

> D.    The Investigation Into Possible Shredding Of Documents And/Or Other Misconduct By Debra Collins And Others Associated With Sheriff Kenney

During the pendency of the investigation into plaintiff White's management of funds, White was elected High Sheriff of Windham County, defeating incumbent James Kenney. See SMFNID at ¶ 54. At some point (the record is not entirely clear when), plaintiff White retained the late Arthur Meisler, Esq., to represent him in connection with the State Police investigation. See SMFNID at ¶ 55. Shortly after plaintiff White's election, Attorney Meisler mailed a letter dated July 13, 1999 to the late John M. Bailey, then-Chief State's Attorney, requesting that

---

[2] Trooper O'Connor performed a number of investigative tasks in furtherance of her investigation of plaintiff White, including reviewing financial and administrative records, consulting with a forensic accountant, and interviewing witnesses. See SMFNID at ¶50. Those witnesses included Sheriff Kenney, officials of the central office of the Sheriff's Department and the Department of Labor, a number of the complaining creditors, and plaintiff White himself. See SMFNID at ¶50. Plaintiff White met with Trooper O'Connor twice and provided three written statements. See SMFNID at ¶ 51. Trooper O'Connor concluded that plaintiff White was not truthful in his dealings with State Police, and in particular that the evidence failed to support his statements and that his statements were inconsistent. See SMFNID at ¶ 52.

State's Attorney Solak be removed from any involvement in the investigation of plaintiff White

and that the matter be handled directly by the Chief State's Attorney's office. <u>See</u> SMFNID at ¶

56. As one of the bases for removal, Attorney Meisler made the following accusation:

> It is Mr. White's understanding that Deputy Assistant State's Attorney Debra Collins is assigned to this investigation. You must understand that Mr. Charles Collins, was a special Deputy Sheriff and very much involved in the losing primary campaign of High Sheriff James Kenney. Mr. Collins resigned his position with the Windham County Sheriff's Department, and later sought employment with another country [sic.] sheriff stating that 'he did not want to work for a sheriff his wife was investigating.'

> During the month preceding Mr. White's assuming the office of High Sheriff Mr. Kenny [sic.] with the assistance of Mr. Charles Collins and Deputy Assistant State's Attorney Debra Collins destroyed, shredded and otherwise disposed of records of the Windham County Sheriff's Office. A shredding machine, property of the Division of Criminal Justice was employed to destroy some of these records. Mr. White was also informed that copies of personnel records were made and removed from the state office by Mr. Kenney without authorization. Finally, the memory of one state owned computer was wiped clean and a second state owned computer was removed by Mr. Kenney from the Putnam Courthouse.

> It is my understanding that Mr. Kenny [sic.] was informed by the administrative office for the County Sheriffs that before removing or destroying any records from his office, the approval of the Public Records Administrator was necessary; and no request for such approval was ever made.

> It is my understanding Mr. Solak was made aware of Mrs. Collins' activities but left Mr. White's file as part of her work assignment.

<u>See</u> SMFNID at ¶ 57.

Attorney Meisler copied his letter to State's Attorney Mark Solak. <u>See</u> SMFNID at ¶ 58.

On July 19, 1999, Attorney Solak delivered to defendant Lt. Larry Gibeault a copy of Attorney

Meisler's letter and requested that the State Police Major Crime Squad investigate the allegations

made therein. <u>See</u> SMFNID at ¶ 59. Lieutenant Gibeault agreed to conduct the investigation,

assigning defendant Sergeant John Szamocki of the Eastern District Major Crime Squad at

Troop D in Danielson to supervise it. <u>See</u> SMFNID at ¶ 60. Sergeant Szamocki, in turn,

assigned defendant Detective Norman Nault to lead the investigation into whether any criminal

activity by any party occurred during the closure of Sheriff Kenney's administration.  See SMFNID at ¶ 61.

Detective Nault and others conducted a thorough investigation into this matter, which included a number of investigatory interviews with officials of the State's Attorneys Office, the administrative offices of the Sheriff's Department, and the Windham County Sheriff's Department, including members of the office under both the Kenney and White Administrations. See SMFNID at ¶ 62.  Detective Nault determined that there was no probable cause to arrest anybody in connection with the closure of the Kenney administration.  See SMFNID at ¶ 63.

Plaintiffs assign great significance to the fact that nobody was arrested following the allegations of misconduct by those associated with Sheriff Kenney, particularly Assistant State's Attorney Debra Collins or her husband Charles Collins, a deputy sheriff under Kenney.  See SMFNID at ¶ 64.  Indeed, plaintiffs claim that the motive for their own arrests was the defendants' friendship with the Collinses.   Indeed, this perceived "friendship" forms the sole supporting theory for this case.  That theory is alleged in the complaint as follows:

> The defendants originally commenced an investigation into the illegal shredding of public documents by Assistant State's Attorney Debra Collins, her husband, former Supervisory Sheriff Charles Collins[,] Aaron Auclair and others, that was initiated after a complaint by the plaintiffs.  However[,] due to one or more of the defendants' personal friendship with the Collins' [sic], the defendants then conspired to turn the investigation into a criminal  investigations of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins, and others both known and unknown to the plaintiffs.

See SMFNID at ¶ 64; Complaint at 5, ¶ 20 (emphasis added).[3]

---

[3] The complaint was amended to remove the direct reference to a friendship between the defendants and Ms. Collins.  Nevertheless, the Amended Complaint makes reference to that purported friendship and continues to allege that the defendants conspired on her behalf.  See Amended Complaint at ¶ 20 ("Defendants conspired to turn the investigation into a criminal investigation of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing.") and ¶ 27(d)(alleging deprivation of the "right to equal protection of the laws and to be treated the same as others who make

While this may seem like an intriguing theory, it is utterly detached from reality. Neither Detective Nault, the lead investigator in this matter, nor any of the other defendants has or had any sort of friendship with Debra or Charles Collins. See SMFNID at ¶ 66.

