J.    The Role Of Each Defendant In Preparing The Warrant Affidavits

As noted above, the portions of the three warrant affidavits for the arrest of plaintiffs on the charges at issue in this case were prepared by Detective Nault, under the direct supervision of State's Attorney Mark Solak.  See SMFNID at ¶ 164.  It was Attorney Solak, not the supervisory defendants, who approved the warrant affidavits.  See SMFNID at ¶ 165.  That process is described in Section II(K) below.

On September 10, 1999, Trooper Karen O'Connor signed the warrant affidavit seeking the arrest on Thomas White on a number of charges, including larceny and charges relating to witness tampering and obstruction of justice.  See SMFNID at ¶ 166.  Trooper O'Connor personally prepared the sections of that affidavit concerning the larceny charge.  See SMFNID at ¶ 167.  As to the sections of the affidavit that concerned witness tampering and obstruction of justice-related conduct, she incorporated language that had been prepared by Norman Nault under the supervision of State's Attorney Mark Solak as described below.  See SMFNID at ¶ 168.  Detective Nault gave Trooper O'Connor a computer disk with those sections, which allowed her to incorporate them into her affidavit for the arrest of Thomas White.  See SMFNID at ¶ 169.  Because Detective Nault had conducted the tampering and obstruction-related aspects of the investigation, Trooper O'Connor relied on his knowledge in preparing those sections of the affidavit.  See SMFNID at ¶ 168, 170.  Her affidavit states explicitly that it was based on my own investigative efforts and those of fellow officers who reported their findings to me.  See SMFNID at ¶ 171.  It is proper and standard police procedure for one investigator to include in a warrant affidavit the findings of another investigator who has direct knowledge of aspects of the case, particularly, as here, when that case is complex and involves related, but separate components.  See SMFNID at ¶ 172.  In some complex investigations, such as this one, it is

33

simply impossible for one investigator to have personal knowledge of all the facts of a case. See SMFNID at ¶ 173.

The remaining defendants had no personal involvement in drafting or approving the aspects of the warrant affidavits at issue in this case. See SMFNID at ¶ 174.

As to the aspects of the investigation of the plaintiffs for witness tampering and obstruction of justice-related offenses, defendant Szamocki did not participate in any way, as a supervisor or otherwise, in drafting or approving the warrant affidavits, making probable cause determinations or submitting warrants to the court. See SMFNID at ¶ 175. By the time those acts were performed, he no longer had a direct or substantive involvement in the investigation. See SMFNID at ¶ 176.

Sergeant Turner did not approve the affidavits. See SMFNID at ¶ 177. Nor did he take the oaths of the affiants, as he felt it would be inappropriate to do so in light of his acquaintance with Henry Bourgeois from his days as a state police officer. See SMFNID at ¶ 177. In fact, he does not recall reading any part of the affidavits prior to their submission to the court. See SMFNID at ¶ 178.

Lieutenant Gibeault did not have any role in drafting the warrants for the arrests of the plaintiffs on crimes relating to witness tampering and obstruction of justice. See SMFNID at ¶ 179. Nor did he review the warrants for substance prior to their submission to the court. See SMFNID at ¶ 180. His only involvement with the affidavits was to take Detective Nault's oath on the affidavit in support of the warrant for the arrest of Henry Bourgeois. See SMFNID at ¶ 181. That act, however, did not involve his attesting to the truth of the matters contained in the affidavit or the sufficiency of the investigation described in the affidavit. See SMFNID at ¶ 182. Rather, it simply consisted of administering an oath to Detective Nault, who swore that the

34

contents of the affidavit were true and accurate to the best of *his* (Nault's) knowledge. See

SMFNID at ¶ 183.   Sergeant Thomas Wakely, a non-defendant, took Detective Nault's oath on

the affidavit for Gloria Marion and Trooper O'Connor's oath on the White affidavit.  See

SMFNID at ¶ 184.

K.    The Role Of The State's Attorney In Drafting The Affidavits And Identifying Appropriate Charges

Mark Solak, the State's Attorney for Windham County, played a central role in

supervising and reviewing the drafting of the warrant affidavits, selecting appropriate criminal

charges and advising the State Police on the existence of probable cause for plaintiffs' arrests,

and signing the actual charging documents that identified the charges against the plaintiffs.  See

SMFNID at ¶ 185.

In particular, over  two days in the end of August and/or the beginning of September of

1999, Attorney Solak supervised Detective Nault in preparing the arrest warrant affidavits at

issue in this case as they pertained to obstruction of justice and witness tampering-related

charges.  See SMFNID at ¶ 186.  Attorney Solak advised Detective Nault on the proper structure

and factual progression of the affidavits.  See SMFNID at ¶ 187.  Attorney Solak actually sat

with Detective Nault as he typed the affidavits.  See SMFNID at ¶ 188.  After Nault typed each

page of the affidavits, he showed it to Attorney Solak, who reviewed it and either suggested

changes or approved it.  See SMFNID at ¶ 189.  Attorney Solak advised Detective Nault to err

on the side of inclusion – including witness statements in the affidavit in their entirety or near

entirety.  See SMFNID at ¶ 190.  On September 10, 1999, after each affidavit was completed,

Attorney Solak signed each page of all three 67-page affidavits.  See SMFNID at ¶ 191.  The

three affidavits were identical in all respects except as to the name of the suspect. <u>See</u> SMFNID at ¶ 192.

In addition to his participation in drafting the affidavits, Attorney Solak identified the charges that were, in his view, supported by the evidence set forth in the affidavits. <u>See</u> SMFNID at ¶ 193. Attorney Solak, after reviewing the affidavits, told Detective Nault that the elements of each such charge were established in the affidavits, and therefore that probable existed for the plaintiffs arrest on those charges. <u>See</u> SMFNID at ¶ 194.

Attorney Solak signed the charging documents, known as "informations" (or warrant "face sheets"), which were submitted with the affidavits to the Superior Court bearing Solak's signature. <u>See</u> SMFNID at ¶ 195. In signing the informations, Attorney Solak attested that "[t]he undersigned Deputy Assistant State's Attorney of the Superior Court of the State of Connecticut on oath of office complains, deposes, and alleges that said Deputy Assistant State's Attorney has reason to believe and does believe that" the plaintiffs committed the offenses charged in the informations. <u>See</u> SMFNID at ¶ 196.

It is important to note that none of the assistance provided by Attorney Solak in preparing the warrants and identifying appropriate charges was unusual or in any way improper. <u>See</u> SMFNID at ¶ 197. To the contrary, as the prosecuting authority, the State's Attorneys Office routinely provides this sort of assistance to state and local police agencies. <u>See</u> SMFNID at ¶ 198. It should also be pointed out that Detective Nault is not a trained lawyer. <u>See</u> SMFNID at ¶ 199. He included in his affidavits the facts that had been gathered during the investigation. <u>See</u> SMFNID at ¶ 200. If there were legal, as opposed to factual, infirmities in the arrest warrants affidavits undermining the existence of probable cause, it was the role of the State's Attorney and the judge to detect those infirmities and refuse to seek or issue the arrest warrants.

