UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS WHITE, ET AL.,<br>*PLAINTIFFS* | : | CIVIL ACTION NO.<br>3:02CV1589(WWE) |
| | : | |
| v. | : | |
| | : | |
| NORMAN NAULT, ET AL.<br>*DEFENDANTS* | : | May 27, 2004 |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Rule 56 of the Federal and Local Rules of Civil Procedure, defendants submit this statement of material facts not in dispute in support of their motion for summary judgment:

### A.    The Plaintiffs

1.    Plaintiff Thomas White was hired as a deputy sheriff in Windham County in 1995.  See White Depo. at 15 (relevant portions attached hereto as Exhibit A).

2.    White was elected to the position of High Sheriff for Windham County in November of 1998, defeating incumbent James Kenney.  See White Depo. at 15-16.

3.    Plaintiff White assumed his duties as High Sheriff on June 1, 1999, serving in that position until the sheriffs system was abolished on December 1, 1999 in favor of the current judicial marshal system.  See White Depo. at 11.

4.    Plaintiff White did not lose his position as High Sheriff as a result of the criminal charges at issue in this case, but rather resigned when the sheriff's system was dismantled.  See White Depo. at 11.

5.    He currently works as a representative for a public employees' union.  See White Depo. at 9.

6.      Plaintiff Gloria Marion was first employed as a deputy sheriff by the Sheriff's Department in September of 1997. See Marion Depo. at 10, 15 (relevant portions attached hereto as Exhibit B).

7.      She served in that capacity until promoted to Lieutenant by plaintiff White immediately after he became High Sheriff in June of 1999. See Marion Depo. at 15.

8.      Plaintiff Marion remained at that rank until the sheriff's system was abolished. See Marion Depo. at 10, 15.

9.      Plaintiff Marion's employment in the courts was not interrupted as a result of either her arrest or the transition to the current marshal system. See Marion Depo. at 9.

10.      Marion is currently employed by the Judicial Branch of the State of Connecticut as a Judicial Marshall II in Windham County.   See Marion Depo. at 6.

11.      Plaintiff Henry Bourgeois became employed as a full-time deputy sheriff in Windham County in July of 1995, having previously worked at various times in the sheriff's office on a per diem basis. See Bourgeois Depo. at 23 (relevant portions attached hereto as Exhibit C).

12.      Bourgeois was promoted to Captain – a supervisory position above lieutenant in the chain of command – by plaintiff White in June of 1999. See Bourgeois Depo. at 23.

13.      Like plaintiff Marion, Mr. Bourgeois' employment in the court system was not interrupted by his arrest or the abolishment of the sheriff's system. See Bourgeois Depo. at 11.

14.      Bourgeois is currently employed as a supervisory judicial marshal. See Bourgeois Depo. at 11.

15.      Prior to his employment in the sheriff's system, plaintiff Bourgeois served as an officer of the Connecticut State Police for 32 years, retiring in 1992. See Bourgeois Depo. at 32.

**B.**    **The Defendants**

16.    Defendant Norman Nault is employed by the Connecticut State Police as a detective, having joined the State Police in 1988.  <u>See</u> Nault Aff. at ¶ 3. (attached hereto as Exhibit D).

17.    At the time of the events at issue in this matter, Detective Nault was assigned to the Eastern District Major Crime Squad, where he specialized in the investigation of serious and/or complex crimes.  <u>See</u> Nault Aff. at ¶ 4 .

18.    Detective Nault lead the investigation into the charges at issue in this matter and prepared the affidavit for the warrants for the arrest of defendants Marion and Bourgeois on those charges.  <u>See</u> Nault Aff. at ¶¶ 5, 39; Affidavit Supporting Warrant For Arrest of Gloria Marion, Sept. 10, 1999 ("Marion Aff.")(copy attached hereto as Exhibit E); Affidavit Supporting Warrant For Arrest of Henry Bourgeois, Sept. 10, 1999 ("Bourgeois Aff.")(copy attached hereto as Exhibit F).

19.    Defendant Karen O'Connor joined the state police in June of 1995.  <u>See</u> O'Connor Aff. at ¶ 3 (copy attached hereto as Exhibit G).

20.    During the relevant time period, Detective O'Connor was assigned to the Eastern District Major Crime Squad as a Trooper.  <u>See</u> O'Connor Aff. at ¶ 3.

21.    Detective O'Connor was responsible for investigating Plaintiff White's conduct relating his handling of funds held by him in his capacity as a deputy sheriff.  <u>See</u> O'Connor Aff. at ¶ 5.

22.     That investigation ultimately resulted in plaintiff White being placed on a special form of probation known as accelerated rehabilitation in connection with criminal charges of misuse of campaign contributions. See O'Connor Aff. at ¶ 5.

23.     Plaintiff White does not challenge in any way in this case the investigation of, and his arrest and prosecution on, financial and election practices charges. See Amended Complaint.

