128.    Detective Nault included relevant parts of that tape in the affidavits he drafted to support the application for warrants for the arrest of the plaintiffs on the charges at issue in this case.  See Nault Aff. at 26.

129.    In particular, the warrants included what Detective Nault heard on the tape as Gloria Marion making the following comments to Aaron Auclair:

- "We want to know what you know or what you don't know."

- "Basically, what we want to know at the bottom, who, what, where, when, what you knew, who told you, what your involvement was, what other people's involvement was that you are aware of, those kinds of things."

- "This is an internal investigation for work, Aaron.  This has nothing to do with the State Police, the federal level.  This is an internal investigation forum, you work for Tom, correct?

- "So, anything you were told about him [Thomas White], investigation, anything that's ongoing, any conversations that you have or had, um, because when we talked about what I said to you Friday, information about how we were trying to say that you did these things based on what you were told to by your boss."

- "Okay, now we're trying to prove that to build you a case, you understand what I'm saying, because if you did something that wasn't legal, such as because you thought your position was administrative…"

- "Be careful, you now work for Tom."

- "But I know and this comes from Captain Bourgeois and this comes from Tom White that there are people in the department that feel that you are still passing information to people outside the department.  That we do know or we will find out and you're in jeopardy of losing your position."

- "Do not carry this conversation out of this department with anyone."

- "You do not discuss this with anyone."

See Nault Aff. at 26; Transcript.

26

130.     Adam Auclair, Aaron's brother, was interviewed by Detective Charles Sarant at the State Police Troop D barracks in Danielson, Connecticut.  His six-page statement contained the following assertions, all of which Detective Nault included in the arrest warrant affidavits:

- On May 28, 1999, Gloria Marion called Adam at home.  During the conversation, Marion brought up Adam's schedule and assignments.  Marion stated that she and Bourgeois had disagreements over Adam's schedule, and that Marion did not believe it should matter whom Adam supported in the Sheriff election or whom he associated with outside of work.

- Marion also made the comment that she hoped he would still be a Special Deputy Sheriff in six months.  Adam understood this to mean that he was at risk of being fired.

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion.  Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer.  Adam did not state, as his brother had done, that there was a second door behind the brothers.

- Marion stated that "we all know what's going on.  There's an investigation going on."  She stated further that they needed to talk about shredding documents and wiping out information on computers.  Adam stated that he "felt threatened and also was concerned that the only way out of the room was a door down the corridor, up the stairs."

- Marion stated that "you work for Tom White now.  You should be on his side. Tom White does not want people working for him who are against him."

- Marion asked the brothers a series of questions, many of which involved their duties under Sheriff Kenney.

- Marion also asked, however, whether they had been present when any discussion occurred about an investigation concerning White, especially any discussion between Kenney and Debra or Charles Collins.

- Marion asked Aaron about whether he knew about how to conduct wage executions and whether he had received complaints about White's handling of such matters.

- Marion also asked whether Aaron had deleted files or shredded documents.

- Marion asked the Aaron Auclair to go talk to White and noted that White had hired attorneys and "needed to go on the offensive." Marion noted that the Auclairs were likely to be subpoenaed by White's attorneys relating to the White criminal investigation.

- Marion ended the conversation by asking about Adam's schedule and noting that his assignment may change "once Tom [White] gets word about [their] conversation today."

- On July 19, 1999, Adam was approached by White at the Valley Street courthouse in Willimantic. White asked to speak to Adam in a conference room.

- White told Adam that he should expect to be contacted by Henry Bourgeois and "the Feds." White mentioned that he had witnesses to what occurred in Kenney's office and that Aaron had no right to be in personnel files. Adam understood this to mean that his brother was to be investigated.

- White stated that he wanted what occurred in the Sheriff's Department to be kept internal. He stated further that he had three lawyers and that the investigation of him was because Kenney lost the election.

- White stated that he did not care who Adam associated with outside of work, but that anything about this must be kept internal, which Adam took to mean that he could not talk to the State's Attorneys Office or the State Police.

- After the meeting with White, Marion approached Adam and requested a one on one meeting. Marion asked Adam to follow her to a small room inside the lockup area, the same room in which she met with Aaron. Marion and Adam sat across a table from each other. Marion placed two tape recorders and a red notebook on the table. Marion then kicked out the doorstop, allowing the door to close. Adam was "really nervous and felt that [he] was not free to leave the room."

- Marion stated that she was going to conduct an internal investigation and asked Adam "who, what, where, when and how [Adam] knew about the Thomas White investigation."

- Adam refused to be tape-recorded, but agreed to write a statement. He started to write about how he heard of the investigation into White from Kenney, but Marion attempted to dictate to Adam him how the statement should read. Adam then stopped writing, causing Marion to state, "you better talk to me because otherwise your going to have to talk to Captain Bourgeois and you know what he was, a State Trooper." At that point, Adam indicated that he wanted a legal representative to speak for him, to which Marion replied, "you can't have an attorney speak for you."

28

- Marion closed the meeting by telling Adam he could not talk to Debra or Charles Collins and that their conversation was part of an internal investigation and must remain internal.

See Nault Aff. at 27; Adam Auclair Statement (copy attached hereto as Exhibit W).

### H.    Other Evidence of Witness Tampering and Obstruction of Justice

131.    In addition to the evidence provided to the Auclairs, Detective Nault included other evidence in the affidavits relevant to witness tampering and obstruction of justice.  See Nault Aff. at 28.

