### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

THOMAS WHITE, HENRY BOURGEOIS  :
and GLORIA MARION,             :
       *Plaintiffs,*       :
                     :     CIVIL ACTION NO.
     v.               :     3:02CV1589 (WWE)
                     :
NORMAN NAULT,  KAREN     :
O CONNOR, JOHN SZAMOCKI,  JOHN :
TURNER and LARRY GIBEAULT   :
       *Defendants.*     :     JUNE 3, 2004

### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFFS  MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

.    In September 2002, the plaintiffs, all high-ranking members of the former Office of the High Sheriff of Windham County,  commenced this civil rights action pursuant to Title 42 U.S.C. §§1983 and 1988, and the first, fourth and fourteenth amendments to the United States Constitution alleging violations of civil rights by the defendants, five members of the Connecticut State Police, who were responsible for their arrest and prosecution.  The plaintiffs claim that the defendants met and conspired to arrest them utilizing warrants issued without probable cause, and recklessly disregarded the truth by submitting false and materially misleading affidavits in support of said warrants, that omitted crucial facts.  All charges relating to these allegations were dismissed by a Connecticut Superior Court judge, following a report by a special prosecutor.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiffs,  respectfully move for summary judgment on their complaint based upon the lack of disputed facts concerning the absence of probable cause in each of the arrest warrants.  The plaintiffs allege that the undisputed facts prove that the defendants jointly drafted and submitted arrest warrants that were issued without probable cause, and recklessly disregarded the truth, by submitting materially

misleading affidavits, and by omitting material evidence known to them at the time.  For these reasons, the plaintiffs are, therefore, entitled to judgment as a matter of law.

## SUMMARY OF FACTS

The defendants admit in their answer that at all relevant times, they were acting under color of law and in the performance of their official duties as officers of the State of Connecticut Department of Public Safety, Division of State Police.  Additional facts are contained in plaintiffs  Rule 56 Statement of Undisputed Material Facts, and are incorporated by reference herein.

Plaintiff , THOMAS WHITE was the High Sheriff of  Windham County, Connecticut, having defeated his predecessor, James Kenney, in a bitterly-fought election the previous November.  After he was sworn in, White appointed Plaintiff  HENRY BOURGEOIS as a supervisor with the rank of Captain in the Windham County Sheriff s Office.  Plaintiff GLORIA MARION was at the same time appointed a Lieutenant in the Windham County Sheriff s Office and thereby became a supervisor in said Office. All three had been deputy sheriffs under the Kenney administration.  Before becoming a sheriff s deputy, Bourgeois had been a state police trooper for over 35 years, attaining the rank of lieutenant, where he was the commander of Troop D, the barracks where he was arrested in this case.

Prior to assuming his post, Plaintiff  White learned through various sources in the Courthouse, that over an extended period of  time, Sheriff Kenney was systematically purging and shredding files in the Sheriff s Office.  He was also told that one of the persons seen engaging in the shredding was Debra Collins, an assistant state s attorney in the Windham Judicial District s State s Attorney s office, and the wife of one of Sheriff Kenney s top assistants, Charles Collins.  On the day he was sworn in as High Sheriff, White and Bourgeois went down to the sheriff s office in the Putnam Superior Court, and discovered that materials

2

appeared to be missing from his office. Desk drawers and filing cabinets were empty, keys had no identifiable tags, and the office computer would not boot up. The computer appeared to have been wiped clean and there were no records of inmates to be picked up for the next court date.

He, therefore, contacted the central administrative office and received permission from Patricia Lempicki, administrator with the Hartford Office of County Sheriffs, to launch an internal affairs investigation to determine whether there was any improper destruction of Sheriff s Department records.  He assigned Captain Bourgeois to look into the allegations and Bourgeois, in turn, requested that Lt. Marion interview two special deputy sheriffs, Adam and Aaron Auclair, who were believed to be present during at least some of the shredding and one of whom was believed to have knowledge of the removal of programs from the Windham County Sheriff s Department computer. Aaron  Auclair had been active in former Sheriff Kenney s re-election campaign. His brother, Adam Auclair, was a regular visitor at the home of Charles Collins, the husband of Assistant State s Attorney Collins.  Adam Auclair  lived in a condominium across the street from the Collins . He  was a friend of  both Collins.   Adam frequently watched Red Sox games at the home of  Assistant State s Attorney Collins and went out to dinner with her and her husband.  Plaintiff  Marion was chosen for this assignment because she knew both Adam and Aaron Auclair. The Auclairs lived in the same town as her for years, they  had gone to school with her children, and  her husband had been the Auclairs   baseball coach in high school. The Auclairs had  been at Marion s  home many times and were very good friends with her daughter.

White had no input into the manner in which the investigation would be conducted. He had no experience in conducting internal affairs investigations.  He relied upon Bourgeois because he knew he was a former state trooper.  Bourgeois and another supervisor advised Marion to question the Auclairs about their knowledge of shredding and computer erasures at the

end of Kenney s term.

Before he assumed his post, Plaintiff White expressed a concern to Defendant Karen O Connor about the shredding. O Connor was the state police detective assigned to investigate financial improprieties of Sheriff White when he was a deputy. Assistant State s Attorney Collins had been assisting O Connor with the review of the bank records as part of the investigation into Deputy Sheriff White s finances. That investigation was instigated, in part, by a complaint made in 1998 by Sheriff Kenney. During a May or early June, 1999 conversation with O Connor, White suggested that it was inappropriate for Collins and the Windham State s Attorney s Office to continue to be involved with the investigation of him, after it came out that Collins was involved in shredding materials that may or may not violate state law. O Connor told White she was about to leave on vacation, and to keep his concerns to himself and not to discuss it with anyone, including an attorney, until she returned. This suggestion by O Connor concerned White who perceived it as a red flag. Contrary to O Connor s suggestion, he went out and hired Attorney Arthur P. Meisler.

On or about July 2, 1999, Plaintiff Bourgeois, a former State Police lieutenant, mentioned in passing a concern about Assistant State s Attorney Collins involvement in the Sheriff s Department shredding, to Lt. Thomas Davoren, a former colleague who was now the commander of the Danielson barracks. Davoren contacted Defendant Sergeant John Szamocki, and asked Szamocki to call him. A few days later, on or about July 6, 1999, Davoren conveyed the substance of his July 2 conversation with Bourgeois to Szamocki. Szamocki immediately assumed that Bourgeois concern was some type of ruse to concoct a defense by Thomas White to the ongoing investigation into White s financial dealings. Szamocki conveyed his concerns in a memorandum to Defendant Lt. Larry Gibeault, dated July 15, 1999, in which he characterized the conversation between Davoren and Bourgeois about the shredding as a

4

possible defense strategy that Thomas White was going to use regarding the current investigation he is the subject of.    Szamocki also passed this information on to an inspector in Windham State s Attorney Mark Solak s office.

