UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THOMAS WHITE, | : | CIVIL ACTION NO. |
| HENRY BOURGEOIS, and | : | 3:02CV1589 (WWE) |
| GLORIA MARION, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| NORMAN NAULT, | : | |
| KAREN O CONNOR, | : | |
| JOHN SZAMOCKI, | : | |
| JOHN TURNER, and | : | |
| LARRY GIBEAULT | : | |
| Defendants | : | JUNE 3, 2004 |

## PLAINTIFFS  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Rule 56, the plaintiffs hereby submit a statement of material facts not in

dispute, with supporting documents, in support of their motion for summary judgment.

1.  James P. Kenney was High Sheriff when Plaintiff Thomas White was hired in 1995.  White defeated Kenney in the Democratic primary election in 1998, and then won the general election in November, 1998. White depo, pp. 15-16

2.  The larceny  investigation of Thomas White commenced with a complaint to the Windham State s Attorney s Office by then High Sheriff James Kenney on or around May of 1998. Warrant Affidavit Tom White paragraphs 3 and 4

3.  Plaintiff Gloria Marion started working for the Windham County Sheriff s Office in September, 1997. She held the position of lieutenant at the time the sheriff s system was abolished.  Marion depo pp. 6, 10

4.  Plaintiff Henry Bourgeois became a state trooper in 1960. He became a sergeant in 1967, and later held the rank of State Police lieutenant for 20 years, at one point serving as the commander of Troop D.  Bourgeois depo, pp. 14-15, 18

5.  After his retirement, Bourgeois worked as a deputy sheriff supervisor under former High Sheriff James Kenney.  He had no knowledge of a police investigation of then deputy sheriff Thomas White until shortly before he was asked to be a supervisor in the White administration. Bourgeois depo pp. 22, 25

6. In March or April 1999, Plaintiff Bourgeois informed Defendant Szamocki that he had been approached by Plaintiff White to become a supervisor in the Windham County Sheriff's Office after White was sworn in, and asked Szamocki about the ongoing investigation of the Sheriff's Office, and whether he thought that White would be arrested. Bourgeois indicated to Szamocki that he did not know whether he should accept the job offer. Szamocki suggested that Bourgeois leave his options open until the investigation is completed. Szamocki did not document this conversation until July 26, 1999, which was then reviewed by Defendant Gibeault. 7/26/99 Szamocki report

7. Sometime between March and April, 1999, before he was sworn in as High Sheriff, White received phone calls from two courthouse custodians, who claimed that there was an overabundance of shredded materials being removed from the sheriff's office. There were several more calls from both custodians, other people in the sheriff's department, about additional accusations of shredding. White Depo. 17-18

8. While Kenney was still High Sheriff, Windham County Assistant State's Attorney Debra Collins met with O'Connor to go over bank records of Thomas White during the criminal investigation, after speaking with an inspector from the State's Attorney's Office. D. Collins p. 87

9. John Novak, the maintenance supervisor at the Putnam Courthouse, had mentioned to Marion that former Sheriff Kenney and others had shredded documents in the Sheriff's Office for a period of time. It wasn't just on one day, but had gone on over a period of time. Marion depo pp. 25-26

10. After a swearing in ceremony at the end of May, 1999, Bourgeois went down to the sheriff's office in the basement of the Putnam Courthouse. The place was empty. Desk drawers and filing cabinets were empty, keys had no identifiable tags and the office computer would not boot up. Bourgeois pp 28, 29; Marion depo p. 24

11. On May 31, 1999, White and Bourgeois went into the sheriff's office in Putnam and saw that records were missing, that the computer had been "wiped clean," that there were no records of inmates to be picked up for the next court date, that courthouse keys were "dismantled" and unidentified and scattered all over. Bourgeois recommended that White conduct an investigation. White depo, p. 26; Bourgeois depo, p. 36

12.   Bourgeois was told by others in the courthouse the names of some of the persons who were in the sheriff s office the night of the shredding, including Assistant State s Attorney Debra Collins, her husband Charles Collins, and  two Special Deputy Sheriffs, Adam and/or Aaron Auclair.  Aaron Auclair had mentioned that he was the last person to use the computer before Sheriff Kenney vacated the offices.  When White and Bourgeois turned on the computer after they assumed their posts, it didn t work.  Bourgeois did not know if someone had sabotaged it or not.  Bourgeois depo p. 75

13.   White complained to Defendant O Connor in June, 1999, about information that Debra Collins and her husband, Charles Collins, were involved in document shredding at the sheriff s office, and that State s Attorney Mark Solak s office should not be making the call because of the Collins  activities.  He spoke to O Connor and told her that  we were hearing rumors that Debra Collins and her husband  were reviewing the records of the investigation. O Connor told White to keep this information to himself, and not to contact an attorney. This raised a  red flag  in his mind, so he hired Attorney Meisler. White depo pp. 22-25, 81

14.   On or about July 13, 1999, Attorney Arthur Meisler, acting as attorney for Thomas White, sent a letter to Chief State s Attorney John Bailey, requesting that Windham State s Attorney Mark Solak and his office be recused from investigating Thomas White because of allegations that Debra Collins and her husband, Special Deputy Sheriff Charles Collins, were involved in shredding.  The initial complaint was forwarded to Defendant Gibeault.  Defendant John Szamocki assigned Defendant Nault to  determine if any criminal activity occurred during the closure of the offices of High Sheriff J. Kenney by anyone.    This description of the assignment was approved by Defendant John Turner, as supervisor, on October 7, 1999   long after the arrest of the plaintiffs.  10/7/99 Nault report; Meisler letter