Attorney Collins confirmed this in her deposition. See SMFNID at ¶ 67. She testified that neither she nor her husband ever socialized with any of the defendants. See SMFNID at ¶ 68. Indeed, according to her testimony, she does not even know defendant Turner and never met defendant Gibeault. See SMFNID at ¶ 69. Attorney Collins testified that she knew defendant O'Connor professionally, and considered her arrest warrants to be of very good quality, but that she did not particularly like her. See SMFNID at ¶ 70. Similarly, although she did not opine that defendant Sergeant Szamocki's work was poor, Attorney Collins testified that she disliked him both professionally and personally. See SMFNID at ¶ 71.

With regard to defendant Nault, the lead investigator in this matter, Debra Collins testified as follows:

Q: Did you ever socialize with Norman Nault?

A: No.

Q: Did Norman Nault have any association or relation with your husband?

A: No....

Q: Did you have any [] negative experiences with any of the other people being sued in this case?

A: .... Detective Nault during this was quite – I didn't know Detective Nault but I had a case coming up with him. All he said was something to the effect that he was in charge of investigating me and he wouldn't think twice about putting the cuffs on me if he found anything against me.

---

complaints to police, but are presumed innocent under the law simply because the officers have personal relationships with the subjects of the complaint.") SMFNID at ¶ 65.

Q:  And you mentioned Nault, you mentioned the personal comment he made about you. What about professionally in relation to other warrant that may have been submitted?

A:  He was – I will give him credit, he was an excellent detective...So, he did a very thorough job as far as that.

See SMFNID at ¶ 72.

Detective Nault agrees that he did inform Debra Collins that, if the evidence warranted it,

he would not hesitate to arrest her.  See SMFNID at ¶ 73.

Attorney Collins offered the following refutation of the allegation that the defendants

conspired to investigate and arrest the plaintiffs as a means of assisting her or her husband:

Q:  Did any of the defendants in this lawsuit ever offer to do you any favor in connection with that investigation?

A:  Absolutely not.

Q:  Are you aware that in this lawsuit there is an allegation that one or more defendants then conspired to turn the investigation into a criminal investigation of the plaintiffs, punishing them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins and others, both known and unknown to the plaintiff?
Are you aware that that allegation has been made?

A:  I'm aware of that allegation.

Q:  Is that allegation true, to your knowledge?

A:  It couldn't be farther from the truth.

Q:  And why do you say that?

A:  The state police – basically you can't find a trooper that likes me.  They hate me.  I can give you the example that I am the only prosecutor in the State of Connecticut that has prosecuted three state troopers, which is, I believe, the record.  They have, in my opinion, have never liked me, will never like and I had always hoped it was just Troop D and everywhere I go it seems to be that everyone knows that I've prosecuted those troopers.  I also charged another trooper with perjury who, you know – they just hate me and they are never going to let it go, as far as I'm concerned.  So, it's laughable, that paragraph.

Q:  So, the general sense you have, you're not popular with the state police, would apply to the defendants in this lawsuit?

10

A:  Absolutely.

Q:  And would it make sense to you that the defendants in this lawsuit would enter into any conspiracy for your benefit?

A:  Absolutely not....

Q:  And the statement you made about being generally unpopular with the state police, would that be true before July of 1999?

A: Absolutely...

Q:  Would it make sense to you if the defendants in this lawsuit entered into conspiracy for the benefit of your husband?

A:  It would shock me.

Q:  And why is that?

A:  Again, they hate me, they hate him associated with me.  There is probably such a deep hate that they will hate my children.

See SMFNID at ¶ 74.

While the State Police Defendants disagree with the characterization of their relationship with the Collinses as hateful or somehow soured by prior prosecutions of their colleagues, they agree that they were not friends with the Collinses and would and did not enter into any conspiracies for their benefit.  See SMFNID at ¶ 75 .[4]

The conclusion of the state police's investigation into the closing of the Kenney administration was not influenced by conspiracies and non-existent friendships with the Collinses, but by a much more mundane reason:  lack of evidence of wrongdoing.  See SMFNID at ¶ 78.  In particular, the State Police interviewed Pat Lempecki, the personnel officer for the

---

[4] It should also be noted that Attorney Collins "absolutely did not assist" the state police or otherwise do any work related to the investigation of the criminal charges that are at issue in this case.   See SMFNID at ¶ 76.   Indeed, she never even read materials relating to the investigation or discussed it with anyone. See SMFNID at ¶ 77.

State of Connecticut Office of the County Sheriffs. <u>See</u> SMFNID at ¶ 79.  Ms. Lempecki

confirmed that the personnel documents destroyed at the close of the Kenney administration

were properly destroyed at her direction. <u>See</u> SMFNID at ¶ 80.  Investigators also interviewed

Robert Heilbrun, fiscal/administrative manager for the County Sheriff's central office, who

confirmed that the computer allegedly destroyed was actually returned to the sheriff's central

office.  <u>See</u> SMFNID at ¶ 81.  Also, based on interviews, Detective Nault concluded that there

was no evidence to support the allegation that computer memory was improperly erased. <u>See</u>

SMFNID at ¶ 82.[5]

It should be noted also that the investigation into Attorney Collins and others following

As discussed below, State Superior Court Judge Jonathan Kaplan later ordered the State's

Attorney's office to investigate whether anybody inappropriately or unlawfully shredded or

removed documents or computer programs in Sheriff Kenney's office on or about May 28, 1999.