See SMFNID at ¶ 201.  Neither the State's Attorney nor the judge concluded that any such legal infirmities existed in this case.  See SMFNID at ¶ 202.

> L.    The Signing Of The Warrants By A Neutral Magistrate And The Arrests Of The Plaintiffs On Witness Tampering And Related Charges

On September 10, 1999, Detective submitted the warrants for plaintiffs' arrests on charges relating to witness tampering and obstruction of justice to  Hon. Michael Mack.[11]  See SMFNID at ¶ 203.  As noted, Attorney Solak drafted the  charging documents ("informations") that accompanied those affidavits, identifying appropriate charges based on the facts contained in affidavits.  See SMFNID at ¶ 204.

On September 10, 1999, Judge Mack thoroughly reviewed each affidavit over a period of several hours and found that probable cause existed based on the facts in the affidavits for the arrest of the plaintiffs on the charges identified by Attorney Solak.  See SMFNID at ¶ 205.  Judge Mack expressed no concerns whatsoever about the adequacy of the affidavits or the existence of probable cause.  See SMFNID at ¶ 206.  In signing *each page of all three the warrant affidavits*, Judge Mack affirmed that: "The foregoing Application for an arrest warrant, and affidavit(s) attached to said Application, having been submitted to and considered by the undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe that an offense has been committed and that the accused committed it and, therefore, that probable cause exists for the issuance of a warrant for the arrest of the above-named accused."  See SMFNID at ¶ 207.  As the foregoing makes clear, both the State's Attorney Office and a neutral magistrate, Judge Mack, reviewed the warrant affidavits prior the arrest of the plaintiffs

---

[11] Plaintiff White was arrested a second time on a separate application in January of 2000 for additional charges relating to embezzlement and unlawful election practices, but that second arrest is not challenged in, or relevant to, this case.  See SMFNID at ¶ 203, n. 11.

and determined that the affidavits provided probable cause that the plaintiffs committed the offenses identified by Attorney Solak.

The information filed by Attorney Solak against Thomas White charged him with the following crimes: larceny by embezzlement in violation of Conn. Gen. Stat. § 53a- 124 (Counts 1 and 2 – not at issue in this case); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Count 3 and 4); accessory to unlawful restraint in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96 (Counts 5 and 6); accessory to bribery of a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-149 (Count 7); accessory to hindering prosecution in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-167 (Count 8); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 9); accessory to coercion in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-192(c) (Count 10); and racketeering in violation of Conn. Gen. Stat. § 53-395(c).  See SMFNID at ¶ 208.

Thomas White was permitted to turn himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 13, 1999.  See SMFNID at ¶ 209.  A non-surety bond of ten thousand dollars was set, and, after being processed, White was released pending arraignment.  See SMFNID at ¶ 210.

The information filed by Attorney Solak against Gloria Marion charged her with the following crimes:  tampering with a witness in violation of Conn. Gen. Stat. § 53a-151 (Counts 1 and 2); unlawful restraint in the second degree in violation of Conn. Gen. Stat. § 53a-96 (Counts 3, 4, 5, 6, 7, 8); bribery of a witness in violation of  Conn. Gen. Stat. § 53a-149 (Count 7); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 8); coercion in violation of Conn. Gen. Stat. § 53a-192(c) (Counts 9 and 10).  See SMFNID at ¶ 211.

Gloria Marion was arrested at her home and processed at the State Police Troop D barracks in Danielson, Connecticut on September 13, 1999. See SMFNID at ¶ 212. A non-surety bond of ten thousand dollars was set and made, and, after processing, Marion was released pending arraignment. See SMFNID at ¶ 213.

The information filed by Attorney Solak against Henry Bourgeois charged him with the following crimes: criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 1); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Counts 2 and 3); hindering prosecution in the second degree in violation of Conn. Gen. Stat. § 53a-167 (Count 4); coercion in violation of Conn. Gen. Stat. § 53a-192(a) (Counts 5 and 6); accessory to unlawful restraint in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96. See SMFNID at ¶ 214.

Henry Bourgeois was in New Jersey when the warrant for his arrest was signed. A decision was made not to seek his arrest in New Jersey and extradition, but rather to await his return to Connecticut to arrest him. See SMFNID at ¶ 215. Upon returning to the state, Bourgeois turned himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 15, 1999. See SMFNID at ¶ 216. A non-surety bond of ten thousand dollars was set, and, after being processed, Bourgeois was released pending arraignment. See SMFNID at ¶ 217.[12]

---

[12] Attorney Solak later filed substitute long form informations, which added additional charges against each plaintiff in this case. See SMFNID at ¶ 218. In accordance with state criminal practice, that substitute information was not required to be supported by an additional factual affidavit. See SMFNID at ¶ 219. Rather, it simply reflected Attorney Solak's judgment that additional charges were warranted under the facts alleged in the original arrest warrant application. See SMFNID at ¶ 220. Thus, the State Police had no role in filing the substitute informations lodged against the plaintiffs. See SMFNID at ¶ 221.

M.    The Decision Not To Interview The Plaintiffs Prior To Their Arrests

Plaintiffs are likely to assign great significance to the fact that they were not interviewed prior to their arrest. As he is entitled to do, Detective Nault determined for very specific investigatory reasons not to seek to interview the plaintiffs prior to seeking warrants for their arrests. See SMFNID at ¶ 222. In particular, he determined that Thomas White would simply not offer any useful information. See SMFNID at ¶ 223. That determination was based in part upon the Trooper O'Connor's conclusion that Thomas White was not candid or forthcoming in the investigation of him for possible financial and election practices crimes. See SMFNID at ¶ 224. Moreover, White had already retained counsel, and Detective Nault believed that counsel would not permit his client to consent to any meaningful pre-arrest questioning. See SMFNID at ¶ 225. As to plaintiff Bourgeois, Detective Nault believed that he would use his experience as a State Police officer to frustrate any attempts during an interview to obtain meaningful information. See SMFNID at ¶ 226. Thus, with regard to plaintiffs White and Bourgeois, Detective Nault concluded that the risks to the investigation of conducting such pre-arrest interviews – namely the potential for revealing sources, evidence, theories and/or methods – outweighed the likely benefits of such interviews. See SMFNID at ¶ 227. Detective Nault did intend to attempt to interview plaintiff Marion, but decided that an interview immediately after her arrest would be the most fruitful, as she would likely be motivated at that time to provide useful evidence against Thomas White and Henry Bourgeois. See SMFNID at ¶ 228. As it turned out, Marion obtained counsel immediately after her arrest and no such interview was permitted by counsel. See SMFNID at ¶ 229.