24.     In light of her investigation into possible financial and election practices crimes by plaintiff White, Detective O'Conner also signed the warrant affidavit for his arrest on the charges that are at issue in this matter.   See O'Connor Aff. at ¶ 7; Affidavit Supporting Warrant For Arrest of Thomas White, Sept. 10, 1999 ("White Aff.")(copy attached hereto as Exhibit H).

25.     O'Connor did not, however, conduct the investigation underlying those charges. See O'Connor Aff. at ¶ 6.

26.     The portions of Trooper O'Connor's affidavit relating to those charges was drafted by Detective Nault and derived from Detective Nault's investigation.  See O'Connor Aff. at ¶ 7; Nault Aff. at 39.

27.     In fact, her affidavit states explicitly that it is the result of "her own investigative efforts and those of fellow officers who reported their findings to her." See White Aff. at ¶ 1.

28.     During all times relevant to this matter, defendant John Szamocki held the rank of Sergeant in the Connecticut State Police, performing supervisory functions in the Eastern District Major Crime Squad. See Szamocki Aff. at ¶ 4 (copy attached hereto as Exhibit I).

29.     Sergeant Szamocki was not directly involved in investigating any of the plaintiffs. Rather, he supervised the investigation of plaintiff White by Trooper O'Connor into possible financial and election practices crimes.  See Szamocki Aff. at ¶¶ 5, 6, 14-17 .

30.     With regard to the investigation preceding the charges that are at issue in this case – i.e., charges relating to witness tampering and obstruction of justice – Sergeant Szamocki's involvement was extremely limited in both time and scope.  <u>See</u> Szamocki Aff. ¶¶ 5, 14-17 .

31.     In particular, Sgt. Szamocki did not participate in drafting or approving the warrant affidavits, making probable cause determinations or submitting warrants to the court. <u>See</u> Szamocki Aff. at ¶¶ 14-17.

32.     Defendant John Turner holds the rank of Sergeant in the Connecticut State Police. <u>See</u> Turner Aff. at ¶ 4 (copy attached hereto as Exhibit J).

33.     At the time of the events at issue, Sgt. Turner was assigned to the Eastern District Major Crime Squad, where he supervised the investigation of primarily major violent, complex, or serious crime investigations.  <u>See</u> Turner Aff. at ¶ 4.

34.     Sergeant Turner did not himself conduct the investigation of the plaintiffs for crimes relating to witness tampering and obstruction of justice, but rather was Norman Nault's supervisor during the relevant time period.  <u>See</u> Turner Aff. at ¶¶ 5-9.

35.     Despite generally supervising the investigation, Sergeant Turner did not approve the warrant affidavits. <u>See</u> Turner Aff. at ¶¶ 8-10.

36.     Nor did Sergeant Turner take the oath of the affiants.  <u>See</u> Turner Aff. at ¶ 8-10.

37.     Indeed, Sergeant Turner does not even recall reading the affidavits before they were signed.  <u>See</u> Turner Aff. ¶ 9.

38.     Defendant Lawrence Gibeault is a retired official of the Connecticut State Police. At the time of the events at issue in this lawsuit, he held the rank of Lieutenant and was assigned to the Eastern District office, where he supervised Sergeants, Detectives and Troopers. <u>See</u> Gibeault Aff. at ¶¶ 3-4 (copy attached hereto as Exhibit K).

39.     While the investigation of the plaintiffs fell generally under Lt. Gibeault's area of command, he was entirely uninvolved in conducting or specifically directing the investigation in this matter.  See Gibeault Aff. at ¶ 5.

40.     Nor did he review the affidavits for the arrest of the plaintiffs for substance.  See Gibeault Aff. at ¶ 6.

41.     Rather, Lt. Gibeault's only involvement with the affidavits was to take detective Nault's oath on plaintiff Bourgeois' affidavit.  See Gibeault Aff. at ¶ 7.

42.     That act, however, does not involve an attestation as to the truth of the matters contained in the affidavit.  See Gibeault Aff. at ¶ 7; Nault Aff. at ¶ 40.

43.     Rather, it simply consists of administering an oath that the affiant – in this case Detective Nault – swears the contents of the affidavit are true and accurate to the best of the affiant's knowledge.  See Gibeault Aff. at ¶ 7, Nault Aff. at ¶ 40.

## C.     The Investigation Into Plaintiff White's Mismanagement of Funds

44.     The charges at issue in this case involve alleged tampering with witnesses and obstruction of justice by the plaintiffs in a state police investigation of plaintiff White for mishandling monies he received in his capacity as a deputy sheriff.  See Amended Complaint.

45.     On June 15, 1998, the Connecticut State Police received a complaint from Mark Solak, State's Attorney for Windham County, regarding a possible misuse or misappropriation of funds by then-Deputy Sheriff Thomas White of the Windham County Sheriff's Department.  See White Aff. at ¶¶ 2-4.

46.     According to Mr. Solak, he had been contacted by then-Sheriff Jay Kenney, who relayed complaints from creditors that plaintiff White had wrongfully withheld funds collected on judgment executions and wage garnishments.  See White Aff. ¶ 3.