132.    Detective Nault included in the affidavits information about an incident in March or April of 1999, in which Henry Bourgeois approached Sergeant Szamocki at Troop D barracks and asked him questions about the investigation into Tom White.  See Nault Aff. at 29.

133.    At that time, Sergeant Szamocki was supervising Trooper O'Connor's on-going investigation of Tom White for embezzlement.  See Nault Aff. at 29.

134.    Bourgeois asked Szamocki generally about the investigation of Tom White, whether White was going to be arrested, and, if so, whether he could remain a sheriff.  See Nault Aff. at 29.

135.    According to Detective Nault, it was inappropriate for plaintiff Bourgeois ask these sorts of questions about an on-going investigation, particularly considering that Bourgeois is a retired state police official and should know better.  See Nault Aff. at 29.

136.    Bourgeois admitted at his deposition to asking these questions.  See Bourgeois Depo. at 59-62.

137.    He also testified that it would be inappropriate for Sergeant Szamocki to provide information about an on-going investigation.  See Bourgeois Depo at 61.

138.    The affidavits also related a second attempt by Henry Bourgeois to discuss the on-going investigation of Thomas White with a state police official.  See Nault Aff. at ¶ 30.

139.    On June 30, 1999, Bourgeois approached Lt. Thomas Davoren, the commanding officer of Troop D.  See Nault Aff. at ¶ 30.

140.    According to Davoren, Bourgeois commented that the White investigation "was about to get messy" and that he (Bourgeois) had counseled White "to take the offensive" in the investigation because "they are coming after him."  See Nault Aff. at ¶ 30.

141.    According to Davoren, Bourgeois then remarked that Assistant State's Attorney Debra Collins and her husband had inappropriately shredded phone documents favorable to White.  See Nault Aff. at ¶ 30.

142.    Lieutenant Davoren understood this remark to be a threat of unfavorable publicity concerning the State's Attorney's Office relating to the White investigation.  See Nault Aff. at ¶ 30.

143.    Bourgeois admits that this conversation with Lt. Davoren.  See SMFNID at ¶    .  Indeed, Bourgeois admits saying that the White investigation was about to "get messy" or words to that effect and to counseling White to take action.  See Bourgeois Depo. at 64-68.

144.    While Bourgeois disputes Davoren's understanding of the implication of these remarks, he does not point to any reason why the state police should have mistrusted Lt. Davoren's report.  See Bourgeois Depo. at 64-68.

145.    The warrant affidavits include a reference to a conversation between Mr. Bourgeois and John Wisnieski, a janitor who witnessed some shredding in Sheriff Kenney's office on May 28, 1999.  See Nault Aff. at ¶ 31.

146.    State Police interviewed Wisnieski, who reported that he first told Sheriff White about shredding. <u>See</u> Nault Aff. at ¶ 31.

147.    A week later, according to Wisnieski, Henry Bourgeois approached him and asked if he knew anymore about the shredding incident. <u>See</u> Nault Aff. at ¶ 31.

148.    Bourgeois then asked Wisnieski to "keep it [his information] under his hat and not tell anyone else what he knew." <u>See</u> Nault Aff. at ¶ 31.

**I.    <u>The Alleged Constitutional Defects In The Warrant Affidavits</u>**

149.    Detective Nault believed – and he was so advised by State's Attorney Mark Solak – that the foregoing evidence provided probable cause to believe that the plaintiffs committed the offenses relating to obstruction of justice and witness tampering with which they were charged. <u>See</u> Nault Aff. at ¶ 32, 41-43.

150.    At the time that the affidavits were prepared and submitted to the court, none of the defendants knew or suspected that any of the information contained therein was false. <u>See</u> Nault Aff at ¶ 32-33; O'Connor Aff. at ¶ 17-18; Szamocki Aff. at ¶ 17; Turner Aff. at ¶ 10; Gibeault Aff. at ¶ 8.

151.    Nor did any of the defendants possess information that was omitted from the affidavits that, had it been included, would have undermined the existence of probable cause. <u>See</u> Nault Aff at ¶ 32-33; O'Connor Aff. at ¶ 17-18; Szamocki Aff. at ¶ 17; Turner Aff. at ¶ 10; Gibeault Aff. at ¶ 8.

152.    The focal point of plaintiffs' challenge to the affidavits is that the room in which the interview between the Auclairs and Gloria Marion occurred on July 16, 1999 was not locked, and therefore that the Auclairs were not physically restrained during that interview. The complaint makes much of this point, alleging that the affidavits were faulty because:

- "the Auclairs were neither abducted nor restrained as a second exit door was located behind the Auclairs during the aforesaid July 19, 1999 meeting, thus allowing the Auclairs to leave the room at any time."

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door was not locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the door in the room adjacent to the aforesaid second exit door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door may not have been closed."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion was sitting at a desk across from the two Auclairs; and the exit door was directly behind them."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion never prevented them from leaving the aforesaid meeting."

See Amended Complaint at ¶ 24(c)-(m).

153.    It is clear from the record that the meeting referenced in the Amended Complaint occurred on July 16, 1999, and not July 19, 1999.  The meeting on July 19, 1999 was the only meeting at which Gloria Marion met with both Auclairs simultaneously.  See, e.g., White, Bourgeois and Marion Affs. at ¶ 47.