On or about July 13, 1999, Meisler wrote a letter to then Chief State s Attorney John Bailey, with a copy to State s Attorney Solak, on behalf of his client, Plaintiff White, reporting the shredding of documents and the erasure of computer files in the Office of the High Sheriff, and asking that the Windham State s Attorney s Office be recused from handling the case.  He expressed concern that Debra Collins, who worked for Solak and who was involved in the investigation of White s financial records, had participated in the destruction of documents.  The letter did not allege any criminal wrongdoing, nor did it request a criminal investigation.  This letter, in turn, resulted in a referral by  Solak to the State Police for investigation.

Collins intercepted the Meisler letter when it arrived at the Windham State s Attorney s Office after it was shown to her by her secretary.  She immediately went to Troop D to discuss the allegations with a Trooper friend, as well as to Defendant John Szamocki, who happened to be present. Everyone present agrees that Collins was  extremely upset  at the time.  Szamocki informed Collins that Bourgeois also alleged that she had shredded telephone logs.  There is, however,  no record of Bourgeois ever having said that.

Gibeault also prepared a memorandum to his supervisor, Major John Rearick, commanding officer of the State Police Eastern District, on July 19, 1999.  Before any investigation commenced, he reported his conclusion that the allegations about shredding and destruction of property in the Meisler letter were  unfounded  and that the letter was attempting to raise a  perception  of a conflict of  interest by Debra Collins  actions.

Immediately his assignment as lead detective on the case by Szamocki, Defendant Norman Nault also assumed that the questions concerning Collins  involvement in shredding of

documents in the sheriff s office were part of an attempt to build a defense for White in the investigation involving his financial records.  He made no effort to contact Meisler, White, Bourgeois, Marion, or anyone else who worked in the Windham Sheriff s Office after the change in administration to determine what might be missing.  Instead, he and the others conducted interviews only with the alleged perpetrators and only relied upon their version of events, including their self-serving claims that nothing was shredded or erased other than items authorized by the central office.

The responsibility for the investigation was conveyed by Defendant Gibeault to Sergeants Szamocki and Defendant John Turner, and, ultimately, to Defendants Norman Nault and Karen O Connor, who conducted the investigation.  O Connor was the affiant on White s arrest warrant affidavit, which was reviewed and endorsed by Szamocki.  Nault prepared and signed the arrest warrant affidavits for Plaintiffs Bourgeois and Marion, which were reviewed by his supervisor, Defendant Turner.  Preparation of the warrants was a group effort between the four of them. O Connor prepared the first 23 paragraphs of the affidavit, and then handed a word processing computer diskette to Nault who prepared the remainder of the affidavit.  There were several drafts, and Szamocki and Turner were consulted regarding these drafts, and made several editing changes.  State s Attorney Solak also reviewed the drafts and offered suggestions.  The ultimate warrant affidavits were virtually identical in all three arrests, with the exception of the name of the accused, the affiant, and the signature of the person taking the oath.

All of the defendants were at the relevant times employees of the State of Connecticut, Department of Public Safety, Division of State Police.  O Connor and Nault were detectives. Szamocki and Turner were sergeants and Gibeault was a lieutenant.  Defendants  Answer to Complaint.  The defendants also concede that each of them acted at all times under color of  law and in the performance of their duties as officers of the Connecticut Department of Public Safety,

Division of State Police.  Stipulation of Parties, Rule 26f Planning Meeting, § IV

On or about July 15, 1999, Plaintiff Marion spoke with Adam Auclair regarding his work schedule and indicated that she wanted to meet with him. On or about July 16, 1999,  Plaintiff Marion met with Special Deputy Sheriffs Adam Auclair and Aaron Auclair (together, the  Auclairs ) in the lockup area of the Willimantic Courthouse to discuss their schedules and to discuss the shredding of documents and erasure of programs from the department s computer. During this meeting in the courthouse, the Auclairs and Marion were eating pizza.  This information about eating lunch during the meeting was expressly conveyed by Adam to one of the detectives involved in the investigation.

On the morning of July 19, 1999 Plaintiff White spoke with Aaron regarding the aforesaid conversation he had with Marion and the internal investigation being conducted in the sheriff s office.  That same day,  July 19, 1999, Plaintiff Marion met with the Auclairs in the Willimantic Courthouse lockup to question them and obtain a statement.  The Auclairs refused to be recorded, and refused at that time to give statements.  Aaron Auclair secretly recorded the interview and later that evening or the next day played the tape for Debra and Charles Collins. Two transcript versions of this tape were prepared by Ruth Simmons, Collins  and Solak s secretary.  Simmons claimed the first version was a draft, and that after corrections, the second one was prepared.  Simmons depo, pp. 13-15, 31-32, Exhibits 1 and 2.  Only excerpts of the tape recording were incorporated into the arrest warrant affidavits by O Connor and Nault.  Those excerpts are both at odds with what actually is said on the tape, and notably omit several key portions of the conversation. It is clear from the tape that Marion is questioning Auclair about the destruction of documents belonging to the Sheriff s Department.

Aaron Auclair worked in the sheriff s office in December of 1997, but had to stop working  because of a complaint that he had worked over sixty days without attending a three day

training academy. During that time period, he did not receive any complaints concerning White. Aaron again worked at the sheriff s office in the summer of 1998. Other than December of 1997, Aaron Auclair never worked during any relevant time period in relation to the larceny charges set forth in the Information in the arrest warrant for Tom White. He, therefore, had no direct knowledge of same.

On or about July 20, 1999, the Auclairs tendered their resignations to White. At that time White asked Adam and Aaron Auclair to reconsider their resignations but they refused. White also suggested that the Auclairs take a few weeks to think about their decision before making it final. Unbeknownst to White, Aaron Auclair taped this conversation as well, at the request of Defendant Szamocki. After the resignation Aaron Auclair phoned Defendant Szamocki at the state police barracks. Defendant Nault and Detective Mike Contre met Aaron at Adam s apartment and took a statement from Aaron and received the aforementioned tape.

The Auclairs were friends of Debra Collins and called her at her place of employment complaining about the fact that they were being questioned by Plaintiff Marion. Both Debra and her husband, Charles, listened to the tape of the conversation between Marion and Aaron Auclair that Aaron had surreptitiously made on 7/19/99, before it was given to the State Police. Charles Collins told Aaron to give the tape to the State Police. Aaron asked Debra Collins to refer them to someone in the State Police who could be trusted so that they could make a complaint. Collins drove Aaron Auclair to the barracks the next morning. She introduced him to Detectives Norman Nault and Mike Contre.

All three plaintiffs were peace officers within the meaning of the applicable Connecticut General Statutes at the time. Conn. Gen. Stat. § 53a-3(9) (1999 Rev.). Sheriffs possessed all powers of other law enforcement agencies within their respective jurisdictions and had the same powers of State Police officers within their jurisdiction. Conn. Gen. Stat. §§ 6-31;

29-7 (1999 Rev.) .  High Sheriffs and their appointed deputies were subject to state codes of ethics and responsibilities.

On or about September 10, 1999, Defendant Nault prepared a sworn affidavit in support of an arrest warrant for Plaintiffs Bourgeois and Marion that falsely alleged that there was probable cause to believe the plaintiffs committed the following offenses involving obstruction of justice through the aforesaid conversations with the Auclairs: conspiracy to tamper with a witness, tampering with a witness, bribery of a witness, hindering prosecution, coercion, and unlawful restraint.