15.   Debra Collins was very upset about the letter that Attorney Meisler sent to the Chief State s Attorney s Office, and she showed her husband a copy of it.  Debra Collins brought a copy of the Meisler letter to Troop D and was visibly upset and agitated about it.  She was talking about the letter with Szamocki, Detective Contre and Detective Sarrant.  Contre and Sarrant communicated and worked with Collins on a regular basis, yet at least one of them was given assignments relative to the shredding investigation.  Szamocki knew that Detective Contre and Debra Collins were  acquaintances.   Szamocki told Debra Collins that Henry Bourgeois had claimed that she shredded phone records.  However, O Connor told her that the phone records had been given to her for the investigation of Kenney  12/6/99 Testimony of Charles Collins, pp. 80-81, Szamocki testimony pp. 163-66,; Debra Collins testimony, p.  98

16.   Szamocki was in the Troop D barracks when Debra Collins came in  visibly shaken.   She was upset about the Meisler letter that was sent to her office implicating her in the shredding of documents in the County Sheriff s Office.  Szamocki concluded that the letter was  some kind of smoke screen  calculated to  cloud the investigation against High Sheriff Tom White.  By this, he meant that its purpose was to divert attention from another investigation.  Transcript of Szamocki, pp. 104-05, 195

3

17.  Szamocki became aware that plaintiff Bourgeois made allegations concerning the shredding by Debra Collins a few days after June 30, 1999.  He decided after seeing Attorney Meisler s letter to the Chief State s Attorney that Bourgeois  allegations were  part of the scheme of tampering with witnesses  and  hindering prosecution by trying to block charges  and thereafter came to believe it was  part of the conspiracy of Mr. White, Mr. Bourgeois and Ms. Marion to block [the] investigation and filing of charges in the Thomas White embezzling investigation.  Szamocki, pp.132-134

18.  On July 6, 1999, Defendant Szamocki spoke to Lt. Thomas Davoren, commanding officer of Troop D.  Davoren told Szamocki that Bourgeois had told him on a previous occasion that Debra and Charles Collins had been observed in the Sheriff s Office shredding papers with a shredding machine.  Szamocki characterized the information from Davoren regarding Bourgeois in a report to defendant Gibeault as  a possible defense strategy that Thomas White was going to use regarding the current investigation he is the subject of.   On July 7, 1999, Szamocki passed the information along to an inspector in Solak s office.  July 15, 1999 Szamocki Memo to Lt. Gibeault White never asked Bourgeois to meet with Lt. Davoren on June 30,1999, referencing paragraph 26 of the arrest warrant, and never received advice from Borrgeois to take the  offensive  with regard to the embezzlement investigation.  White depo pp. 78-79

19.  Szamocki personally concluded there was probable cause to believe that witness tampering was occurring and that it involved a conspiracy.  Szamocki p. 134.

20.  On July 19, 1999, State s Attorney Solak asked that the State Police conduct an investigation into the allegations against Collins pertaining to her taking part in shredding of official documents and the tampering with a sheriff s department computer.  Defendant Gibeault sent a memorandum to the commanding officer of the Eastern District, Major John J. Rearick, stating that State s Attorney  Solak had previously assigned Debra Collins to assist State Police investigators in their review of Thomas White s wage execution records.  He noted that while Collins and others were observed shredding papers in the Sheriff s Office at the Putnam Superior Court House, he claimed (falsely) that Collins told Solak that only  personal letterhead of Former Sheriff Kenney  was shredded.  7/19/99 Gibeault Memo

21.  Defendant Gibeault stated in the aforementioned July 19, 1999 memorandum that Plaintiff Bourgeois made inquiries to Lt. Thomas Davoren and Defendant Szamocki  on several occasions  regarding  this investigation.   He also informed Rearick, before any investigation had commenced,  that the allegations by Attorney Meisler concerning the shredding of official documents and missing information were  unfounded,  and accused Meisler of trying to create a  perception  of a serious conflict of interest within the Windham State s Attorney s Office, noting that there was  bad blood  between Solak and Meisler.  7/19/99 Gibeault Memo

22.  Charles Collins spoke to both Adam and Aaron Auclair shortly after 7/15/99 about problems they were having with Gloria Marion. Aaron called Charles Collins right after taping Gloria Marion on 7/19/99 and was told to come over after work to play the tape. Aaron brought the tape of his 7/19/99 meeting with Marion to Charles and Debra Collins  home that evening. Both Charles and Debra Collins listened to it. Charles Collins told Aaron to drop it off with detectives at Troop D. 12/6/99 Testimony of Charles Collins, pp. 93-93, 98-101, 111 -113; Adam Auclair testimony p. 8

23.  Adam Auclair was a friend of both Debra and Charles Collins. He lived in a condominium across the street from them.  He went out to dinner with Debra and Charles Collins on 7/14/99. Adam and Charles would watch Red Sox games together two or three times a week, at each other s residences. 11/15/99 Testimony of Adam Auclair, pp. 97-98;  D. Collins testimony, p. 90

24.  Aaron Auclair was friends with Charles Collins. D. Collins, testimony, p. 99; 11/29/99 Aaron Auclair testimony, p. 118

25.  Adam Auclair knew Gloria Marion and her family. He occasionally lunched with Marion s daughter.  11/15/99 Testimony of Adam Auclair, p. 56

26.  Gloria Marion knew the Auclairs because they all lived in the same town for years, and had gone to school with Marion s children.  Marion s husband coached both Auclairs as a high school baseball coach.  They had been to her home many times, and were  very good friends with Marion s daughter.  Marion depo, p. 30, 42-43

27.  Defendant Gibeault was aware prior to the commencement of a formal investigation that the two special deputy sheriffs were submitting statements about their conversations with Marion. 7/19/99. Gibeault Memo

28.  Defendants Gibeault, Szamocki and Mark Solak had a meeting at Eastern District headquarters in Norwich to discuss the allegations of shredding. Gibeault was briefed on all aspects of the investigation. It was determined that Sergeant Turner would handle the supervision of the investigation.  Szamocki assigned particular officers to conduct interviews.  Szamocki Depo p. 107-08, 142; Gibeault, p. 55

29.  From the very beginning the investigation initiated by Solak was not just about destruction of documents and files in the sheriff s office, but included, allegations against the plaintiffs of witness tampering, racketeering, coercion, unlawful restraint, and other charges.  Szamocki Testimony, p. 166.