<u>See</u> SMFNID at ¶ 87.  Special Assistant State's Attorney Glenn Coe conducted an investigation

and concluded that there existed "no credible evidence that any documents were shredded that

should not have been shredded." <u>See</u> SMFNID at ¶ 88.   Attorney Coe also found that no

credible evidence supported the conclusion that "any items belonging to the Sheriff's office or

departments was wrongfully removed … by anyone[.]" <u>See</u> SMFNID at ¶ 89.

E.       <u>The Initiation Of An Investigation Into Witness Tampering And Related Crimes</u>

It should be noted also that the investigation into Attorney Collins and others following

Attorney Meisler's complaint not *precede* the investigation into misconduct by the plaintiffs – an

allegation that is central to plaintiffs' theory of this case. <u>See</u> Amended Complaint at ¶ 20 ("The

---

[5] Finally, another allegation not mentioned specifically in Attorney Meisler's letter concerning the closure of Kenney's office was investigated and found to be baseless. <u>See</u> SMFNID at ¶ 83.  Plaintiff Henry Bourgeois alleged that Charles Collins shredded Sheriff's Office telephone records. <u>See</u> SMFNID at ¶ 84.   In fact, these telephone records were the same records seized by Trooper O'Connor in connection with her investigation of plaintiff White. <u>See</u> SMFNID at ¶ 85.  Also, some records alleged by plaintiff

defendants originally commenced an investigation into the shredding of public documents that was initiated after a complaint was made by the plaintiffs. However, the defendants conspired to turn the investigation into a criminal investigation of the plaintiffs to punish them for initiating the complaint and to cover up wrongdoing."); Amended Complaint at ¶ 20; SMFNID at ¶ 90. To the contrary, those investigations were both formally requested by Attorney Solak, and commenced by the State Police, at the same time – during the July 19, 1999 meeting discussed above. See SMFNID at ¶ 91.

The exact chronology of the commencement of the investigation into the plaintiffs for possible witness tampering and obstruction of justice is as follows. On Friday, July 16, 1999, Windham County State's Attorney Mark Solak called Sergeant Szamocki, the supervisor of the White investigation, indicating that there was a possible problem of witness tampering in that investigation. See SMFNID at ¶ 93. On July 19, 1999, a meeting was held at the headquarters of the Eastern District Major Crime Squad. See SMFNID at ¶ 94. Present were Attorney Solak, Lt. Gibeault, Sergeant Szamocki and Detective David LeBlanc. See SMFNID at ¶ 95. At the meeting, Attorney Solak requested that the State Police investigate two matters relating to the Windham County Sheriff's Department. See SMFNID at ¶ 96. One matter involved the complaint by Attorney Meisler discussed above concerning possible illegal shredding and other misconduct by individuals associated with Sheriff James Kenney, including an Assistant State's Attorney, Debra Collins, and her husband, Charles Collins. See SMFNID at ¶ 97. Lieutenant Gibeault agreed to commence an investigation, assigning it to Sergeant Szamocki. See SMFNID at ¶ 98.

---

Bourgeois to have been destroyed were later located – in plaintiff's Bourgeois' own garage! See SMFNID at ¶ 86.

Attorney Solak also informed those present at the meeting that he had received information suggesting that two Special Deputy Sheriffs, Aaron and Adam Auclair, had been interrogated and intimidated by their supervisor, Lieutenant Gloria Marion, a close associate of Sheriff White. See SMFNID at ¶ 99 . According to Attorney Solak, the Auclairs were interrogated by Marion about what they knew of the State Police investigation of Thomas White and were subjected to threats concerning their employment if they imparted any information to outside authorities that would be damaging to White. See SMFNID at ¶ 100. Attorney Solak requested a State Police Investigation. See SMFNID at ¶ 101. Lieutenant Gibeault agreed, assigning this investigation as well to Sergeant Szamocki. See SMFNID at ¶ 101. Having assigned it to a sergeant (and later reassigning it to Sergeant Turner, as discussed below), Lt. Gibeault had no further substantive role in the investigation of the plaintiffs relating to witness tampering and obstruction of justice. See SMFNID at ¶ 102.

On July 20, 1999, Sergeant Szamocki assigned Detective Norman to conduct both investigations requested by Attorney Solak. See SMFNID at ¶ 103. Sergeant Szamocki did not personally conduct the investigation, but rather assisted Detective Nault in defining the initial direction of the investigation and assigned detectives to conduct a series of initial investigatory interviews. See SMFNID at ¶ 104. After just three days, however, supervision of the investigation was transferred to Sergeant John Turner, who assumed control of the investigation upon his return from vacation on or about July 22, 1999. See SMFNID at ¶ 105. After July 22, 1999, Sergeant Szamocki had no further substantive responsibility for, or active role in, the investigation. See SMFNID at ¶ 106.

Sergeant Turner was not directly involved in investigating Thomas White, Gloria Marion and Henry Bourgeois for any crime, including crimes relating to witness tampering and

14

obstruction of justice. See SMFNID at ¶ 107. It is important to note that the detectives assigned to the Major Crime Squads are of the highest competence and caliber and typically require minimal supervision in conducting investigations once those investigations are underway, which was the case with the investigation at issue in this case. See SMFNID at ¶ 108. By the time Sergeant Turner assumed supervision of the investigation, the investigation was well under way. See SMFNID at ¶ 108. Thus, Sergeant Turner's actual supervisory role in the investigation was extremely limited. See SMFNID at ¶ 108. He did not, for example, direct that any particular witnesses be interviewed or not interviewed. See SMFNID at ¶ 108.

Defendant O'Connor played almost no role in the investigation of the plaintiffs for possible witness tampering and obstruction of justice. See SMFNID at ¶ 109. Apart from three interviews on one day with representatives of the central office of the sheriff's system relating to administrative procedures, she had no involvement whatsoever in conducting the investigation. See SMFNID at ¶ 110.