N.    Subsequent Proceedings, The Coe Report And The Disposition Of The Charges

On June 28, 2000, Attorney Glenn Coe was appointed and sworn in as Special Assistant State's Attorney for purposes of investigating and prosecuting the pending criminal cases against the plaintiffs: State v. Thomas White, CR 99-106088/CR00-107163 (J.D. Rockville); State v. Gloria Marion, CR 99-106081 (J.D. Rockville); and State v. Henry Bourgeois, CR 99-106135 (J.D. Tolland).   See SMFNID at ¶ 230.  Attorney Coe's appointment was a result of a decision by the Hon. Jonathan Kaplan to disqualify Mark Solak and the Office of the State's Attorney for Windham County from the afore-mentioned cases. See SMFNID at ¶ 231.   Judge Kaplan also ordered that the Office of the Chief State's Attorney investigate whether grounds existed for the criminal prosecution of perjury of two witnesses, Aaron and Adam, relating to their testimony in the hearings held on the issue of disqualification. See SMFNID at ¶ 232.  In addition, Judge Kaplan ordered an investigation into whether any person, including Assistant State's Attorney Debra Collins, had committed criminal misconduct in connection with the reported shredding of state documents, and destruction of computer records in the Windham County Sheriff's Department.  See SMFNID at ¶ 233.

Attorney Coe investigated the issues requested by Judge Kaplan as part of his overall investigation in connection with the prosecutions of Thomas White, Gloria Marion, and Henry Bourgeois.  See SMFNID at ¶ 234.  His investigation was thorough and exhaustive, consisting of over ninety interviews and the review of hundreds of documents.  See SMFNID at ¶ 235.  In particular, he reviewed documents provided by the Office of the State's Attorney for Windham County, the Office of the Chief State's Attorney, the Connecticut State Police, the Windham County Sheriff's Department and others.  See SMFNID at ¶ 236.

Attorney Coe issued a comprehensive report on July 25, 2001, setting forth his conclusions. See SMFNID at ¶ 237. His conclusions can be summarized as follows: (1) the obstruction of justice and witness tampering-related charges against Thomas White, Henry Bourgeois and Gloria Marion would be nolled; (2) sufficient evidence existed to support a prosecution of Thomas White for larceny by embezzlement; (3) racketeering counts against Thomas White based on obstruction of justice and corrupt election practices would be nolled; and, while legally sufficient, racketeering counts against Thomas White based on larceny would be nolled as duplicative; (4) sufficient evidence did not exist to prosecute either Adam or Aaron Auclair for perjury; (5) no probable cause existed to arrest and prosecute Debra Collins or any other person for shredding of state documents, and destruction of computer records relating to the Windham County Sheriff's Department; and (5) the Connecticut State Police acted properly in the investigation and arrest of the Thomas White, Gloria Marion and Henry Bourgeois. See SMFNID at ¶ 238. Attorney Coe later consented to the dismissal of the obstruction of justice and witness tampering-related charges against Thomas White, Gloria Marion and Henry Bourgeois. See SMFNID at ¶ 239.

Attorney Coe also specifically concluded that, based on the information produced during the hearings before Judge Kaplan and during his investigation, Connecticut State Police acted entirely properly in investigating and drawing up warrant affidavits for the arrest of the Thomas White, Gloria Marion, and Henry Bourgeois. See SMFNID at ¶ 240. As set forth in Attorney Coe's affidavit, his conclusion that obstruction of justice and witness tampering-related prosecutions should not be pursued against Thomas White, Gloria Marion and Henry Bourgeois was based in large measure on problems with the credibility of Adam Auclair and, to a lesser degree, Aaron Auclair, both of whom would be the crucial witnesses in the State's case. See

42

SMFNID at ¶ 241. Indeed, because the Auclairs were, in effect, the putative victims, their credibility was particularly important to successful prosecutions. See SMFNID at ¶ 242.

Attorney Coe does not believe, however, that the Connecticut State Police knew or should have known, at the time that they prepared and submitted arrest warrant affidavits relying in large measure on the Auclairs' statements, that the Auclairs were unreliable witnesses. See SMFNID at ¶ 243. Indeed, as set forth in his affidavit, Attorney Coe is aware of no information that would have called the Auclairs' credibility into question at the time the warrant affidavits were prepared. See SMFNID at ¶ 244. Concerns about the credibility of the Auclairs arose after the arrest of White, Bourgeois and Marion, during disqualification hearings before Judge Kaplan. See SMFNID at ¶ 245. In particular, Attorney Coe does not believe the Connecticut State Police knew or should have known at the time they prepared the warrant affidavits that Adam and Aaron Auclair were not locked in a room with Gloria Marion on July 16, 1999. See SMFNID at ¶ 246. Nor does he believe that the Connecticut State Police knew or should have known at the time they prepared their warrant affidavits that the Auclairs were eating pizza at their meeting with Gloria Marion on July 16, 1999. See SMFNID at ¶ 247.

More generally stated, Attorney Coe does not believe that the Connecticut State Police knew or should have known, at the time that they prepared the warrant affidavits, that *any* material information contained in those warrant affidavits was false. See SMFNID at ¶ 248. Nor, according to Attorney Coe, did the Connecticut State Police possess any information that the omitted from their warrant affidavits that would have undermined probable cause to arrest Thomas White, Gloria Marion, and Henry Bourgeois. See SMFNID at ¶ 249.

Based on Attorney Coe's expertise as a prosecutor and his investigation, he does not believe that it was, or should have been, obvious to the Connecticut State Police that the warrant

affidavits failed to provide probable cause for the arrest of Thomas White, Gloria Marion or Henry Bourgeois for crimes relating to obstruction of justice or witness tampering. See SMFNID at ¶ 250. Nor, more generally, does he believe that the Connecticut State Police knew or should have known that their warrant affidavits were faulty in any material respect. See SMFNID at ¶ 251.

Based on his investigation, Attorney Coe believe that the State's Attorney Mark Solak gave poor legal advice to the Connecticut State Police regarding the existence of probable cause to arrest plaintiffs White, Marion and Bourgeois on obstruction of justice-related charges based on the facts gathered by the State Police. See SMFNID at ¶ 252. Attorney Solak's advise, however, was not so obviously wrong that it should have been perceived as faulty by the Connecticut State Police at the time that they prepared and submitted to the court their warrant affidavits. See SMFNID at ¶ 253. To the contrary, in Attorney Coe's view, it was entirely reasonable of the Connecticut State Police to rely upon the advice of State's Attorney Solak as to the existence of probable cause to arrest Mr. White, Ms. Marion, and Mr. Bourgeois on obstruction of justice and witness tampering-related charges. See SMFNID at ¶ 254.