47.    At the time of the referral of the complaint, plaintiff White was challenging Sheriff Kenney for the democratic nomination for High Sheriff of Windham County.  See White Aff. at ¶ 21.

48.    After receipt of the complaint, Trooper O'Connor was assigned to investigate whether plaintiff White had embezzled funds collected in his official capacity as a deputy sheriff. See O'Connor Aff. at ¶ 5.

49.    That investigation and the resulting charges of larceny and election misconduct are not challenged in this lawsuit.  Trooper O'Connor's investigation, however, forms part of the backdrop for the investigation and charges of witness tampering and obstruction of justice that are challenged in this case.  See O'Connor Aff. at ¶ 5.

50.    Trooper O'Connor performed a number of investigative tasks in furtherance of her investigation of plaintiff White, including reviewing financial and administrative records, consulting with a forensic accountant, and interviewing witnesses.  See White Aff.

51.    Those witnesses included Sheriff Kenney, officials of the central office of the Sheriff's Department and the Department of Labor, a number of the complaining creditors, and plaintiff White himself.  See White Aff.

52.    Plaintiff White met with Trooper O'Connor twice and provided three written statements.  See White Aff. at ¶¶  11, 12, 15, 16.

53.    Trooper O'Connor concluded that plaintiff White was not truthful in his dealings with State Police, and in particular that the evidence failed to support his statements and that his statements were inconsistent.  See White Aff. ¶ 19.

D.    **The Investigation Into Possible Shredding Of Documents And/Or Other**
**Misconduct By Debra Collins And Others Associated With Sheriff Kenney**

54.    During the pendency of the investigation into plaintiff White's management of

funds – White was elected High Sheriff of Windham County, defeating incumbent James

Kenney.  See Nault Aff. at ¶ 7.

55.    At some point (the record is not entirely clear when), plaintiff White retained the

late Arthur Meisler, Esq., to represent him in connection with the State Police Investigation.  See

Nault Aff. at ¶ 8.

56.    Shortly after plaintiff White's election, Attorney Meisler mailed a letter to the late

John M. Bailey, then-Chief State's Attorney, requesting that State's Attorney Solak be removed

from any involvement in the investigation of plaintiff White and that the matter be handled

directly by the Chief State's Attorney's office.  See Nault Aff. at ¶ 8.

57.    As one of the bases for removal, Attorney Meisler made the following accusation:

It is Mr. White's understanding that Deputy Assistant State's Attorney Debra Collins is
assigned to this investigation.  You must understand that Mr. Charles Collins, was a
special Deputy Sheriff and very much involved in the losing primary campaign of High
Sheriff James Kenney.  Mr. Collins resigned his position with the Windham County
Sheriff's Department, and later sought employment with another country [sic.] sheriff
stating that 'he did not want to work for a sheriff his wife was investigating.'

During the month preceding Mr. White's assuming the office of High Sheriff Mr. Kenny
[sic.] with the assistance of Mr. Charles Collins and Deputy Assistant State's Attorney
Debra Collins destroyed, shredded and otherwise disposed of records of the Windham
County Sheriff's Office.  A shredding machine, property of the Division of Criminal
Justice was employed to destroy some of these records.  Mr. White was also informed
that copies of personnel records were made and removed from the state office by Mr.
Kenney without authorization.  Finally, the memory of one state owned computer was
wiped clean and a second state owned computer was removed by Mr. Kenney from the
Putnam Courthouse.

It is my understanding that Mr. Kenny [sic.] was informed by the administrative office
for the County Sheriffs that before removing or destroying any records from his office,
the approval of the Public Records Administrator was necessary; and no request for
such approval was ever made.

8

It is my understanding Mr. Solak was made aware of Mrs. Collins' activities but left Mr. White's file as part of her work assignment.

See Meisler Letter to Bailey, July 13, 1999 (copy attached hereto as Exhibit L).

58.    Attorney Meisler copied his letter to State's Attorney Mark Solak. See Szamocki Aff. at ¶ 9.

59.    On July 19, 1999, Attorney Solak delivered to defendant Lt. Larry Gibeault a copy of Attorney Meisler's letter and requested that the State Police Major Crime Squad investigate the allegations made by Attorney Meisler. See White Aff. at ¶ 31.

60.    Lieutenant Gibeault agreed to conduct the investigation, assigning defendant Sergeant John Szamocki of the Eastern District Major Crime Squad at Troop D in Danielson to supervise it. See Gibeault Aff. at ¶ 5.

61.    Sergeant Szamocki, in turn, assigned defendant Detective Norman Nault to lead the investigation into whether any criminal activity by any party occurred during the closure of Sheriff Kenney's administration. See Szamocki Aff. at ¶ 9.

62.    Detective Nault and others conducted a thorough investigation into this matter, which included a number of investigatory interviews with officials of the State's Attorneys Office, the administrative offices of the Sheriff's Department, the Windham County Sheriff's department, including members of the office under both the Kenney and White Administrations. See Szamocki Aff. at ¶ 9; Nault Aff. at ¶ 10.