154.    In fact, the warrant affidavits do not omit the fact that the door may have been unlocked.  See White, Bourgeois and Marion Affs. at ¶ 48.

155.    Rather, the affidavits simply recount what the Auclairs stated about the door.  In particular (see Nault Aff. at ¶¶ 34-35), the warrants stated:

- According to Aaron Auclair, "[i]n the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area.  One locked door was directly behind Lt. Marion and the second **_unlocked_** door was behind us."  See White,

32

Bourgeois and Marion Aff. at ¶ 48. (emphasis added); Aaron Auclair statement July 21, 1999..

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. <u>See</u> White, Bourgeois and Marion Affs. at ¶ 34; Adam Auclair Statement, July 20, 1999..

155.5.  When confronted at his deposition by the statement in the affidavits regarding the

unlocked door, plaintiff White admitted that the affidavits were truthful in this respect:

> Q:  About halfway down on page 38, paragraph 48, it [the affidavit] says, "One locked door was directly behind Lieutenant Marion, and the second unlocked door was behind them [the Auclairs]?...is it fair to say based on this sentence that I just read to you in paragraph 48, that Trooper O'Connor and Trooper Nault gave the court the correct information about the doors being unlocked during that meeting?
>
> A:  Based on that one sentence that you read me?  Yes...
>
> Q:  So, whichever state police officer prepared this affidavits and submitted it to a judge, told the judge that one locked door was directly behind Lieutenant Marion, the second unlocked door was behind them [the Auclairs], correct?
>
> A:  Correct.  That Aaron and Adam had told them that, yes.

> <u>See</u> White Depo at ¶ 99-101.

156.    Russell Downer, a former Special Deputy Sheriff familiar with the room in

question, testified as follows in his deposition:

> Q:  Okay.  Now the door where the interview took place that you were asked about, I mean where the interview took place where you were asked about, you mentioned it could be locked.  Correct?
>
> A:  Yes.
>
> Q:  Now, what I wasn't able to understand from the questioning was whether there was any circumstances where you could be in the office but locked in and couldn't get out through either of the two doors?

A: Okay, the doorway leading into that room from the staircase, which would be coming out of the court, I do not believe you could be locked in that room without putting a key in and locking a deadbolt.

Q: What side of the door would you have been on to put the key in and lock the dead bolt?

A: The inside.

Q: The inside. So, if you didn't have the key and the dead bolt was locked, you could be locked in that door?

A: No, I don't believe, I don't believe, you could be locked in from that side.

Q: All right, I'm confused...Mr. Downer, you mentioned there is a dead bolt that locks with a key?

A: Correct.

Q: If there were two people in the room, one person, person A, has the key, locks the door, puts the key in her pocket or his pocket, person B doesn't have the key, is that person then locked in that room?

A: Yes.

Q: Okay, now, what about the other door? That's the door we've been talking about, the door that goes up to the courtroom. Correct?

A: That's the door we were just referring to.

Q: What about the other door is it possible to be locked in and unable to get out of that door?

A: Yes. That's automatically locked door that only opens with a key.

Q: Okay, and if you didn't happen to have that key, you could be locked in and not able to get out of that door as well. Correct?

A: Correct. ...

Q: The keys you talked about, that we've talked about, getting in and out of that interview room downstairs, would every special deputy sheriff have a set of those keys on his person at all times?

A: No. Only those that were assigned to the lockup. Only for the event that someone would lose their keys. The general public couldn't come down there at any time.

34

Q: So, were special deputy sheriffs instructed not to take those keys out of the lockup area?

A: When there were inmate in there, yes, and the supervisor may have had a key to that door.

Q: So, the supervisor might always have had, during work hours, a key on his or her person?

A: Yes.

Q: If somebody was working security at the door, for example, or prisoner transport, would that person have a key on this person at that time?

A: To get into that area, no.

See Downer Depo. at 55-66.

157.    The Auclairs were not assigned to the lock up area on July 16, 1999 and would not, therefore, have had keys to the door in question. See White, Bourgeois and Marion Affs. at ¶ 34, 36, 37, 47, 48, 52.

158.    Plaintiffs cite only one other specific factual omission from the warrant affidavits – that the Auclair boys were eating pizza at the meeting with Marion on July 16, 1999. See Amended Complaint.

159.    However, neither Auclair mentioned anything about pizza to the State Police, and it was simply not known to the State Police at the time that the warrant affidavits were prepared or submitted to the court. See Nault Aff at ¶ 37; O'Connor Aff. at ¶ 21; Szamocki Aff. at ¶ 19; Turner Aff. at ¶ 14; Gibeault Aff. at ¶ 12.

159.5  The Auclairs statements' to the State Police make no mention of Tom White, on July 20, 1999, asking them to reconsider their resignations, informing them they were good employees or expressing concern about how their resignation would affect their financial status.

35

See Aaron Auclair Statement of July 20, 1999; Aaron Auclair Statement of July 21, 1999; and Adam Auclair statement of July 20, 1999.

160.    Plaintiffs point to no other specific factual deficiencies in the affidavit. Instead, plaintiffs allege in the complaint that the affidavits failed to allege certain necessary factual elements of the charged offenses. See, e.g., Amended Complaint at ¶ 24(n)(Defendants allegedly omitted from affidavit "fact" that "no evidence existed that either plaintiff Marion or Bourgeois knew or believed plaintiff White had committed a Class A or B felony, which is an essential element of the crime of hindering prosecution.").