On or about September 10, 1999, Defendant O Connor prepared a sworn affidavit in support of an arrest warrant for Plaintiff White that falsely alleged that there was probable cause to believe that Plaintiff White committed the following offenses involving obstruction of justice through the aforesaid conversations with the Auclairs: conspiracy to tamper with a witness, tampering with a witness, bribery of a witness, hindering prosecution, coercion, and unlawful restraint.

All three affidavits were virtually identical, with only the name of the accused, and the affiant, differentiating the three warrant applications.  O Connor was primarily responsible for writing the first 23 paragraphs of the affidavit. She then transferred the information to a computer diskette and gave it to Nault, who prepared the rest of the affidavit.  The aforesaid investigation and preparation of the aforesaid affidavits were reviewed and approved by Defendants Szamocki, Turner and  Gibeault.  The warrants were characterized by the defendants as essentially a  group effort.

On or about September 13, 1999, Plaintiff White turned himself in at the Danielson police barracks and was charged with two counts of tampering with a witness, two counts of unlawful restraint, one count of bribery of a witness, one count of hindering prosecution in the

9

second degree, one count of conspiracy, one count of coercion, and one count of racketeering, that arose from the shredding investigation.  He was also charged at that time with various larceny offenses that arose out of the investigation of wage executions.[1]  On the same date, Plaintiff Marion was arrested at her house by Defendant Nault and was charged with two counts of bribery of a witness, one count of conspiracy, two counts of unlawful restraint, two counts of tampering with a witness and one count of coercion.

On or about September 15, 1999, Plaintiff Bourgeois turned himself in at the Danielson police barracks and was charged with one count of conspiracy, two counts of tampering with a witness, one count of hindering prosecution in the second degree,  two counts of coercion and two counts of unlawful restraint.

All three defendants were released on non-surety bonds after formal processing.

On or about July 25, 2001, the defendants were advised that all of the charges against the plaintiffs resulting from the so-called tampering investigation would not be prosecuted.  7/27/01 O Connor Report.  On July 27, 2001,  the charges against each of the plaintiffs were dismissed.

## ARGUMENT

The plaintiffs claim that the defendants deliberately conducted the investigation in a way to ignore and/or cover up the activities of Kenney, Collins and company, in an effort to turn the investigation prompted by Meisler s letter into an all-out assault against the plaintiffs.  Although White and/or Meisler were conceded to be the complainants and although a Superior Court judge found that serious improprieties occurred during the waning days of the Kenney administration, these defendants deliberately conducted themselves with blinders, concluding before the commencement of the investigation, that the allegations were unfounded.  They spoke to nobody

---

[1] Although all of the larceny-related charges were also dismissed at a later date, they do not form a part of this civil rights action.

in the Sheriff s Office who could identify what type of information was missing.  Instead, they

only contacted the alleged perpetrators of the document destruction, and accepted as fact, their

version of events.  The arrests without probable cause and subsequent malicious prosecution

violated the fourth amendment and Article I, §§7 & 9 of the Connecticut Constitution.  It is the

retaliatory nature of the arrests that also forms the basis of plaintiffs  first amendment claims.

_____Subsequently all charges were nolled by the special prosecutor, and the court dismissed

the cases.

## I.    STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should

be granted if  the pleadings, depositions, answers to interrogatories and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law.   When deciding a motion for

summary judgment, the court  must resolve all ambiguities and draw all inferences in favor of

the nonmoving party.  *Millgard Corp. v. White Oak Corp.,* 224 F. Supp. 2d 425, 428, (D. Conn.

2002), *citing Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992).

The moving parties bear the initial burden of demonstrating that no factual issue exists

and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986).  In ruling on a motion for summary judgment,

> [t]he inquiry performed is the threshold inquiry of determining whether there is a
> need for a trial - whether, in other words, there are any factual issues that properly
> can be resolved only by a finder of fact because they may reasonably be resolved
> in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here the plaintiffs must demonstrate the absence of a genuine issue of material fact.  If

the plaintiffs carry this burden, the burden then shifts to the non-moving party to produce

concrete evidence sufficient to establish a genuine unresolved issue of material fact.  *See Celotex*

*Corp. v. Catrett, supra*, 477 U.S. at 322-24. The court then must view the facts in the light most favorable to the non-movant and give that party the benefit of all reasonable inferences from the evidence that can be drawn in that party's favor. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). The court neither weighs evidence nor resolves material factual issues but only determines whether, after adequate discovery, any such issues remain unresolved because a reasonable factfinder could decide for either party. *See Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 249; *Gibson v. American Broadcasting Corp.*, 892 F.2d 1128, 1132 (2d Cir. 1989). However, neither conclusory statements, conjecture, nor speculation suffice to defeat summary judgment. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

## II.    THE ARRESTS VIOLATED THE FOURTH AMENDMENT

### A.    All Three Arrest Warrants Failed to Establish Probable Cause to Arrest

The fourth amendment to the United States Constitution guarantees, *inter alia*, that no warrants shall issue, but upon probable cause, that must particularly describe the place to be searched, and the persons or things to be seized. The Connecticut Supreme Court has interpreted Article 1, § 7 of the Connecticut constitution as providing greater protection than the fourth amendment involving similar arrests and seizures. See, *State v. Geisler,* 222 Conn. 672, 684 (1992).[2] Furthermore, Article I, § 9 of the Connecticut constitution, which has no federal counterpart, expressly provides, that no person shall be arrested, detained or punished, except in cases clearly warranted by law. Probable cause, which means the same thing under both Connecticut and federal law, encompasses such facts as would reasonably persuade an impartial and reasonable mind *not merely to suspect or conjecture, but to believe* that criminal activity has

---

[2] The relevant portion of Article I, § 7 states: The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.

occurred.  *State v. Barton,* 219 Conn. 529, 547, 594 A.2d 917 (1991) (emphasis supplied); *See also Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).   Probable cause means more than mere suspicion;  *Beck v. Ohio*, 379 U.S. 89, 91 (1964); and   common rumor or report, suspicion, or even strong reason to suspect, are not sufficient to constitute probable cause. . ..  *State v. Shifflett*, 199 Conn. 718, 748, 508 A.2d 748 (1986) (internal quotation marks omitted).  *See also Henry v. United States*, 361 U.S. 98, 101 (1959).

This is the quintessential case where a bunch of unrelated and convoluted facts were thrown together in a massive document with a hope that something would stick.  Although the plaintiffs assert elsewhere in this memorandum, that the affiants recklessly disregarded the truth in a number of ways in the preparation and submission of the three arrest warrants, see *infra,* nevertheless, the Supreme Court has made clear that police are not entitled to rely on the fact that a magistrate signed the warrants, as proof that applying for the warrants was *per se* reasonable. To the contrary, the proper inquiry is   whether a reasonably well-trained officer in [the defendants ] position would have known that [the] affidavit failed to establish probable cause and that he should not have applied for the warrant.  *Malley v. Briggs*, 475 U.S. 335, 345 (1986).  The Court s analysis was based upon the  objective reasonableness  standard of *United States v. Leon*, 468 U.S. 897 (1984), which confined the  good-faith  reasonableness to  whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate s authorization.  *Id*. at 922.[3]

The reason given for permitting judicial scrutiny of warrants in § 1983 cases was explained as follows:

---

[3] The Connecticut Supreme Court rejected the notion of a  good faith  reasonableness exception to the probable cause requirement in a warrant, finding that it was  incompatible  with Connecticut Constitution, Article I, § 7.  *State v. Marsala*, 216 Conn. 150, 151 (1990).  Thus, the plaintiffs submit that the lack of probable cause would, in and of itself, constitute a violation of the state constitution    a much lower threshold for liability.