30.  The investigation concerning possible destruction of public records was  lumped into  the investigation of the plaintiffs for tampering with witnesses.  Szamocki Testimony, p. 112.

31.  Nault was assigned by Szamocki to be the case officer for the investigation of plaintiffs.  As information and reports came in, they were turned over to Szamocki as the supervisor.  Szamocki reviewed and read the content of each and every statement and made further assignments from the information.  Szamocki Testimony, pp. 108, 116, 124

32.  Norman D. Nault was a sworn State Police officer by the State of Connecticut Department of Public Safety, assigned to Eastern Major Crime Squad, as a detective.  On July 20, 1999 he was geographically assigned at district Headquarters in Norwich.  Sergeant Turner was his supervisor. 11/10/99 Nault Testimony,  p.83

33.  As Nault changed his assignment on 7/20/99 John Szamocki became his supervisor.  Szamocki assigned Nault as principal investigator regarding a letter received through State Police chain of command, written by Attorney Meisler to Chief State s Attorney Bailey. A  copy was sent to Windham State s Attorney Solak and  Solak gave it to Lt. Gibeault.  Improprieties were alleged in the letter about shredding, erasing memories of computers, and missing supplies in the High Sheriff s Office of Windham County.  Nault was physically given a copy of the letter. 11/10/99 Nault Testimony, pp. 84,90.

34.  When Nault received the assignment on July 20, 1999 there was a meeting with several detectives. Those present included Lieutenant Gibeault, Sergeant Szamocki, Trooper O Connor, Detective Contre, and Detective Nault. This meeting concerned Attorney Meisler s letter. 10/7/99 Nault Report; 11/10/99 Nault testimony  p.85

35.  Szamocki was also supervising the activities of Defendant O Connor in the underlying embezzlement investigation concerning Thomas White.  Szamocki Testimony p. 156.

36. Nault s duties as case officer were to coordinate the investigation, prepare the paperwork and reports that were submitted, and get the case ready for prosecution, including preparation of any affidavits. Defendant Turner was Nault s immediate supervisor. Turner was technically in charge of the investigation concerning the shredding in the sheriff s office on or about May 28, 1999. Turner and Szamocki worked hand in hand on the assignments and leads as a team effort. Both Turner and Szamocki reviewed everything and then determined assignments. Szamocki Testimony, pp. 124-26

37. After being sworn in as High Sheriff, White requested and obtained authority from Patricia Lempicki in the Hartford Office to conduct an investigation. On June 3, 1999, Thomas White authorized in writing an internal investigation into the shredding and the disappearance of files, under the Kenney administration. He directed Bourgeois and Marion to commence the investigation. 6/3/99 White memo; White depo p. 27.

38. Because Aaron and Adam Auclair were special deputy sheriffs, they had no responsibility with respect to wage or bank executions. D. Collins, Testimony, p. 94

39. At the time of the Marion interviews with the Auclairs, White had no knowledge that the Auclairs were involved in or had any information concerning or knowledge about the embezzlement investigation. White depo pp. 94-95

40. White gave Bourgeois the authority to conduct the internal investigation into the possible destruction of and damage to department materials, because Bourgeois was an ex-state trooper, and because White had never conducted an internal investigation himself. He left the conduct and manner of the investigation to Bourgeois s discretion. White never suggested to anyone that witnesses couldn t talk to other state agencies, state police or the State s Attorney s office. Bourgeois stated that the investigation should be kept confidential, and conducted like a state police internal investigation. White depo, pp. 28-31

41. Section 21 of the Sheriff s Code of Ethics, states that occurrences involving the sheriff s office are to remain confidential within the sheriff s department, and are not to be discussed outside the department. Aaron Auclair received a copy of this Code and was familiar with it. 11/29/99 Aaron Auclair testimony, pp. 10-11, copy of Sheriff s code (excerpt)

42. The Sheriff s Code of Ethics, Section A-25 requires deputy sheriffs to cooperate truthfully in internal investigations. 11/29/99 Aaron Auclair testimony, pp. 118-11; copy of Sheriff s code

43.  Captains Bourgeois and David Griffith met with Lt. Marion in their Danielson office on July 16, 1999, and requested that she assist in the internal investigation concerning the shredding of materials and deleting of computer files.  She later met with Adam and Aaron Auclair.  Marion depo pp. 29-30

44.  Marion was told by Bourgeois and Griffith that the investigation was to determine whether or not the Auclairs participated in the shredding of any documents and how the office was left when Kenney departed, because of the amount of items missing from the sheriff's office when white took over.  Marion depo p. 31, 38

45.  As part of the internal investigation, White and Bourgeois wanted Marion to question the Auclairs, and she agreed to do so.  Bourgeois suggested that statements could be obtained either in written form or as a taped interview.  Bourgeois delegated this portion of the investigation to Marion.  Bourgeois pp. 45-47; Marion depo p. 38