F.    The Victims/Witnesses: Adam and Aaron Auclair

The primary witnesses in the State Police investigation into witness tampering and the related crimes were believed to be the victims of those crimes: Adam and Aaron Auclair. See SMFNID at ¶ 111. Adam and Aaron Auclair were employed in the Windham County Sheriff's Department as Special Deputy Sheriffs in both the Kenney and White administrations. See SMFNID at ¶ 112. The thrust of the plaintiffs' case is that statements made by the Auclairs and incorporated into the State Police's arrest warrant affidavits were false.

At the time the Auclairs made their statements to the State Police, however, there was no reason for any objective observer to conclude that they were anything less than fully credible and reliable witnesses. See SMFNID at ¶ 113. Neither had been convicted of a crime. See SMFNID

at ¶ 114.  Neither had any history of known lying or other dishonest behavior.  <u>See</u> SMFNID at ¶ 115.  Both were known as reliable employees of the Sheriff's Department.  <u>See</u> SMFNID at ¶ 116.

Significantly, the plaintiffs, all of whom knew and supervised the Auclairs in one capacity or another, conceded that the Auclairs were credible at the time they made their statements.  Plaintiff Marion testified at her deposition as follows concerning the apparent trustworthiness of the Auclairs:

> Q:  Now, prior to this investigation into the criminal charges against you, did you have an opinion about whether the Auclairs were trustworthy or no?
>
> A:  The came into my house.  I fed them.  My kids thought that they were trustworthy and I respect the opinion of my kids.
>
> Q:  Did you have any reason to believe that they were dishonest prior to all this occurring?
>
> A:  No.

<u>See</u> SMFNID at ¶ 118.

Plaintiff Bourgeois also testified that he had no information suggesting that either Auclair was dishonest at the time of the State Police investigation:

> Q:  When did you first meet the Auclair boys?
>
> A:  When I started working, when we got sworn in that night.  I knew of them, but I didn't know them.
>
> Q:  I see.  So you were their supervisor for a short period of time?
>
> A:  Yes.  Very short.  I guess they quit after six weeks.  From June 1st to July 10th, I think it was.
>
> Q:  Had you heard anything about their reputation for honesty or dishonesty by the time you met them?
>
> A:  No.

16

Q: And as far as how they conducted their job, filling out time sheets, or that sort of thing, did you have any indication that they were dishonest?

A: Then or now?

Q: Then.

A: No….

Q: Did anyone ever tell you words to the effect, look out for those Auclair boys. They are bad news. They are dishonest?

A: I never heard anybody say they were dishonest, then.

See SMFNID at ¶ 119.

Similarly, plaintiff White conceded in his deposition that the Auclairs were apparently trustworthy:

Q: Okay. Who hired the Auclairs originally by the Sheriffs Department? Was it Kenney?

A: I believe it was James Kenney. I don't think they were working underneath Sheriff Green. That was the one before Mr. Kenney.

Q: Did you reappoint them after you were elected.

A: Yes, I did…

Q: Okay. At the time that you reappointed them, did you believe that they were honest individuals?

A: Yes.

Q: Okay. And you had had no previous indications that they were dishonest in any way?

A: No. I had with them in an out of going into the office, and stuff, and up until that point, no…

Q: Okay. Do you have any knowledge as to whether the Auclairs have criminal records?

A: No. No knowledge at all.

17

Q:  Okay.  It's kind of a difficult question to phrase, but putting aside anything that occurred in the investigation, was there anything from other areas of the Auclairs' life, before that, or unconnected with the investigation, that should have put the state police on notice that these guys may have some honesty problems?

A:  I didn't know the Auclairs outside of work, for the couple of years that I knew them. I never had a drink with them.  I never went out with them.  I did not know them personally, except for work.  I have no idea.  They didn't live in the town that I came from.  I never went to Putnam or Thompson, really, before I started working with the Sheriff's Department.

Q:  Sir, have you become aware that the Auclairs had a reputation in the community for being dishonest?

A:  No.

Q:  Okay.  Or any conduct –

A:  Not even up to this day, no.

Q:  Okay.  So any indication of dishonesty with regard to the Auclairs, would simply be limited to this investigation, and subsequent testimony by the Auclairs?

A:  It was never brought to my attention, even when I was high sheriff, that they had problems in the community, if that is what you are asking me.  And I would believe, because one of them became a correction officer and one became a state trooper, I think, in New Jersey, I would tend to believe that there wouldn't be any problems back in that area.


See SMFNID at ¶ 120.[6]

---

[6] The seemingly unanimous view of the Auclairs' apparent trustworthiness is confirmed by Russell Downer, a non-party and an employee of the Windham County Sheriff's Department, who testified at his deposition as follows:

Q:  Did you ever have occasion to supervise the Auclair boys, either of them?
A:  As far as training goes, yes.  In any other capacity other than being a more senior sheriff, no.
Q:  So, you were involved in their training?
A:  Yes.
Q:  Was that during the Kenney administration or White administration?
A:  That was during the Kenney administration.
Q:  Did you ever have occasion to discipline them or reprimand them?
A:  No.
Q:  And as far as just your involvement with them through training, did you ever have cause to believe that they were untrustworthy?
A:  No.

Certainly, none of the defendants knew or had even heard of any information that would suggest that the Auclairs were anything other than perfectly reliable witnesses. See SMFNID at ¶ 121. Indeed, as individuals serving in a quasi-law enforcement positions, accused or suspected of no present or past crime or dishonest behavior, the Auclair brothers possessed inherently greater credibility than many witnesses upon whom criminal investigators must often rely. See SMFNID at ¶ 122.

G.    The Evidence Provided By The Auclairs And Included In the Arrest Warrant Affidavits Concerning Obstruction Of Justice And Witness Tampering.