Based on Attorney Coe's experience, it is entirely proper for police officers to rely on prosecuting attorneys for advice on the existence or absence of probable cause based on a given set of facts, as was done in this instance. See SMFNID at ¶ 255. The exception would be where the facts are so obviously insufficient to sustain the proposed charges that the insufficiency should be obvious even to the average police officer. See SMFNID at ¶ 256. This was not the case here, according to Attorney Coe, as the affidavits were not so obviously deficient as to alert the officers that probable cause was not present to arrest Thomas White, Gloria Marion, and

Henry Bourgeois on obstruction of justice and witness-tampering related charges. <u>See</u> SMFNID at ¶ 257.

Attorney Coe's conclusion that the Connecticut State Police acted properly is not undermined by the fact that they did not interview Thomas White, Gloria Marion and Henry Bourgeois prior to seeking their arrest. <u>See</u> SMFNID at ¶ 258. Valid investigative reasons often counsel against such pre-arrest interviews, and there is no indication in this instance that such valid reasons did not exist. <u>See</u> SMFNID at ¶ 259.

In sum, Attorney Coe is aware of no evidence whatsoever that would remotely suggest that the investigation by the Connecticut State Police of Thomas White, Gloria Marion, and Henry Bourgeois was motivated by any improper motive. <u>See</u> SMFNID at ¶ 260.

Indeed, the defendants affirm in their affidavits that their conduct in connection with the investigation and arrest of the plaintiffs was, in their view, entirely proper and was not motivated by malice, a desire to harm or retaliate against the plaintiffs or any other improper motives. <u>See</u> SMFNID at ¶ 261.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56(c) requires the entry of Summary Judgment ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986). A "material fact" is one whose resolution will affect the ultimate determination of the case. <u>Id.</u> "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

45

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Samuels v. Smith, 839 F. Supp. 959, 962 (D.Conn. 1993)(emphasis in original).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., supra, 477 U.S. at 256; see also Knight v. United States Fire Insurance Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Where summary judgment is available, "[n]either courts nor defendants should be subjected to trials which can be little more than harassment." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial. Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in opposition to a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. See First National Bank Co. of Clinton, Ill. v. Insurance Co. of North America, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the District Court properly relied on documents and exhibits identified by affidavit). For example, conjecture and speculation as to an opposing parties' motivation, unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay which does not fall under

one or more of the exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered in opposition to summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Beyene v. Coleman Security Service, Inc., 854 F.2d 1179 (9th Cir. 1988); Edward B. Marks Music Corp. v. Stasny Music Corp., 1 F.R.D. 720 (S.D.N.Y. 1941).

Where, as here, the issue is the existence of probable cause to arrest the plaintiff, the plaintiff bears the burden to demonstrate that there is no reasonable basis for instituting the criminal proceedings. Zenik v. O'Brien, 137 Conn. 592, 597, 79 A.2d 769 (1951).   Further, although probable cause is defined in terms of "reasonableness," it is an issue of law for the court to decide. McMahon v. Florio, 147 Conn. 704, 707; Paranto v. Ball, 132 Conn. 568, 571, 46 A.2d 6 (1946) (citations omitted).  Thus, the issue is one appropriately decided by way of summary judgment.

## III.    ARGUMENT

### A.    PLAINTIFFS FAIL TO STATE A CLAIM BASED ON A THE SUBMISSION OF FALSE AND/OR MATERIALLY INCOMPLETE WARRANT AFFIDAVITS

Plaintiffs' primary claim in this matter is that the affidavits submitted in support of the warrants for their arrest included false information and omitted material information and, therefore, that the warrants violated the Fourth Amendment of the United States Constitution. For the reasons discussed below, plaintiffs fail to state any viable claim arising out of the arrest warrant affidavits.

The Fourth Amendment to the United States Constitution provides that no person may be subjected to unreasonable searches or seizures. See U.S. Const., Amend. IV.  This protection includes the right to be free from searches or seizures unsupported by probable cause.  Weyant v. Okst, 101 F.3d 845, 852 (2nd Cir. 1996).  The existence of probable cause is a complete defense to a civil action alleging an unreasonable arrest.  Id., 101 F.3d at 852 (internal citations and

quotations omitted). A plaintiff challenging a warrant as lacking probable cause faces a "heavy burden." Golino v. City of New Haven, 950 F.2nd 864, 870 (2nd Cir. 1991), cert. denied, 505 U.S. 1221 (1992).

Normally, the issuance of a warrant by a neutral magistrate creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause to effect a disputed arrest. Id. In order to overcome this presumption, the plaintiff must make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was "necessary to the finding of probable cause." Id. (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). Moreover, probable cause to arrest for *any* offense - even one with which the plaintiff was not ultimately charged - is sufficient to overcome the charge of false arrest or imprisonment. See, e.g., Avery v. King, 110 F.3d 12 (6th Cir. 1997); Biddle v. Martin, 992 F.2d 673 (7th Cir. 1993); Pfannstiel v. City of Marion, 918 F.2d 1178 (5th Cir. 1990).

A civil rights plaintiff challenging a warrant affidavit as false or materially incomplete must make the same showing that is required at a suppression hearing under Franks v. Delaware, supra, 438 U.S. at 171-72: the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause. Id.; Golino, supra, 950 F.2nd at 870-71. The Franks plaintiff must make specific allegations of deficiencies in the warrant; that is to say, unsupported conclusory allegations of falsehood or material omission will not support a claim. See, e.g., Zandhri v. Dortenzio, 228 F.Supp.2d 167, 174 (D.Conn. 2002), citing Franks v. Delaware, supra, 438 U.S. at 171.

In order to establish a <u>Franks</u> violation, it is not enough simply to show that the warrant affidavits were false, that additional investigation would have rebutted probable cause, or even that the affidavit was the result of negligent or sloppy police work. "Allegations of negligence or innocent mistake are insufficient to require a reevaluation of the affidavit." <u>Franks</u>, <u>supra</u>, 438 U.S. at 171. Rather, a plaintiff is required *to prove* that the defendants possessed a culpable mental state, i.e., that their affidavit contained "deliberate falsehood" or reflected "reckless disregard for the truth." <u>Franks</u>, <u>supra</u>, 438 U.S. at 165, 171. Thus, an affidavit containing false information or suffering from material omissions will not support a claim where, as here, circumstances suggest that the affiant believed it to be true. <u>Id.</u> at 165.