63.    Detective Nault determined that there was no probable to arrest anybody in connection with the closure of the Kenney administration. See Nault Aff. at ¶ 10.

64.    Plaintiffs assign great significance to the fact that nobody was arrested following the allegations of misconduct by those associated with Sheriff Kenney, particularly Assistant

State's Attorney Debra Collins or her husband Charles Collins, a deputy sheriff under Kenney.

Indeed, plaintiffs claim that the motive for their own arrests was the defendants' friendship with

the Collinses.   Indeed, this perceived "friendship" forms the sole supporting theory for this case:

> The defendants originally commenced an investigation into the illegal shredding of public documents by Assistant State's Attorney Debra Collins, her husband, former Supervisory Sheriff Charles Collins[,] Aaron Auclair and others, that was initiated after a complaint by the plaintiffs.  However[,] due to one or more of the defendants' personal friendship with the Collins' [sic], the defendants then conspired to turn the investigation into a criminal  investigations of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins, and others both known and unknown to the plaintiffs.

See Complaint at 5, ¶ 20 (emphasis added).

65.    The complaint was amended to remove the direct reference to a friendship

between the defendants and Ms. Collins.  Nevertheless, the Amended Complaint makes

reference to that purported friendship and continues to allege that the defendants conspired on

her behalf.  See Amended Complaint at ¶ 20 ("Defendants conspired to turn the investigation

into a criminal investigation of the plaintiffs to punish them for initiating the complaint and to

cover up suspected wrongdoing.") and ¶ 27(d)(alleging deprivation of the "right to equal

protection of the laws and to be treated the same as others who make complaints to police, but

are presumed innocent under the law simply because the officers have personal relationships

with the subjects of the complaint.").

66.    Neither Detective Nault, the lead investigator in this matter, nor any of the other

defendants has or had any sort of friendship with Debra or Charles Collins.  See  Nault Aff. at ¶

11-13; Szamocki Aff. at ¶ 11-12; Turner Aff. at ¶ 11-12; Gibeault Aff. at ¶ 9-10; O'Connor Aff.

at ¶ 12.

67.     Attorney Collins confirmed this in her deposition.  <u>See</u> Collins Depo. at 41 (relevant portions attached hereto as Exhibit M.)

68.     She testified that neither she nor her husband ever socialized with any of the defendants.  <u>See</u> Collins Depo. at 37-41.

69.     Indeed, according to her testimony, she does not even know defendant Turner and never met defendant Gibeault.  <u>See</u> Collins Depo. at 38-39, 92.

70.     Attorney Collins testified that she knew defendant Trooper O'Connor professionally, and considered her arrest warrants to be of very good quality, but that she did not particularly like her.  <u>See</u> Collins Depo. at 37-41, 90-91.

71.     Similarly, although she did not opine that defendant Sergeant Szamocki's work quality was poor, Attorney Collins testified that she disliked him both professionally and personally.  <u>See</u> Collins Depo. at 88-90.

72.     With regard to defendant Nault, the lead investigator in this matter, Debra Collins testified as follows:

Q:  Did you ever socialize with Norman Nault?

A:  No.

Q:  Did Norman Nault have any association or relation with your husband?

A:  No....

Q:  Did you have any [] negative experiences with any of the other people being sued in this case?

A:  .... Detective Nault during this was quite – I didn't know Detective Nault but I had a case coming up with him.  All he said was something to the effect that he was in charge of investigating me and he wouldn't think twice about putting the cuffs on me if he found anything against me.

Q:  And you mentioned Nault, you mentioned the personal comment he made about you. What about professionally in relation to other warrant that may have been submitted?

A:  He was – I will give him credit, he was an excellent detective…So, he did a very thorough job as far as that.

See Collins Depo. at 37, 90-91.

73.    Detective Nault agrees that he did inform Debra Collins that, if the evidence warranted it, he would not hesitate to arrest her.  See Nault Aff. at ¶ 12.

74.    Attorney Collins offered the following refutation of the allegation that the defendants conspired to investigate and arrest the plaintiffs as a means of assisting her or her husband:

Q:  Did any of the defendants in this lawsuit ever offer to do you any favor in connection with that investigation?

A:  Absolutely not.

Q:  Are you aware that in this lawsuit there is an allegation that one or more defendants then conspired to turn the investigation into a criminal investigation of the plaintiffs, punishing them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins and others, both known and unknown to the plaintiff?  Are you aware that that allegation has been made?

A:  I'm aware of that allegation.

Q:  Is that allegation true, to your knowledge?

A:  It couldn't be farther from the truth.

Q:  And why do you say that?

A:  The state police – basically you can't find a trooper that likes me.  They hate me.  I can give you the example that I am the only prosecutor in the State of Connecticut that has prosecuted three state troopers, which is, I believe, the record.  They have, in my opinion, have never liked me, will never like and I had always hoped it was just Troop D and everywhere I go it seems to be that everyone knows that I've prosecuted those troopers.  I also charged another trooper with perjury who, you know – they just hate me and they are never going to let it go, as far as I'm concerned.  So, it's laughable, that paragraph.