161.    The State Police simply included in the affidavits the evidence they did had and presented it for review to a prosecutor, who approved the affidavits, and then to a judge, who signed them. See Nault Aff. at ¶ 38, 41-43; O'Connor Aff. at ¶ 22.

162.    Other than the issues of the door and the pizza, therefore, plaintiffs' complaints about the affidavit are really legal determinations about the factual sufficiency of the evidence. See Amended Complaint.

163.    If necessary factual elements of proposed charges were not supported by the affidavits, it was the responsibility of the State's Attorney and the court to reject the warrants. See Nault Aff. at ¶ 38; O'Connor Aff. at ¶ 22; Coe Aff. at ¶ 16-17.

J.    **The Role Of Each Defendant In Preparing The Warrant Affidavits**

164.    The portions of the three warrant affidavits for the arrest of plaintiffs on the charges at issue in this case were prepared by Detective Nault, under the direct supervision of State's Attorney Mark Solak. See Nault Aff. at ¶ 38-45; O'Connor Aff. at ¶ 7.

36

165     Thus it was Attorney Solak, not the supervisory defendants, approved the warrant affidavits. See Nault Aff. at ¶ 38-45; Szamocki Aff. at ¶17; Turner Aff. at ¶ 8-9; Gibeault Aff. at ¶ 6.

166.     On September 10, 1999, Trooper Karen O'Connor signed the warrant affidavit seeking the arrest on Thomas White on a number of charges, including larceny and charges relating to witness tampering and obstruction of justice. See O'Connor Aff. at ¶ 7.

167.     Trooper O'Connor personally prepared the sections of that affidavit concerning the larceny charge. See O'Connor Aff. at ¶ 7.

168.     As to the sections of the affidavit that concerned witness tampering and obstruction of justice-related conduct, she incorporated language that had been prepared by Norman Nault under the supervision of State's Attorney Mark Solak as described below. See O'Connor Aff. at ¶ 7.

169.     Detective Nault gave Trooper O'Connor a computer disk with those sections, which allowed her to incorporate them into her affidavit for the arrest of Thomas White. See O'Connor Aff. at ¶ 7.

170.  ·  Because Detective Nault had conducted the tampering and obstruction-related aspects of the investigation, Trooper O'Connor relied on his knowledge in preparing those sections of the affidavit. See O'Connor Aff. at ¶ 7, 17.

171.     Her affidavit states explicitly that it was based on my own investigative efforts and those of fellow officers who reported their findings to me. See White Aff. at ¶ 1; O'Connor Aff. at 7.

172.     It is proper and standard police procedure for one investigator to include in a warrant affidavit the findings of another investigator who has direct knowledge of aspects of the

37

case, particularly, as here, when that case is complex and involves related, but separate components. <u>See</u> O'Connor Aff. at ¶ 8.

173.    In some complex investigations, such as this one, it is simply impossible for one investigator to have personal knowledge of all the facts of a case. <u>See</u> O'Connor Aff. at ¶ 8.

174.    The remaining defendants had no personal involvement in drafting or approving the aspects of the warrant affidavits at issue in this case. <u>See</u> Nault Aff. at ¶ 38-45; Szamocki Aff. at ¶17; Turner Aff. at ¶ 8-9; Gibeault Aff. at ¶ 6.

175.    With regard to the investigation of the plaintiffs for witness tampering and obstruction of justice-related offenses, defendant Szamocki did not participate in any way, as a supervisor or otherwise, in drafting or approving the warrant affidavits, making probable cause determinations or submitting warrants to the court. <u>See</u> Szamocki Aff. at ¶ 17.

176.    By the time those acts were performed, he no longer had a direct or substantive involvement in the investigation. <u>See</u> Szamocki Aff. at ¶ 17.

177.    Sergeant Turner did not approve the affidavits. <u>See</u> Turner Aff. at 8-9.

177.    Nor did Turner take the oaths of the affiants, as he felt it would be inappropriate to do so in light of my acquaintance with Henry Bourgeois from his days as a state police officer. <u>See</u> Turner  at ¶ 9.

178.    In fact, he does not recall reading any part of the affidavits prior to their submission to the court. <u>See</u> Turner Aff. at ¶ 9.

179.    Lieutenant Gibeault did not have any role in drafting the warrants for the arrests of the plaintiffs on crimes relating to witness tampering and obstruction of justice.  <u>See</u> Gibeault Aff. at ¶ 6.

180.   Nor did Gibeault review the warrants for substance prior to their submission to the court.  See Gibeault Aff. at ¶ 6.

181.   Gibeault's only involvement with the affidavits was to take Detective Nault's oath on the affidavit in support of the warrant for the arrest of Henry Bourgeois.  See Gibeault Aff. at ¶ 6.

182.   That act, however, did not involve his attesting to the truth of the matters contained in the affidavit or the sufficiency of the investigation described in the affidavit.  See Gibeault Aff. at ¶ 6; Nault Aff. at ¶ 40.

183.   Rather,  it simply consisted of administering an oath to Detective Nault, who swore that the contents of the affidavit were true and accurate to the best of *his* (Nault's) knowledge. See Gibeault Aff. at ¶ 6; Nault Aff. at ¶ 40.

184.   Sergeant Thomas Wakely, a non-defendant, took Detective Nault's oath on the affidavit for Gloria Marion and Trooper O'Connor's oath on the White affidavit.  See Nault Aff. at ¶ 40.