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Malley v. Briggs*, 475 U.S. at 345-46. *See also, Greenstreet v. County of San Bernardino*, 41 F.3d 1306 (1994). This maxim is particularly true here, where the defendants submitted three massive warrant affidavits, each totaling 67 pages of single-spaced typed material, without differentiating the separate warrants, except as to the name of the accused and the affiant.

To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996). Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff. *Id.* Probable cause to arrest exists, therefore, when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.*

Even if probable cause to arrest is ultimately found not to have existed in this case, the defendant officers may not assert a claim of qualified immunity from a suit for damages unless they can establish that there was "arguable probable cause" to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven,* 950 F.2d 864, 868 (2d Cir. 1991); see also *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002) (stating that "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is

14

nonetheless entitled to qualified immunity.") (citations omitted); *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000). The plaintiffs submit that there was no arguable probable cause and that the personal relationship between several of these officers and the assistant prosecutor who was initially accused of wrongdoing, clouded their collective judgment.

### B.    The Warrant Affidavits Fail to Establish that any Crime was Committed.

The plaintiffs submit that there was not even arguable probable cause. In fact there was not a scintilla of evidence to support these charges. Probable cause to arrest means more than mere suspicion. There must be facts and circumstances within the officer s knowledge, and of which he or she has trustworthy information, sufficient to justify the belief of a reasonable person that an offense has been or is being committed. *Beck v. Ohio, supra; Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). While there is a fine line between suspicion and probable cause, that line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances. *Id.* at 176.

At the outset, it is important to emphasize that pursuant to Connecticut law, the plaintiffs, as sheriffs, deputy sheriffs and special deputy sheriffs, were peace officers within the meaning of Conn. Gen. Stat. § 53a-3(9) (1999 Rev.) just as the defendants were. As such, plaintiffs could make arrests within their jurisdiction; Conn. Gen. Stat. § 54-1f; and, when necessary, with force and strong hand, suppress all tumults, riots, unlawful assemblies and breaches of the peace and may raise the power of the county and command any person to assist him in the execution of his office. Conn. Gen. Stat. 6-31. The powers of the state police with regard to law enforcement were, in fact, by statute, co-extensive with the powers of sheriffs within their own jurisdiction. Conn. Gen. Stat. § 29-7. Thus, the plaintiffs were law enforcement officers pursuant to Connecticut statute, and, therefore, had the right to engage in certain actions which the average citizen might not have the right to engage in.

Bearing in mind that the warrant affidavits themselves were basically identical in the case of Plaintiffs White, Bourgeois and Marion, in order for this Court to analyze the affidavits to determine whether or not probable cause existed for each of the crimes charged, it is necessary first to set forth each of the penal statutes at issue, and to identify which plaintiff was the subject of each charge. The following chart will aid in that review:

| Offense Charged | Plaintiff | Counts |
|---|---|---|
| Conspiracy 53a-48 | White, Thomas | One Count |
| | Marion, Gloria | One Count |
| | Bourgeois, Henry | One Count |
| Unlawful Restraint, 2d Degree 53a-96 | White, Thomas | Two Counts |
| | Marion, Gloria | Four Counts |
| | Bourgeois, Henry | Two Counts |
| Bribery of a Witness 53a-149 | Marion, Gloria | One Count |
| | White, Thomas | One Count |
| Tampering with a Witness 53a-151 | White, Thomas | Two Counts |
| | Bourgeois, Henry | Two Counts |
| | Marion, Gloria | Two Counts |
| Hindering Prosecution, 2d Degree 53a-167 | White, Thomas | One Count |
| | Bourgeois, Henry | One Count |
| Coercion 53a-192 | Marion, Gloria | Two Counts |
| | Bourgeois, Henry | Two Counts |
| | White, Thomas | One Count |
| Racketeering 53-395(c) | White, Thomas | One Count |

An analysis of each of the offenses follows.  The only reasonable conclusion is that there was no probable cause to arrest the plaintiffs on any of these charges.

**53a-149: Bribery of a witness**:
> (a) A person is guilty of bribery of a witness if he offers, confers or agrees to confer upon a witness any benefit to influence the testimony or conduct of such witness in, or in relation to, an official proceeding.

Some of the terms used in this statute are defined in Conn. Gen. Stat. § 53a-146.   An official proceeding  is   any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath.   A benefit  means  monetary advantage, or anything regarded by the beneficiary as a monetary advantage . ...   A  witness  is  any person summoned or who may be summoned, to give testimony in any official proceeding.

At the outset, plaintiffs note that there is nothing in the affidavits to suggest that Adam or Aaron Auclair were  witnesses  in any investigation of Deputy Sheriff White,  or that they were offered a  benefit.   The charging information alleging two counts of larceny against White cover the period of December, 1996 and then from February 1997 through February 1998.  Aaron Auclair s July 21, 1999 statement clearly demonstrates that he did not receive any complaints about White during the relevant time periods of the investigation.  The lack of probable cause, therefore, is obvious.[4]

It is certainly clear that the only official proceeding that was going on at the time alleged in the information was White s own internal investigation of misconduct in the Sheriff s Office, which did not involve  evidence under oath.  .  There is absolutely nothing in this warrant to

---

[4]A copy of the special prosecutor s report is included in the documents supplied in support of summary judgment as a reference.  Although the analysis of the various charges by the special prosecutor is based upon the subsequent charges in the amended information, the basic analysis of the offenses is the same, although the factual conclusions are to some extent incomplete and based upon subsequent interviews of witnesses.

17

suggest that White did anything to influence the conduct of any   witness   presumably the Auclairs   other than to get them to cooperate with his investigation involving destruction of evidence in the closing of Sheriff Kenney s office.  This, of course, had nothing to do with the investigation of White for financial improprieties.

### 53a-167: Hindering prosecution in the second degree

(a) A person is guilty of hindering prosecution in the first degree when he renders criminal assistance to a person who has committed a class C or class D felony or an unclassified offense for which the maximum penalty is imprisonment for ten years or less but more than one year.

Certain of the above terms are also defined by the General Statutes.  For example, a person   renders criminal assistance   in Conn. Gen. Stat. § 53a-165 when

with intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, another person whom such person knows or believes has committed a felony or is being sought by law enforcement officials for the commission of a felony, or with intent to assist another person in profiting or benefiting from the commission of a felony, such person:  (1) Harbors or conceals such other person;  or (2) warns such other person of impending discovery or apprehension; or (3) provides such other person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension;  or (4) prevents or obstructs, by means of force, intimidation or deception, any person from performing an act which might aid in the discovery or apprehension of such other person or in the lodging of a criminal charge against such other person;  or (5) suppresses, by an act of concealment, alteration or destruction, any physical evidence which might aid in the discovery or apprehension of such other person or in the lodging of a criminal charge against such other person;  or (6) aids such other person to protect or expeditiously profit from an advantage derived from such crime.