46.  Bourgeois believed that the Auclairs had a duty to talk to Marion because the Sheriff's Office was a state agency with the right to conduct an internal investigation about possible misconduct.  This authority was the same or similar to other state agencies investigating improprieties in their offices.  Bourgeois depo, pp. 75-76

47.  The Auclairs could have received administrative discipline for any misconduct in which they were involved while employed by the sheriff's department.  If they refused to be interviewed, they could be subject to disciplinary action pursuant to a  Loudermill  hearing.  If they claimed a privilege against self-incrimination, they could be compelled to answer questions subject to being given their  Garrity  rights.  Bourgeois depo p. 76

48.  Marion believed that the Auclairs had the right to refuse to cooperate with the internal investigation and could get up and leave whenever they wished, which is what they did.  They were never held against their will.  Marion depo, p. 41

49.  Marion knew that she had the authority to conduct internal investigations, pursuant to a written policy of the statewide office for sheriffs, and pursuant to the code of conduct book that required all deputy sheriffs to cooperate with internal investigations.  Marion depo 34-35

50.  The investigation into the activities of the Auclairs had nothing to do with the allegations against White and the alleged mishandling of funds.  Marion depo, p. 44

51.  Marion never received any training on how to conduct an internal investigations.  Marion depo p. 37

52.  On or about July 19, 1999 O'Connor went to the Administrative Offices of the County Sheriff's in Hartford and obtained a copy of a written request  Sheriff White sent to Patricia C. Lempicki, administrative director for the Office of the County Sheriffs, for permission to conduct an investigation into the shredding of documents by former High Sheriff Kenney.  According to O'Connor's report, Lempicki gave a statement to Defendant O Connor on July 21, 1999 concerning this matter, and also explained the internal investigation procedures utilized by the sheriff s offices.  Lempicki gave O Connor a copy of the Office of the County Sheriffs Policy Statement & Implementing Procedures,  which describes the procedures for the investigation of alleged violations of the code of conduct by sheriffs.  Defendant Szamocki was aware of the content of Lempicki s statements to O Connor because he reviewed and approved O Connor s report concerning same on 8/12/99.  8/9/99 O Connor report

53.  Defendant Turner was aware of the contents of Lempicki s statements to O Connor, because he signed and approved a separate report prepared by O Connor on 7/21/99 that attached Lempicki s statement, but that was incorrectly dated 6/21/99, (which would be prior to the commencement of, and her assignment to, the particular investigation under Case No. D-99-172940).  6/21/99 [sic] O Connor report

54.  The Sheriff s Department has authority over law enforcement and security within the jurisdiction of the courthouses.  Turner Testimony, p. 12

55.  Adam Auclair received a phone call at 6:30 a.m. on July 20, 1999 from Szamocki.  He told Szamocki that he was resigning. Up until that time, Auclair had never spoken to Szamocki before.  11/15/99 Adam Auclair Testimony, pp. 1-2

56.  On July 20, 1999, D Collins drove Aaron Auclair to the State Police barracks, Troop D.  She had a  good relationship  with the officers at Troop D, and often went there. Collins knew the reason why Aaron Auclair was going to Troop D, and introduced him to Detectives  Nault and Contre.  D Collins Testimony, p. 91; 11/29/99 Aaron Auclair testimony p. 29

57.  On July 20, 1999 Nault personally received and logged in as inventory the two audio cassette tapes from Aaron Auclair, that  documented his conversations, respectively, with Gloria Marion on July 19, 1999 and Thomas White on July 20, 1999. The Marion tape came into Szamocki s possession on July 20th at 8:40 a.m. when it was personally handed to him by Aaron Auclair.  Szamocki Testimony, p. 154; Inventory of property seized, dated July 20, 1999

58.  Szamocki had asked Aaron Auclair earlier that morning to come to the barracks and bring the tape, after Aaron Auclair told Szamocki he was going to tape his encounter with Sheriff White when he tendered his resignation. Szamocki may even have provided the blank tape. Szamocki Testimony, p. 154, 157

59.  Aaron Auclair was interviewed by Defendant Nault on 7/20/99.  7/20/99 Nault report

60.  Aaron Auclair gave a written statement to Nault on 7/21/99 indicating that shredding occurred in the Office of the County Sheriff on May 28, 1999; that he was present, along with Debra Collins; that they used a shredder from the State s Attorney s Office; that he retrieved garbage bags from the custodian, John Wisnewski; and deleted materials from the office computer.  Aaron Auclair statement, 7/21/99

61.  Aaron Auclair stated in the 7/21/99 statement, that both he and his brother, Adam, were employed as deputy sheriffs in 1999, and that Lt. Gloria Marion was their supervisor.  He also stated that Marion approached the two brother to discuss their work schedule on or about July 16, 1999.  He further stated that Marion repeatedly questioned him about his handling of personnel files, and about the involvement, if any, of Charles and Debra Collins and Kenney, in destruction of records.  In particular, he stated that  Lt. Marion pressed on asking if I had any knowledge of any documents getting shredded on the night on May 28, 1999.   Aaron Auclair statement, dated 7/21/99

62.  With regard to the comment about being  jammed up  on his schedule, Adam Auclair initiated the subject about being  jammed up  on his schedule with Marion on June 28, 1999, asking her to intervene on his behalf to fix his schedule, and Adam believes that Marion did help him.  When Marion spoke to Adam Auclair on 7/16/99 regarding his schedule, it was precipitated by an earlier request from Adam to Marion about his schedule.  Marion never suggested that Adam should lie. He told the State Police investigators that Marion, his brother Aaron and, himself, were all eating pizza for lunch while talking in the courthouse room.  Adam did not believe there was anything inappropriate about the 7/16/99 conversation with Marion. 11/15/99 Testimony Adam Auclair, pp. 30-36, 38, 39-40, 49, 76, 83-89, 92-96