As noted above, the Auclair brothers were the primary witnesses/victims relied upon by the State Police in conducting their investigation into possible witness tampering and obstruction of justice by the plaintiffs. Aaron Auclair gave Detective Nault a one-paragraph statement on July 20, 1999 indicating that he had been interrogated by Gloria Marion. See SMFNID at ¶ 124. He returned to Troop D barracks the next day, July 21, 1999, and gave Detective Nault and Mike Contre a much more detailed eleven-page statement. See SMFNID at ¶ 125. That statement included the following assertions, which were included in the arrest warrant affidavits in support of obstruction of justice and witness tampering-related charges[7]:

- Aaron was present in Kenney's office when documents were shredded and participated in the shredding. Those documents were earmarked by Laurie Parent of the Central Office of the Sheriff's Department for shredding. More generally, Aaron stated that neither he nor anybody else destroyed papers or computer files that should not have been destroyed.

---

See SMFNID at ¶ 123.

[7] As discussed below, the warrant affidavits for all three plaintiffs were identical in all respects except as to the name of the suspect. See SMFNID at ¶ 192. The language in defendant O'Connor's affidavit for the arrest of plaintiff White was prepared by Detective Nault and incorporated into the White affidavit. See SMFNID at ¶ 168.

19

- On July 16, 1999, plaintiff Marion approached him and Adam Auclair and ordered them to a meeting in the lock up of the Valley Street courthouse in Willimantic.

- In Aaron's words, the physical layout for the meeting was as follows: "In the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second unlocked door was behind us."

- At that meeting, Marion "reminded both Adam and [Aaron] that we were now under the direction of the current High Sheriff Thomas White and that anything pertaining to Mr. White during Mr. Kenney's administration should be brought to her attention per order of Sheriff White." Aaron took this to mean that, if he did not talk to Marion, he might lose his job.

- Marion also stated to the Auclairs, "you work for Tom White now. You have to be on his side." Marion also stated the Auclairs "couldn't get 'unjammed' (referring to [their] schedules) unless [they] cooperated." Aaron understood Marion to mean that he would continue to get the worst assignments in the county and have to drive furthest to work unless he cooperated with her.

- Marion stated, "we all know there is an investigation going on," and that the Auclairs needed to tell her what they did in the High Sheriff's office during the prior administration. Aaron understood her to be referring to the investigation of Thomas White for mishandling wage executions. Aaron felt "very threatened" because he felt she was "inferring that if [he] did not speak with her and answer her questions [he] would never work again."

- Marion asked the Aaron if he had any knowledge about complaints against Sheriff White as a deputy sheriff and if he knew the procedures relating to wage executions. Aaron told Marion about answering calls from people wishing to complaint about White's handling of wage executions.

- Marion asked if Aaron knew of the White investigation regarding wage executions while Kenney was in office. She also asked if either Auclair was ever present when that investigation was discussed with Charles or Debra Collins or with Jay Kenney.

- Lt. Marion strongly recommended that Aaron meet with White the following day because he "knew too much." Aaron thought she was referring to the criminal investigation into White for mishandling wage executions.

- Aaron felt that the entire conversation with Marion made him feel "like [he] was going to be accused of destroying property if [he] didn't answer the questions the way Lt. Marion wanted [him] to."

- On July 19, 1999, Aaron encountered Sheriff White at the Juvenile Courthouse in Willimantic.  White asked Aaron to step outside because he had something for Aaron to sign.  There was nothing to be signed.  Rather, White told Aaron that he (Aaron) had no right to access personnel files.  White also stated that he did not know how much Aaron knew "about the investigation, but people make mistakes."  Aaron believed White was referring to the criminal investigation of regarding wage executions.

- White told Aaron that nothing from Kenney's office should have been shredded, and that he had unnamed witnesses of what happened on the evening that shredding occurred.

- White stated several times that "if they would just leave it alone, this would never have to happen."  Aaron understood "it" as referring to the criminal investigation into White for mishandling wage executions.  White added that "Mr. Solak and his office should never pursuit it [sic] this far and that he, High Sheriff White, talked with other prosecutors from around the state and they couldn't believe what was happening."

- White then stated that he had hired five attorneys, including Attorney Meisler, and that he would not go down without a fight."  This comment was followed by a remark that an internal investigation into shredding was to continue and that Aaron and Adam would be contacted by a supervisor for further interviews.  Aaron felt White's comments meant that "if he was going down for the wage execution investigation against him than he would take my brother and I down [Aaron and Adam]."

- That same day, July 19, 1999, Aaron received a telephone call from Marion, ordering him to attend a meeting that afternoon at the Valley Street Courthouse in Willimantic.  Prior to the meeting, Aaron purchased a small tape recorder.  Marion met Aaron in the parking lot and led him to a small room off of the lockup area.   Aaron activated the tape recorder.

- Marion kicked the peg out of the door, allowing the door to close.  Marion then placed her own tape recorder on the table and told Aaron that she wanted to take a statement about what they had discussed at their previous meeting.  Aaron understood this to me that she wanted to discuss the wage execution investigation.  Marion told Aaron that making a statement was for his benefit.

- Marion told Aaron that White and Bourgeois had ordered her to have this meeting with Aaron.  Marion went on to say that "there are people in this department that feel that [Aaron] is in fact still passing on information outside this department.  If that is not the case that's fine, if that [is] the case, [k]now that we do know, or we will find out and you're in jeopardy of loosing [sic] your position."

21

- Aaron told Marion that White should not be asking questions about the wage execution investigation, to which Marion replied that White had a right to know and, conversely, Aaron had no right to go into personnel files, an allusion to the breaking down of the Kenney office.

- As the meeting ended, Marion ordered Aaron not to discuss their conversation with anybody.

See SMFNID at ¶ 125.