The standard enunciated in <u>Franks</u> recognizes that information an affiant reports may not ultimately be found to be accurate, and is nonetheless willing to tolerate such a result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made. <u>Id.</u>, 438 U.S. at 165. Because the consequences of arrest or search are less severe and easier to remedy than the consequences of an adverse criminal verdict, accuracy and completeness in the context of a warrant affidavit are of less constitutional import than at later stages in the criminal process. <u>Mays v. City of Dayton</u>, 134 F.3d 809, 816 (6th Cir. 1998).

Except in the "*very* rare case" where a plaintiff makes a strong preliminary showing that the affiant "*with an intention to mislead*" excluded critical information from a warrant affidavit, and the omission is critical to the finding of probable cause, <u>Franks</u> is inapplicable to the omission of disputed facts. <u>Id.</u> (emphasis in original).[13] Thus, while not immune from a <u>Franks</u>

---

[13]  Courts have applied the <u>Franks</u> analysis to omissions of information from warrant affidavits as well. See <u>Mays v. City of Dayton</u>, <u>supra</u>. However, where the constitutional claim arises from alleged material omissions from warrant affidavits, a much stricter level of scrutiny applies. This is so because allowing omissions to be challenged on the same footing as that of false statements included in the warrant would create a situation where almost every affidavit of an officer would be questioned. <u>Mays</u>, <u>supra</u>, 134 F.2d at 815.

inquiry, affidavits with potentially material omissions are much less likely to merit a <u>Franks</u>

hearing than are affidavits which allegedly include false statements. <u>Id.</u>, citing <u>U.S. v. Atkins</u>,

107 F.3d 1213, 1217 (6th Cir. 1997).

Against these standards, plaintiffs' <u>Franks</u> claim clearly fails.

i.      *Plaintiffs cannot overcome the presumption of validity afforded by the*
        *magistrate's finding of probable cause.*

A magistrate's finding of probable cause receives "great deference." <u>Spinelli v. United</u>

<u>States</u>, 393 U.S. 410, 419 (1969).   In the absence of obvious irregularity or facial deficiency,

officers are shielded from liability by a neutral magistrate's finding of probable cause and

issuance of a warrant.  <u>United States v. Leon</u>, 468 U.S. 897 (1984); <u>Amato v. City of Richmond</u>,

875 F. Supp. at 1144-45.

There can be no dispute in this case that a neutral magistrate carefully evaluated the

warrant affidavits and found probable cause.  Indeed, as set forth in Detective Nault's affidavit,

Judge Mack reviewed the affidavits over a period of several hours, after which he expressed no

concerns whatsoever about the adequacy of the affidavits or the existence of probable cause.  <u>See</u>

SMFNID at ¶ 205-06.  Thus, the warrant affidavits were carefully scrutinized by both the State's

Attorney and Judge Mack, both of whom concluded that probable cause existed.  It is impossible

to conclude, therefore, that the defendants – none of whom is a trained lawyer – should have

noted obvious deficiencies in the affidavits undermining the existence of probable cause.

Attorney Coe's affidavit supports the conclusion that no such obvious deficiencies exited in the

affidavits.

ii        *There are no actionable falsehoods or omissions in the affidavits.*

The plaintiffs' complaint focuses primarily on three specific *factual*

misrepresentations or omissions in the affidavit:  (1) the Auclairs were not locked into the room

with plaintiff Marion during the meeting on July 16, 1999; (2) the Auclairs were eating pizza

during that meeting; and (3) that Thomas White urged Adam and Aaron Auclair not to resign.[14]

The only information on these subjects in the possession of the State Police at the time the

affidavits were submitted to court was that provided by the Auclairs.  Defendants did not at that

time know that any of the Auclairs' information was false or incomplete.  The defendants were

fully entitled to rely on the Auclairs at the time the warrant affidavits were prepared.  Thus,

because defendants did not knowingly present any false information, or omit any material

information in their possession, plaintiffs' Fourth Amendment claim must fail.

The law clearly allows police officials, as was done here, to base probable cause

determinations on the statements of victims and/or seemingly credible witnesses.  See, e.g.,

Garcia v. Gasparri, 193 F. Supp. 2d 445, 452 (D. Conn. 2002).  "When information is received

from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise

doubt as to the person's veracity."  Curley v. Village of Suffern, 268 F.3d 65, 69-70 (2d Cir.

2001)(citing Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) and Singer v. Fulton

County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995)).  When, as here, "an average citizen tenders

---

[14] Most of the alleged omissions/misrepresentations are variations on the theme that the Auclairs were not restrained or abducted during the July 16, 1999 meeting because they were not locked into the room and were sufficiently relaxed to be eating pizza.  The remainder of the alleged infirmities involve failures to include sufficient information in the affidavits to support necessary elements of the various charges.  See Amended Complaint at ¶ 24.  These are legal deficiencies, not factual misrepresentations or omissions.  In the absence of specific factual misrepresentations or omissions of facts known to the affiants, such legal insufficiency claims are not actionable under Franks.

information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case." Calderado v. Calabrese, 298 F.3d 156, 165 (2002).

In this instance, the defendants relied upon the Auclairs, and the plaintiffs simply cannot point to any facts to suggest that this reliance was unwarranted. As discussed above in Section II(F), supra, there was no reason for any objective observer to conclude that the Auclairs were anything less than fully reliable witnesses at the time they gave their statements to the State Police. Certainly, none of the defendants was aware of any information that might undermine the credibility of the Auclairs. Neither Auclair brother had any known history of conduct suggesting unreliability. Indeed, the plaintiffs themselves were unable in their depositions to point to any reason why the Auclairs should not have been perceived as anything less than fully reliable or credible witnesses. Simply put, the Auclairs compared extremely favorably to many of the witnesses upon whom police are often forced rely.

It is also worth noting that, had the Auclairs intentionally mislead the State Police in their statements, they would have been subjected themselves to criminal liability. See Conn. Gen. Stat. § 53a-157b(providing criminal liability for making a false written statement intended to mislead a public servant in the performance of his official function). The Supreme Court has recognized that "if an unquestionably honest citizen comes forward with a report of criminal activity – which if fabricated would subject him to criminal liability – . . . rigorous scrutiny of the basis of his knowledge [is] unnecessary." Illinois v. Gates, 462 U.S. 213, 233-34 (1983)(citing Adams v. Williams, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972)).

As Attorney Coe's affidavit makes clear, it was not until the issuance of the arrest warrants that *any* questions about the Auclairs' credibility arose. Thus, to the extent that

anything in the affidavits attributed to either or both of Auclairs later proved to be false, the

defendants were not, and should not have been, aware of such falsity and cannot, therefore, be

liable under <u>Franks</u>. Otherwise stated, the defendants are not alleged to have known *at the time*

*that they swore out their warrant affidavit*, that it contained materially false or incomplete

information. The absence of such an allegation is fatal to plaintiffs' <u>Franks</u> claim.