Q:  So, the general sense you have, you're not popular with the state police, would apply to the defendants in this lawsuit?

12

A: Absolutely.

Q: And would it make sense to you that the defendants in this lawsuit would enter into any conspiracy for your benefit?

A: Absolutely not....

Q: And the statement you made about being generally unpopular with the state police, would that be true before July of 1999?

A: Absolutely...

Q: Would it make sense to you if the defendants in this lawsuit entered into conspiracy for the benefit of your husband?

A: It would shock me.

Q: And why is that?

A: Again, they hate me, they hate him associated with me.  There is probably such a deep hate that they will hate my children.

See Collins Depo. at ¶ 117-119, 124.

75.    While the State Police Defendants disagree with the characterization of their relationship with the Collinses as hateful or somehow soured by prior prosecutions of their colleagues, they agree that they were not friends with the Collinses and would and did not enter into any conspiracies for the their benefit.  See  Nault Aff. at ¶ 11-13; Szamocki Aff. at ¶ 11-12; Turner Aff. at ¶ 11-12; Gibeault Aff. at ¶ 9-10; O'Connor Aff. at ¶ 12 .

76.    Attorney Collins "absolutely did not assist" the state police or otherwise do any work related to the investigation of the criminal charges that are at issue in this case.   See Collins Depo. at 116-117; Nault Aff. at ¶ 13.

77.    Indeed, she never even read materials relating to the investigation or discussed it with anyone.  See Collins Depo. at 102.

78.    The conclusion of the state police's investigation into the closing of the Kenney administration was not influenced by conspiracies and non-existent friendships with the Collinses, but by a much more mundane reason:  lack of evidence of wrongdoing.  See Nault Aff. at ¶ 10; Szamocki Aff. at 10.

79.    In particular, the State Police interviewed Pat Lempecki, the personnel officer for the State of Connecticut Office of the County Sheriffs.  See Nault Aff. at ¶ 14.

80.    Ms. Lempecki confirmed that the personnel documents destroyed at the close of the Kenney administration were properly destroyed at her direction.  See Nault Aff. at ¶ 14.

81.    Investigators also interviewed Robert Heilbrun, fiscal/administrative manager for the County Sheriff's central office, who confirmed that the computer allegedly destroyed was actually returned to the sheriff's central office.   See Nault Aff. at ¶ 14.

82.    Also, based on interviews, Detective Nault concluded that there was no evidence to support the allegation that computer memory was improperly erased. See Nault Aff. at ¶ 14.

83.   Finally, another allegation not mentioned specifically in Attorney Meisler's letter concerning the closure of Kenney's office were investigated and found to be baseless. See Nault Aff. at ¶ 15.

84.    Plaintiff Henry Bourgeois alleged that Charles Collins shredded Sheriff's Office telephone records. See Nault Aff. at ¶ 15.

85.    In fact, these telephone records were the same records seized by Trooper O'Connor in connection with her investigation of plaintiff White. See Nault Aff. at ¶ 15.

86.    Also, some records alleged by plaintiff Bourgeois to have been destroyed were later located – in plaintiff's Bourgeois' own garage.  See Nault Aff. at ¶ 15.

87.    State Superior Court Judge Jonathan Kaplan later ordered the State's Attorneys office to investigate whether anybody inappropriately or unlawfully shredded or removed documents or computer programs in Sheriff Kenney's office on May 28, 1999. See Nault Aff. at ¶ 14; Coe Affidavit at ¶ 8 (attached hereto as Exhibit N).

88.    Special Assistant State's Attorney Glenn Coe conducted an investigation and concluded that there existed "no credible evidence that any documents were shredded that should not have been shredded." See Coe Report (copy attached hereto as Exhibit O) at 67.

89.    Attorney Coe also no credible evidence supported the conclusion that "any items belonging to the Sheriff's office or departments was wrongfully removed by Aaron or by anyone else on or about that date." See Coe Report at 69.

**E.    The Initiation Of An Investigation Into Witness Tampering And Related Crimes**

90.    It should be noted also that the investigation into Attorney Collins and others following Attorney Meisler's complaint not *precede* the investigation into misconduct by the plaintiffs – an allegation that is central to plaintiffs' theory of this case. See Amended Complaint at ¶ 20 ("The defendants originally commenced an investigation into the shredding of public documents that was initiated after a complaint was made by the plaintiffs.")