**K.      The Role Of The State's Attorney In Drafting The Affidavits And Identifying Appropriate Charges**

185.   Mark Solak, the State's Attorney for Windham County, played a central role in supervising and reviewing the drafting of the warrant affidavits, selecting appropriate criminal charges and advising the State Police on the existence of probable cause for plaintiffs' arrests, and signing the actual charging documents that identified the charges against the plaintiffs.  See Nault Aff. at ¶ 41-42; O'Connor Aff. at ¶ 25.

186.    In particular, over two days in the end of August and/or the beginning of September of 1999, Attorney Solak supervised Detective Nault in preparing the arrest warrant affidavits at issue in this case as they pertained to obstruction of justice and witness tampering-related charges. <u>See</u> Nault Aff. at ¶ 42.

187.    Attorney Solak advised Detective Nault on the proper structure and factual progression of the affidavits. <u>See</u> Nault Aff. at ¶ 42.

188.    Attorney Solak actually sat with Detective Nault as he typed the affidavits. <u>See</u> Nault Aff. at ¶ 42.

189.    After Nault typed each page of the affidavits, he showed it to Attorney Solak, who reviewed it and either suggested changes or approved it. <u>See</u> Nault Aff. at ¶ 42.

190.    Attorney Solak advised Detective Nault to err on the side of inclusion – including witness statements in the affidavit in their entirety or near entirety. <u>See</u> Nault Aff. at ¶ 34, 42.

191.    On September 10, 1999, after each affidavit was completed, Attorney Solak signed each page of all three 67-page affidavits. <u>See</u>  Nault Aff. at ¶ 42; White Aff.; Marion Aff.; Bourgeois Aff.

192.    The three affidavits were identical in all respects except as to the name of the suspect. <u>See</u> Nault Aff. at ¶ 42; White Aff.; Bourgeois Aff.; Marion Aff.

193.    In addition to his participation in drafting the affidavits, Attorney Solak identified the charges that were, in his view, supported by the evidence set forth in the affidavits. <u>See</u> Nault Aff. at ¶ 42; O'Connor Aff. at ¶ 26.; White Information (copy attached as Exhibit R; Marion Information (copy attached as Exhibit S); Bourgeois Information (copy attached hereto as Exhibit T).

40

194.    Attorney Solak, after reviewing the affidavits, told Detective Nault that the elements of each such charge were established in the affidavits, and therefore that probable existed for the plaintiffs arrest on those charges. See Nault Aff. at ¶ 43.

195.    Attorney Solak signed the charging documents, known as "informations" (or warrant "face sheets"), which were submitted with the affidavits to the Superior Court bearing Solak's signature. See Nault Aff. at ¶ 44; O'Connor Aff. at ¶ 26; White Information; Marion Information; Bourgeois Information.

196.    In signing the informations, Attorney Solak attested that "[t]he undersigned Deputy Assistant State's Attorney of the Superior Court of the State of Connecticut on oath of office complains, deposes, and alleges that said Deputy Assistant State's Attorney has reason to believe and does believe that" the plaintiffs committed the offenses charged in the informations. See Nault Aff. at ¶ 44; O'Connor Aff. at 26; White Information; Marion Information; Bourgeois Information.

197.    It is important to note that none of the assistance provided by Attorney Solak in preparing the warrants and identifying appropriate charges was unusual or in any way improper. See Nault Aff. at ¶ 45; O'Connor Aff. at ¶ 27; Coe Aff. at ¶ 17.

198.    To the contrary, as the prosecuting authority, the State's Attorneys Office routinely provides this sort of assistance to state and local police agencies. See Nault Aff. at ¶ 45; O'Connor Aff. at ¶ 27; Coe Aff. at ¶ 17.

199.    It should also be pointed out that neither Detective Nault nor Trooper O'Connor is a trained lawyer. See Nault Aff. at ¶ 38; O'Connor Aff. at ¶ 22.

200.    Detective Nault included in his affidavits the facts that had been gathered during the investigation. See Nault Aff. at ¶ 38; O'Connor Aff. at ¶ 22.

201.    If there were legal, as opposed to factual, infirmities in the arrest warrants affidavits undermining the existence of probable cause, it was the role of the State's Attorney and the judge to detect those infirmities and refuse to seek or issue the arrest warrants. See Nault Aff. at ¶ 38; O'Connor Aff. at ¶ 22.

202.    Neither the State's Attorney nor the judge concluded that any such legal infirmities existed in this case. See Nault Aff. at ¶ 38; O'Connor Aff. at ¶ 22.

**L.    The Signing Of The Warrants By A Neutral Magistrate And The Arrests Of The Plaintiffs On Witness Tampering And Related Charges**

203.    On September 10, 1999, Detective submitted the warrants for plaintiffs' arrests on charges relating to witness tampering and obstruction of justice to Hon. Michael Mack.[1]  See Nault Aff. at ¶ 46-47; O'Connor Aff. at ¶ 28-29; White Aff.; Marion Aff.; Bourgeois Aff.

204.    Attorney Solak drafted the charging documents ("informations") that accompanied those affidavits, identifying appropriate charges based on the facts contained in affidavits. See Nault Aff. at 44; O'Connor Aff. at ¶ 26.