There is nothing in the warrant affidavits to suggest that Plaintiffs Marion and Bourgeois   or even Plaintiff White himself   had any advance knowledge that White would be accused of a felony, and there is no evidence that they did any of the things that constitute   criminal assistance.   To the contrary, the evidence is clear that when Bourgeois earlier asked Szamocki about the investigation to determine whether he should take a job with the Sheriff s Office, he

18

was told that the information was confidential.  There is no evidence presented at all that Marion knew or had any reason to know about the substance of the investigation of White when he was a deputy sheriff.

**53a-151: Tampering with a Witness**

> (a) A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding.

All of the defendants are charged with multiple counts of tampering.  The definitions of  official proceeding  and  witness  have been set forth above in connection with the charge of bribery.  Plaintiffs need not repeat their arguments here concerning the utter lack of proof of either an  official proceeding  or  witness  status, and adopt the previous analysis by reference.  Furthermore, the Connecticut Supreme Court years ago interpreted the statute to apply only to narrow circumstances:   [T]he statute applies to any conduct that is *intended* to prompt a witness to *testify falsely or to refrain from testifying* in an official proceeding that the perpetrator believes to be pending or imminent.  *State v. Cavallo*, 200 Conn. 664, 668 (1986) (emphasis supplied).  Further,  [a]lthough the statute does not expressly mandate that the perpetrator intend to cause the witness to alter or withhold his testimony, this implicit requirement is apparent when the statute is read as a whole.  *Id*. at 668.

As noted above, there is absolutely no evidence that the plaintiffs had any inkling that there was any pending proceeding or one that was  about to be instituted.    There was no evidence that the plaintiffs had any inkling that the Auclairs were potential witnesses.  Even Defendant Szamocki admits that he had no inkling that they could be witnesses. Moreover, the statute had been interpreted to mean that a witness must be prompted to testify falsely or refrain from testifying at all.  Clearly there is nothing in the affidavit that could lead to that conclusion.

**Unlawful restraint 2nd degree: 53a-96**

> (a) A person is guilty of unlawful restraint in the second degree when he restrains another person.

19

Restrain is defined in Conn. Gen. Stat. § 53a-91(1) and means, in relevant part:

> to restrict a person's movements intentionally and unlawfully in such a manner as
> to interfere substantially with his liberty by moving him from one place to
> another, or by confining him either in the place where the restriction commences
> or in a place to which he has been moved, without consent.

Even without addressing the reckless disregard of material fact that the place where the July 16 and 19 interviews took place could not be locked, there is nothing in the warrant that remotely suggests that it is unlawful for a supervisor to order a subordinate to attend a meeting to discuss possible misconduct by the subordinate, even if the meeting is in a locked room (which was clearly not the case here). This dearth of evidence is even more obvious when the employer in question is a law enforcement agency and the location of employment is a secure facility where the employees work, involving the handling of prisoners. The Auclairs claims that they felt they were not free to leave, is irrelevant. It is patently frivolous to suggest that the Auclairs were confined when they never expressed a desire to leave. The defendants decision to claim probable cause for this crime is ludicrous.

In any event, and as a completely separate matter, there is not a single iota of evidence that Bourgeois or White had anything to do with the location of the meeting between Gloria Marion and the Auclairs, or suggested a technique for the interview. It is simply inconceivable that anyone would think that there was probable cause to charge Bourgeois and White with unlawful restraint under these circumstances.

**53a-48: Conspiracy**

> A person is guilty of conspiracy when, with intent that conduct constituting a
> crime be performed, he agrees with one or more persons to engage in or cause the
> performance of such conduct, and any one of them commits an overt act in
> pursuance of such conspiracy.

Conspiracy is not a crime under Connecticut law in and of itself. To allege the crime of conspiracy, there must be probable cause that an agreement existed between two or more persons

20

to engage in conduct constituting a crime and that subsequent to the agreement one of the conspirators performed an overt act in furtherance of the conspiracy. *State v. Rouleau,* 204 Conn. 240, 258(1987); *State v. Estrada,* 28 Conn. App. 416, 420, cert. denied, 223 Conn. 925 (1992). There must be evidence that an accused intended the conduct *constituting a crime* be performed. *State v. Rouleau, supra*, 204 Conn. at 258; *State v. Channer,* 28 Conn. App. 161, 168, *cert. denied*, 223 Conn. 921 (1992).

> The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy.... *State v. Rouleau, supra* [at 258]. Conspiracy is an inchoate offense the essence of which is an agreement to commit an unlawful act.... The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object.... Conspiracy is an anticipatorial offense distinguished by a corrupt agreement by two or more persons to commit a specific crime. *State v. Beccia,* 199 Conn. 1, 3 (1986)." (Internal quotation marks omitted.)

*State v. Hooks,* 30 Conn. App. 232, 241-42, cert. denied, 225 Conn. 915 (1993). The failure of the warrant to suggest what crime the plaintiffs may have been agreeing to, renders the allegation a nullity. There can t be probable cause for a non-existent offense.

Finally, the warrants fail to suggest how or where, or even if, the plaintiffs agreed to commit any of the crimes otherwise charged, or intended that such crimes be committed.

## 53a-192: Coercion

> (a) A person is guilty of coercion when he compels or induces another person to engage in conduct which such other person has a legal right to abstain from engaging in, or to abstain from engaging in conduct in which such other person has a legal right to engage, by means of instilling in such other person a fear that, if the demand is not complied with, the actor or another will: (1) Commit any criminal offense; or (2) accuse any person of a criminal offense; or (3) expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair any person's credit or business repute; or (4) take or withhold action as an official, or cause an official to take or withhold action.

> (b) It shall be an affirmative defense to prosecution based on subdivision (2), (3) or (4) of subsection (a) of this section that the actor believed the accusation or secret to be true or the proposed official action justified and that his purpose was limited to compelling the other person to behave in a way reasonably related to the circumstances which were the subject of the accusation, exposure or proposed

21

official action, as by desisting from further misbehavior or making good a wrong done.

Again, assuming that the Auclairs were the  victims,  there is nothing in the warrant that suggests that they were compelled or induced to engage in conduct that they had  a legal right to abstain from engaging in.   As noted, the Auclairs were possible witnesses in an internal investigation being conducted by Sheriff White.  They were not witnesses in the larceny investigation of Deputy Sheriff White.  As special deputy sheriffs, they were compelled by the code of coduct and their position as law enforcement officers and subordinate employees, to cooperate with that investigation and/or give statements.  Moreover there is nothing in the warrant that suggests that White or Bougeois instructed Marion to say or do anything in particular with regard to the internal investigation and even the misleading excerpts of the taped conversation included in the warrant affidavit demonstrate that Marion gave Aaron Auclair the opportunity to consult with a legal representative before continuing with the questioning.