63.  The July 20, 1999 taped conversation between White and the Auclairs concerning their resignation demonstrates that White asked them not to quit, and suggested they take a few weeks off to think about it.  White also asked them during this taped conversation to stay on as special deputy sheriffs.  White depo pp. 52-53

64.  The July 20, 1999 tape was turned over to Defendant Nault on July 20, 1999. 7/20/99 Inventory of Seized Property

65.  Aaron Auclair gave a written statement to Defendant Nault at his apartment on July 20, 1999, in which he stated that he was employed as an office assistant to Sheriff Kenney only in the summers and during winter college breaks.  He told Nault that he and his brother Adam Auclair resigned from the sheriff s office that date and recorded the conversation with Sheriff White.  He told Nault that he was  interrogated by Gloria Marion and told I was part of an internal investigation.  I could not stand this anymore and that s why I resigned.  He saw his brother turn over to Nault a tape of the conversation that he secretly made. Defendant Turner endorsed Nault s report.   7/20/99 statement of Aaron Auclair; 11/15/99 Adam Auclair testimony, pp. 18-19

66.  Aaron Auclair s July 21, 1999 written statement taken by Defendant Nault and Detective Contre notes that in the fall of 1998 he worked on Kenney s reelection campaign as High Sheriff of Windham County. During the primary, Kenney lost to Aaron White.  Statement of Aaron Auclair dated 7/21/99; 11/15/99 Testimony of Adam Auclair, p. 37

67.  In a 7/21/99 written statement taken by Nault, Aaron Auclair described a July 16, 1999 meeting with Marion at the Willimantic Courthouse, which involved his work schedule.  He said that he and Adam went with Marion to the lock up area for privacy.  He wrote:   In the lockup area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading out of area. One locked door was directly behind Lt. Marion and the second unlocked door was behind us    7/21/99 Statement of Aaron Auclair.

68.  The door directly behind where Adam and Aaron Auclair were sitting led to an open staircase that went directly into a courtroom.  The door behind the Auclairs that led upstairs to the courtroom was opened.  That door had no lock. If the Auclairs had wanted at any time to get up and turn around and climb the stairs into the courtroom, there was nothing to restrict their exit.  Marion depo 54-55; 11/29/99; White depo p. 59-60; Testimony of Aaron Auclair, p. 102

69.  None of the plaintiffs were ever interviewed by anyone from the State Police during the course of the investigation. White depo p. 69

70.  At least two transcripts of the July 19, 1999 recorded conversation between Gloria Marion and Aaron Auclair were prepared by Ruth Simmons, secretary to State s Attorney Solak.  Copies of both versions were identified by Simmons. 12/16 /03  Simmons depo, pp.  13-15, 31-32, Exhibits 1& 2

71.  During the taped conversation between Aaron Auclair and Gloria Marion on July 19, 1999, Marion states several times that the purpose of the interview is an  internal investigation  that has nothing to do with the State Police.  Marion also states that she is not trying to  build Tom s case.   Furthermore, Marion explained that she was sent to conduct the interview because of a belief that Aaron Auclair would  feel more comfortable  talking to her.  Only excerpts of the taped interview are included in the arrest warrant affidavits.  Transcripts of interview; warrants, affidavits,  pp.  33,34

72.  Adam Auclair was aware that Plaintiff White was conducting an internal investigation relating to the shredding of papers, and erasure of files from department computers, as well as investigating whether Aaron Auclair had accessed personnel files.  11/15/99 Transcript of Adam Auclair, p. 27

73.  Szamocki was aware that Marion and Bourgeois told the Auclairs that they were conducting an internal investigation.  He was also aware that a protocol existed within the sheriff s departments statewide to conduct their own internal investigations, or refer them to the central office in Hartford.  Szamocki Testimony, p. 157-58

74.  The room where Marion and the Auclairs spoke had two exits.  The one behind Plaintiff Marion was locked.  The other one does not lock.  Adam was sitting sideways to the unlocked door while taking notes. 11/15/99 Adam Auclair Testimony, p. 40

75.  Turner did not see any problems with the investigation from the materials he reviewed, including the warrant affidavits.  He was aware that there was a claim of a legitimate internal investigation regarding the destruction of materials under Sheriff Kenney.  A  tactical  decision was made, in consultation with Szamocki, not to contact the plaintiffs or obtain memos concerning their own investigation. Turner Testimony pp. 6, 8-9

76.  The Windham State s Attorney s Office was deemed to be the complainant.  Szamocki did not consider Attorney Meisler or Sheriff White to be the complainants, because they did not send any correspondence directly to the State Police requesting an investigation.  Nobody was assigned to talk to Attorney Meisler, or anyone in the Sheriff s Office after White assumed his post, to determine what, if anything, was missing. Szamocki Testimony pp. 109, 196

77.  Nault went down to the lockup area where the interview with Marion and the Auclairs took place to view the room.  Turner Testimony, pp. 10-11

12

78.  Szamocki never directed any officers to interview anyone connected with the Sheriff s Office after June 1, 1999 to help determine what documents might be missing. Because none of those individuals involved with Sheriff White s administration ever approached the State Police directly regarding missing items, no statements were taken by the State Police.  A decision was made by Turner and Gibeault that the internal investigation by the Sheriff s Office was being interpreted as tampering with a witness and therefore, the State Police did not want to take statements from any of those individuals regarding the destruction of documents.  This decision not to conduct these interviews meant that no information would be gathered about whether the individuals involved in the May, 1999 shredding were telling the truth.  Szamocki Testimony, p. 196-97, 198-99