On July 20, 1999, Aaron Auclair gave Detective Nault a tape he made of his meeting with Gloria Marion on July 19, 1999. See SMFNID at ¶ 126. In addition, Detective Nault reviewed a transcript of that tape that was prepared by a secretary in the State's Attorney's office, which he found to be generally accurate. See SMFNID at ¶ 127.

Detective Nault included relevant parts of that tape in the affidavits he drafted to support the application for warrants for the arrest of the plaintiffs on the charges at issue in this case. See SMFNID at ¶ 128. In particular, the warrants included in support of the obstruction of justice and witness tampering charges what Detective Nault heard on the tape as Gloria Marion making the following comments to Aaron Auclair:

- "We want to know what you know or what you don't know."

- "Basically, what we want to know at the bottom, who, what, where, when, what you knew, who told you, what your involvement was, what other people's involvement was that you are aware of, those kinds of things."

- "This is an internal investigation for work, Aaron. This has nothing to do with the State Police, the federal level. This is an internal investigation forum, you work for Tom, correct?

- "So, anything you were told about him [Thomas White], investigation, anything that's ongoing, any conversations that you have or had, um, because when we talked about what I said to you Friday, information about how we were trying to say that you did these things based on what you were told to by your boss."

- "Okay, now we're trying to prove that to build you a case, you understand what I'm saying, because if you did something that wasn't legal, such as because you thought your position was administrative…"

- "Be careful, you now work for Tom."

- "But I know and this comes from Captain Bourgeois and this comes from Tom White that there are people in the department that feel that you are still passing information to people outside the department. That we do know or we will find out and you're in jeopardy of losing your position."

- "Do not carry this conversation out of this department with anyone."

- "You do not discuss this with anyone."

See SMFNID at ¶ 129.

Adam Auclair, Aaron's brother, was interviewed by Detective Charles Sarant at the State Police Troop D barracks in Danielson, Connecticut. See SMFNID at ¶ 130. His six-page statement contained the following assertions, all of which Detective Nault included in the arrest warrant affidavits to support the obstruction of justice and witness tampering-related charges:

- On May 28, 1999, Gloria Marion called Adam at home. During the conversation, Marion brought up Adam's schedule and assignments. Marion stated that she and Bourgeois had disagreements over Adam's schedule, and that Marion did not believe it should matter whom Adam supported in the Sheriff election or whom he associated with outside of work.

- Marion also made the comment that she hoped he would still be a Special Deputy Sheriff in six months. Adam understood this to mean that he was at risk of being fired.

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. Adam did not state, as his brother had done, that there was a second door behind the brothers.

- Marion stated that "we all know what's going on. There's an investigation going on." She stated further that they needed to talk about shredding documents and wiping out information on computers. Adam stated that he "felt threatened and

23

also was concerned that the only way out of the room was a door down the corridor, up the stairs."

- Marion stated that "you work for Tom White now. You should be on his side. Tom White does not want people working for him who are against him."

- Marion asked the brothers a series of questions, many of which involved their duties under Sheriff Kenney.

- Marion also asked, however, whether they had been present when any discussion occurred about an investigation concerning White, especially any discussion between Kenney and Debra or Charles Collins.

- Marion asked Aaron about whether he knew about how to conduct wage executions and whether he had received complaints about White's handling of such matters.

- Marion also asked whether Aaron had deleted files or shredded documents.

- Marion asked the Aaron Auclair to go talk to White and noted that White had hired attorneys and "needed to go on the offensive." Marion noted that the Auclairs were likely to be subpoenaed by White's attorneys relating to the White criminal investigation.

- Marion ended the conversation by asking about Adam's schedule and noting that his assignment may change "once Tom [White] gets word about [their] conversation today."

- On July 19, 1999, Adam was approached by White at the Valley Street courthouse in Willimantic. White asked to speak to Adam in a conference room.

- White told Adam that he should expect to be contacted by Henry Bourgeois and "the Feds." White mentioned that he had witnesses to what occurred in Kenney's office and that Aaron had no right to be in personnel files. Adam understood this to mean that his brother was to be investigated.

- White stated that he wanted what occurred in the Sheriff's Department to be kept internal. He stated further that he had three lawyers and that the investigation of him was because Kenney lost the election.

- White stated that he did not care who Adam associated with outside of work, but that anything about this must be kept internal, which Adam took to mean that he could not talk to the State's Attorneys Office or the State Police.

- After the meeting with White, Marion approached Adam and requested a one on one meeting. Marion asked Adam to follow her to a small room inside the lockup

area, the same room in which she met with Aaron. Marion and Adam sat across a table from each other. Marion placed two tape recorders and a red notebook on the table. Marion then kicked out the doorstop, allowing the door to close. Adam was "really nervous and felt that [he] was not free to leave the room."

- Marion stated that she was going to conduct an internal investigation and asked Adam "who, what, where, when and how [Adam] knew about the Thomas White investigation."

- Adam refused to be tape-recorded, but agreed to write a statement. He started to write about how he heard of the investigation into White from Kenney, but Marion attempted to dictate to Adam him how the statement should read. Adam then stopped writing, causing Marion to state, "you better talk to me because otherwise your going to have to talk to Captain Bourgeois and you know what he was, a State Trooper." At that point, Adam indicated that he wanted a legal representative to speak for him, to which Marion replied, "you can't have an attorney speak for you."

- Marion closed the meeting by telling Adam he could not talk to Debra or Charles Collins and that their conversation was part of an internal investigation and must remain internal.

See SMFNID at ¶ 130.

H.    Other Evidence of Witness Tampering and Obstruction of Justice

In addition to the evidence provided to the Auclairs, Detective Nault included other

evidence in the affidavits relevant to witness tampering and obstruction of justice. See SMFNID

at ¶ 131.