Not only were the Auclairs evidently reliable, the warrant affidavits simply did not

mislead Judge Mack in the manner alleged by the plaintiffs. With regard to the issue of the door

to room where the Auclairs met with plaintiff Marion on July 16, 1999, the affidavits stated as

follows:

- According to Aaron Auclair, "[i]n the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second ***unlocked*** door was behind us." <u>See</u> SMFNID at ¶ 155. (emphasis added).

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. <u>See</u> SMFNID at ¶ 155.

Clearly, therefore, the affiants in this case did not mislead Judge Mack into believing that

the Auclairs were locked into a room with Gloria Marion. As discussed above in Section II(F),

the statements in the affidavits concerning the door by the Auclairs are not mutually exclusive

and, indeed, it is far from clear to this day that *either* is false. Thus, upon closer inspection, the

central "falsehood" alleged by the plaintiffs is not a falsehood at all.

Nor is it actionable under <u>Franks</u> that the defendants failed to inform Judge Mack that the

Auclairs were eating pizza at the time of their meeting with Gloria Marion or that Thomas White

may have urged the Auclairs not to resign. An officer seeking a warrant need only advise the

judicial authority of information within his knowledge. <u>See, e.g.</u>, <u>Martinez v. City of</u>

53

Schenectedy, 115 F. 3d 111, 115, (2d Cir. 1997); Brown v. D'Amico, 35 F.3d 97, 99 (2d Cir.

1994). As discussed above, at the time the affidavits were submitted to the Judge Mack, none of

the defendants knew that the Auclairs were eating pizza during their meeting with Marion. As to

the resignation issue – assuming arguendo that it can even be considered material at all, which it

cannot – the Auclairs' statements did not mention any effort by Thomas White to persuade them

not to resign. The affidavits faithfully reported to Judge Mack what the statements did state –

that White accepted the Auclairs' resignations.

The record is clear: the defendants did not include any information in the arrest warrant

affidavits that they knew to be false; nor did they omit from the affidavits any information in

their possession that undermined the existence of probable cause. Defendants' affidavits

submitted herewith clearly so state, and no competent evidence remotely rebuts this conclusion.

Indeed, Attorney Coe affirms that, even after a thorough investigation of this matter, he is aware

of no evidence at all to suggest that the defendants falsified or omitted information from the

affidavits. To the contrary, Detective Nault simply put in the affidavits all the relevant

information he possessed regarding possible witness tampering and obstruction of justice.

Attorney Solak believed that evidence to be sufficient to sustain a probable cause finding, and

Judge Mack, after careful review, agreed. If there existed information of which Detective Nault

was unaware that undermined probable cause, he cannot be liable for failing to include such

information in the affidavits.

    ii.    *Failure to interview the plaintiffs or otherwise further investigate this matter*
            *prior to seeking arrest warrants is not actionable.*

Plaintiffs are likely to suggest that further investigation by the defendants would have

rebutted probable cause. Even if true, the failure to conduct pre-arrest interviews of the plaintiffs

cannot form the basis for liability.   If, as here, officers reasonable believe probable cause exists to support an arrest, there is simply no constitutional duty to further investigate before seeking an arrest warrant.  See, e.g., Franco-de Jerez v. Burgos, 876 F.2d 1038, 1041 (1st Cir. 1989).

It is entirely inconsequential that the defendants did not interview the plaintiffs prior to seeking warrants for their arrest.  As set forth above in Section II(M), Detective Nault had sound investigative reasons not to interview the plaintiffs prior to their arrest.   Moreover, the law simply does not require such pre-arrest interviews, and the fact that a person to be arrested, if asked, would deny the allegation of wrongdoing is of no significance in evaluating the constitutionality of an arresting officer's conduct:

> [There is no requirement] that an officer otherwise equipped with probable cause to arrest an individual has a duty to question and weigh the  suspect's version of the incident prior to making the arrest . . . .  Although police officers must exercise judgment in assessing the existence or non-existence of probable cause in a given situation, they are not required to arbitrate the matter with the suspect.

Baker v. McCollan, 443 U.S. 137, 145-46 (1979); Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).  Similarly, in Krause v. Bennett, 887 F.2d 362, 365-66 (2d Cir. 1989), the Second Circuit found that an investigating officer was entitled to qualified immunity notwithstanding that he had failed to consider possibly exculpatory evidence offered by the plaintiff.  See also Calderado, supra, at 167-78 ("The police are not required to explore and eliminate every technically plausible claim of innocence before making an arrest.")

At worst, the failure to conduct any further investigation prior to seeking arrest warrants represents negligence, which does not suffice to state a claim under Franks.  See Franks, supra, 438 U.S. at 171.

iii.    *Defendants' conduct was not improperly motivated.*

The defendants affirm, and the record clearly shows, that their conduct was not motivated by a desire to retaliate against or punish the plaintiffs or by any other improper motive. See SMFNID at ¶ 261. The only motive alleged in this case is that the defendants sought to punish the plaintiffs for complaining about their "friend" Debra and Charles Collins. As discussed in detail in Section II(E) above, that alleged motive is utterly rebutted by the evidence obtained through discovery, including the deposition of Debra Collins. The defendants simply were not friends with the Collinses; nor did they have any other conceivable motivation to jeopardize their livelihoods by entering into unlawful conspiracies for the benefit of the Collinses.

However, even if the plaintiffs could establish some untoward motive, which they cannot, defendants would still be entitled to summary judgment. An arresting officer's subjective feelings about the arrest are simply not relevant to the issue of whether the contested arrest was supported by probable cause, even if the officer subjectively believed that probable cause did not exist and if the arresting officer harbored personal ill feelings toward the person arrested. See Graham v. Connor, 490 U.S. 386, 396 (1989); Peters v. New York, 392 U.S. 40, 66-67 (1968), cited with favor in Florida v. Royer, 460 U.S. 491, 507 (1983).[15]    Thus, plaintiffs' effort – albeit ineffective – to establish improper motives on the part of the defendants is pointless.

---

[15] An additional reason exists to dismiss plaintiff White's claims. As noted above, plaintiff White was charged with larceny and election practices charges, which were *not* nolled by Attorney Coe or dismissed by the Court. Plaintiff White ultimately took accelerated rehabilitation on an election practices charge. Where probable cause to arrest for *any* offense - even one with which the plaintiff was not ultimately charged - is sufficient to overcome the charge of false arrest or imprisonment. See, e.g., Avery v. King, 110 F.3d 12 (6th Cir. 1997); Biddle v. Martin, 992 F.2d 673 (7th Cir. 1993); Pfannstiel v. City of Marion, 918 F.2d 1178 (5th Cir. 1990).