91.    To the contrary, those investigations were both formally requested by Attorney Solak, and commenced by the State Police, at the July 19, 1999 meeting discussed above. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

92.    The exact chronology of the commencement of the investigation into the plaintiffs for possible witness tampering and obstruction of justice is as follows. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

93.     On Friday, July 16, 1999, Windham County State's Attorney Mark Solak called Sergeant Szamocki, the supervisor of the White investigation, indicating that there was a possible problem of witness tampering in that investigation. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

94.     On July 19, 1999, a meeting was held at the headquarters of the Eastern District Major Crime Squad. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

95.     Present were Attorney Solak, Lt. Gibeault, Sergeant Szamocki and Detective David LeBlanc. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

96.     At the meeting, Attorney Solak requested that the State Police investigate two matters relating to the Windham County Sheriff's Department. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

97.     One matter involved the complaint by Attorney Meisler discussed above concerning possible illegal shredding and other misconduct by individuals associated with Sheriff James Kenney, including an Assistant State's Attorney, Debra Collins, and her husband, Charles Collins. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

98.     Lieutenant Gibeault agreed to commence an investigation, assigning it to Sergeant Szamocki. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

99.     Attorney Solak also informed those present at the meeting that he had received information suggesting that two Special Deputy Sheriffs, Aaron and Adam Auclair, had been interrogated and intimidated by their supervisor, Lieutenant Gloria Marion, a close associate of Sheriff White. <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

100.     According to Attorney Solak, the Auclairs were interrogated by Marion about what they knew of the State Police investigation of Thomas White and were subjected to threats

concerning their employment if they imparted any information to outside authorities that would be damaging to White.  <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

101.    Attorney Solak requested a State Police Investigation.  <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.  Lieutenant Gibeault agreed, assigning this investigation as well to Sergeant Szamocki.  <u>See</u> Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

102.    Having assigned it to a sergeant (and later reassigning it to Sergeant Turner, as discussed below), Lt. Gibeault had no further substantive role in the investigation of the plaintiffs relating to witness tampering and obstruction of justice.  <u>See</u> Gibeault Aff at ¶ 5.

103.    On July 20, 1999, Sergeant Szamocki assigned Detective Norman to conduct both investigations requested by Attorney Solak.  <u>See</u> Nault Aff. at ¶ 18; Szamocki Aff. at ¶ 9, 15.

104.    Sergeant Szamocki did not personally conduct the investigation, but rather assisted Detective Nault in defining the initial direction of the investigation and assigned detectives to conduct a series of initial investigatory interviews.  <u>See</u> Szamocki Aff. at ¶ 15-16.

105.    After just three days, however, supervision of the investigation was transferred to Sergeant John Turner, who assumed control of the investigation upon his return from vacation on or about July 22, 1999.  <u>See</u> Szamocki Aff. at ¶ 15; Turner Aff. at ¶ 6.

106.    After July 22, 1999, Sergeant Szamocki had no further substantive responsibility for, or active role in, the investigation.  <u>See</u> Szamocki Aff. at ¶ 15-16.

107.    Sergeant Turner was not directly involved in investigating Thomas White, Gloria Marion and Henry Bourgeois for any crime, including crimes relating to witness tampering and obstruction of justice.  <u>See</u> Turner Aff. at ¶ 5-9.

108.    The detectives assigned to the Major Crime Squads are of the highest competence and caliber and typically require minimal supervision in conducting investigations once those investigations are underway, which was the case with the investigation at issue in this case.  <u>See</u> Turner Aff. at ¶ 5-9.  By the time Sergeant Turner assumed supervision of the investigation, the investigation was well under way.  <u>See</u> Turner Aff. at ¶ 5-9.  Thus, Sergeant Turner's actual supervisory role in the investigation was extremely limited.  <u>See</u> Turner Aff. at ¶ 5-9.  He did not, for example, direct that any particular witnesses be interviewed or not interviewed.  <u>See</u> Turner Aff. at ¶ 5-9.

109.    Defendant O'Connor played almost no role in the investigation of the plaintiffs for possible witness tampering and obstruction of justice.  <u>See</u> O'Connor Aff. at 6.

110.    Apart from three interviews on one day with representatives of the central office of the sheriff's system relating to administrative procedures, she had no involvement whatsoever in conducting the investigation.  <u>See</u> O'Connor Aff. at ¶ 6.

F.      **<u>The Victims/Witnesses:  Adam and Aaron Auclair</u>**

111.    The primary witnesses in the State Police investigation into witness tampering and the related crimes were believed to be the victims of those crimes:  Adam and Aaron Auclair.  <u>See</u> Nault Aff. at ¶ 19.

112.    Adam and Aaron Auclair were employed in the Windham County Sheriff's Department as Special Deputy Sheriffs in both the Kenney and White administrations.  <u>See</u> Nault Aff. at ¶ 19.

113.    The thrust of the plaintiffs' case is that statements made by the Auclairs and incorporated into the State Police's arrest warrant affidavits were false.  <u>See</u> Amended Complaint.

114.    At the time the Auclairs made their statements to the State Police, however, there was no reason for any objective observer to conclude that they were anything less than fully credible and reliable witnesses. <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

115.    Neither had been convicted of a crime. <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

116.    Neither had any history of known lying or other dishonest behavior. <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

117.    Both were known as reliable employees of the Sheriff's Department. <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

118.    Plaintiff Marion testified at her deposition as follows concerning the apparent trustworthiness of the Auclairs at her deposition:

Q: Now, prior to this investigation into the criminal charges against you, did you have an opinion about whether the Auclairs were trustworthy or no?

A: The came into my house. I fed them. My kids thought that they were trustworthy and I respect the opinion of my kids.