205.    On September 10, 1999, Judge Mack thoroughly reviewed each affidavit over a period of several hours and found that probable cause existed based on the facts in the affidavits for the arrest of the plaintiffs on the charges identified by Attorney Solak. See Nault Aff. at ¶ 46-47; O'Connor Aff. at ¶ 28-29; White Aff.; Marion Aff.; Bourgeois Aff.

206.    Judge Mack expressed no concerns whatsoever about the adequacy of the affidavits or the existence of probable cause. See Nault Aff. at ¶ 46-47; O'Connor Aff. at ¶ 28-29; White Aff.; Marion Aff.; Bourgeois Aff.

---

[1] Plaintiff White was arrested a second time on a separate application in January of 2000 for additional charges relating to embezzlement and unlawful election practices, but that second arrest is not challenged in, or relevant to, this case. See Nault Aff. 46, n. 1; Amended Complaint.

42

207.    In signing the warrants, Judge Mack affirmed that: "The foregoing Application for an arrest warrant, and affidavit(s) attached to said Application, having been submitted to and considered by the undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe that an offense has been committed and that the accused committed it and, therefore, that probable cause exists for the issuance of a warrant for the arrest of the above-named accused." See Nault Aff. at ¶ 46-47; O'Connor Aff. at ¶ 28-29; White Aff.; Marion Aff.; Bourgeois Aff.

208.    The information filed by Attorney Solak against Thomas White charged him with the following crimes:  larceny by embezzlement in violation of Conn. Gen. Stat. § 53a- 124 (Counts 1 and 2 – not at issue in this case); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Count 3 and 4); accessory to unlawful restraint in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96 (Counts 5 and 6); accessory to bribery of a witness in violation of  Conn. Gen. Stat. §§ 53a-8 and 53a-149 (Count 7); accessory to hindering prosecution in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-167 (Count 8); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 9); accessory to coercion in violation of  Conn. Gen. Stat. §§ 53a-8 and 53a-192(c) (Count 10); and racketeering in violation of Conn. Gen. Stat. § 53-395(c).  See Nault Aff. at ¶ 48; White Information.

209.    Thomas White was permitted to turn himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 13, 1999.  See Nault Aff. at ¶ 49.

210.    A non-surety bond of ten thousand dollars was set, and, after being processed, White was released pending arraignment.  See Nault Aff. at ¶ 49.

211.    The information filed by Attorney Solak against Gloria Marion charged her with the following crimes:  tampering with a witness in violation of Conn. Gen. Stat. § 53a-151 (Counts 1 and 2); unlawful restraint in the second degree in violation of Conn. Gen. Stat. § 53a-96 (Counts 3, 4, 5, 6, 7, 8); bribery of a witness in violation of Conn. Gen. Stat. § 53a-149 (Count 7); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 8); coercion in violation of Conn. Gen. Stat. § 53a-192(c) (Counts 9 and 10).  See Nault Aff. at ¶ 50, Marion Information.

212.    Gloria Marion was arrested at her home and processed at the State  Police Troop D barracks in Danielson, Connecticut on September 13, 1999.  See Nault Aff. at ¶ 51.

213.    A non-surety bond of ten thousand dollars was set and made, and, after processing, Marion was released pending arraignment.  See Nault Aff. at ¶ 51.

214.    The information filed by Attorney Solak against Henry Bourgeois charged him with the following crimes:  criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 1); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Counts 2 and 3); hindering prosecution in the second degree in violation of Conn. Gen. Stat. § 53a-167 (Count 4);  coercion in violation of Conn. Gen. Stat. § 53a-192(a) (Counts 5 and 6); accessory to unlawful restraint in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96.  See Nault Aff. at ¶ 52; Bourgeois Information.

215.    Henry Bourgeois was in New Jersey when the warrant for his arrest was signed. A decision was made not to seek his arrest in New Jersey and extradition, but rather to await his return to Connecticut to arrest him.  See Nault at ¶ 53.

216.    Upon returning to the state, Bourgeois turned himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 15, 1999.  See Nault at ¶ 53.

44

217.    A non-surety bond of ten thousand dollars was set, and, after being processed, Bourgeois was released pending arraignment.    See Nault at ¶ 53.

218.    Attorney Solak later filed substitute long form informations, which added additional charges against each plaintiff in this case. See Nault Aff. at ¶ 54.

219.    In accordance with state criminal practice, that substitute information was not required to be supported by an additional factual affidavit. See Nault Aff. at ¶ 54.

220.    Rather, it simply reflected Attorney Solak's judgment that additional charges were warranted under the facts alleged in the original arrest warrant application. See Nault Aff. at ¶ 54.

221.    Thus, the State Police had no role in filing the substitute informations lodged against the plaintiffs. See Nault Aff. at ¶ 54.

**M.    The Decision Not To Interview The Plaintiffs Prior To Their Arrests**

222.    Detective Nault determined for very specific investigatory reasons not to seek to interview the plaintiffs prior to seeking warrants for their arrests. See Nault Aff. at ¶ 55.

223.    In particular, he determined that Thomas White would simply not offer any useful information. See Nault Aff. at ¶ 55.

224.    That determination was based in part upon the Trooper O'Connor's conclusion that Thomas White was not candid or forthcoming in the investigation of him for possible financial and election practices crimes. See Nault Aff. at ¶ 55.

225.    Moreover, White had already retained counsel, and Detective Nault believed that counsel would not permit his client to consent to any meaningful pre-arrest questioning. See Nault Aff. at ¶ 55.