Only subsection (4) of Conn. Gen. Stat. § 53a-192 might even remotely apply to the facts set forth in the warrant.  That subsection discusses means of instilling fear by  tak[ing] or withhold[ing] action as an official, or cause an official to take or withhold action.    It is unclear what action that any of the plaintiffs might have taken against or withheld from the Auclairs. Certainly the warrant affidavit does not suggest what that might be.

**53-395(c): Racketeering**

(c) It is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity or through the collection of an unlawful debt.

 Racketeering activity  as it relates to the allegations in the information against Thomas

White in July 1999 is  defined by Conn. Gen. Stat. § 530-594(a) as the

means to commit, or attempt to commit, to conspire to commit, or to intentionally aid, solicit, coerce or intimidate another person to commit any crime which, at the time of the commission was a felony chargeable by indictment or information under the following provisions of the general statutes then applicable . . . (10) relating to bribery and related offenses.

A  pattern of racketeering activity  requires  at least two incidents of racketeering activity that have the same or similar purposes, results, participants, victims or methods of commission . . . .    Conn. Gen. Stat. § 53-394(e).

As previously noted, there was no evidence set forth in the warrant affidavits to suggest evidence of bribery, and no evidence of a pattern of racketeering activity.  Such slim pickings did not so much as suggest evidence of racketeering, let alone provide probable cause for such crime.

To sum up, with regard to Plaintiffs White and Bourgeois, it is obvious that they said nothing to the Auclairs that could be construed as threats or that suggested that their jobs were in jeopardy if they cooperated with an outside investigation.  To the contrary, the taped conversation of July 20, 1999 between the Auclairs and White demonstrates that White tried to convince them to reconsider their resignations, but if they were found to have been involved in the destruction of evidence, that they could face discipline.

Furthermore, even assuming that there was any basis for the (false) allegation that Gloria Marion held the Auclairs in a room against their will    a ludicrous proposition in light of the facts known at least to Defendant Nault    that had nothing to do with White or Bourgeois.  There is nothing in the warrant to suggest that White or Bourgeois had anything at all to say about where Marion would conduct her interrogation, what words she would use, or anything at all to do with the time, place and manner of the internal investigation questioning of the Auclairs.

Yet even the inaccurate and misleading paragraphs of the warrants that describe Gloria Marion s conversations with the Auclairs fail to demonstrate that anything she said suggests a coercion, a hindering of prosecution, bribery of a witness, or tampering with a witness.

Moreover, although there was an ongoing and lengthy (separate) investigation of Thomas White (in which he was cooperating) regarding alleged financial improprieties in the manner in which he collected wage and bank executions as a deputy sheriff, there is nothing in the warrant to alert any of the plaintiffs, including White himself, that he could be charged with a Class A or

23

Class B felony, necessary and essential elements of the crime of hindering prosecution. There is nothing in the warrant to suggest that either of the Auclairs was a material witness in the financial investigation of White or, more importantly, that any of the plaintiffs here knew or had any reason to believe, that they were material witnesses. In fact, neither Adam nor Aaron Auclair were in a position to know anything about the investigation, other than what they might have been told by their good friends, Charles and Debra Collins.

Furthermore, assuming *arguendo* the completeness of the material contained in the warrant, there is nothing in there to suggest that the Auclairs were being held against their wills. Of course, when one adds the undisputed evidence that the area in the courthouse where the meetings took place had no locks on the door where the Auclairs were sitting and that, at least with respect to the July 16 meeting, they were all sitting around eating pizza, the defendants misleading affidavits are all the more outrageous.

However, just examining the facts as set forth by Nault and O Connor, after approval by Turner and Szamocki in this group effort, the only reasonable conclusion to be drawn is that Adam and Aaron Auclair were subordinate employees in a law enforcement agency, who were required to attend a series of meetings with a supervisor. The very suggestion that mandatory attendance at such a meeting could constitute an abduction or restraint, within the meaning of the unlawful restraint or kidnapping statutes, defies credulity.

In *Biehunik v. Felicetta*, 441 F.2d 228, 230 (2d Cir.), *cert. denied*, 403 U.S. 932 (1971), a police chief ordered 62 officers to appear in a line-up so that a number of citizens could try to identify which group of 10 to 25 officers were involved in a recent incident of police brutality. While the Second Circuit held that the officers had been seized within the meaning of the fourth amendment even though they were ordered to appear, the seizure was determined to be reasonable and, therefore, lawful. Thus, Lt. Marion s order to two subordinates to come with her

to a meeting, could never be  unlawful.

The warrants also fail to set forth any basis to conclude that anything that the three plaintiffs did was intended to  prevent, hinder or delay the discovery or apprehension or lodging of criminal charges  against anyone.  The investigation of White was conducted by Defendant O Connor.  By July, 1999, she had been reviewing and investigating Thomas White for more than a year.  She had gathered documents, including checks, and had interviewed various persons who had not received disbursements from wage and/or bank executions.  At no time did either Adam or Aaron Auclair s name come up, and Defendant Szamocki knew that, as well.  The warrant sets forth nothing to suggest how the plaintiffs  conduct of an internal investigation of possible misconduct by the former High Sheriff in the waning days of his administration interfered with the conduct of the financial case, or resulted in bribery of a witness.

In conclusion, the warrant affidavits are simply long-winded arrays of comments by two disgruntled former employees who were later found to have lied to State Police investigators. However, even when assuming the truth of what the Auclairs said, it did not add up to probable cause for any crime.

### C.    The Arrest Warrants were Obtained by the Inclusion of Half-Truths and by Deliberately Omitting Information and in Reckless Disregard of the Truth

The Fourth Amendment of the United States Constitution states in relevant part that no  Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . .  Probable cause to arrest exists under federal law when the authorities have knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.   *Smith v. Edwards*, 175 F.3d 99, 106 (D. Conn. 1999), *quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), *cert. denied*, 112 S. Ct. 3032 (1992) (*citing Dunaway v. New York*, 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 99 S.Ct. 2248 (1979)).   Similarly, under Connecticut state law, probable cause

comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. *Smith v. Edwards*, 175 F.3d 99, 106 (D. Conn. 1999), *quoting State v. Barton*, 219 Conn. 527, 594 A.2d 917, 928 (Conn. 1991) and *Stone v. Stevens*, 12 Conn. 219, 230 (1837). Probable cause means more than mere suspicion, *Alabama v. White*, 496, U.S. 325, 330 (1990) ; and common rumor or report, suspicion, or even strong reason to suspect, are not sufficient to constitute probable cause. . .. *Henry v. United States,* 361 U.S. 98, 101 (1959).

> In determining the existence of probable cause to search, the issuing judge must make a practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence *of a crime* will be found in a particular place.

*State v. Martinez*, 51 Conn. App. 59, 66, 719 A.2d 1213 (1998) (emphasis supplied).

When the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a *truthful* showing. *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (emphasis in original). Thus, an officer can have no reasonable grounds for believing that [a] warrant was properly issued if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991), *quoting United States v. Leon*, 468 U.S. 897, 923 (1984).

A section 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks v. Delaware, supra*, 438 U.S. at 155-56 : the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause.