79.  As case officer, Nault would consult with Szamocki about the direction and the way the investigation was going and what was turning up.  Any paperwork coming in would go to Sergeant Szamocki who reviewed it and then would be given to Nault.  11/15/99 Nault Testimony, p. 66

80.  No effort was made to take statements from White or Marion during the conduct of the investigation. The only statements taken were from the alleged perpetrators.  A decision was made by Turner, Szamocki and others not to interview the plaintiffs until after they were arrested.  No effort was made to obtain the plaintiffs   side of the story  prior to the application for arrest warrant.  Szamocki Testimony pp. 111-112; Turner Testimony p. 4

81.  Nault reviewed all statements taken by himself or others working on the investigation concerning people present on 5/28/99 in the Sheriff s office.    11/15/99 Nault testimony, p.7

82.  Turner and Nault made a  tactical decision  not to go speak to White. They decided only to speak to him after his arrest. 11/15/99 Nault testimony,  p.7

83.  Nault made the decision not to speak to Marion prior to arrest which was also a tactical decision based on his opinion that she was more apt to give information post-arrest.  Underlying factors considered in arriving at that decision were that  we had the tape with her with Adam Auclair. I could check that with Aaron Auclair when he was being talked to. So we had that tape and what she said, so basically we had it there.   11/15/99 Nault Testimony, p. 9

84.  Nault never contemplated interviewing Attorney Meisler because he had his letter, and took that as a complaint.  11/15/99 Nault testimony, pp. 9-10

85.  On July 22, 1999, John Wisnieski, a custodian at the courthouse, gave a signed written statement to the Connecticut State Police disclosing that at the end of May 1999 he went down to the Sheriff s Office at the Putnam Courthouse and saw Charles and Debra Collins, Adam Auclair, Kenney and Ardel Derry in the sheriff s office, while Debra was sitting at a shredding machine shredding paper. Wisneiski went to White and told him about the shredding.  Statement of John Wisnieski

86.  Szamocki concluded from the investigation that Debra Collins had, in fact, participated in the shredding of documents.  Szamocki Testimony p. 141

87.  Nault concluded that Debra Collins destroyed , shredded and otherwise disposed of records of the Windham County Sheriff s Office and that the shredding machine employed to shred some of these records was the property of the Division of Criminal Justice.  11/15/99 Nault Testimony, pp.12-13

88.  White s complaint was correct that copies of personnel records were made and removed from the sheriff s office without authorization.  It was determined that Kenney brought these records to the Office of the County Sheriffs in Hartford. 11/15/99 Nault Testimony, p.13

89.  A second state owned computer was removed by Kenney from the Putnam courthouse and turned into the Office of the County Sheriff in Hartford.  11/15/99 Nault Testimony, p.14

90.  Nault decided that the allegations in Attorney Meisler s letter to the Office of the Chief State s Attorney were false, and part of a conspiracy by White and  others  to hinder prosecution by attempting to block the lodging of charges against him. 11/15/99 Nault Testimony, p. 14

91.  Nault never discussed with anyone whether Sheriff Kenney could lawfully remove and retain copies of  documents from the Sheriff s Office personnel files after his term of office ended. Nault had no idea what documents White complained were missing from the sheriff s office after he took over as High Sheriff.  11/15/99 Nault Testimony, pp. 16-17, 38

92.  The arrest warrant affidavit for Thomas White by Karen O Connor was prepared under the direction and supervision of Defendant Szamocki.  During the supervision in the embezzlement case, neither Adam nor Aaron Auclair s names ever came up nor at the time did Szamocki believe they had any significance to that investigation .  Szamocki Testimony, pp. 159, 160

93. Nault never asked anyone in the Windham Sheriff s Office who was employed there at the time of his investigation what the problem with the Sheriff s Office computer had been, nor did he ask anyone in the Hartford Office with computer experience what the problem was. Nault, instead, concluded that materials had not been removed from the computer in the sheriff s office through interviews with Adele Dery, Adam Auclair and Kenney, none of whom were employees of the County Sheriff s Office at the time Nault conducted the interviews. 11/15/99 Nault Testimony, pp.18-19, 21

94. Nault did not know specifically what, if any, documents were erased from the computer and relied only on what was told to him by Aaron and Adam Auclair and Adele Dery. Nault did not check the computer himself, nor did he determine independently from the computer memory what files were deleted. He never spoke to White. 11/15/99 Nault Testimony, pp.46-47, 50-53

95. Nault had been down in the lockup area at the Willimantic Courthouse previously and knew which doors could lock or not lock. However he did not go down there again after being assigned to the investigation on July 20, 1999. 11/15/99 Nault Testimony, p.29

96. Nault noticed that in Adam Auclair s statement, Adam claimed all the doors were locked during the meeting with Gloria Marion, while Aaron s statement states that the door behind them that goes up to the courthouse was open at the time. 11/15/99 Nault Testimony, p. 29

97. The first part of the warrant affidavit was prepared by O Connor and reviewed and supervised by Szamocki. The second part of the warrant affidavit, dealing with tampering, etc. was prepared by Nault, whose work product was supervised, in turn, by Turner. Szamocki Testimony, pp. 180-81.