Detective Nault included in the affidavits information about an incident in March  or

April of 1999, in which Henry Bourgeois approached Sergeant Szamocki at Troop D barracks

and asked him questions about the investigation into Tom White. See SMFNID at ¶ 132. At that

time, Sergeant Szamocki was supervising Trooper O'Connor's on-going investigation of Tom

White for embezzlement. See SMFNID at ¶ 133. Bourgeois asked Szamocki generally about

the investigation of Tom White, whether White was going to be arrested, and, if so, whether he

could remain a sheriff. See SMFNID at ¶ 134.

According to Detective Nault, it was inappropriate for plaintiff Bourgeois ask these sorts of questions about an on-going investigation, particularly considering that Bourgeois is a retired state police official and should know better.  See SMFNID at ¶ 135.  Bourgeois admitted at his deposition to asking these questions.  See SMFNID at ¶ 136.  He also testified that it would be inappropriate for Sergeant Szamocki to provide information about an on-going investigation.  See SMFNID at ¶ 137.

The affidavits also related a second attempt by Henry Bourgeois to discuss the on-going investigation of Thomas White with a state police official.  See SMFNID at ¶ 138.  On June 30, 1999, Bourgeois approached Lt. Thomas Davoren, the commanding officer of Troop D.  See SMFNID at ¶ 139.  According to Davoren, Bourgeois commented that the White investigation "was about to get messy" and that he (Bourgeois) had counseled White "to take the offensive" in the investigation because "they are coming after him."  See SMFNID at ¶ 140.  According to Davoren, Bourgeois then remarked that Assistant State's Attorney Debra Collins and her husband had inappropriately shredded phone documents favorable to White.  See SMFNID at ¶ 141.[8]  Lieutenant Davoren understood this remark to be a threat of unfavorable publicity concerning the State's Attorney's Office relating to the White investigation.  See SMFNID at ¶ 142.

Bourgeois admits that this conversation with Lt. Davoren.  See SMFNID at ¶ 143.  Indeed, Bourgeois admits saying that the White investigation was about to "get messy" or words to that effect and to counseling White to take action.  See SMFNID at ¶ 143.  While Bourgeois disputes Davoren's understanding of the implication of these remarks, he does not point to any reason why the state police should have mistrusted Lt. Davoren's report.  See SMFNID at ¶ 144.

---

[8] As noted above, the phone records in question were not shredded, but rather had been properly taken into evidence by the State Police in furtherance of their investigation.  See SMFNID at ¶ 84-86.

26

Finally, the warrant affidavits include a reference to a conversation between Mr.

Bourgeois and John Wisnieski, a janitor who witnessed some shredding in Sheriff Kenney's

office on May 28, 1999. See SMFNID at ¶145.  State Police interviewed Wisnieski, who

reported that he first told Sheriff White about shredding. See SMFNID at ¶ 146.  A week later,

according to Wisnieski, Henry Bourgeois approached him and asked if he knew anymore about

the shredding incident. See SMFNID at ¶ 147.  Bourgeois then asked Wisnieski to "keep it [his

information] under his hat and not tell anyone else what he knew." See SMFNID at ¶ 148.

I.      The Alleged Constitutional Defects In The Warrant Affidavits

As discussed below, Detective Nault believed – and he was so advised by State's

Attorney Mark Solak – that the foregoing evidence provided probable cause to believe that the

plaintiffs committed the offenses relating to obstruction of justice and witness tampering with

which they were charged. See SMFNID at ¶ 149.  Indeed, at the time that the affidavits were

prepared and submitted to the court, none of the defendants knew or suspected that any of the

information contained therein was false. See SMFNID at ¶ 150.  Nor did any of the defendants

possess information that was omitted from the affidavits that, had it been included, would have

undermined the existence of probable cause. See SMFNID at ¶ 151.

It is not disputed that, as discussed below, a special prosecutor determined that the

prosecutions against the plaintiffs for obstruction of justice and witness tampering should be

abandoned. It is important to note, however, that the present challenge is not one of insufficiency

of evidence, but rather that the warrant affidavits were false and/or omitted material information.

Plaintiffs do not and cannot point to any evidence *possessed by the State Police* undermining the

evidence contained in the affidavits that was omitted from the affidavits.  Nor can plaintiffs point

27

to any evidence contained in the affidavits that was *known to the State Police* to be false at the time the warrants were submitted.

The focal point of plaintiffs' challenge to the affidavits is that the room in which the interview between the Auclairs and Gloria Marion occurred on July 16, 1999 was not locked, and therefore that the Auclairs were not physically restrained during that interview. <u>See</u> SMFNID at ¶ 152. The complaint makes much of this point, alleging that the affidavits were faulty because:

- "the Auclairs were neither abducted nor restrained as a second exit door was located behind the Auclairs during the aforesaid July 19, 1999 meeting, thus allowing the Auclairs to leave the room at any time." [9]

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door was not locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the door in the room adjacent to the aforesaid second exit door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door may not have been closed."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion was sitting at a desk across from the two Auclairs; and the exit door was directly behind them."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion never prevented them from leaving the aforesaid meeting."

<u>See</u> Amended Complaint at ¶ 24(c)-(m).

---

[9] It is clear from the record that the meeting referenced in the Amended Complaint occurred on July 16, 1999, and not July 19, 1999. The meeting on July 19, 1999 was the only meeting at which Gloria Marion met with both Auclairs simultaneously. <u>See</u> SMFNID at ¶ 153.

In fact, the warrant affidavits do not omit the fact that the door may have been unlocked.

See SMFNID at ¶ 154. Rather, the affidavits simply recount what the Auclairs stated about the

door. See SMFNID at ¶ 154. In particular, the warrant affidavits stated:

- According to Aaron Auclair, "[i]n the lock up area Lt. Marion sat behind a desk and we sat in front of her and there there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second **_unlocked_** door was behind us." See SMFNID at ¶ 155. (emphasis added).