It is clear in the record that Detective Nault believed in good faith that the warrant affidavits were true and complete and that probable cause existed to arrest the plaintiffs for witness tampering and obstruction of justice-related offenses. That view was endorsed and advocated by Attorney Solak and affirmed first by Judge Mack and later by Attorney Coe. None of the defendants possessed any information or belief, at the time the arrest warrant applications were submitted, that undermined this conclusion.

For the foregoing reasons, the State Police Defendants cannot be liable under Franks for deficiencies in the arrest warrant affidavits, and this claim should therefore be dismissed.[16]

B.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendants are protected by the doctrine of qualified immunity from an award of money damages against them in their individual capacities. The shield of qualified immunity generally protects government officials from liability for monetary damages on account of their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). The availability of the defense turns upon the "objective legal reasonableness" of the allegedly unlawful official action, "assessed in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting

---

[16] Plaintiffs also assert state law constitutional claims based on alleged defects in the warrant affidavits. Franks-type claims raised under Connecticut's constitution are analyzed in the same manner as those raised under the Fourth Amendment. See State v. Glenn, 47 Conn. App. 706, 714-15 (1998)("[W]e conclude that the Franks analysis applies under our state constitution when a defendant challenges the veracity of statements made in a warrant affidavit.").

Harlow v. Fitzgerald, supra, 457 U.S. at 818-19). In this case, it is simply impossible to conclude that the defendants' conduct was objectively unreasonable.

The qualified immunity defense is intended to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Lee v. Sandberg, 136 F.3d 94, 100 (2d Cir. 1997) (citations omitted). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001), citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier, supra, 533 U.S. at 201.

Typically, the first inquiry under the qualified immunity analysis is whether the right purportedly violated was clearly established at the time of the challenged official action. Saucier, supra, 533 U.S. at 201. Here, the defendants do not question that the Fourth Amendment right to be free from unreasonable searches or searches supported by materially false or incomplete warrants was established at the time of the conduct at issue in this case. Rather, the defendants are shielded by the second prong of the qualified immunity doctrine, which provides immunity "even if the actions violated a clearly established law, [but] the official was objectively reasonable in believing in the lawfulness of his actions." Connecticut ex rel Blumenthal v. Crotty, 2003 U.S. App. Lexis 20041, * 46 (2d Cir. Sept. 30, 2003). As to this aspect of the doctrine, "[t]he presumption in favor of finding qualified immunity is necessarily high, protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)(emphasis added).

With particular reference to cases of alleged police misconduct:

> the U.S. Court of Appeals for the Second Circuit has held that even
> where the plaintiff's federal rights and the scope of the official's
> permissible conduct are clearly established, the qualified immunity
> defense protects a government actor if it was 'objectively
> reasonable' for him to believe that his actions were lawful at the
> time of the challenged act . . . .  The objective reasonableness test
> is met - and the defendant is entitled to qualified immunity - if
> officers of reasonable competence could disagree on the legality of
> the defendant's actions . . . .  In qualified immunity cases, [the
> courts] are not concerned with the correctness of the defendants'
> conduct, but rather with the 'objective reasonableness' of their
> chosen course of action given the circumstances confronting them
> at the scene . . . .  The ultimate legal determination whether . . . a
> reasonable police officer should have known he acted unlawfully is
> a question of law better left for the court to decide.

Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995) (quotations and internal citations omitted).

As discussed in detail above, the defendants are alleged to have relied on information

provided by witnesses and victims, as they were entitled under law to do, and they neither

falsified or omitted information from the affidavits.  The record also shows that the defendants

relied in good faith on the advice of Attorney Solak, who informed them that probable cause

existed based on the facts set forth in the affidavits.  After careful review, Judge Mack agreed

that probable cause existed.  Attorney Coe subsequently concluded that the defendants' conduct

was proper and reasonable.  Defendants are clearly, therefore, entitled to qualified immunity.

Plaintiffs allege essentially that defendants' reliance on their legal counsel, the chief

prosecutor in Windham County, Attorney Solak, and seemingly reliable witnesses, the Auclairs,

was mistaken.  Even if plaintiffs are ultimately shown to be correct in this assertion, qualified

immunity is grounded on the notion that a state official's good faith mistake will not subject him

to liability:

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on

59

> particular [governmental] conduct.  It is sometimes difficult for an
> [official] to determine how the relevant legal doctrine [...] will
> apply to the factual situation the [official] confronts.  If the
> [official's] mistake as to what the law requires is reasonable,
> however, the [official] is entitled to the immunity defense.

Saucier v. Katz, supra, 533 U.S. at 205;  see also, Malley v. Briggs, 475 U.S. 335, 343 (1986)

(qualified immunity leaves ample room for mistaken judgments).

An officer is protected by qualified immunity even when, as alleged here, he

"'mistakenly conclude[s] that probable cause is present,' i.e., when he reasonably believes that a

reasonably prudent police officer would have acted even though a reasonably prudent police

officer would not have acted." Oliveira v. Mayer, 23 F.3d at 648 (quoting Anderson v.

Creighton, 483 U.S. 635, 641(1987)).  "Mere negligence" on the part of a search warrant affiant

will not support a Franks claim." State v. Cobb, 251 Conn. 285, 317 (1999), cert. denied 121

S.Ct. 106 (2000); State v. Pappas, 256 Conn. 854, 864-65 (2001).

Where, as here, an arrest is based upon facially valid warrants, supported by the

information of seemingly reliable witnesses and issued by a judge of the Superior Court, the

overwhelming presumption is in favor of finding qualified immunity – it is only where the

warrant application so lacks indicia of probable cause as to render official belief in its existence

objectively unreasonable that the shield of immunity will be lost.  See, e.g., United States v.

Leon, 468 U.S. 897, 923 (1984).

The Second Circuit Court of Appeals recently confirmed that, in cases like this

challenging probable cause, the presumption in favor granting qualified immunity is strong:

> we have said that in the context of a qualified immunity defense to an
> allegation of false arrest, the defending officer need only show arguable probable
> cause.  This is because at its heart, the concern of the immunity inquiry is to
> acknowledge that reasonable mistakes can be made as to the legal constraints on
> particular police conduct.  Officers can have reasonable, but mistaken, beliefs as
> to the facts establishing the existence of probable cause and in those situations

> courts will not hold that they have violated the Constitution. Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials should not be held personally liable.

Calderado, supra, at 298 F.3d. at 162.

In this instance, there are simply no facts from which to conclude that the defendants, even if mistaken, acted so unreasonably as to take them outside the broad protections of qualified immunity. As set forth in detail above, the State Police relied upon information from trustworthy witnesses – the Auclairs. In addition, Detective Nault was advised by Attorney Solak that probable cause existed based on the facts set forth in the warrant affidavits. That advice was ratified by Judge Mack, who carefully reviewed the warrant affidavits. Furthermore, Attorney Coe affirms that the State Police acted properly, and any deficiencies in the warrants were due to the legal conclusions made by Attorney Solak.