Q: Did you have any reason to believe that they were dishonest prior to all this occurring?

A: No.

<u>See</u> Marion Depo. at 44.

119.    Plaintiff Bourgeois also testified that he had no information suggesting that either Auclair was dishonest at the time of the State Police investigation:

19

Q:  When did you first meet the Auclair boys?

A:  When I started working, when we got sworn in that night.  I knew of them, but I didn't know them.

Q:  I see.  So you were their supervisor for a short period of time?

A:  Yes.  Very short.  I guess they quit after six weeks.  From June 1st to July 10th, I think it was.

Q:  Had you heard anything about their reputation for honesty or dishonesty by the time you met them?

A:  No.

Q:  And as far as how they conducted their job, filling out time sheets, or that sort of thing, did you have any indication that they were dishonest?

A:  Then or now?

Q:  Then.

A:  No....

Q:  Did anyone ever tell you words to the effect, look out for those Auclair boys.  They are bad news.  They are dishonest?

A.:  I never heard anybody say they were dishonest, then.

See Bourgeois Depo at 79-80.

120.    Similarly, plaintiff White conceded in his deposition that the Auclairs were

apparently trustworthy:

Q:  Okay.  Who hired the Auclairs originally by the Sheriffs Department?  Was it Kenney?

A:  I believe it was James Kenney.  I don't think they were working underneath Sheriff Green.  That was the one before Mr. Kenney.

Q:  Did you reappoint them after you were elected.

A:  Yes, I did...

Q: Okay. At the time that you reappointed them, did you believe that they were honest individuals?

A: Yes.

Q: Okay. And you had had no previous indications that they were dishonest in any way?

A: No. I had with them in an out of going into the office, and stuff, and up until that point, no…

Q: Okay. Do you have any knowledge as to whether the Auclairs have criminal records?

A: No. No knowledge at all.

Q: Okay. It's kind of a difficult question to phrase, but putting aside anything that occurred in the investigation, was there anything from other areas of the Auclairs' life, before that, or unconnected with the investigation, that should have put the state police on notice that these guys may have some honesty problems?

A: I didn't know the Auclairs outside of work, for the couple of years that I knew them. I never had a drink with them. I never went out with them. I did not know them personally, except for work. I have no idea. They didn't live in the town that I came from. I never went to Putnam or Thompson, really, before I started working with the Sheriff's Department.

Q: Sir, have you become aware that the Auclairs had a reputation in the community for being dishonest?

A: No.

Q: Okay. Or any conduct –

A: Not even up to this day, no.

Q: Okay. So any indication of dishonesty with regard to the Auclairs, would simply be limited to this investigation, and subsequent testimony by the Auclairs?

A: It was never brought to my attention, even when I was high sheriff, that they had problems in the community, if that is what you are asking me. And I would believe, because one of them became a correction officer and one became a state trooper, I think, in New Jersey, I would tend to believe that there wouldn't be any problems back in that area.


See White Depo. at  71-77


21

121.    Certainly, none of the defendants knew or had even heard of any information that would suggest that the Auclairs were anything other than perfectly reliable witnesses.  <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12. .

122.    Indeed, as individuals serving in a quasi-law enforcement accused or suspected of no present or past crime or dishonest behavior, the Auclair brothers possessed inherently greater credibility than many witnesses upon whom criminal investigators must often rely.  <u>See</u> Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

123.    The seemingly unanimous view of the Auclairs' apparent trustworthiness is confirmed by Russell Downer, a non-party and an employee of the Windham County Sheriff's Department, who testified at his deposition as follows:

> Q:  Did you ever have occasion to supervise the Auclair boys, either of them?
> A:  As far as training goes, yes.  In any other capacity other than being a more senior sheriff, no.
> Q:  So, you were involved in their training?
> A:  Yes.
> Q:  Was that during the Kenney administration or White administration?
> A:  That was during the Kenney administration.
> Q:  Did you ever have occasion to discipline them or reprimand them?
> A:  No.
> Q:  And as far as just your involvement with them through training, did you ever have cause to believe that they were untrustworthy?
> A:  No.

<u>See</u> Downer Depo. (relevant portions attached as Exhibit P) .at 53 .

G.    **The Evidence Provided By The Auclairs And Included In the Arrest Warrant Affidavits Concerning Obstruction Of Justice And Witness Tampering.**

124.    Aaron Auclair gave Detective Nault a one-paragraph statement on July 20, 1999 indicating that he had been interrogated by Gloria Marion. See Nault Aff. at ¶ 22; Aaron Auclair Statement of July 20, 1999 (copy attached hereto as Exhibit U)

125.    He returned to Troop D barracks the next day, July 21, 1999, and gave Detective Nault and Mike Contre a much more detailed eleven-page statement. That statement included the following assertions, which were included in the arrest warrant affidavits:

- Aaron was present in Kenney's office when documents were shredded and participated in the shredding. Those documents were earmarked by Laurie Parent of the Central Office of the Sheriff's Department for shredding. More generally, Aaron stated that neither he nor anybody else destroyed papers or computer files that should not have been destroyed.