45

226.    As to plaintiff Bourgeois, Detective Nault believed that he would use his experience as a State Police officer to frustrate any attempts during an interview to obtain meaningful information.  See Nault Aff. at ¶ 55.

227.    Thus, with regard to plaintiffs White and Bourgeois, Detective Nault concluded that the risks to the investigation of conducting such pre-arrest interviews – namely the potential for revealing sources, evidence, theories and/or methods – outweighed the likely benefits of such interviews.  See Nault Aff. at ¶ 55.

228.    Detective Nault did intend to attempt to interview plaintiff Marion, but decided that an interview immediately after her arrest would be the most fruitful, as she would likely be motivated at that time to provide useful evidence against Thomas White and Henry Bourgeois. See Nault Aff. at ¶ 55.

229.    As it turned out, Marion obtained counsel immediately after her arrest and no such interview was permitted by counsel.  See Nault Aff. at ¶ 55.

**N.    Subsequent Proceedings, The Coe Report And The Disposition Of The Charges**

230.    On June 28, 2000, Attorney Glenn Coe was appointed and sworn in as Special Assistant State's Attorney for purposes of investigating and prosecuting the pending criminal cases against the plaintiffs:  State v. Thomas White, CR 99-106088/CR00-107163 (J.D. Rockville); State v. Gloria Marion, CR 99-106081 (J.D. Rockville); and State v. Henry Bourgeois, CR 99-106135 (J.D. Tolland).   See Coe Aff. at ¶ 5; Coe Report.

231.    Attorney Coe's appointment was a result of a decision by the Hon. Jonathan Kaplan to disqualify Mark Solak and the Office of the State's Attorney for Windham County from the afore-mentioned cases. See Coe Aff. at ¶ 6; Coe Report.

46

232.    Judge Kaplan also ordered that the Office of the Chief State's Attorney investigate whether grounds existed for the criminal prosecution of perjury of two witnesses, Aaron and Adam, relating to their testimony in the hearings held on the issue of disqualification. See Coe Aff. at ¶ 6; Coe Report.

233.    In addition, Judge Kaplan ordered an investigation into whether any person, including Assistant State's Attorney Debra Collins, had committed criminal misconduct in connection with the reported shredding of state documents, possible misuse of a state fax machine, and destruction of computer records in the Windham County Sheriff's Department. See Coe Aff. at ¶ 6; Coe Report.

234.    Attorney Coe investigated the issues requested by Judge Kaplan as part of my overall investigation in connection with the prosecutions of Thomas White, Gloria Marion, and Henry Bourgeois. See Coe Aff. at ¶ 6; Coe Report.

235.    His investigation was thorough and exhaustive, consisting of over ninety interviews and the review of hundreds of documents. See Coe Aff. at ¶ 7; Coe Report.

236.    In particular, he reviewed documents provided by the Office of the State's Attorney for Windham County, the Office of the Chief State's Attorney, the Connecticut State Police, the Windham County Sheriff's Department and others. See Coe Aff. at ¶ 7; Coe Report.

237.    Attorney Coe issued a comprehensive report on July 25, 2001, setting forth my conclusions. See Coe Aff. at ¶ 8; Coe Report.

238.    His conclusions can be summarized as follows: (1) the obstruction of justice and witness tampering-related charges against Thomas White, Henry Bourgeois and Gloria Marion would be nolled; (2) sufficient evidence existed to support a prosecution of Thomas White for larceny by embezzlement; (3) racketeering counts against Thomas White based on obstruction of

47

justice and corrupt election practices would be nolled; and, while legally sufficient, racketeering counts against Thomas White based on larceny would be nolled as duplicative; (3) sufficient evidence did not exist to prosecute either Adam or Aaron Auclair for perjury; (4) no probable cause existed to arrest and prosecute Debra Collins or any other person for shredding of state documents, possible misuse of a state fax machine, and destruction of computer records relating to the Windham County Sheriff's Department; and (5) the Connecticut State Police . <u>See</u> Coe Aff. at ¶ 8; Coe Report.

239.    Attorney Coe later consented to the dismissal of the obstruction of justice and witness tampering-related charges against Thomas White, Gloria Marion and Henry Bourgeois. <u>See</u> Coe Aff. at ¶ 9.

240.    Attorney Coe also specifically concluded that, based on the information produced during the hearings before Judge Kaplan and during my investigation, Connecticut State Police acted entirely properly in investigating and drawing up warrant affidavits for the arrest of the Thomas White, Gloria Marion, and Henry Bourgeois.  <u>See</u> Coe Aff. at ¶ 11; Coe Report.

241.    Attorney Coe's conclusion that obstruction of justice and witness tampering-related prosecutions should not be pursued against Thomas White, Gloria Marion and Henry Bourgeois was based in large measure on problems with the credibility of Adam Auclair and, to a lesser degree, Aaron Auclair, both of whom would be the crucial witnesses in the State's case. <u>See</u> Coe Aff. at ¶ 11; Coe Report.

242.    Because the Auclairs were, in effect, the victims, their credibility was particularly important to successful prosecutions.  <u>See</u> Coe Aff. at ¶ 11; Coe Report.

243.    Attorney Coe does not believe that the Connecticut State Police knew or should have known, at the time that they prepared and submitted arrest warrant affidavits relying in

large measure on the Auclairs' statements, that the Auclairs were unreliable witnesses. See Coe Aff. at ¶ 12; Coe Report.