26

*Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)*, citing Golino*, 950 F.2d at 870-71; *Franks*, 438 U.S. at 171-72.   *See also Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367-68 (2d Cir. 1990); *United States v. Orozco-Prada*, 732 F.2d 1076, 1089 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S. Ct. 154, 83 L. Ed. 2d 92 (1984); *United States v. Barnes*, 604 F.2d 121, 151-53 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S. Ct. 1833, 64 L. Ed. 2d 260 (1980); *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989), *cert. denied*, 494 U.S. 1068, 108 L. Ed. 2d 788, 110 S. Ct. 1787 (1990).  The plaintiff must also demonstrate that the judge would not have issued the warrant on the basis of  corrected affidavits.   *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994).  Finally, a plaintiff may prevail in this type of action if  a reasonably well-trained officer in [the defendants ] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.   *Malley v. Briggs, supra*, 475 U.S. at 344.  This is to avoid  the unnecessary danger of an unlawful arrest.   *Id.* at 345.

To succeed in this challenge, the plaintiffs must demonstrate that the misstatements and omissions were "'necessary to the finding of probable cause'" *Golino, supra,* 950 F.2d at 870, quoting *Franks v. Delaware,* 438 U.S. at 156. This determination is a mixed question of law and fact;  *id.*, and implicates what the Second Circuit calls the "corrected affidavits doctrine." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).   Under this doctrine, [judges] look to the hypothetical contents of a  corrected  application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law.   *Id.* at 743-44.  See *also, Loria v. Gorman,* 306 F.3d 1271, 1289 (2d Cir. 2002); *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir. 1999).

In performing the  correcting process,  this Court must examine all of the information the

officers possessed when they applied for the arrest warrant. *Martinez v. City of Schenectady,* 115 F.3d 111, 115 (2d Cir. 1997).

> If there remains an objective basis to support arguable probable cause, remaining factual disputes are not material to the issue of qualified immunity and summary judgment should be granted to the defendant on the basis of qualified immunity. Only if the corrected affidavit would not "support a reasonable officer's belief that probable cause existed" would the identified factual disputes be material to resolving the issue.

*Escalera, supra*, 361 F.3d at 744.

In the instant case, the defendants omitted several material facts that would have dramatically illuminated the obvious lack of probable cause that a crime was committed.

As a paramount issue, the warrant omits the fact   known to the defendants   that the Windham County Sheriff s Department was a law enforcement agency that had received authorization from its state-wide administrative office to conduct an internal affairs investigation into the possible unauthorized shredding and destruction of department documents, and the tampering with the department s computer.  In this regard, Aaron Auclair was a witness, if not a suspect, in that investigation, because of his admitted use of the shredding machine on the evening of May 28, 1999.  Adam Auclair was believed to have information because of his close friendship with Charles Collins, Sheriff Kenney s supervisor.  Also, as special deputy sheriffs, the Auclairs could be ordered to attend an interview session.

All the defendants were aware of the concerns raised in June and early July by Sheriff White and his attorney, Arthur Meisler, about the shredding.  Indeed, all of the defendants immediately assumed without any investigation whatsoever, that the complaints were  unfounded,  and simply a  smokescreen  orchestrated by Sheriff White to deflect the investigation of his financial practices as a deputy sheriff.  The custodian who initially blew the whistle on the night-time activities of Sheriff Kenney and company was persecuted and

threatened with criminal charges, after the complaint by Debra Collins was simply taken from the local Putnam Police Department and assigned to these defendants.

The defendants knew that Patricia Lempicki had authorized such an investigation, and that such investigations were permitted by administrative regulations. Defendant O Connor interviewed Lempicki regarding this fact, obtained a copy of Sheriff White s written request to launch an internal investigation, and documented it in a report, that was presumably shared with her supervisor, Szamocki, as well as Defendant Nault and his supervisor, Turner. Turner signed off on a report that referenced the conversation with Lempicki. Szamocki admitted in testimony that he was aware that Marion and Bourgeois informed the Auclairs that they were conducting an internal investigation, and that protocols existed within the sheriff s departments statewide to conduct their own internal investigations. Szamocki, pp. 157-58. The tape of the conversation between Gloria Marion and Aaron Auclair, which the defendants obtained on July 20, 1999, clearly shows Marion stating repeatedly that she is conducting an internal investigation that has nothing to do with Sheriff White s case.

The defendants also possessed a copy of the code of ethics for the sheriffs, which required that investigations remain confidential and that all employees were required to answer questions concerning such investigations. Yet they chose to omit this material information from the warrants.

Furthermore, White personally told O Connor before the commencement of any investigation involving shredding or tampering, of his belief that Assistant State s Attorney Debra Collins had participated in some of the shredding in Sheriff Kenney s office, and that it was, in his opinion, improper that she should remain involved in the investigation of his activities. Attorney Meisler s letter also preceded the investigation, and expressed similar concerns. While all the defendants, including Gibeault, dismissed these concerns, a Superior

29

Court judge specifically found that Collins  involvement in the shredding of documents created a

conflict of interest requiring the disqualification of the entire Windham State s Attorney s Office.

See Memorandum of Decision by Judge Kaplan.

The defendants also omitted from the warrant that Debra Collins, one of those named in

the initial complaint about destruction of Sheriff s Department records,  had listened to the

Auclair tape with her friend, Aaron Auclair, and then drove him to the barracks the next morning

to deliver the tape, and introduced him to the investigators.  Aaron s July 21, 1999 statement also

discloses that he worked on former Sheriff Kenney s re-election campaign in the fall of 1998

the election that Kenney lost to White.  The omission of this information precluded the

magistrate from considering any bias that either Auclair might harbor against Tom White.

The warrant affidavits also notably omit the fact that the names of Aaron and Adam

Auclair never came up during the course of the investigation of Thomas White s financial

dealings.  During his supervision of the investigation into White s financial affairs, Szamocki

admitted that he never heard the names of Adam and Aaron Auclair, nor did he believe that they

had any significance to the investigation.  Szamocki Testimony, pp. 159, 160.  However, the

warrants notably ignore this material fact, which was critical to the determination of probable

cause on such charges of hindering prosecution,  witness bribery, racketeering and witness

tampering.

The defendants also expressly excluded the material fact that although White and his

attorney were the complainants in the investigation of the disappearance of documents and

computer files, noone in the Sheriff s Office after Kenney vacated the premises was ever

interviewed and no determination was ever made as to whether any materials were improperly

destroyed.  Indeed, only the alleged suspects and perpetrators were interviewed, and their self-

serving denials of wrongdoing were accepted by the defendants as true without any further

investigation.  As a result, as Nault conceded, the investigators never determined what, if anything, was missing from the Putnam Sheriff s Office, what had been removed from the computer, and whether any items were shredded in violation of state law.

With regard to the July 16, 1999 and July 19, 1999 meetings between the Auclairs and Gloria Marion, Nault admitted in his testimony that he was familiar with the  lockup area  at the Willimantic Courthouse, although he did not go down there after his assignment to the case on July 20.  Therefore, Nault knew that the term  lockup  was a misnomer, and that, in fact, there was no lock on the door behind where the Auclairs were sitting, allowing them free egress from the building at any time, was a reckless omission of the worst sort, and its inclusion would not support a reasonable belief that the Auclairs were subjected to unlawful restraint, kidnapping, or any other offense that suggested they were abducted or  locked up.   Furthermore, Adam Auclair admitted that he told one of the State Police investigators that on July 16, 1999 he, his brother, and Gloria Marion were sitting around eating pizza for lunch while talking in the  lockup.