98. Nault, Szamocki, Turner and other detectives discussed putting the arrest warrants together and determining the charges. They believed they had probable cause to arrest at that time. They relied primarily on the Auclair statements, the audio tape and the memorandum by Lt. Davoren. Meetings were held to discuss the investigation. Those present, in addition to Nault, Szamocki and Turner, included Solak and, on some occasions, Gibeault. 11/16/99 Testimony John Turner pp. 2-3, 4

99. Gibeault did not attend all the meetings, but was briefed on the progress of the investigation. Szamocki and Turner were required to keep him informed to keep abreast of what was happening with the case. Gibeault believes he reviewed a draft of Nault s arrest warrant affidavit before it was submitted in final form. Gibeault Testimony, p. 56, 58, 67

15

100.  The decision to submit the warrants was a joint one between Turner, Szamocki, Nault and Gibeault.  Gibeault discussed the decision to obtain the warrants with  Szamocki and Turner and he relied on their judgment.  Turner Testimony, pp. 14-15, 58

101.  Turner concluded from the materials submitted in the warrant that Marion interrogated one of the Auclair brothers in a room that was locked and had no way out at the time. This was one of the factors in believing there was probable cause.  Turner conceded that if the door was not locked while Aaron Auclair was being questioned by Marion that there would probably not be grounds to charge anyone with unlawful restraint or kidnaping.  Turner Testimony, pp. 32-33

102.  Lieutenant Gibeault attended a meeting with Solak and Szamocki regarding the 7/13/99 letter from Arthur Meisler , was at Troop D on more than one occasion discussing the case with  his people , reviewed a  draft of the arrest warrant and gave it back to Nault, while Sergeant Turner was on vacation. Gibeault Testimony 11/16/99 pp. 59, 60, 67

103.  Turner and Nault made the decision regarding probable cause in the warrants they signed. Gibeault Testimony, p. 68

104.  It is a common law enforcement technique to use half-truths when talking to suspects to get them to cooperate and tell everything they know, as well as threatening consequences if they don t cooperate.  Turner Testimony,  pp. 34-35

105.  Defendant Nault went to Plaintiff Marion s house on September 13, 1999 at 7:10 a.m. to arrest her.  She was taken into custody and transported to Troop D where she was processed, and charged with two counts of tampering with a witness, four counts of unlawful restraint, bribery of a witness, conspiracy, and coercion.  9/20/99 Nault report & UAR

106.  On September 13, 1999 at approximately 9:45 a.m. Plaintiff Thomas White was arrested by defendant Nault and charged with Larceny by Embezzlement, two counts of tampering with a witness, two counts of unlawful restraint second degree, bribery of a witness, hindering prosecution and conspiracy, coercion, and racketeering.  9/30/99 Nault report, Uniform Arrest Report signed by Nault

107.  On September 15, 1999, at approximately 2:35 p.m., a State Police detective arrested Plaintiff Henry Bourgeois and charged him with two counts of tampering with a witness, conspiracy, two counts unlawful restraint second degree, two counts of coercion, and hindering prosecution. 9/24/99 Contre report, approved by defendant Szamocki

108. In a written report, Nault identified Aaron Auclair and Adam Auclair as the victims of the crimes charged against the plaintiffs. The report was approved by Defendant Turner. 9/13/00 Nault report

109. All criminal charges against Plaintiff Bourgeois were dismissed in the Windham Judicial District on July 27, 2001. Bourgeois depo, p. 51

110. The charges against the plaintiffs relative to this case were nolled by Special State s Attorney Glen Coe on July 27, 2001. A copy of Coe s report was provided to defendant Nault. 10/6/01 Nault report; Coe report

111. Pursuant to Connecticut statute, State Police officers in 1999 had the same powers with respect to the enforcement of the laws as sheriffs did in their respective jurisdictions. Conn. Gen. Stat. § 29-7 (1999 Rev.)

112. Pursuant to statute, sheriffs and deputy sheriffs were defined as peace officers by the Connecticut General Statutes. Conn. Gen. Stat. § 53a-3( 9 ) (1999 Rev.)

113. Nault interviewed Aaron Auclair on 7/20/99 and 7/21/99, taking separate statements on each day. Sergeant Szamocki had the tape given to him by Aaron Auclair concerning the meeting that Aaron had with Lieutenant Marion on the Friday prior that he had taped. Detective Nault listened to that tape before he met with Aaron Auclair. 11/10/99, Nault Testimony, pp. 87-88

114. Nault received the 7/19/99 recorded tape from Szamocki. Szamocki had seized the tape after it was given to him by Aaron Auclair at Troop D. Szamocki received that tape on 7/20/99. Detective Nault called Aaron Auclair and left message on his answering machine 11/10/99,Nault Testimony, pp. 88-90

115. The two different audio tapes were received by Nault from Aaron Auclair. The first tape was of a conversation with Gloria Marion. The second tape was of a conversation between Aaron Auclair, Adam Auclair and Thomas White. 11/10/99,Nault Testimony, pp.93

116.  Nault filled out the state police evidence form JDCR-18 on 7/20/99. Nault had received the second cassette tape around 1235 as Aaron came to the barracks and met with Detective Nault and gave the tape to him. At that time Nault questioned Aaron Auclair about the complaint that was outlined in the letter to Jack Bailey because that was what he was investigating at that point. However, Nault filled out the JDCR 18 form showing that he was taking evidence regarding tampering with a witness. 11/10/99, Nault Testimony, at p 94

117.  Nault concluded that there was an issue of tampering with a witness when he listened to the 7/19/99 tape. Detective Nault  contacted the Office of the County Sheriff to determine how internal affairs investigations are handled within the various sheriff s departments. 11/10/99, Nault Testimony, p. 95