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. See SMFNID at ¶ 155.

When confronted at his deposition by the above-recited statement in the affidavits

regarding the unlocked door, plaintiff White admitted that the affidavits were truthful in this

critical respect:

Q: About halfway down on page 38, paragraph 48, it [the affidavit] says, "One locked door was directly behind Lieutenant Marion, and the second unlocked door was behind them [the Auclairs]?...is it fair to say based on this sentence that I just read to you in paragraph 48, that Trooper O'Connor and Trooper Nault gave the court the correct information about the doors being unlocked during that meeting?

A: Based on that one sentence that you read me? Yes...

Q: So, whichever state police officer prepared this affidavits and submitted it to a judge, told the judge that one locked door was directly behind Lieutenant Marion, the second unlocked door was behind them [the Auclairs], correct?

A: Correct. That Aaron and Adam had told them that, yes.

See SMFNID ¶ 155.5.

Indeed, to this day, there remains ambiguity as to whether the doors to that room were

capable of being locked. Russell Downer, a former Special Deputy Sheriff familiar with the

room in question, testified as follows in his deposition:

Q:  Okay.  Now the door where the interview took place that you were asked about, I mean where the interview took place where you were asked about, you mentioned it could be locked.  Correct?

A:  Yes.

Q:  Now, what I wasn't able to understand from the questioning was whether there was any circumstances where you could be in the office but locked in and couldn't get out through either of the two doors?

A:  Okay, the doorway leading into that room from the staircase, which would be coming out of the court, I do not believe you could be locked in that room without putting a key in and locking a deadbolt.

Q:  What side of the door would you have been on to put the key in and lock the dead bolt?

A:  The inside.

Q:  The inside.  So, if you didn't have the key and the dead bolt was locked, you could be locked in that door?

A:  No, I don't believe, I don't believe, you could be locked in from that side.

Q:  All right, I'm confused…Mr. Downer, you mentioned there is a dead bolt that locks with a key?

A:  Correct.

Q:  If there were two people in the room, one person, person A, has the key, locks the door, puts the key in her pocket or his pocket, person B doesn't have the key, is that person then locked in that room?

A:  Yes.

Q:  Okay, now, what about the other door?  That's the door we've been talking about, the door that goes up to the courtroom.  Correct?

A:  That's the door we were just referring to.

Q:  What about the other door is it possible to be locked in and unable to get out of that door?

A:  Yes.  That's automatically locked door that only opens with a key.

30

Q:  Okay, and if you didn't happen to have that key, you could be locked in and not able to get out of that door as well.  Correct?

A:  Correct. …

Q:  The keys you talked about, that we've talked about, getting in and out of that interview room downstairs, would every special deputy sheriff have a set of those keys on his person at all times?

A:  No.  Only those that were assigned to the lockup.  Only for the event that someone would lose their keys.  The general public couldn't come down there at any time.

Q:  So, were special deputy sheriffs instructed not to take those keys out of the lockup area?

A:  When there were inmate in there, yes, and the supervisor may have had a key to that door.

Q:  So, the supervisor might always have had, during work hours, a key on his or her person?

A:  Yes.

Q:  If somebody was working security at the door, for example, or prisoner transport, would that person have a key on this person at that time?

A:  To get into that area, no.[10]

See SMFNID at ¶ 156.

Plaintiffs cite only two other specific factual omission from the warrant affidavits – that the Auclair boys were eating pizza at the meeting with Marion on July 16, 1999.  See SMFNID at ¶ 158.  However, neither Auclair mentioned this fact to the State Police, and it was simply not known to the State Police at the time that the warrant affidavits were prepared or submitted to the court.  See SMFNID at ¶ 159.

Plaintiffs also claim that the affidavits wrongfully omitted that Thomas White, on July 20, 1999, urged the Auclairs not to resign from the Sheriffs Office, noted that they were good

---

[10] There is no suggestion in the Auclairs were assigned to the lock up area on July 16, 1999.  Thus, they would not, therefore, have had keys to the door in question.  See SMFNID at ¶ 157.

employees and The Auclairs statements' to the State Police make no mention of Tom White, on July 20, 1999, asking them to reconsider their resignations, informing and expressed concerns about how their resignation would affect their financial status, although it is unclear how that is relevant to probable cause. In any event, the Auclairs' statements to the State Police did not mention these purported statements to Thomas White, but rather simply stated that White accepted their resignations. See SMFNID at ¶ 159.5. The affidavits faithfully recounted the Auclairs' statements in this regard. See SMFNID at ¶ 159.5.

Plaintiffs point to no other specific factual deficiencies in the affidavit. Instead, plaintiffs allege in the complaint that the affidavits failed to allege certain necessary factual elements of the charged offenses. See, e.g., Amended Complaint at ¶ 24(n)(Defendants allegedly omitted from affidavit "fact" that "no evidence existed that either plaintiff Marion or Bourgeois knew or believed plaintiff White had committed a Class A or B felony, which is an essential element of the crime of hindering prosecution."); See SMFNID at ¶ 160. Plaintiffs do not and cannot, however, allege that the state police mislead the court into believing that such factual elements did exist. In fact, the State Police simply included in the affidavits the evidence they had and presented it for review to a prosecutor, who approved the affidavits, and then to a judge, who signed them. See SMFNID at ¶ 161. Other than the issues of the door, the pizza, and Thomas White's alleged statements to the Auclairs concerning their resignations, therefore, plaintiffs' complaints about the affidavit are really legal determinations about the factual sufficiency of the evidence. See SMFNID at ¶ 162. If necessary factual elements of proposed charges were not supported by the affidavits, it was the responsibility of the State's Attorney and the court to reject the warrants. See SMFNID at ¶ 163.