Plaintiffs would have this court hold that officers can neither rely on apparently reliable witnesses or heed the legal advice of the county's leading prosecutor. To the contrary, this is a paradigmatic case of police officers reasonably concluding, even if mistakenly, that probable cause existed. Thus, plaintiffs cannot surmount the high barriers necessary to defeat qualified immunity.

C.    THE DEFENDANTS LACKED THE REQUISITE PERSONAL INVOLVEMEN TO STATE A CLAIM AGAINST THEM UNDER 42 U.S.C. § 1983

The fact that the defendants did not have had any contemporaneous knowledge of the purported falsity or incompleteness of the warrant affidavits suggests another fundamental flaw in plaintiffs' constitutional claims. Section 1983 imposes liability only for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the

Constitution and laws." <u>Rizzo v. Goode</u>, 423 U.S. 362, 370-71 (1976) (<u>quoting</u> 42 U.S.C. § 1983). Otherwise put, a "plaintiff must...allege a tangible connection between the acts of the defendants and the injuries suffered." <u>Bass v. Jackson</u>, 790 F.2d 260, 263 (2d Cir. 1986). Thus, in order to be held liable under 42 U.S.C. § 1983, a defendant must have had a role in subjecting the plaintiff to a deprivation of a federally guaranteed right. That is to say, a showing of personal involvement is a necessary prerequisite for establishing liability under § 1983. <u>See</u>, <u>e.g.</u>, <u>Gill v. Mooney</u>, 824 F.2d 192, 196 (2d Cir. 1987); <u>Johnson v. Glick</u>, 481 F.2d 1028, 1034 (2d Cir.), <u>cert</u>. <u>denied</u>, 414 U.S. 1033 (1973), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Graham v. Connor</u>, 490 U.S. 386 (1989); <u>McKinnon v. Patterson</u>, 568 F.2d 930 (2d Cir. 1977), <u>cert</u>. <u>denied</u>, 434 U.S. 1087 (1978). In this instance, plaintiffs' alleged injury, to the extent it is actionable at all, was caused by acts of parties other than the defendants.

As set forth above in Section II(J), none of the defendants except Detective Nault had any substantive role in preparing or approving the warrant affidavits at issue in this case. Nor did they have any meaningful participation in the investigation of the plaintiffs for crimes relating to witness tampering and obstruction of justice. Thus, defendants Szamocki, Turner, Gibeault and O'Connor clearly lack sufficient personal involvement to sustain claims against them.[17]

Even Detective Nault, who did prepare the warrant affidavits at issue, is not responsible for any harm the plaintiffs might have suffered. Detective Nault received seemingly reliable information from outwardly trustworthy witnesses and seemingly valid legal advice from the State's Attorney for Windham County regarding the existence of probable cause. Detective Nault should not be held responsible if either the Auclairs' evidence or Attorney Solak's advice ultimately proved unreliable.

D.    PLAINTIFFS' OTHER CLAIMS FAIL AS A MATTER OF LAW

While the thrust of plaintiffs' complaint is clearly a Fourth Amendment Franks claim,

they also assert claims based on alleged false arrest/malicious prosecution, violation of the

Fourteenth Amendment's guarantees of equal protection, and violation of the First Amendment.

Those claims are all deficient for a variety of reasons, including the following:

- For the reasons discussed above, all Fourth Amendment-based claims are baseless and defendants are entitled to qualified immunity from liability on any such claims, whether those claims are framed as Franks claims or false arrest/malicious prosecution.

- Plaintiffs have not alleged, and cannot prove, that the defendants' conduct was motivated by a desire to retaliate against them for complaining about misconduct by the Collinses or anybody else. As discussed above, defendants' conduct was not improperly motivated. Moreover, the suggestion that the defendants acted to assist the Collinses is clearly rebutted by the evidence. Finally, it should be noted that the complaint referenced by the plaintiffs was issued by Attorney Meisler on behalf of Thomas White alone. Attorney Meisler did not represent the other plaintiffs when he sent his letter of July 13, 1999 to Chief State's Attorney Jack Bailey. Thus, plaintiffs Marion and Bourgeois do not even allege any speech upon which purported retaliation could be based. Finally, as discussed above, if a warrant is supported by probable cause, the arresting officers' subjective motivations are irrelevant.

- Plaintiffs "equal protection" claim is also entirely baseless. That claim alleges that plaintiff were treated differently and worse than those who do not have personal relationships with investigating officers. This is evidently a repackaging of the assertion that the plaintiffs were arrested because the defendants were friendly with the Collinses. As demonstrated in detail above, no such friendships existed.

- If the court dismisses plaintiffs' federal law causes of action but leaves pending one or more state law claims, the defendants would respectfully request that the court decline to retain jurisdiction over those remaining state law claims. If "the only subject matter jurisdictional basis for this lawsuit . . . [is] properly dismissed, it [is] well within the discretion of the district court to dismiss the pendent state law claims". Albany Insurance Co. v. Esses, 831 F.2d 41, 45 (2d Cir. 1987). "[C]ertainly, if the federal claims are dismissed before trial . . . the state claims

---

[17] As noted above, defendant O'Connor did not draft the sections of the White affidavit relating to witness tampering and obstruction of justice-related crimes. See SMFNID at ¶ 166-174.

should be dismissed as well." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966); <u>see also</u> <u>Spear v. Town of West Hartford</u>, 771 F. Supp. 521, 530 (D. Conn. 1991) ("Absent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of . . ."), <u>aff'd.</u>, 954 F.2d 63 (2d Cir.), <u>cert. denied</u>, 506 U.S. 819 (1992).

- Plaintiffs' claims of equal protection, First Amendment and any other constitutional violations should be analyzed under the Fourth Amendment. <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994). As discussed above, plaintiffs' Fourth Amendment claims fail as a matter of law.

## IV.  CONCLUSION

For the foregoing reasons, the defendants respectfully request that summary judgment be granted in their favor on all claims.

                                        DEFENDANTS, NORMAN NAULT, ET
                                        AL.

                                        RICHARD BLUMENTHAL
                                        ATTORNEY GENERAL

                    BY:
                                        Perry Zinn Rowthorn
                                        Assistant Attorney General
                                        Federal Bar No. ct
                                        55 Elm Street
                                        P.O. Box 120
                                        Hartford, CT  06141-0120
                                        Tel: (860) 808-5020
                                        Fax: (860) 808-5347
                                        Perry.Zinn-Rowthorn@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure on this 27th day of May, 2004 to:

Jon Schoenhorn, Esq.
97 Oak St.
Hartford, CT 06106

Perry Zinn Rowthorn
Assistant Attorney General