- On July 16, 1999, plaintiff Marion approached him and Adam Auclair and ordered them to a meeting in the lock up of the Valley Street courthouse in Willimantic.

- In Aaron's words, the physical layout for the meeting was as follows: "In the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second unlocked door was behind us."

- At that meeting, Marion "reminded both Adam and [Aaron] that we were now under the direction of the current High Sheriff Thomas White and that anything pertaining to Mr. White during Mr. Kenney's administration should be brought to her attention per order of Sheriff White." Aaron took this to mean that, if he did not talk to Marion, he might lose his job.

- Marion also stated to the Auclairs, "you work for Tom White now. You have to be on his side." Marion also stated the Auclairs "couldn't get 'unjammed' (referring to [their] schedules) unless [they] cooperated." Aaron understood Marion to mean that he would continue to get the worst assignments in the county and have to drive furthest to work unless he cooperated with her.

- Marion stated, "we all know there is an investigation going on," and that the Auclairs needed to tell her what they did in the High Sheriff's office during the

23

prior administration. Aaron understood her to be referring to the investigation of Thomas White for mishandling wage executions. Aaron felt "very threatened" because he felt she was "inferring that if [he] did not speak with her and answer her questions [he] would never work again."

- Marion asked the Aaron if he had any knowledge about complaints against Sheriff White as a deputy sheriff and if he knew the procedures relating to wage executions. Aaron told Marion about answering calls from people wishing to complaint about White's handling of wage executions.

- Marion asked if Aaron knew of the White investigation regarding wage executions while Kenney was in office. She also asked if either Auclair was ever present when that investigation was discussed with Charles or Debra Collins or with Jay Kenney.

- Lt. Marion strongly recommended that Aaron meet with White the following day because he "knew too much." Aaron thought she was referring to the criminal investigation into White for mishandling wage executions.

- Aaron felt that the entire conversation with Marion made him feel "like [he] was going to be accused of destroying property if [he] didn't answer the questions the way Lt. Marion wanted [him] to."

- On July 19, 1999, Aaron encountered Sheriff White at the Juvenile Courthouse in Willimantic. White asked Aaron to step outside because he had something for Aaron to sign. There was nothing to be signed. Rather, White told Aaron that he (Aaron) had no right to access personnel files. White also stated that he did not know how much Aaron knew "about the investigation, but people make mistakes." Aaron believed White was referring to the criminal investigation of regarding wage executions.

- White told Aaron that nothing from Kenney's office should have been shredded, and that he had unnamed witnesses of what happened on the evening that shredding occurred.

- White stated several times that "if they would just leave it alone, this would never have to happen." Aaron understood "it" as referring to the criminal investigation into White for mishandling wage executions. White added that "Mr. Solak and his office should never pursue it [sic] this far and that he, High Sheriff White, talked with other prosecutors from around the state and they couldn't believe what was happening."

- White then stated that he had hired five attorneys, including Attorney Meisler, and that he would not go down without a fight." This comment was followed by a remark that an internal investigation into shredding was to continue and that Aaron and Adam would be contacted by a supervisor for further interviews.

24

Aaron felt White's comments meant that "if he was going down for the wage execution investigation against him than he would take my brother and I down [Aaron and Adam]."

- That same day, July 19, 1999, Aaron received a telephone call from Marion, ordering him to attend a meeting that afternoon at the Valley Street Courthouse in Willimantic. Prior to the meeting, Aaron purchased a small tape recorder. Marion met Aaron in the parking lot and led him to a small room off of the lockup area. Aaron activated the tape recorder.

- Marion kicked the peg out of the door, allowing the door to close. Marion then placed her own tape recorder on the table and told Aaron that she wanted to take a statement about what they had discussed at their previous meeting. Aaron understood this to me that she wanted to discuss the wage execution investigation. Marion told Aaron that making a statement was for his benefit.

- Marion told Aaron that White and Bourgeois had ordered her to have this meeting with Aaron. Marion went on to say that "there are people in this department that feel that [Aaron] is in fact still passing on information outside this department. If that is not the case that's fine, if that [is] the case, [k]now that we do know, or we will find out and you're in jeopardy of loosing [sic] your position."

- Aaron told Marion that White should not be asking questions about the wage execution investigation, to which Marion replied that White had a right to know and, conversely, Aaron had no right to go into personnel files, an allusion to the breaking down of the Kenney office.

- As the meeting ended, Marion ordered Aaron not to discuss their conversation with anybody.

See Nault Aff. at ¶ 23; Aaron Auclair Statement (copy attached hereto as Exhibit V).

126.    On July 20, 1999, Aaron Auclair gave Detective Nault the tape he made of his meeting with Gloria Marion on July 19, 1999. See Nault Aff. at 25.

127.    In addition, Detective Nault reviewed a transcript of that tape that was prepared by a secretary in the State's Attorney's office, which he found to be generally accurate. See Nault Aff. at 25; Transcript (copy attached hereto as Exhibit Q).