244.    Attorney Coe is aware of no information that would have called the Auclairs' credibility into question at the time the warrant affidavits were prepared. See Coe Aff. at ¶ 12; Coe Report.

245.    In Attorney Coe's opinion, concerns about the credibility of the Auclairs arose after the arrest of White, Bourgeois and Marion, during disqualification hearings before Judge Kaplan. See Coe Aff. at ¶ 12; Coe Report.

246.    In particular, Attorney Coe does not believe the Connecticut State Police knew or should have known at the time they prepared the warrant affidavits that Adam and Aaron Auclair were not locked in a room with Gloria Marion on July 16, 1999. See Coe Aff. at ¶ 13; Coe Report.

247.    Nor does Attorney Coe believe that the Connecticut State Police knew or should have known at the time they prepared their warrant affidavits that the Auclairs were eating pizza at their meeting with Gloria Marion on July 16, 1999. See Coe Aff. at ¶ 13; Coe Report..

248.    Attorney Coe does not believe that the Connecticut State Police knew or should have known, at the time that they prepared the warrant affidavits, that *any* material information contained in those warrant affidavits was false. See Coe Aff. at ¶ 14; Coe Report..

249.    Nor does Attorney Coe believe that the Connecticut State Police possessed any information that the omitted from their warrant affidavits that would have undermined probable cause to arrest Thomas White, Gloria Marion, and Henry Bourgeois. See Coe Aff. at ¶ 14; Coe Report.

250. Based on Attorney Coe's expertise as a prosecutor and my investigation, he does not believe that it was, or should have been, obvious to the Connecticut State Police that the warrant affidavits failed to provide probable cause for the arrest of Thomas White, Gloria Marion or Henry Bourgeois for crimes relating to obstruction of justice or witness tampering. See Coe Aff. at ¶ 15; Coe Report.

251. Nor, more generally, does Attorney Coe believe that the Connecticut State Police knew or should have known that their warrant affidavits were faulty in any material respect. See Coe Aff. at ¶ 15; Coe Report.

252. Based on his investigation, Attorney Coe believes that the State's Attorney Mark Solak gave poor legal advice to the Connecticut State Police regarding the existence of probable cause to arrest Mr. White, Ms. Marion and Mr. Bourgeois on obstruction of justice-related charges based on the facts gathered by the State Police. See Coe Aff. at ¶ 16; Coe Report.

253. According to Attorney Coe, Attorney Solak's advise, however, was not so obviously wrong that it should have been perceived as faulty by the Connecticut State Police at the time that they prepared and submitted to the court their warrant affidavits. See Coe Aff. at ¶ 16; Coe Report..

254. In Attorney Coe's view, it was entirely reasonable of the Connecticut State Police to rely upon the advice of State's Attorney Solak as to the existence of probable cause to arrest Mr. White, Ms. Marion, and Mr. Bourgeois on obstruction of justice and witness tampering-related charges. See Coe Aff. at ¶ 16; Coe Report..

255. Based on Attorney Coe's experience, his opinion is that it is entirely proper for police officers to rely on prosecuting attorneys for advice on the existence or absence of probable

cause based on a given set of facts, as was done in this instance. <u>See</u> Coe Aff. at ¶ 17; Coe Report.

256.    In Attorney Coe's experience, the exception would be where the facts are so obviously insufficient to sustain the proposed charges that the insufficiency should be obvious even to the average police officer. <u>See</u> Coe Aff. at ¶ 17; Coe Report.

257.    This was not the case here, according to Attorney Coe, as the affidavits were not so obviously deficient as to alert the officers that probable cause was not present to arrest Thomas White, Gloria Marion, and Henry Bourgeois on obstruction of justice and witness-tampering related charges. <u>See</u> Coe Aff. at ¶ 17; Coe Report.

258.    Attorney Coe's conclusion that the Connecticut State Police acted properly is not, in his view, in any way undermined by the fact that they did not interview Thomas White, Gloria Marion and Henry Bourgeois prior to seeking their arrest. <u>See</u> Coe Aff. at ¶ 18; Coe Report.

259.    Valid investigative reasons often counsel against such pre-arrest interviews, and there is no indication in this instance that such valid reasons did not exist in this instance. <u>See</u> Coe Aff. at ¶ 18; Coe Report.

260.    Attorney Coe is aware of no evidence whatsoever that would remotely suggest that the investigation by the Connecticut State Police of Thomas White, Gloria Marion, and Henry Bourgeois was motivated by any improper motive. <u>See</u> Coe Aff. at ¶ 18; Coe Report.

261.    The defendants conduct in connection with the investigation and arrest of the plaintiffs was entirely proper and was not motivated by malice, a desire to harm or retaliate against the plaintiffs or by any other improper motives. <u>See</u> Nault Aff. at ¶ 56; O'Connor Aff. at 32; Szamocki Aff. at ¶20; Turner Aff. at ¶ 15; Gibeault Aff. at ¶ 13.

51

DEFENDANTS, NORMAN NAULT, ET
AL.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____

PERRY ZINN ROWTHORN
Assistant Attorney General
Federal Bar No. ct 19749
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5020
Fax: (860) 808-5347
Perry.Zinn-Rowthorn@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure on this 27th day of May, 2004 to:

Jon Schoenhorn, Esq.
97 Oak St.
Hartford, CT 06106

Perry Zinn Rowthorn
Assistant Attorney General

3