However it is apparent from the manner in which the warrants describe  the area where the meetings took place, that the defendants wished to leave the false impression that this area was as defined: a  lockup     i.e. a locked, secured area which required a key to exit.  Since Nault knew that any suggestion of restraint in the  lockup  area was false and misleading, his failure to note that in the warrant was a reckless omission of material fact.  Furthermore,  Nault admits that he noticed the discrepancy between Adam Auclair s statement that the doors were locked, with Aaron s statement that the door leading into the courthouse was open, but did nothing to resolve it.  Of course, if he had, it would have led to the conclusion that Adam Auclair, at the very least, was not credible.  Yet Nault and O Connor failed to identify this discrepancy in the affidavit.

The admissions and actions of the defendants demonstrate that there was no objective

investigation here, but an all-out effort to  get  the plaintiffs, and to cover up wrongdoing that

might have implicated a prosecutor in unprofessional conduct, and which ultimately led to the

disqualification of her entire office.  The issue, then,  under the corrected affidavit analysis is

whether, if Nault, O Connor, Turner and Szamocki had included all they learned from their

investigation, the warrant applications would have "supported a reasonable officer's [or

magistrate's] belief that probable cause existed." *Cartier, supra,* 955 F.2d at 845 (citation

omitted).  The answer is an unequivocal no.

      **D.**    **The Plaintiffs Demonstrated the Elements of Malicious Prosecution.**

      The plaintiffs submit that the uncontested evidence showing lack of probable cause either

on the face of the warrant affidavits or after application of the  corrected affidavit  doctrine, also

demonstrates the lack of contested facts concerning their claims of malicious prosecution.  Under

Second Circuit precedent, which adopts the elements of the Connecticut common law malicious

prosecution tort, plaintiffs can succeed on a fourth amendment claim of malicious prosecution if

they show that (1) they were charged in a criminal prosecution; (2) the charges were brought or

authorized by a person who is now a defendant; (3) the criminal charges were brought without

probable cause; (4) the party acted with malice in bringing the charges (with malice being

presumed in the absence of probable cause); and (5) the criminal prosecution resulted in a

favorable termination to the accused person.  *Robinson v. Cattaraugus*, 147 F.3d 153, 163 (2d

Cir. 1998); *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997);

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997); *Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d

Cir. 1995); *Janetka v. Dabe*, 892 F.2d 187 (2d Cir. 1989); *Conway v. Village of Mount Kisco*,

750 F.2d 205, 214 (2d Cir. 1984).  *See, also*, *DeLaurentis v. City of New Haven,* 220 Conn. 225,

252-55 (1991).

      The defendants admit that the plaintiffs were arrested and that the charges were dismissed

and, by implication, concede that this was a disposition favorable to the plaintiffs. The plaintiffs have set forth, *supra,* the facts that demonstrate that there was no probable cause for the institution of the charges and, therefore, no probable cause to prosecute them. The plaintiffs incorporate their arguments as to the lack of probable cause by reference herein.

Consequently, the plaintiffs submit that they are entitled to summary judgment on their state and federal claims of malicious prosecution.

## III.    ALL FIVE DEFENDANTS ARE LIABLE FOR THE VIOLATIONS OF THE PLAINTIFFS  CIVIL RIGHTS.

This is not the type of case where the Court must search through obscure fact passages or administrative handbooks to discern the level of supervisory liability. Four of the Defendants, O Connor, Turner, Nault and Szamocki, admit that this was a  group effort  between them;  that every report was reviewed; that the supervisors made changes to the draft warrant affidavits and sent them back to the affiants, who signed them, with approval. In addition, Gibeault personally initiated the investigation and created the tone by disparaging the allegations of shredding and computer file deletions in his memorandum to Major Rearick, even before the first witness was interviewed. He also attended planning meetings concerning the investigation of the plaintiffs, including the initial meeting with State s Attorney Solak and Defendant Szamocki, where they discussed  aspects of the investigation.   Gibeault further admitted in testimony that he was at Troop D  on more than one occasion where [he] was just discussing the case with his people.

Most significantly, Gibeault admitted that he reviewed a draft of the warrant and gave it back to Nault, during a time when Defendant Turner was on vacation. Therefore there is ample uncontested evidence to prove Gibeault s liability here.

Plaintiffs concede that legal responsibility for supervisors cannot be supported on a theory of vicarious liability. *Williams v. Smith*, 781 F.2d 319 (2d Cir. 1986). The mere right to control, without any control or direction being exercised, and without failure to supervise, is not enough.

*Monell v. NYC Dept. of Social Services*, 436 U.S. 658 (1976).

However, demonstrating an affirmative link between the misconduct of the subordinate officers and supervisors can easily be established here. *See Rizzo v. Goode*, 423 U.S. 362 (1976). A supervisor may be held liable for the actions of subordinates if he (1) directly participated in the constitutional violation; (2) if he was informed of the violation and did nothing about it; (3) if he created a policy or custom that allowed the unconstitutional practice to occur; (4) if he was grossly negligent in supervising subordinates; or (5) if he exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 251 (2d Cir. 2001). It is not necessary for Section 1983 liability that appellees directed any particular action with respect to these specific individuals, only that they affirmatively promoted a policy which sanctioned the type of act which caused the violation. *Duchesne v. Sugarman*, 566 F.2d 817, 830-31 (2d Cir. 1977).

The plaintiffs submit that there was sufficient personal participation by Gibeault, Turner and Szamocki to establish their individual liability, regardless of their additional roles as supervisors. *See, e.g., Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857 (7th Cir. 1999) (sheriff who personally directed illegal search liable for § 1983 violation); *Wilson v. City of North Little Rock*, 801 F.2d 316 (8th Cir. 1986) (police lieutenant authorized unconstitutional road block liable); *Dean v. Gladney*, 621 F.2d 1331 (5th Cir. 1980) (chain of command in illegal arrest); *Maclin v. Paulson*, 627 F.2d 83 (7th Cir. 1980) (personal participation of police chief results in direct liability).

Consequently each of the defendants is equally liable for the violation of the plaintiffs civil rights.

34

## CONCLUSION

For the foregoing reasons, the plaintiffs submit that their cross motion for summary judgment should be granted.

THE PLAINTIFFS    THOMAS WHITE,
HENRY BOURGEOIS AND GLORIA MARION

BY:_____
    Jon L. Schoenhorn
    Federal Bar No. ct00119
    Jon L. Schoenhorn & Associates
    97 Oak Street
    Hartford, CT 06106
    Tel: (860)278-3500
    Fax: (860)278-6393

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, first class postage prepaid, in accordance with the Federal Rules of Civil Procedure on this 3rd day of June, 2004, to the following counsel of record:

Perry Zinn Rowthorn, Esq.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

_____
    Jon L. Schoenhorn

F:\SHARED\CLIENTS\White, T\Pleadings\SJ2-memo

35