118.  Nault spoke with Pat Lempicki at the Hartford County Sheriff s Office and was told that each county sheriff office had its own procedures for investigations, and some of them weren t in place. There wasn t any specific protocol from the Sheriff s central office regarding overseeing of internal investigations 11/10/99, Nault Testimony, p.96

119.  Detective Nault did not listen to the second tape recording before he took a statement from Aaron Auclair on 7/20/99. Subsequent to taking the statements from Aaron Auclair, Nault listened  to it. 11/10/99, Nault Testimony, pp. 97, 129

120.  Nault consulted with Szamocki and Turner as to the specific offenses that he would include in the warrant application for the warrant for Gloria Marion. 11/10/99, Nault Testimony,  p. 109

120.  Detective Nault compiled the charges on the face sheet of the warrant affidavit, to wit, two counts of tampering with a witness, one count of unlawful restraint, two counts of coercion, one count of bribery, one count of conspiracy, three more counts of unlawful restraint. After compiling the charges Detective Nault asked Attorney Solak if the charges were going to fit. Detective Nault went alone when he went to see Mr. Solak with the warrant affidavit. 11/10/99, Nault Testimony,  p.110

121.  Detective Nault prepared preliminary drafts of the warrant applications and reviewed them with his supervisors. There were several copies of the drafts which he left with his supervisor to review and the supervisor would return the copy to Detective Nault with corrections. Detective Nault then shredded those copies. On the copies of the drafts Detective Nault s supervisor had suggestions of things to change. 11/10/99, Nault Testimony, p. 111

18

122.  The affidavits in support of the arrest warrants for Gloria Marion and Tom White were the same in both files. Mr. White s affidavit is signed by Trooper O Connor and Gloria Marion s. Detective Nault and Trooper O Connor made use of  word processing capacities. Some of the charges, the pronouns and the attributions change between the two versions. In other words, O Connor indicates what she did and Nault in his affidavit states what O Connor did. 11/10/99, Nault Testimony, p.112


123.  Nault s authorship of the warrant affidavits began with paragraph marked twenty-four, on page twenty-three. Paragraphs one through paragraph twenty three were authored by O Connor. Nault printed out a copy which was reviewed by his supervisor who suggested changes and Nault made those changes. Then Nault finally prepared a disk and made the changes before returning the disc to Trooper O Connor so they were appropriate for her to sign. Once O Connor gave the disc back to Nault he was the one who produced the reminder the three affidavits. His computer had the form itself on it so that Nault had to change who the defendant was in each of them. 11/10/99, Nault Testimony, pp.125-26


124.  Detective Nault stated that he was trained to talk to a complainant after he received a complaint, but he did not do so in this case. Nault stated that he was investigating improprieties within the office of High Sheriff under Kenney but it turned into a tampering with a witness later on in the day of 7/20/99. 11/10/99, Nault Testimony, p. 137


125.  Nault never went to the Windham County Sheriff s Office to ask them if any document were missing, claiming they had no  baseline , therefore he did not ask anybody what was missing or what they thought was missing.  11/10/99, Nault Testimony, p.138


126.  Nault was assigned the case but the detectives go out and do interviews. Sergeant Szamocki assigned the detectives to do the interviews in this case. 11/10/99, Nault Testimony, p.139


127.  Sergeants don t take cases; they re assigned to the detectives, so Nault was assigned the case. Nault had no say in who went out and who was interviewed. The sergeants make the assignments. It is Nault s case in that the tracking system through the State is a punch card system, and Nault s badge number is put on that system. However, this investigation was basically a group effort. 11/10/99, Nault Testimony, p.140


128.  Nault decided he would take the more aggressive role in the investigation, including taking whatever was assigned to him by the Sergeant. When asked if it s the sergeant s case as he s assigning everybody and Nault. does not have any say-so on who gets assigned, Nault. replied in the affirmative,  That s correct . 11/10/99, Nault Testimony at 140

129.  The sergeant, assigns the people. All the statements that were obtained came back into a file folder, the sergeant would review them, and then Nault would review them, and then  we d go from there.  In the beginning the sergeant made the decision about where the investigation would go from there.  We use a group effort  . 11/10/99, Nault Testimony, pp. 141-142

130.  Nault. had been doing these type of group investigations for over 11. 11/10/99, Nault Testimony, at 145

131.  Nault and Sergeant Turner made the decision that there was no criminal activity that occurred in relation to the shredding of documents. 11/10/99 at 149

132.  Aaron Auclair worked as an office assistant within the Sheriff s office in December 1997. During this time he did not receive complaints. During the summer of 1998 he again worked for Kenney at the Sheriff s office. Statement Aaron Auclair dated 7/21/99

133.  On July 19, 1999 White spoke with Aaron Auclair regarding the internal investigation being conducted by his office outside the Juvenile Court in Willimantic. Statement Aaron Auclair dated 7/21/99

           THE PLAINTIFFS   THOMAS WHITE,
           HENRY BOURGEOIS AND GLORIA MARION

           BY:_____
               Jon L. Schoenhorn
               Federal Bar No. ct00119
               Jon L. Schoenhorn & Associates
               97 Oak Street
               Hartford, CT 06106
               Tel: (860)278-3500
               Fax: (860)278-6393

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, first class postage prepaid, in accordance with the Federal Rules of Civil Procedure on this 3rd day of June, 2004, to the following counsel of record:

Perry Zinn Rowthorn, Esq.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

_____
Jon L. Schoenhorn

F:\SHARED\CLIENTS\White, T\Pleadings\RULE56E-TomWhite 2.wpd

21