**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| THOMAS WHITE, ET AL., | : | CIVIL ACTION NO. |
| *PLAINTIFFS* | | 3:02CV1589(WWE) |
| | : | |
| v. | : | |
| | : | |
| NORMAN NAULT, ET AL. | | |
| *DEFENDANTS* | : | July 29, 2004 |

**DEFENDANTS' MEMORANDUM IN**
**IN OPPOSITION TO PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

Defendants submit this memorandum in opposition to plaintiffs' cross motion for summary judgment. Submitted herewith is defendants' Local Rule 56(a)(2) statement. Plaintiffs fail to state a claim upon which relief can be granted based on their arrest for charges relating to witness tampering and obstruction of justice. Plaintiffs allege that the defendants violated their civil rights by seeking and obtaining warrants for their arrest. Plaintiffs evidently believe that the mere fact that the charges against them were not pursued by the State means that the defendants violated their Fourth Amendment rights. Plaintiffs do not and cannot rebut the facts set forth in defendants' motion that the defendants lacked any improper motives in seeking the arrest warrants at issue, and that they relied on both evidence provided by seemingly reliable witnesses and the advice of State's Attorney Mark Solak, who advised defendants that probable cause existed to arrest the plaintiffs. Plaintiffs have not, therefore, established the requisite mental state on the part of the defendants to either state a claim for violation of the Fourth Amendment or to overcome defendants' entitlement to qualified immunity. Accordingly, plaintiffs are not

entitled to summary judgment.  To the contrary, summary judgment should enter on behalf of all defendants on all claims.

I.    **MATERIAL FACTS ENTITLING DEFENDANTS' TO SUMMARY JUDGMENT AND REQUIRING THAT PLAINTIFFS' MOTION BE DENIED.**

The following recitation of material facts is reproduced from defendants' memorandum in support of summary judgment.[1]   Those facts establish that defendants – not plaintiffs – are entitled to summary judgment.

A.    The Plaintiffs

Plaintiff Thomas White was hired as a deputy sheriff in Windham County in 1995.  See Statement of Material Facts Not In Dispute ("SMFNID") at ¶ 1.[2]   He was elected to the position of High Sheriff for Windham County in November of 1998, defeating incumbent James Kenney. See SMFNID at ¶ 2.  Plaintiff White assumed his duties as High Sheriff on June 1, 1999, serving in that position until the sheriffs system was abolished on December 1, 1999 in favor of the current judicial marshal system.   See SMFNID at ¶ 3.  Plaintiff White did not lose his position as High Sheriff as a result of the criminal charges at issue in this case, but rather resigned when the sheriff's system was dismantled.   See SMFNID at ¶ 4.  He currently works as a representative for a public employees' union.   See SMFNID at ¶ 5.

Plaintiff Gloria Marion was first employed as a deputy sheriff by the Sheriff's Department in September of 1997.  See SMFNID at ¶6.  She served in that capacity until promoted to Lieutenant by plaintiff White immediately after he became High Sheriff in June of

---

[1] Rather than resubmitting the evidence already appended to Defendants' Statement of Material Facts Not In Dispute, that evidence is simply referenced in Defendants' Local Rule 56(a)(2) Statement.  Should the Court desire any additional copies of that evidence, counsel will of course supply them.

1999.  See SMFNID at ¶ 7.  Plaintiff Marion remained at that rank until the sheriff's system was

abolished.  See SMFNID at ¶ 8.  Plaintiff Marion's employment in the courts was not interrupted

as a result of either her arrest or the transition to the current marshal system.  See SMFNID at ¶

9.  She is currently employed by the Judicial Branch of the State of Connecticut as a Judicial

Marshall II in Windham County.   See SMFNID at ¶ 10.

Plaintiff Henry Bourgeois became employed as a full-time deputy sheriff in Windham

County in July of 1995, having previously worked at various times in the sheriff's office on a per

diem basis.  See SMFNID at ¶ 11.  He was promoted to captain – a supervisory position above

lieutenant in the chain of command – by plaintiff White in June of 1999.  See SMFNID at ¶ 12.

Like plaintiff Marion, Mr. Bourgeois' employment in the court system was not interrupted by his

arrest or the abolishment of the sheriff's system.  See SMFNID at ¶ 13.   He is currently

employed as a supervisory judicial marshal.  See SMFNID at ¶ 14.  Prior to his employment in

the sheriff's system, plaintiff Bourgeois served as an officer of the Connecticut State Police for

32 years, retiring in 1992.  See SMFNID at ¶ 15

B.    The Defendants

Defendant Norman Nault is employed by the Connecticut State Police as a detective,

having joined the State Police in 1988.  See SMFNID at ¶ 16.   At the time of the events at issue

in this matter, Detective Nault was assigned to the Eastern District Major Crime Squad, where he

specialized in the investigation of serious and/or complex crimes.  See SMFNID at ¶ 17.

Detective Nault lead the investigation into the charges at issue in this matter and prepared the

affidavit for the warrants for the arrest of defendants Marion and Bourgeois on those charges, as

---

[2] Each paragraph of the SMFNID contains a citation to one or more exhibits supporting the truth of the
statement.  Those exhibits are attached to the SMFNID.

well as the language incorporated into the affidavit supporting the warrant for the arrest of

plaintiff White that is challenged in this case. See SMFNID at ¶18.

 Defendant Karen O'Connor joined the state police in June of 1995. See SMFNID at ¶   .

During the relevant time period, Detective O'Connor was assigned to the Eastern District Major

Crime Squad as a Trooper.  Detective O'Connor was responsible for investigating Plaintiff

White's conduct relating to his handling of funds held by him in his capacity as a deputy sheriff.

See SMFNID at ¶ 21.  That investigation ultimately resulted in plaintiff White being placed on a

special form of probation known as accelerated rehabilitation in connection with criminal

charges of misuse of campaign contributions.  See SMFNID at ¶ 22.  Plaintiff White does not

challenge in any way in this case the investigation of, and his arrest and prosecution on, financial

and election practices charges.  See SMFNID at ¶ 23

 In light of her investigation into possible financial and election practices crimes by

plaintiff White, Detective O'Conner also signed the warrant affidavit for his arrest on the charges

that are at issue in this matter.  See SMFNID at ¶ 24.   She did not, however, conduct the

investigation underlying those charges.  See SMFNID at ¶ 25.  The portions of Trooper

O'Connor's warrant affidavit relating to those charges was drafted by Detective Nault and

derived from Detective Nault's investigation.  See SMFNID at ¶ 26.  In fact, her affidavit states

explicitly that it is the result of "her own investigative efforts and those of fellow officers who

reported their findings to her."  See SMFNID at ¶ 27.

 During all times relevant to this matter, defendant John Szamocki held the rank of

Sergeant in the Connecticut State Police, performing supervisory functions in the Eastern District

Major Crime Squad.  See SMFNID at ¶ 28.  Sergeant Szamocki did not participate in drafting or

approving the warrant affidavits at issue, making probable cause determinations or submitting warrants to the court.  See SMFNID at ¶ 31.

Defendant John Turner holds the rank of Sergeant in the Connecticut State Police.  See SMFNID at ¶ 32.  At the time of the events at issue, he was assigned to the Eastern District Major Crime Squad, where he supervised the investigation of primarily major violent, complex, or serious crime investigations.  See SMFNID at ¶ 33.  Sergeant Turner did not draft or approve the warrant affidavits at issue in this case.  See SMFNID at ¶ 35, 36.  Indeed, Sergeant Turner does not even recall reading the affidavits before they were signed.  See SMFNID at ¶ 37.

Defendant Lawrence Gibeault is a retired official of the Connecticut State Police.  See SMFNID at ¶ 38.  At the time of the events at issue in this lawsuit, he held the rank of Lieutenant and was assigned to the Eastern District office, where he supervised sergeants, detectives and troopers.  See SMFNID at ¶ 38.  While the investigation of the plaintiffs fell generally under Lt. Gibeault's area of command, he was entirely uninvolved in conducting or specifically directing the investigation in this matter.  See SMFNID at ¶ 39.  Lieutenant Gibeault did not draft, substantively review or approve the affidavits for the arrest of the plaintiffs.  See SMFNID at ¶ 40.

C.    The Investigation Into Plaintiff White's Mismanagement of Funds

The charges at issue in this case involve alleged tampering with witnesses and obstruction of justice by the plaintiffs in a state police investigation of plaintiff White for mishandling monies he received in his capacity as a deputy sheriff.  See SMFNID at ¶ 43.  On June 15, 1998, the Connecticut State Police received a complaint from Mark Solak, State's Attorney for Windham County, regarding a possible misuse or misappropriation of funds by then-Deputy Sheriff Thomas White of the Windham County Sheriff's Department.  See

SMFNID at ¶ 45.   According to Mr. Solak, he had been contacted by then-Sheriff Jay Kenney, who relayed complaints from creditors that plaintiff White had wrongfully withheld funds collected on judgment executions and wage garnishments.  See SMFNID at ¶  46.

At the time of the referral of the complaint, plaintiff White was challenging Sheriff Kenney for the democratic nomination for High Sheriff of Windham County.  See SMFNID at ¶ 47.  After receipt of the complaint, Trooper O'Connor was assigned to investigate whether plaintiff White had embezzled funds collected in his official capacity as a deputy sheriff.  See SMFNID at ¶ 48.  That investigation and the resulting charges of larceny and election misconduct are not challenged in this lawsuit.  See SMFNID at ¶ 49.  Trooper O'Connor's investigation, however, forms part of the backdrop for the investigation and charges of witness tampering and obstruction of justice that are challenged in this case.  See SMFNID at ¶ 49.[3]

D.    The Investigation Into Possible Shredding Of Documents And/Or Other
          Misconduct By Debra Collins And Others Associated With Sheriff Kenney

During the pendency of the investigation into plaintiff White's management of funds, White was elected High Sheriff of Windham County, defeating incumbent James Kenney.  See SMFNID at ¶ 54.  At some point (the record is not entirely clear when), plaintiff White retained the late Arthur Meisler, Esq., to represent him in connection with the State Police investigation. See SMFNID at ¶ 55.   Shortly after plaintiff White's election, Attorney Meisler mailed a letter

---

[3] Trooper O'Connor performed a number of investigative tasks in furtherance of her investigation of plaintiff White, including reviewing financial and administrative records, consulting with a forensic accountant, and interviewing witnesses.  See SMFNID at ¶50.  Those witnesses included Sheriff Kenney, officials of the central office of the Sheriff's Department and the Department of Labor, a number of the complaining creditors, and plaintiff White himself.  See SMFNID at ¶50.  Plaintiff White met with Trooper O'Connor twice and provided three written statements.  See SMFNID at ¶ 51.  Trooper O'Connor concluded that plaintiff White was not truthful in his dealings with State Police, and in particular that the evidence failed to support his statements and that his statements were inconsistent.  See SMFNID at ¶ 52.

dated July 13, 1999 to the late John M. Bailey, then-Chief State's Attorney, requesting that

State's Attorney Solak be removed from any involvement in the investigation of plaintiff White

and that the matter be handled directly by the Chief State's Attorney's office.  See SMFNID at ¶

56.  As one of the bases for removal, Attorney Meisler made the following accusation:

> It is Mr. White's understanding that Deputy Assistant State's Attorney Debra Collins is
> assigned to this investigation.  You must understand that Mr. Charles Collins, was a
> special Deputy Sheriff and very much involved in the losing primary campaign of High
> Sheriff James Kenney.  Mr. Collins resigned his position with the Windham County
> Sheriff's Department, and later sought employment with another country [sic] sheriff
> stating that 'he did not want to work for a sheriff his wife was investigating.'
>
> During the month preceding Mr. White's assuming the office of High Sheriff Mr. Kenny
> [sic.] with the assistance of Mr. Charles Collins and Deputy Assistant State's Attorney
> Debra Collins destroyed, shredded and otherwise disposed of records of the Windham
> County Sheriff's Office.  A shredding machine, property of the Division of Criminal
> Justice was employed to destroy some of these records.  Mr. White was also informed
> that copies of personnel records were made and removed from the state office by Mr.
> Kenney without authorization.  Finally, the memory of one state owned computer was
> wiped clean and a second state owned computer was removed by Mr. Kenney from the
> Putnam Courthouse.
>
> It is my understanding that Mr. Kenny [sic.] was informed by the administrative office
> for the County Sheriffs that before removing or destroying any records from his office,
> the approval of the Public Records Administrator was necessary; and no request for
> such approval was ever made.
>
> It is my understanding Mr. Solak was made aware of Mrs. Collins' activities but left Mr.
> White's file as part of her work assignment.

See SMFNID at ¶ 57.

Attorney Meisler copied his letter to State's Attorney Mark Solak.  See SMFNID at ¶ 58.

On July 19, 1999, Attorney Solak delivered to defendant Lt. Larry Gibeault a copy of Attorney

Meisler's letter and requested that the State Police Major Crime Squad investigate the allegations

made therein. See SMFNID at ¶ 59.   Lieutenant Gibeault agreed to conduct the investigation,

assigning defendant Sergeant John Szamocki of  the Eastern District Major Crime Squad at

Troop D in Danielson to supervise it.  See SMFNID at ¶ 60.   Sergeant Szamocki, in turn,

assigned defendant Detective Norman Nault to lead the investigation into whether any criminal activity by any party occurred during the closure of Sheriff Kenney's administration.  See SMFNID at ¶ 61.

Detective Nault and others conducted a thorough investigation into this matter, which included a number of investigatory interviews with officials of the State's Attorneys Office, the administrative offices of the Sheriff's Department, and the Windham County Sheriff's Department, including members of the office under both the Kenney and White Administrations.  See SMFNID at ¶ 62.  Detective Nault determined that there was no probable cause to arrest anybody in connection with the closure of the Kenney administration.  See SMFNID at ¶ 63.

Plaintiffs assign great significance to the fact that nobody was arrested following the allegations of misconduct by those associated with Sheriff Kenney, particularly Assistant State's Attorney Debra Collins or her husband Charles Collins, a deputy sheriff under Kenney.  See SMFNID at ¶ 64.  Indeed, plaintiffs claim that the motive for their own arrests was the defendants' friendship with the Collinses.   Indeed, this perceived "friendship" forms the sole supporting theory for this case.  That theory is alleged in the complaint as follows:

> The defendants originally commenced an investigation into the illegal shredding of public documents by Assistant State's Attorney Debra Collins, her husband, former Supervisory Sheriff Charles Collins[,] Aaron Auclair and others, that was initiated after a complaint by the plaintiffs.  However[,] due to one or more of the defendants' personal friendship with the Collins' [sic], the defendants then conspired to turn the investigation into a criminal  investigations of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins, and others both known and unknown to the plaintiffs.

See SMFNID at ¶ 64; Complaint at 5, ¶ 20 (emphasis added).[4]

---

[4] The complaint was amended to remove the direct reference to a friendship between the defendants and Ms. Collins.  Nevertheless, the Amended Complaint makes reference to that purported friendship and continues to allege that the defendants conspired on her behalf.  See Amended Complaint at ¶ 20 ("Defendants conspired to turn the investigation into a criminal investigation of the plaintiffs to punish

While this may seem like an intriguing theory, it is utterly detached from reality.  Neither Detective Nault, the lead investigator in this matter, nor any of the other defendants has or had any sort of friendship with Debra or Charles Collins.  See SMFNID at ¶ 66.

Attorney Collins confirmed this in her deposition.  See SMFNID at ¶ 67.  She testified that neither she nor her husband ever socialized with any of the defendants.  See SMFNID at ¶ 68.  Indeed, according to her testimony, she does not even know defendant Turner and never met defendant Gibeault.  See SMFNID at ¶ 69.   Attorney Collins testified that she knew defendant O'Connor professionally, and considered her arrest warrants to be of very good quality, but that she did not particularly like her.  See SMFNID at ¶ 70.  Similarly, although she did not opine that defendant Sergeant Szamocki's work was poor, Attorney Collins testified that she disliked him both professionally and personally.  See SMFNID at ¶ 71.

With regard to defendant Nault, the lead investigator in this matter, Debra Collins testified as follows:

Q:  Did you ever socialize with Norman Nault?

A:  No.

Q:  Did Norman Nault have any association or relation with your husband?

A:  No….

Q:  Did you have any [] negative experiences with any of the other people being sued in this case?

A:  …. Detective Nault during this was quite – I didn't know Detective Nault but I had a case coming up with him.  All he said was something to the effect that he was in charge of investigating me and he wouldn't think twice about putting the cuffs on me if he found anything against me.

---

them for initiating the complaint and to cover up suspected wrongdoing.") and ¶ 27(d)(alleging deprivation of the "right to equal protection of the laws and to be treated the same as others who make complaints to police, but are presumed innocent under the law simply because the officers have personal relationships with the subjects of the complaint.") SMFNID at ¶ 65.

Q:  And you mentioned Nault, you mentioned the personal comment he made about you. What about professionally in relation to other warrant that may have been submitted?

A:  He was – I will give him credit, he was an excellent detective…So, he did a very thorough job as far as that.

See SMFNID at ¶ 72.

Detective Nault agrees that he did inform Debra Collins that, if the evidence warranted it, he would not hesitate to arrest her.  See SMFNID at ¶ 73.

Attorney Collins offered the following refutation of the allegation that the defendants conspired to investigate and arrest the plaintiffs as a means of assisting her or her husband:

Q:  Did any of the defendants in this lawsuit ever offer to do you any favor in connection with that investigation?

A:  Absolutely not.

Q:  Are you aware that in this lawsuit there is an allegation that one or more defendants then conspired to turn the investigation into a criminal investigation of the plaintiffs, punishing them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins and others, both known and unknown to the plaintiff?
Are you aware that that allegation has been made?

A:  I'm aware of that allegation.

Q:  Is that allegation true, to your knowledge?

A:  It couldn't be farther from the truth.

Q:  And why do you say that?

A:  The state police – basically you can't find a trooper that likes me.  They hate me.  I can give you the example that I am the only prosecutor in the State of Connecticut that has prosecuted three state troopers, which is, I believe, the record.  They have, in my opinion, have never liked me, will never like and I had always hoped it was just Troop D and everywhere I go it seems to be that everyone knows that I've prosecuted those troopers.  I also charged another trooper with perjury who, you know – they just hate me and they are never going to let it go, as far as I'm concerned.  So, it's laughable, that paragraph.

Q:  So, the general sense you have, you're not popular with the state police, would apply to the defendants in this lawsuit?

A:  Absolutely.

Q:  And would it make sense to you that the defendants in this lawsuit would enter into any conspiracy for your benefit?

A:  Absolutely not….

Q:  And the statement you made about being generally unpopular with the state police, would that be true before July of 1999?

A: Absolutely…

Q:  Would it make sense to you if the defendants in this lawsuit entered into conspiracy for the benefit of your husband?

A:  It would shock me.

Q:  And why is that?

A:  Again, they hate me, they hate him associated with me.  There is probably such a deep hate that they will hate my children.

See SMFNID at ¶ 74.

While the State Police Defendants disagree with the characterization of their relationship with the Collinses as hateful or somehow soured by prior prosecutions of their colleagues, they agree that they were not friends with the Collinses and would and did not enter into any conspiracies for their benefit.  See SMFNID at ¶ 75 .[5]

The conclusion of the state police's investigation into the closing of the Kenney administration was not influenced by conspiracies and non-existent friendships with the Collinses, but by a much more mundane reason:  lack of evidence of wrongdoing.  See SMFNID

---

[5] It should also be noted that Attorney Collins "absolutely did not assist" the state police or otherwise do any work related to the investigation of the criminal charges that are at issue in this case.   See SMFNID at ¶ 76.   Indeed, she never even read materials relating to the investigation or discussed it with anyone. See SMFNID at ¶ 77.

at ¶ 78.  In particular, the State Police interviewed Pat Lempecki, the personnel officer for the State of Connecticut Office of the County Sheriffs.  <u>See</u> SMFNID at ¶ 79.  Ms. Lempecki confirmed that the personnel documents destroyed at the close of the Kenney administration were properly destroyed at her direction.  <u>See</u> SMFNID at ¶ 80.  Investigators also interviewed Robert Heilbrun, fiscal/administrative manager for the County Sheriff's central office, who confirmed that the computer allegedly destroyed was actually returned to the sheriff's central office.  <u>See</u> SMFNID at ¶ 81.  Also, based on interviews, Detective Nault concluded that there was no evidence to support the allegation that computer memory was improperly erased. <u>See</u> SMFNID at ¶ 82.[6]

As discussed below, State Superior Court Judge Jonathan Kaplan later ordered the State's Attorney's office to investigate whether anybody inappropriately or unlawfully shredded or removed documents or computer programs in Sheriff Kenney's office on or about May 28, 1999. <u>See</u> SMFNID at ¶ 87.  Special Assistant State's Attorney Glenn Coe conducted an investigation and concluded that there existed "no credible evidence that any documents were shredded that should not have been shredded."  <u>See</u> SMFNID at ¶ 88.   Attorney Coe also found that no credible evidence supported the conclusion that "any items belonging to the Sheriff's office or departments was wrongfully removed … by anyone[.]"  <u>See</u> SMFNID at ¶ 89.

 E. <u>The Initiation Of An Investigation Into Witness Tampering And Related Crimes</u>

It should be noted also that the investigation into Attorney Collins and others following Attorney Meisler's complaint not *precede* the investigation into misconduct by the plaintiffs – an

---

[6] Finally, another allegation not mentioned specifically in Attorney Meisler's letter concerning the closure of Kenney's office was investigated and found to be baseless. <u>See</u> SMFNID at ¶ 83.  Plaintiff Henry Bourgeois alleged that Charles Collins shredded Sheriff's Office telephone records. <u>See</u> SMFNID at ¶ 84.  In fact, these telephone records were the same records seized by Trooper O'Connor in connection with her investigation of plaintiff  White. <u>See</u> SMFNID at ¶ 85.  Also, some records alleged by plaintiff

allegation that is central to plaintiffs' theory of this case. <u>See</u> Amended Complaint at ¶ 20 ("The defendants originally commenced an investigation into the shredding of public documents that was initiated after a complaint was made by the plaintiffs. However, the defendants conspired to turn the investigation into a criminal investigation of the plaintiffs to punish them for initiating the complaint and to cover up wrongdoing."); Amended Complaint at ¶ 20; SMFNID at ¶ 90. To the contrary, those investigations were both formally requested by Attorney Solak, and commenced by the State Police, at the same time – during the July 19, 1999 meeting discussed above. <u>See</u> SMFNID at ¶ 91.

The exact chronology of the commencement of the investigation into the plaintiffs for possible witness tampering and obstruction of justice is as follows. On Friday, July 16, 1999, Windham County State's Attorney Mark Solak called Sergeant Szamocki, the supervisor of the White investigation, indicating that there was a possible problem of witness tampering in that investigation. <u>See</u> SMFNID at ¶ 93. On July 19, 1999, a meeting was held at the headquarters of the Eastern District Major Crime Squad. <u>See</u> SMFNID at ¶ 94. Present were Attorney Solak, Lt. Gibeault, Sergeant Szamocki and Detective David LeBlanc. <u>See</u> SMFNID at ¶ 95. At the meeting, Attorney Solak requested that the State Police investigate two matters relating to the Windham County Sheriff's Department. <u>See</u> SMFNID at ¶ 96. One matter involved the complaint by Attorney Meisler discussed above concerning possible illegal shredding and other misconduct by individuals associated with Sheriff James Kenney, including an Assistant State's Attorney, Debra Collins, and her husband, Charles Collins. <u>See</u> SMFNID at ¶ 97. Lieutenant Gibeault agreed to commence an investigation, assigning it to Sergeant Szamocki. <u>See</u> SMFNID at ¶ 98.

---

Bourgeois to have been destroyed were later located – in plaintiff's Bourgeois' own garage! <u>See</u> SMFNID at ¶ 86.

Attorney Solak also informed those present at the meeting that he had received information suggesting that two Special Deputy Sheriffs, Aaron and Adam Auclair, had been interrogated and intimidated by their supervisor, Lieutenant Gloria Marion, a close associate of Sheriff White.  See SMFNID at ¶ 99 .  According to Attorney Solak, the Auclairs were interrogated by Marion about what they knew of the State Police investigation of Thomas White and were subjected to threats concerning their employment if they imparted any information to outside authorities that would be damaging to White.  See SMFNID at ¶ 100.  Attorney Solak requested a State Police Investigation.  See SMFNID at ¶ 101.  Lieutenant Gibeault agreed, assigning this investigation as well to Sergeant Szamocki.  See SMFNID at ¶ 101.  Having assigned it to a sergeant (and later reassigning it to Sergeant Turner, as discussed below), Lt. Gibeault had no further substantive role in the investigation of the plaintiffs relating to witness tampering and obstruction of justice.  See SMFNID at ¶ 102.

On July 20, 1999, Sergeant Szamocki assigned Detective Norman to conduct both investigations requested by Attorney Solak.   See SMFNID at ¶ 103.  Sergeant Szamocki did not personally conduct the investigation, but rather assisted Detective Nault in defining the initial direction of the investigation and assigned detectives to conduct a series of initial investigatory interviews.  See SMFNID at ¶ 104.  After just three days, however, supervision of the investigation was transferred to Sergeant John Turner, who assumed control of the investigation upon his return from vacation on or about July 22, 1999.  See SMFNID at ¶ 105.  After July 22, 1999, Sergeant Szamocki had no further substantive responsibility for, or active role in, the investigation.  See SMFNID at ¶ 106.

Sergeant Turner was not directly involved in investigating Thomas White, Gloria Marion and Henry Bourgeois for any crime, including crimes relating to witness tampering and

obstruction of justice.  See SMFNID at ¶ 107.   It is important to note that the detectives assigned to the Major Crime Squads are of the highest competence and caliber and typically require minimal supervision in conducting investigations once those investigations are underway, which was the case with the investigation at issue in this case.  See SMFNID at ¶ 108. By the time Sergeant Turner assumed supervision of the investigation, the investigation was well under way.  See SMFNID at ¶ 108.   Thus, Sergeant Turner's actual supervisory role in the investigation was extremely limited.  See SMFNID at ¶ 108.  He did not, for example, direct that any particular witnesses be interviewed or not interviewed.  See SMFNID at ¶ 108.

Defendant O'Connor played almost no role in the investigation of the plaintiffs for possible witness tampering and obstruction of justice.  See SMFNID at ¶ 109.  Apart from three interviews on one day with representatives of the central office of the sheriff's system relating to administrative procedures, she had no involvement whatsoever in conducting the investigation. See SMFNID at ¶ 110.

F.     The Victims/Witnesses:  Adam and Aaron Auclair

The primary witnesses in the State Police investigation into witness tampering and the related crimes were believed to be the victims of those crimes:  Adam and Aaron Auclair.  See SMFNID at ¶ 111.  Adam and Aaron Auclair were employed in the Windham County Sheriff's Department as Special Deputy Sheriffs in both the Kenney and White administrations.  See SMFNID at ¶ 112.  The thrust of the plaintiffs' case is that statements made by the Auclairs and incorporated into the State Police's arrest warrant affidavits were false.

At the time the Auclairs made their statements to the State Police, however, there was no reason for any objective observer to conclude that they were anything less than fully credible and reliable witnesses.  See SMFNID at ¶ 113.  Neither had been convicted of a crime.  See SMFNID

at ¶ 114.  Neither had any history of known lying or other dishonest behavior.  See SMFNID at ¶

115.    Both were known as reliable employees of the Sheriff's Department.  See SMFNID at ¶

116.

Significantly, the plaintiffs, all of whom knew and supervised the Auclairs in one

capacity or another, conceded that the Auclairs were credible at the time they made their

statements.   Plaintiff Marion testified at her deposition as follows concerning the apparent

trustworthiness of the Auclairs:

> Q:  Now, prior to this investigation into the criminal charges against you, did you have an
> opinion about whether the Auclairs were trustworthy or no?
>
> A:  The came into my house.  I fed them.  My kids thought that they were trustworthy
> and I respect the opinion of my kids.
>
> Q:  Did you have any reason to believe that they were dishonest prior to all this
> occurring?
>
> A:  No.

See SMFNID at ¶ 118.

Plaintiff Bourgeois also testified that he had no information suggesting that either Auclair

was dishonest at the time of the State Police investigation:

> Q:  When did you first meet the Auclair boys?
>
> A:  When I started working, when we got sworn in that night.  I knew of them, but I
> didn't know them.
>
> Q:  I see.  So you were their supervisor for a short period of time?
>
> A:  Yes.  Very short.  I guess they quit after six weeks.  From June 1st to July 10th, I think
> it was.
>
> Q:   Had you heard anything about their reputation for honesty or dishonesty by the time
> you met them?
>
> A:  No.

Q:  And as far as how they conducted their job, filling out time sheets, or that sort of thing, did you have any indication that they were dishonest?

A:  Then or now?

Q:  Then.

A:  No….

Q:  Did anyone ever tell you words to the effect, look out for those Auclair boys.  They are bad news.  They are dishonest?

A:  I never heard anybody say they were dishonest, then.

See SMFNID at ¶ 119.

Similarly, plaintiff White conceded in his deposition that the Auclairs were apparently

trustworthy:

Q:  Okay.  Who hired the Auclairs originally by the Sheriffs Department?  Was it Kenney?

A:  I believe it was James Kenney.  I don't think they were working underneath Sheriff Green.  That was the one before Mr. Kenney.

Q:  Did you reappoint them after you were elected.

A:  Yes, I did…

Q:  Okay.  At the time that you reappointed them, did you believe that they were honest individuals?

A:  Yes.

Q:  Okay.  And you had had no previous indications that they were dishonest in any way?

A:  No.  I had with them in an out of going into the office, and stuff, and up until that point, no…

Q:  Okay.  Do you have any knowledge as to whether the Auclairs have criminal records?

A:  No.  No knowledge at all.

Q:  Okay.  It's kind of a difficult question to phrase, but putting aside anything that occurred in the investigation, was there anything from other areas of the Auclairs' life, before that, or unconnected with the investigation, that should have put the state police on notice that these guys may have some honesty problems?

A:  I didn't know the Auclairs outside of work, for the couple of years that I knew them. I never had a drink with them.  I never went out with them.  I did not know them personally, except for work.  I have no idea.  They didn't live in the town that I came from.  I never went to Putnam or Thompson, really, before I started working with the Sheriff's Department.

Q:  Sir, have you become aware that the Auclairs had a reputation in the community for being dishonest?

A:  No.

Q:  Okay.  Or any conduct –

A:  Not even up to this day, no.

Q:  Okay.  So any indication of dishonesty with regard to the Auclairs, would simply be limited to this investigation, and subsequent testimony by the Auclairs?

A:  It was never brought to my attention, even when I was high sheriff, that they had problems in the community, if that is what you are asking me.  And I would believe, because one of them became a correction officer and one became a state trooper, I think, in New Jersey, I would tend to believe that there wouldn't be any problems back in that area.

See SMFNID at ¶ 120.[7]

---

[7] The seemingly unanimous view of the Auclairs' apparent trustworthiness is confirmed by Russell Downer, a non-party and an employee of the Windham County Sheriff's Department, who testified at his deposition as follows:

Q:  Did you ever have occasion to supervise the Auclair boys, either of them?
A:  As far as training goes, yes.  In any other capacity other than being a more senior sheriff, no.
Q:  So, you were involved in their training?
A:  Yes.
Q:  Was that during the Kenney administration or White administration?
A:  That was during the Kenney administration.
Q:  Did you ever have occasion to discipline them or reprimand them?
A:  No.
Q:  And as far as just your involvement with them through training, did you ever have cause to believe that they were untrustworthy?
A:  No.

Certainly, none of the defendants knew or had even heard of any information that would suggest that the Auclairs were anything other than perfectly reliable witnesses. See SMFNID at ¶ 121. Indeed, as individuals serving in a quasi-law enforcement positions, accused or suspected of no present or past crime or dishonest behavior, the Auclair brothers possessed inherently greater credibility than many witnesses upon whom criminal investigators must often rely. See SMFNID at ¶ 122.

G.     The Evidence Provided By The Auclairs And Included In the Arrest Warrant Affidavits Concerning Obstruction Of Justice And Witness Tampering.

As noted above, the Auclair brothers were the primary witnesses/victims relied upon by the State Police in conducting their investigation into possible witness tampering and obstruction of justice by the plaintiffs. Aaron Auclair gave Detective Nault a one-paragraph statement on July 20, 1999 indicating that he had been interrogated by Gloria Marion. See SMFNID at ¶ 124. He returned to Troop D barracks the next day, July 21, 1999, and gave Detective Nault and Mike Contre a much more detailed eleven-page statement. See SMFNID at ¶ 125. That statement included the following assertions, which were included in the arrest warrant affidavits in support of obstruction of justice and witness tampering-related charges[8]:

- Aaron was present in Kenney's office when documents were shredded and participated in the shredding. Those documents were earmarked by Laurie Parent of the Central Office of the Sheriff's Department for shredding. More generally, Aaron stated that neither he nor anybody else destroyed papers or computer files that should not have been destroyed.

---

See SMFNID at ¶ 123.

[8] As discussed below, the warrant affidavits for all three plaintiffs were identical in all respects except as to the name of the suspect. See SMFNID at ¶ 192. The language in defendant O'Connor's affidavit for the arrest of plaintiff White was prepared by Detective Nault and incorporated into the White affidavit. See SMFNID at ¶ 168.

- On July 16, 1999, plaintiff Marion approached him and Adam Auclair and ordered them to a meeting in the lock up of the Valley Street courthouse in Willimantic.

- In Aaron's words, the physical layout for the meeting was as follows: "In the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second unlocked door was behind us."

- At that meeting, Marion "reminded both Adam and [Aaron] that we were now under the direction of the current High Sheriff Thomas White and that anything pertaining to Mr. White during Mr. Kenney's administration should be brought to her attention per order of Sheriff White." Aaron took this to mean that, if he did not talk to Marion, he might lose his job.

- Marion also stated to the Auclairs, "you work for Tom White now. You have to be on his side." Marion also stated the Auclairs "couldn't get 'unjammed' (referring to [their] schedules) unless [they] cooperated." Aaron understood Marion to mean that he would continue to get the worst assignments in the county and have to drive furthest to work unless he cooperated with her.

- Marion stated, "we all know there is an investigation going on," and that the Auclairs needed to tell her what they did in the High Sheriff's office during the prior administration. Aaron understood her to be referring to the investigation of Thomas White for mishandling wage executions. Aaron felt "very threatened" because he felt she was "inferring that if [he] did not speak with her and answer her questions [he] would never work again."

- Marion asked the Aaron if he had any knowledge about complaints against Sheriff White as a deputy sheriff and if he knew the procedures relating to wage executions. Aaron told Marion about answering calls from people wishing to complaint about White's handling of wage executions.

- Marion asked if Aaron knew of the White investigation regarding wage executions while Kenney was in office. She also asked if either Auclair was ever present when that investigation was discussed with Charles or Debra Collins or with Jay Kenney.

- Lt. Marion strongly recommended that Aaron meet with White the following day because he "knew too much." Aaron thought she was referring to the criminal investigation into White for mishandling wage executions.

- Aaron felt that the entire conversation with Marion made him feel "like [he] was going to be accused of destroying property if [he] didn't answer the questions the way Lt. Marion wanted [him] to."

- On July 19, 1999, Aaron encountered Sheriff White at the Juvenile Courthouse in Willimantic. White asked Aaron to step outside because he had something for Aaron to sign. There was nothing to be signed. Rather, White told Aaron that he (Aaron) had no right to access personnel files. White also stated that he did not know how much Aaron knew "about the investigation, but people make mistakes." Aaron believed White was referring to the criminal investigation of regarding wage executions.

- White told Aaron that nothing from Kenney's office should have been shredded, and that he had unnamed witnesses of what happened on the evening that shredding occurred.

- White stated several times that "if they would just leave it alone, this would never have to happen." Aaron understood "it" as referring to the criminal investigation into White for mishandling wage executions. White added that "Mr. Solak and his office should never pursuit it [sic] this far and that he, High Sheriff White, talked with other prosecutors from around the state and they couldn't believe what was happening."

- White then stated that he had hired five attorneys, including Attorney Meisler, and that he would not go down without a fight." This comment was followed by a remark that an internal investigation into shredding was to continue and that Aaron and Adam would be contacted by a supervisor for further interviews. Aaron felt White's comments meant that "if he was going down for the wage execution investigation against him than he would take my brother and I down [Aaron and Adam]."

- That same day, July 19, 1999, Aaron received a telephone call from Marion, ordering him to attend a meeting that afternoon at the Valley Street Courthouse in Willimantic. Prior to the meeting, Aaron purchased a small tape recorder. Marion met Aaron in the parking lot and led him to a small room off of the lockup area. Aaron activated the tape recorder.

- Marion kicked the peg out of the door, allowing the door to close. Marion then placed her own tape recorder on the table and told Aaron that she wanted to take a statement about what they had discussed at their previous meeting. Aaron understood this to me that she wanted to discuss the wage execution investigation. Marion told Aaron that making a statement was for his benefit.

- Marion told Aaron that White and Bourgeois had ordered her to have this meeting with Aaron. Marion went on to say that "there are people in this department that feel that [Aaron] is in fact still passing on information outside this department. If that is not the case that's fine, if that [is] the case, [k]now that we do know, or we will find out and you're in jeopardy of loosing [sic] your position."

- Aaron told Marion that White should not be asking questions about the wage execution investigation, to which Marion replied that White had a right to know and, conversely, Aaron had no right to go into personnel files, an allusion to the breaking down of the Kenney office.

- As the meeting ended, Marion ordered Aaron not to discuss their conversation with anybody.

See SMFNID at ¶ 125.

On July 20, 1999, Aaron Auclair gave Detective Nault a tape he made of his meeting with Gloria Marion on July 19, 1999.  See SMFNID at ¶ 126.  In addition, Detective Nault reviewed a transcript of that tape that was prepared by a secretary in the State's Attorney's office, which he found to be generally accurate.  See SMFNID at ¶ 127.

Detective Nault included relevant parts of that tape in the affidavits he drafted to support the application for warrants for the arrest of the plaintiffs on the charges at issue in this case.  See SMFNID at ¶ 128.  In particular, the warrants included in support of the obstruction of justice and witness tampering charges what Detective Nault heard on the tape as Gloria Marion making the following comments to Aaron Auclair:

- "We want to know what you know or what you don't know."

- "Basically, what we want to know at the bottom, who, what, where, when, what you knew, who told you, what your involvement was, what other people's involvement was that you are aware of, those kinds of things."

- "This is an internal investigation for work, Aaron.  This has nothing to do with the State Police, the federal level.  This is an internal investigation forum, you work for Tom, correct?

- "So, anything you were told about him [Thomas White], investigation, anything that's ongoing, any conversations that you have or had, um, because when we talked about what I said to you Friday, information about how we were trying to say that you did these things based on what you were told to by your boss."

- "Okay, now we're trying to prove that to build you a case, you understand what I'm saying, because if you did something that wasn't legal, such as because you thought your position was administrative…"

- "Be careful, you now work for Tom."

- "But I know and this comes from Captain Bourgeois and this comes from Tom White that there are people in the department that feel that you are still passing information to people outside the department.  That we do know or we will find out and you're in jeopardy of losing your position."

- "Do not carry this conversation out of this department with anyone."

- "You do not discuss this with anyone."

See SMFNID at ¶ 129.

Adam Auclair, Aaron's brother, was interviewed by Detective Charles Sarant at the State Police Troop D barracks in Danielson, Connecticut.  See SMFNID at ¶ 130.  His six-page statement contained the following assertions, all of which Detective Nault included in the arrest warrant affidavits to support the obstruction of justice and witness tampering-related charges:

- On May 28, 1999, Gloria Marion called Adam at home.  During the conversation, Marion brought up Adam's schedule and assignments.  Marion stated that she and Bourgeois had disagreements over Adam's schedule, and that Marion did not believe it should matter whom Adam supported in the Sheriff election or whom he associated with outside of work.

- Marion also made the comment that she hoped he would still be a Special Deputy Sheriff in six months.  Adam understood this to mean that he was at risk of being fired.

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion.  Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer.  Adam did not state, as his brother had done, that there was a second door behind the brothers.

- Marion stated that "we all know what's going on.  There's an investigation going on."  She stated further that they needed to talk about shredding documents and wiping out information on computers.  Adam stated that he "felt threatened and

also was concerned that the only way out of the room was a door down the corridor, up the stairs."

- Marion stated that "you work for Tom White now.  You should be on his side. Tom White does not want people working for him who are against him."

- Marion asked the brothers a series of questions, many of which involved their duties under Sheriff Kenney.

- Marion also asked, however, whether they had been present when any discussion occurred about an investigation concerning White, especially any discussion between Kenney and Debra or Charles Collins.

- Marion asked Aaron about whether he knew about how to conduct wage executions and whether he had received complaints about White's handling of such matters.

- Marion also asked whether Aaron had deleted files or shredded documents.

- Marion asked the Aaron Auclair to go talk to White and noted that White had hired attorneys and "needed to go on the offensive."  Marion noted that the Auclairs were likely to be subpoenaed by White's attorneys relating to the White criminal investigation.

- Marion ended the conversation by asking about Adam's schedule and noting that his assignment may change "once Tom [White] gets word about [their] conversation today."

- On July 19, 1999, Adam was approached by White at the Valley Street courthouse in Willimantic.  White asked to speak to Adam in a conference room.

- White told Adam that he should expect to be contacted by Henry Bourgeois and "the Feds."  White mentioned that he had witnesses to what occurred in Kenney's office and that Aaron had no right to be in personnel files.  Adam understood this to mean that his brother was to be investigated.

- White stated that he wanted what occurred in the Sheriff's Department to be kept internal.  He stated further that he had three lawyers and that the investigation of him was because Kenney lost the election.

- White stated that he did not care who Adam associated with outside of work, but that anything about this must be kept internal, which Adam took to mean that he could not talk to the State's Attorneys Office or the State Police.

- After the meeting with White, Marion approached Adam and requested a one on one meeting.  Marion asked Adam to follow her to a small room inside the lockup

24

area, the same room in which she met with Aaron.  Marion and Adam sat across a table from each other.  Marion placed two tape recorders and a red notebook on the table.  Marion then kicked out the doorstop, allowing the door to close.  Adam was "really nervous and felt that [he] was not free to leave the room."

- Marion stated that she was going to conduct an internal investigation and asked Adam "who, what, where, when and how [Adam] knew about the Thomas White investigation."

- Adam refused to be tape-recorded, but agreed to write a statement.  He started to write about how he heard of the investigation into White from Kenney, but Marion attempted to dictate to Adam him how the statement should read.  Adam then stopped writing, causing Marion to state, "you better talk to me because otherwise your going to have to talk to Captain Bourgeois and you know what he was, a State Trooper."  At that point, Adam indicated that he wanted a legal representative to speak for him, to which Marion replied, "you can't have an attorney speak for you."

- Marion closed the meeting by telling Adam he could not talk to Debra or Charles Collins and that their conversation was part of an internal investigation and must remain internal.

See SMFNID at ¶ 130.

H.    Other Evidence of Witness Tampering and Obstruction of Justice

In addition to the evidence provided to the Auclairs, Detective Nault included other evidence in the affidavits relevant to witness tampering and obstruction of justice.  See SMFNID at ¶ 131.

Detective Nault included in the affidavits information about an incident in March  or April of 1999, in which Henry Bourgeois approached Sergeant Szamocki at Troop D barracks and asked him questions about the investigation into Tom White.  See SMFNID at ¶ 132.  At that time, Sergeant Szamocki was supervising Trooper O'Connor's on-going investigation of Tom White for embezzlement.  See SMFNID at ¶ 133.  Bourgeois asked Szamocki generally about the investigation of Tom White, whether White was going to be arrested, and, if so, whether he could remain a sheriff.  See SMFNID at ¶ 134.

25

According to Detective Nault, it was inappropriate for plaintiff Bourgeois ask these sorts of questions about an on-going investigation, particularly considering that Bourgeois is a retired state police official and should know better.  See SMFNID at ¶ 135.  Bourgeois admitted at his deposition to asking these questions.  See SMFNID at ¶ 136.  He also testified that it would be inappropriate for Sergeant Szamocki to provide information about an on-going investigation. See SMFNID at ¶ 137.

The affidavits also related a second attempt by Henry Bourgeois to discuss the on-going investigation of Thomas White with a state police official.  See SMFNID at ¶ 138.  On June 30, 1999, Bourgeois approached Lt. Thomas Davoren, the commanding officer of Troop D.  See SMFNID at ¶ 139.  According to Davoren, Bourgeois commented that the White investigation "was about to get messy" and that he (Bourgeois) had counseled White "to take the offensive" in the investigation because "they are coming after him."  See SMFNID at ¶ 140.  According to Davoren, Bourgeois then remarked that Assistant State's Attorney Debra Collins and her husband had inappropriately shredded phone documents favorable to White.  See SMFNID at ¶ 141. [9]  Lieutenant Davoren understood this remark to be a threat of unfavorable publicity concerning the State's Attorney's Office relating to the White investigation.  See SMFNID at ¶ 142.

Bourgeois admits that this conversation with Lt. Davoren.  See SMFNID at ¶ 143. Indeed, Bourgeois admits saying that the White investigation was about to "get messy" or words to that effect and to counseling White to take action.  See SMFNID at ¶ 143.  While Bourgeois disputes Davoren's understanding of the implication of these remarks, he does not point to any reason why the state police should have mistrusted Lt. Davoren's report.  See SMFNID at ¶ 144.

---

[9] As noted above, the phone records in question were not shredded, but rather had been properly taken into evidence by the State Police in furtherance of their investigation.  See SMFNID at ¶ 84-86.

Finally, the warrant affidavits include a reference to a conversation between Mr. Bourgeois and John Wisnieski, a janitor who witnessed some shredding in Sheriff Kenney's office on May 28, 1999.  See SMFNID at ¶145.   State Police interviewed Wisnieski, who reported that he first told Sheriff White about shredding.  See SMFNID at ¶ 146.  A week later, according to Wisnieski, Henry Bourgeois approached him and asked if he knew anymore about the shredding incident.  See SMFNID at ¶ 147.  Bourgeois then asked Wisnieski to "keep it [his information] under his hat and not tell anyone else what he knew."  See SMFNID at ¶ 148.

I.       The Alleged Constitutional Defects In The Warrant Affidavits

As discussed below, Detective Nault believed – and he was so advised by State's Attorney Mark Solak – that the foregoing evidence provided probable cause to believe that the plaintiffs committed the offenses relating to obstruction of justice and witness tampering with which they were charged.  See SMFNID at ¶ 149.  Indeed, at the time that the affidavits were prepared and submitted to the court, none of the defendants knew or suspected that any of the information contained therein was false.  See SMFNID at ¶ 150.  Nor did any of the defendants possess information that was omitted from the affidavits that, had it been included, would have undermined the existence of probable cause.  See SMFNID at ¶ 151.

It is not disputed that, as discussed below, a special prosecutor determined that the prosecutions against the plaintiffs for obstruction of justice and witness tampering should be abandoned. It is important to note, however, that the present challenge is not one of insufficiency of evidence, but rather that the warrant affidavits were false and/or omitted material information. Plaintiffs do not and cannot point to any evidence *possessed by the State Police* undermining the evidence contained in the affidavits that was omitted from the affidavits.  Nor can plaintiffs point

to any evidence contained in the affidavits that was *known to the State Police* to be false at the time the warrants were submitted.

The focal point of plaintiffs' challenge to the affidavits is that the room in which the interview between the Auclairs and Gloria Marion occurred on July 16, 1999 was not locked, and therefore that the Auclairs were not physically restrained during that interview.  See SMFNID at ¶ 152.  The complaint makes much of this point, alleging that the affidavits were faulty because:

- "the Auclairs were neither abducted nor restrained as a second exit door was located behind the Auclairs during the aforesaid July 19, 1999 meeting, thus allowing the Auclairs to leave the room at any time." [10]

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door was not locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the door in the room adjacent to the aforesaid second exit door was not capable of being locked."

- "the Auclairs were neither abducted nor restrained as the aforesaid second exit door may not have been closed."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion was sitting at a desk across from the two Auclairs; and the exit door was directly behind them."

- "the Auclairs were neither abducted nor restrained as Plaintiff Marion never prevented them from leaving the aforesaid meeting."

See Amended Complaint at ¶ 24(c)-(m).

---

[10] It is clear from the record that the meeting referenced in the Amended Complaint occurred on July 16, 1999, and not July 19, 1999.  The meeting on July 19, 1999 was the only meeting at which Gloria Marion met with both Auclairs simultaneously.  See SMFNID at ¶ 153.

In fact, the warrant affidavits do not omit the fact that the door may have been unlocked.

See SMFNID at ¶ 154. Rather, the affidavits simply recount what the Auclairs stated about the

door. See SMFNID at ¶ 154. In particular, the warrant affidavits stated:

- According to Aaron Auclair, "[i]n the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door directly behind Lt. Marion and the second ***unlocked*** door was behind us." See SMFNID at ¶ 155. (emphasis added).

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. See SMFNID at ¶ 155.

When confronted at his deposition by the above-recited statement in the affidavits

regarding the unlocked door, plaintiff White admitted that the affidavits were truthful in this

critical respect:

> Q: About halfway down on page 38, paragraph 48, it [the affidavit] says, "One locked door was directly behind Lieutenant Marion, and the second unlocked door was behind them [the Auclairs]?...is it fair to say based on this sentence that I just read to you in paragraph 48, that Trooper O'Connor and Trooper Nault gave the court the correct information about the doors being unlocked during that meeting?
>
> A: Based on that one sentence that you read me? Yes…
>
> Q: So, whichever state police officer prepared this affidavits and submitted it to a judge, told the judge that one locked door was directly behind Lieutenant Marion, the second unlocked door was behind them [the Auclairs], correct?
>
> A: Correct. That Aaron and Adam had told them that, yes.
>
> See SMFNID ¶ 155.5.

Indeed, to this day, there remains ambiguity as to whether the doors to that room were

capable of being locked. Russell Downer, a former Special Deputy Sheriff familiar with the

room in question, testified as follows in his deposition:

Q:  Okay.  Now the door where the interview took place that you were asked about, I mean where the interview took place where you were asked about, you mentioned it could be locked.  Correct?

A:  Yes.

Q:  Now, what I wasn't able to understand from the questioning was whether there was any circumstances where you could be in the office but locked in and couldn't get out through either of the two doors?

A:  Okay, the doorway leading into that room from the staircase, which would be coming out of the court, I do not believe you could be locked in that room without putting a key in and locking a deadbolt.

Q:  What side of the door would you have been on to put the key in and lock the dead bolt?

A:  The inside.

Q:  The inside.  So, if you didn't have the key and the dead bolt was locked, you could be locked in that door?

A:  No, I don't believe, I don't believe, you could be locked in from that side.

Q:  All right, I'm confused…Mr. Downer, you mentioned there is a dead bolt that locks with a key?

A:  Correct.

Q:  If there were two people in the room, one person, person A, has the key, locks the door, puts the key in her pocket or his pocket, person B doesn't have the key, is that person then locked in that room?

A:  Yes.

Q:  Okay, now, what about the other door?  That's the door we've been talking about, the door that goes up to the courtroom.  Correct?

A:  That's the door we were just referring to.

Q:  What about the other door is it possible to be locked in and unable to get out of that door?

A:  Yes.  That's automatically locked door that only opens with a key.

Q:  Okay, and if you didn't happen to have that key, you could be locked in and not able to get out of that door as well.  Correct?

A:  Correct. …

Q:  The keys you talked about, that we've talked about, getting in and out of that interview room downstairs, would every special deputy sheriff have a set of those keys on his person at all times?

A:  No.  Only those that were assigned to the lockup.  Only for the event that someone would lose their keys.  The general public couldn't come down there at any time.

Q:  So, were special deputy sheriffs instructed not to take those keys out of the lockup area?

A:  When there were inmate in there, yes, and the supervisor may have had a key to that door.

Q:  So, the supervisor might always have had, during work hours, a key on his or her person?

A:  Yes.

Q:  If somebody was working security at the door, for example, or prisoner transport, would that person have a key on this person at that time?

A:  To get into that area, no.[11]

See SMFNID at ¶ 156.

Plaintiffs cite only two other specific factual omission from the warrant affidavits – that the Auclair boys were eating pizza at the meeting with Marion on July 16, 1999.  See SMFNID at ¶ 158.  However, neither Auclair mentioned this fact to the State Police, and it was simply not known to the State Police at the time that the warrant affidavits were prepared or submitted to the court.  See SMFNID at ¶ 159.

Plaintiffs also claim that the affidavits wrongfully omitted that Thomas White, on July 20, 1999, urged the Auclairs not to resign from the Sheriffs Office, noted that they were good

---

[11] There is no suggestion in the Auclairs were assigned to the lock up area on July 16, 1999.  Thus, they would not, therefore, have had keys to the door in question.  See SMFNID at ¶ 157.

employees and  The Auclairs statements' to the State Police make no mention of Tom White, on July 20, 1999, asking them to reconsider their resignations, informing and expressed concerns about how their resignation would affect their financial status, although it is unclear how that is relevant to probable cause.  In any event, the Auclairs' statements to the State Police did not mention these purported statements to Thomas White, but rather simply stated that White accepted their resignations.  See SMFNID at ¶ 159.5.  The affidvits faithfully recounted the Auclairs' statements in this regard.  See SMFNID at ¶ 159.5.

Plaintiffs point to no other specific factual deficiencies in the affidavit.  Instead, plaintiffs allege in the complaint that the affidavits failed to allege certain necessary factual elements of the charged offenses.  See, e.g., Amended Complaint at ¶ 24(n)(Defendants allegedly omitted from affidavit "fact" that "no evidence existed that either plaintiff Marion or Bourgeois knew or believed plaintiff White had committed a Class A or B felony, which is an essential element of the crime of hindering prosecution."); See SMFNID at ¶ 160.  Plaintiffs do not and cannot, however, allege that the state police mislead the court into believing that such factual elements did exist.  In fact, the State Police simply included in the affidavits the evidence they had and presented it for review to a prosecutor, who approved the affidavits, and then to a judge, who signed them.  See SMFNID at ¶ 161.  Other than the issues of the door, the pizza, and Thomas White's alleged statements to the Auclairs concerning their resignations, therefore, plaintiffs' complaints about the affidavit are really legal determinations about the factual sufficiency of the evidence.  See SMFNID at ¶ 162.  If necessary factual elements of proposed charges were not supported by the affidavits, it was the responsibility of the State's Attorney and the court to reject the warrants. See SMFNID at ¶ 163.

J.    The Role Of Each Defendant In Preparing The Warrant Affidavits

As noted above, the portions of the three warrant affidavits for the arrest of plaintiffs on the charges at issue in this case were prepared by Detective Nault, under the direct supervision of State's Attorney Mark Solak.  See SMFNID at ¶ 164.  It was Attorney Solak, not the supervisory defendants, who approved the warrant affidavits.  See SMFNID at ¶ 165.  That process is described in Section II(K) below.

On September 10, 1999, Trooper Karen O'Connor signed the warrant affidavit seeking the arrest on Thomas White on a number of charges, including larceny and charges relating to witness tampering and obstruction of justice.  See SMFNID at ¶ 166.  Trooper O'Connor personally prepared the sections of that affidavit concerning the larceny charge.  See SMFNID at ¶ 167.  As to the sections of the affidavit that concerned witness tampering and obstruction of justice-related conduct, she incorporated language that had been prepared by Norman Nault under the supervision of State's Attorney Mark Solak as described below.  See SMFNID at ¶ 168.  Detective Nault gave Trooper O'Connor a computer disk with those sections, which allowed her to incorporate them into her affidavit for the arrest of Thomas White.  See SMFNID at ¶ 169.  Because Detective Nault had conducted the tampering and obstruction-related aspects of the investigation, Trooper O'Connor relied on his knowledge in preparing those sections of the affidavit.  See SMFNID at ¶ 168, 170.  Her affidavit states explicitly that it was based on my own investigative efforts and those of fellow officers who reported their findings to me.  See SMFNID at ¶ 171.  It is proper and standard police procedure for one investigator to include in a warrant affidavit the findings of another investigator who has direct knowledge of aspects of the case, particularly, as here, when that case is complex and involves related, but separate components.  See SMFNID at ¶ 172.  In some complex investigations, such as this one, it is

33

simply impossible for one investigator to have personal knowledge of all the facts of a case.  See SMFNID at ¶ 173.

The remaining defendants had no personal involvement in drafting or approving the aspects of the warrant affidavits at issue in this case.  See SMFNID at ¶ 174.

As to the aspects of the investigation of the plaintiffs for witness tampering and obstruction of justice-related offenses, defendant Szamocki did not participate in any way, as a supervisor or otherwise, in drafting or approving the warrant affidavits, making probable cause determinations or submitting warrants to the court.  See SMFNID at ¶ 175.  By the time those acts were performed, he no longer had a direct or substantive involvement in the investigation.  See SMFNID at ¶ 176.

Sergeant Turner did not approve the affidavits.  See SMFNID at ¶ 177.  Nor did he take the oaths of the affiants, as he felt it would be inappropriate to do so in light of his acquaintance with Henry Bourgeois from his days as a state police officer.  See SMFNID at ¶ 177.  In fact, he does not recall reading any part of the affidavits prior to their submission to the court.  See SMFNID at ¶ 178.

Lieutenant Gibeault did not have any role in drafting the warrants for the arrests of the plaintiffs on crimes relating to witness tampering and obstruction of justice.  See SMFNID at ¶ 179.  Nor did he review the warrants for substance prior to their submission to the court.  See SMFNID at ¶ 180.  His only involvement with the affidavits was to take Detective Nault's oath on the affidavit in support of the warrant for the arrest of Henry Bourgeois.  See SMFNID at ¶ 181.  That act, however, did not involve his attesting to the truth of the matters contained in the affidavit or the sufficiency of the investigation described in the affidavit.  See SMFNID at ¶ 182.  Rather,  it simply consisted of administering an oath to Detective Nault, who swore that the

contents of the affidavit were true and accurate to the best of *his* (Nault's) knowledge. <u>See</u> SMFNID at ¶ 183.   Sergeant Thomas Wakely, a non-defendant, took Detective Nault's oath on the affidavit for Gloria Marion and Trooper O'Connor's oath on the White affidavit.  <u>See</u> SMFNID at ¶ 184.

      K.    <u>The Role Of The State's Attorney In Drafting The Affidavits And Identifying Appropriate Charges</u>

Mark Solak, the State's Attorney for Windham County, played a central role in supervising and reviewing the drafting of the warrant affidavits, selecting appropriate criminal charges and advising the State Police on the existence of probable cause for plaintiffs' arrests, and signing the actual charging documents that identified the charges against the plaintiffs.  <u>See</u> SMFNID at ¶ 185.

In particular, over  two days in the end of August and/or the beginning of September of 1999, Attorney Solak supervised Detective Nault in preparing the arrest warrant affidavits at issue in this case as they pertained to obstruction of justice and witness tampering-related charges.  <u>See</u> SMFNID at ¶ 186.  Attorney Solak advised Detective Nault on the proper structure and factual progression of the affidavits.  <u>See</u> SMFNID at ¶ 187.  Attorney Solak actually sat with Detective Nault as he typed the affidavits.  <u>See</u> SMFNID at ¶ 188.  After Nault typed each page of the affidavits, he showed it to Attorney Solak, who reviewed it and either suggested changes or approved it.   <u>See</u> SMFNID at ¶ 189.  Attorney Solak advised Detective Nault to err on the side of inclusion – including witness statements in the affidavit in their entirety or near entirety.  <u>See</u> SMFNID at ¶ 190.  On September 10, 1999, after each affidavit was completed, Attorney Solak signed each page of all three 67-page affidavits.  <u>See</u> SMFNID at ¶ 191.  The

three affidavits were identical in all respects except as to the name of the suspect.  <u>See</u> SMFNID at ¶ 192.

 In addition to his participation in drafting the affidavits, Attorney Solak identified the charges that were, in his view, supported by the evidence set forth in the affidavits.  <u>See</u> SMFNID at ¶ 193.  Attorney Solak, after reviewing the affidavits, told Detective Nault that the elements of each such charge were established in the affidavits, and therefore that probable existed for the plaintiffs arrest on those charges.  <u>See</u> SMFNID at ¶ 194.

Attorney Solak signed the charging documents, known as "informations" (or warrant "face sheets"), which were submitted with the affidavits to the Superior Court bearing Solak's signature.  <u>See</u> SMFNID at ¶ 195.  In signing the informations, Attorney Solak attested that "[t]he undersigned Deputy Assistant State's Attorney of the Superior Court of the State of Connecticut on oath of office complains, deposes, and alleges that said Deputy Assistant State's Attorney has reason to believe and does believe that" the plaintiffs committed the offenses charged in the informations. <u>See</u> SMFNID at ¶ 196.

It is important to note that none of the assistance provided by Attorney Solak in preparing the warrants and identifying appropriate charges was unusual or in any way improper.  <u>See</u> SMFNID at ¶ 197.  To the contrary, as the prosecuting authority, the State's Attorneys Office routinely provides this sort of assistance to state and local police agencies.  <u>See</u> SMFNID at ¶ 198.   It should also be pointed out that Detective Nault is not a trained lawyer.  <u>See</u> SMFNID at ¶ 199.  He included in his affidavits the facts that had been gathered during the investigation. <u>See</u> SMFNID at ¶ 200.  If there were legal, as opposed to factual, infirmities in the arrest warrants affidavits undermining the existence of probable cause, it was the role of the State's Attorney and the judge to detect those infirmities and refuse to seek or issue the arrest warrants.

See SMFNID at ¶ 201.   Neither the State's Attorney nor the judge concluded that any such legal

infirmities existed in this case.  See SMFNID at ¶ 202.

      L.      The Signing Of The Warrants By A Neutral Magistrate And The Arrests Of The
              Plaintiffs On Witness Tampering And Related Charges

On September 10, 1999, Detective submitted the warrants for plaintiffs' arrests on

charges relating to witness tampering and obstruction of justice to  Hon. Michael Mack.[12]  See

SMFNID at ¶ 203.  As noted, Attorney Solak drafted the  charging documents ("informations")

that accompanied those affidavits, identifying appropriate charges based on the facts contained in

affidavits.  See SMFNID at ¶ 204.

On September 10, 1999, Judge Mack thoroughly reviewed each affidavit over a period of

several hours and found that probable cause existed based on the facts in the affidavits for the

arrest of the plaintiffs on the charges identified by Attorney Solak.  See SMFNID at ¶ 205.

Judge Mack expressed no concerns whatsoever about the adequacy of the affidavits or the

existence of probable cause.  See SMFNID at ¶ 206.  In signing *each page of all three the*

*warrant affidavits*, Judge Mack affirmed that:  "The foregoing Application for an arrest warrant,

and affidavit(s) attached to said Application, having been submitted to and considered by the

undersigned, the undersigned finds from said affidavit(s) that there is probable cause to believe

that an offense has been committed and that the accused committed it and, therefore, that

probable cause exists for the issuance of a warrant for the arrest of the above-named accused."

See SMFNID at ¶ 207.  As the foregoing makes clear, both the State's Attorney Office and a

neutral magistrate, Judge Mack, reviewed the warrant affidavits prior the arrest of the plaintiffs

---

[12] Plaintiff White was arrested a second time on a separate application in January of 2000 for
additional charges relating to embezzlement and unlawful election practices, but that second
arrest is not challenged in, or relevant to, this case.  See SMFNID at ¶ 203, n. 11.

and determined that the affidavits provided probable cause that the plaintiffs committed the offenses identified by Attorney Solak.

The information filed by Attorney Solak against Thomas White charged him with the following crimes:  larceny by embezzlement in violation of Conn. Gen. Stat. § 53a- 124 (Counts 1 and 2 – not at issue in this case); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Count 3 and 4); accessory to unlawful restraint in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96 (Counts 5 and 6); accessory to bribery of a witness in violation of  Conn. Gen. Stat. §§ 53a-8 and 53a-149 (Count 7); accessory to hindering prosecution in the second degree in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-167 (Count 8); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 9); accessory to coercion in violation of  Conn. Gen. Stat. §§ 53a-8 and 53a-192(c) (Count 10); and racketeering in violation of Conn. Gen. Stat. § 53-395(c).  See SMFNID at ¶ 208.

Thomas White was permitted to turn himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 13, 1999.  See SMFNID at ¶ 209.  A non-surety bond of ten thousand dollars was set, and, after being processed, White was released pending arraignment.  See SMFNID at ¶ 210.

The information filed by Attorney Solak against Gloria Marion charged her with the following crimes:  tampering with a witness in violation of Conn. Gen. Stat. § 53a-151 (Counts 1 and 2); unlawful restraint in the second degree in violation of Conn. Gen. Stat. § 53a-96 (Counts 3, 4, 5, 6, 7, 8); bribery of a witness in violation of  Conn. Gen. Stat. § 53a-149 (Count 7); criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 8); coercion in violation of Conn. Gen. Stat. § 53a-192(c) (Counts 9 and 10).  See SMFNID at ¶ 211.

Gloria Marion was arrested at her home and processed at the State Police Troop D barracks in Danielson, Connecticut on September 13, 1999. See SMFNID at ¶ 212. A non-surety bond of ten thousand dollars was set and made, and, after processing, Marion was released pending arraignment. See SMFNID at ¶ 213.

The information filed by Attorney Solak against Henry Bourgeois charged him with the following crimes: criminal conspiracy in violation of Conn. Gen. Stat. § 53a-48 (Count 1); accessory to tampering with a witness in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-151 (Counts 2 and 3); hindering prosecution in the second degree in violation of Conn. Gen. Stat. § 53a-167 (Count 4); coercion in violation of Conn. Gen. Stat. § 53a-192(a) (Counts 5 and 6); accessory to unlawful restraint in violation of Conn. Gen. Stat. §§ 53a-8 and 53a-96. See SMFNID at ¶ 214.

Henry Bourgeois was in New Jersey when the warrant for his arrest was signed. A decision was made not to seek his arrest in New Jersey and extradition, but rather to await his return to Connecticut to arrest him. See SMFNID at ¶ 215. Upon returning to the state, Bourgeois turned himself in for arrest at the State Police Troop D barracks in Danielson, Connecticut on September 15, 1999. See SMFNID at ¶ 216. A non-surety bond of ten thousand dollars was set, and, after being processed, Bourgeois was released pending arraignment. See SMFNID at ¶ 217.[13]

---

[13] Attorney Solak later filed substitute long form informations, which added additional charges against each plaintiff in this case. See SMFNID at ¶ 218. In accordance with state criminal practice, that substitute information was not required to be supported by an additional factual affidavit. See SMFNID at ¶ 219. Rather, it simply reflected Attorney Solak's judgment that additional charges were warranted under the facts alleged in the original arrest warrant application. See SMFNID at ¶ 220. Thus, the State Police had no role in filing the substitute informations lodged against the plaintiffs. See SMFNID at ¶ 221.

M.    The Decision Not To Interview The Plaintiffs Prior To Their Arrests

Plaintiffs are likely to assign great significance to the fact that they were not interviewed prior to their arrest.  As he is entitled to do, Detective Nault determined for very specific investigatory reasons not to seek to interview the plaintiffs prior to seeking warrants for their arrests.  See SMFNID at ¶ 222.  In particular, he determined that Thomas White would simply not offer any useful information.  See SMFNID at ¶ 223.  That determination was based in part upon the Trooper O'Connor's conclusion that Thomas White was not candid or forthcoming in the investigation of him for possible financial and election practices crimes.  See SMFNID at ¶ 224.  Moreover, White had already retained counsel, and Detective Nault believed that counsel would not permit his client to consent to any meaningful pre-arrest questioning.  See SMFNID at ¶ 225.  As to  plaintiff Bourgeois, Detective Nault believed that he would use his  experience as a State Police officer to frustrate any attempts during an interview to obtain meaningful information.  See SMFNID at ¶ 226.  Thus, with regard to plaintiffs White and Bourgeois, Detective Nault concluded that the risks to the investigation of conducting such pre-arrest interviews – namely the potential for revealing sources, evidence, theories and/or methods – outweighed the likely benefits of such interviews.  See SMFNID at ¶ 227.  Detective Nault did intend to attempt to interview plaintiff Marion, but decided that an interview immediately after her arrest would be the most fruitful, as she would likely be motivated at that time to provide useful evidence against Thomas White and Henry Bourgeois.  See SMFNID at ¶ 228.  As it turned out, Marion obtained counsel immediately after her arrest and no such interview was permitted by counsel.  See SMFNID at ¶ 229.

N.      <u>Subsequent Proceedings, The Coe Report And The Disposition Of The Charges</u>

On June 28, 2000, Attorney Glenn Coe was appointed and sworn in as Special Assistant State's Attorney for purposes of investigating and prosecuting the pending criminal cases against the plaintiffs:  <u>State v. Thomas White</u>, CR 99-106088/CR00-107163 (J.D. Rockville); <u>State v. Gloria Marion</u>, CR 99-106081 (J.D. Rockville); and <u>State v. Henry Bourgeois</u>, CR 99-106135 (J.D. Tolland).  <u>See</u> SMFNID at ¶ 230.  Attorney Coe's appointment was a result of a decision by the Hon. Jonathan Kaplan to disqualify Mark Solak and the Office of the State's Attorney for Windham County from the afore-mentioned cases. <u>See</u> SMFNID at ¶ 231.  Judge Kaplan also ordered that the Office of the Chief State's Attorney investigate whether grounds existed for the criminal prosecution of perjury of two witnesses, Aaron and Adam, relating to their testimony in the hearings held on the issue of disqualification.  <u>See</u> SMFNID at ¶ 232.  In addition, Judge Kaplan ordered an investigation into whether any person, including Assistant State's Attorney Debra Collins, had committed criminal misconduct in connection with the reported shredding of state documents, and destruction of computer records in the Windham County Sheriff's Department.  <u>See</u> SMFNID at ¶ 233.

Attorney Coe investigated the issues requested by Judge Kaplan as part of his overall investigation in connection with the prosecutions of Thomas White, Gloria Marion, and Henry Bourgeois.  <u>See</u> SMFNID at ¶ 234.  His investigation was thorough and exhaustive, consisting of over ninety interviews and the review of hundreds of documents.  <u>See</u> SMFNID at ¶ 235.  In particular, he reviewed documents provided by the Office of the State's Attorney for Windham

County, the Office of the Chief State's Attorney, the Connecticut State Police, the Windham County Sheriff's Department and others.  See SMFNID at ¶ 236.

Attorney Coe issued a comprehensive report on July 25, 2001, setting forth his conclusions.  See SMFNID at ¶ 237.  His conclusions can be summarized as follows:  (1) the obstruction of justice and witness tampering-related charges against Thomas White, Henry Bourgeois and Gloria Marion would be nolled;  (2) sufficient evidence existed to support a prosecution of Thomas White for larceny by embezzlement; (3) racketeering counts against Thomas White based on obstruction of justice and corrupt election practices would be nolled; and, while legally sufficient, racketeering counts against Thomas White based on larceny would be nolled as duplicative; (4) sufficient evidence did not exist to prosecute either Adam or Aaron Auclair for perjury; (5) no probable cause existed to arrest and prosecute Debra Collins or any other person for shredding of state documents, and destruction of computer records relating to the Windham County Sheriff's Department; and (5) the Connecticut State Police acted properly in the investigation and arrest of the Thomas White, Gloria Marion and Henry Bourgeois.  See SMFNID at ¶ 238.  Attorney Coe later consented to the dismissal of the obstruction of justice and witness tampering-related charges against Thomas White, Gloria Marion and Henry Bourgeois.  See SMFNID at ¶ 239.

Attorney Coe also specifically concluded that, based on the information produced during the hearings before Judge Kaplan and during his investigation, Connecticut State Police acted entirely properly in investigating and drawing up warrant affidavits for the arrest of the Thomas White, Gloria Marion, and Henry Bourgeois.  See SMFNID at ¶ 240.  As set forth in Attorney Coe's affidavit, his conclusion that obstruction of justice and witness tampering-related prosecutions should not be pursued against Thomas White, Gloria Marion and Henry Bourgeois

was based in large measure on problems with the credibility of Adam Auclair and, to a lesser degree, Aaron Auclair, both of whom would be the crucial witnesses in the State's case. <u>See</u> SMFNID at ¶ 241. Indeed, because the Auclairs were, in effect, the putative victims, their credibility was particularly important to successful prosecutions. <u>See</u> SMFNID at ¶ 242.

Attorney Coe does not believe, however, that the Connecticut State Police knew or should have known, at the time that they prepared and submitted arrest warrant affidavits relying in large measure on the Auclairs' statements, that the Auclairs were unreliable witnesses. <u>See</u> SMFNID at ¶ 243. Indeed, as set forth in his affidavit, Attorney Coe is aware of no information that would have called the Auclairs' credibility into question at the time the warrant affidavits were prepared. <u>See</u> SMFNID at ¶ 244. Concerns about the credibility of the Auclairs arose after the arrest of White, Bourgeois and Marion, during disqualification hearings before Judge Kaplan. <u>See</u> SMFNID at ¶ 245. In particular, Attorney Coe does not believe the Connecticut State Police knew or should have known at the time they prepared the warrant affidavits that Adam and Aaron Auclair were not locked in a room with Gloria Marion on July 16, 1999. <u>See</u> SMFNID at ¶ 246. Nor does he believe that the Connecticut State Police knew or should have known at the time they prepared their warrant affidavits that the Auclairs were eating pizza at their meeting with Gloria Marion on July 16, 1999. <u>See</u> SMFNID at ¶ 247.

More generally stated, Attorney Coe does not believe that the Connecticut State Police knew or should have known, at the time that they prepared the warrant affidavits, that *any* material information contained in those warrant affidavits was false. <u>See</u> SMFNID at ¶ 248. Nor, according to Attorney Coe, did the Connecticut State Police possess any information that the omitted from their warrant affidavits that would have undermined probable cause to arrest Thomas White, Gloria Marion, and Henry Bourgeois. <u>See</u> SMFNID at ¶ 249.

Based on Attorney Coe's expertise as a prosecutor and his investigation, he does not believe that it was, or should have been, obvious to the Connecticut State Police that the warrant affidavits failed to provide probable cause for the arrest of Thomas White, Gloria Marion or Henry Bourgeois for crimes relating to obstruction of justice or witness tampering. <u>See</u> SMFNID at ¶ 250. Nor, more generally, does he believe that the Connecticut State Police knew or should have known that their warrant affidavits were faulty in any material respect. <u>See</u> SMFNID at ¶ 251.

Based on his investigation, Attorney Coe believe that the State's Attorney Mark Solak gave poor legal advice to the Connecticut State Police regarding the existence of probable cause to arrest plaintiffs White, Marion and Bourgeois on obstruction of justice-related charges based on the facts gathered by the State Police. <u>See</u> SMFNID at ¶ 252. Attorney Solak's advise, however, was not so obviously wrong that it should have been perceived as faulty by the Connecticut State Police at the time that they prepared and submitted to the court their warrant affidavits. <u>See</u> SMFNID at ¶ 253. To the contrary, in Attorney Coe's view, it was entirely reasonable of the Connecticut State Police to rely upon the advice of State's Attorney Solak as to the existence of probable cause to arrest Mr. White, Ms. Marion, and Mr. Bourgeois on obstruction of justice and witness tampering-related charges. <u>See</u> SMFNID at ¶ 254.

Based on Attorney Coe's experience, it is entirely proper for police officers to rely on prosecuting attorneys for advice on the existence or absence of probable cause based on a given set of facts, as was done in this instance. <u>See</u> SMFNID at ¶ 255. The exception would be where the facts are so obviously insufficient to sustain the proposed charges that the insufficiency should be obvious even to the average police officer. <u>See</u> SMFNID at ¶ 256. This was not the case here, according to Attorney Coe, as the affidavits were not so obviously deficient as to alert

the officers that probable cause was not present to arrest Thomas White, Gloria Marion, and

Henry Bourgeois on obstruction of justice and witness-tampering related charges.  <u>See</u> SMFNID

at ¶ 257.

Attorney Coe's conclusion that the Connecticut State Police acted properly is not

undermined by the fact that they did not interview Thomas White, Gloria Marion and Henry

Bourgeois prior to seeking their arrest.  <u>See</u> SMFNID at ¶ 258.  Valid investigative reasons often

counsel against such pre-arrest interviews, and there is no indication in this instance that such

valid reasons did not exist.  <u>See</u> SMFNID at ¶ 259.

In sum, Attorney Coe is aware of no evidence whatsoever that would remotely suggest

that the investigation by the Connecticut State Police of Thomas White, Gloria Marion, and

Henry Bourgeois was motivated by any improper motive.  <u>See</u> SMFNID at ¶ 260.

Indeed, the defendants affirm in their affidavits that their conduct in connection with the

investigation and arrest of the plaintiffs was, in their view, entirely proper and was not motivated

by malice, a desire to harm or retaliate against the plaintiffs or any other improper motives.  <u>See</u>

SMFNID at ¶ 261.

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56(c) requires the entry of Summary Judgment ". . . if

the pleadings, depositions, answers to interrogatories, and admissions on file together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  A factual dispute is "genuine" when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986).  A "material fact" is one whose

resolution will affect the ultimate determination of the case.  <u>Id.</u>  "The mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." Samuels v. Smith, 839 F. Supp. 959, 962 (D.Conn. 1993)(emphasis in original).

Where, as here, the issue is the existence of probable cause to arrest the plaintiff, the

plaintiff bears the burden to demonstrate that there is no reasonable basis for instituting the

criminal proceedings. Zenik v. O'Brien, 137 Conn. 592, 597, 79 A.2d 769 (1951). Further,

although probable cause is defined in terms of "reasonableness," it is an issue of law for the court

to decide. McMahon v. Florio, 147 Conn. 704, 707; Paranto v. Ball, 132 Conn. 568, 571, 46

A.2d 6 (1946) (citations omitted). Thus, the issue is one appropriately decided by way of

summary judgment.

### III.    ARGUMENT

A.    PLAINTIFFS FAIL TO STATE A CLAIM BASED ON A THE SUBMISSION OF
      FALSE AND/OR MATERIALLY INCOMPLETE WARRANT AFFIDAVITS

Plaintiffs' motion for summary judgment relies primarily on the fact that the State of

Connecticut chose not to continue its prosecution of charges related to witness tampering and

obstruction of justice. This fact alone, however, does not in any way establish a violation of the

Fourth Amendment to the United States Constitution; and it certainly does not entitle plaintiff to

summary judgment. To the contrary, plaintiffs have not proved that defendants possessed the

mental state necessary to establish a violation of the Fourth Amendment.

The Fourth Amendment to the United States Constitution provides that no person may be

subjected to unreasonable searches or seizures. See U.S. Const., Amend. IV. This protection

includes the right to be free from searches or seizures unsupported by probable cause. Weyant v.

Okst, 101 F.3d 845, 852 (2nd Cir. 1996). The existence of probable cause is a complete defense

to a civil action alleging an unreasonable arrest. Id., 101 F.3d at 852 (internal citations and

quotations omitted).  A plaintiff challenging a warrant as lacking probable cause faces a "heavy burden."  Golino v. City of New Haven, 950 F.2nd 864, 870 (2nd Cir. 1991), cert. denied, 505 U.S. 1221 (1992).

Normally, the issuance of a warrant by a neutral magistrate creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause to effect a disputed arrest.  Id.  In order to overcome this presumption, the plaintiff must make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was "necessary to the finding of probable cause."  Id. (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)).  Moreover, probable cause to arrest for *any* offense - even one with which the plaintiff was not ultimately charged - is sufficient to overcome the charge of false arrest or imprisonment.  See, e.g., Avery v. King, 110 F.3d 12 (6th Cir. 1997); Biddle v. Martin, 992 F.2d 673 (7th Cir. 1993); Pfannstiel v. City of Marion, 918 F.2d 1178 (5th Cir. 1990).

A civil rights plaintiff challenging a warrant affidavit as false or materially incomplete must make the same showing that is required at a suppression hearing under Franks v. Delaware, supra, 438 U.S. at 171-72: the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause. Id.; Golino, supra, 950 F.2nd at 870-71. The Franks plaintiff must make specific allegations of deficiencies in the warrant; that is to say, unsupported conclusory allegations of falsehood or material omission will not support a claim.  See, e.g., Zandhri v. Dortenzio, 228 F.Supp.2d 167, 174 (D.Conn. 2002), citing Franks v. Delaware, supra, 438 U.S. at 171.

In order to establish a Franks violation, it is not enough simply to show that the warrant affidavits were false, that additional investigation would have rebutted probable cause, or even that the affidavit was the result of negligent or sloppy police work. "Allegations of negligence or innocent mistake are insufficient to require a reevaluation of the affidavit." Franks, supra, 438 U.S. at 171. Rather, a plaintiff is required *to prove* that the defendants possessed a culpable mental state, i.e., that their affidavit contained "deliberate falsehood" or reflected "reckless disregard for the truth." Franks, supra, 438 U.S. at 165, 171. Thus, an affidavit containing false information or suffering from material omissions will not support a claim where, as here, circumstances suggest that the affiant believed it to be true. Id. at 165.

The standard enunciated in Franks recognizes that information an affiant reports may not ultimately be found to be accurate, and is nonetheless willing to tolerate such a result at that early stage of the process, so long as the affiant believed the accuracy of the statement at the time it was made. Id., 438 U.S. at 165. Because the consequences of arrest or search are less severe and easier to remedy than the consequences of an adverse criminal verdict, accuracy and completeness in the context of a warrant affidavit are of less constitutional import than at later stages in the criminal process. Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir. 1998).

Except in the "*very* rare case" where a plaintiff makes a strong preliminary showing that the affiant "*with an intention to mislead*" excluded critical information from a warrant affidavit, and the omission is critical to the finding of probable cause, Franks is inapplicable to the omission of disputed facts. Id. (emphasis in original).[14] Thus, while not immune from a Franks

---

[14]   Courts have applied the Franks analysis to omissions of information from warrant affidavits as well. See Mays v. City of Dayton, supra. However, where the constitutional claim arises from alleged material omissions from warrant affidavits, a much stricter level of scrutiny applies. This is so because allowing omissions to be challenged on the same footing as that of false statements included in the warrant would create a situation where almost every affidavit of an officer would be questioned. Mays, supra, 134 F.2d at 815.

inquiry, affidavits with potentially material omissions are much less likely to merit a <u>Franks</u> hearing than are affidavits which allegedly include false statements.  <u>Id</u>., <u>citing</u> <u>U.S. v. Atkins</u>, 107 F.3d 1213, 1217 (6th Cir. 1997).

Against these standards, plaintiffs' <u>Franks</u> claim clearly fails.

i.    *Plaintiffs cannot overcome the presumption of validity afforded by the magistrate's finding of probable cause.*

A magistrate's finding of probable cause receives "great deference." <u>Spinelli v. United States</u>, 393 U.S. 410, 419 (1969).   In the absence of obvious irregularity or facial deficiency, officers are shielded from liability by a neutral magistrate's finding of probable cause and issuance of a warrant.  <u>United States v. Leon</u>, 468 U.S. 897 (1984); <u>Amato v. City of Richmond</u>, 875 F. Supp. at 1144-45.

There can be no dispute in this case that a neutral magistrate carefully evaluated the warrant affidavits and found probable cause.  Indeed, as set forth in Detective Nault's affidavit, Judge Mack reviewed the affidavits over a period of several hours, after which he expressed no concerns whatsoever about the adequacy of the affidavits or the existence of probable cause.  <u>See</u> SMFNID at ¶ 205-06.  Thus, the warrant affidavits were carefully scrutinized by both the State's Attorney and Judge Mack, both of whom concluded that probable cause existed.  It is impossible to conclude, therefore, that the defendants – none of whom is a trained lawyer – should have noted obvious deficiencies in the affidavits undermining the existence of probable cause.  Attorney Coe's affidavit supports the conclusion that no such obvious deficiencies exited in the affidavits.

   *ii*   *There are no actionable falsehoods or omissions in the affidavits.*

    Putting aside arguments of counsel in the memorandum in support of plaintiffs' motion for summary, the *complaint* focuses primarily on three specific factual misrepresentations or omissions in the affidavit:  (1) the Auclairs were not locked into the room with plaintiff Marion during the meeting on July 16, 1999; (2) the Auclairs were eating pizza during that meeting; and (3) that Thomas White urged Adam and Aaron Auclair not to resign.[15] The only information on these subjects in the possession of the State Police at the time the affidavits were submitted to court was that provided by the Auclairs.  Defendants did not at that time know that any of the Auclairs' information was false or incomplete.  The defendants were fully entitled to rely on the Auclairs at the time the warrant affidavits were prepared.  Thus, because defendants did not knowingly present any false information, or omit any material information in their possession, plaintiffs' Fourth Amendment claim must fail.

    The law clearly allows police officials, as was done here, to base probable cause determinations on the statements of victims and/or seemingly credible witnesses.  See, e.g., Garcia v. Gasparri, 193 F. Supp. 2d 445, 452 (D. Conn. 2002).  "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity."  Curley v. Village of Suffern, 268 F.3d 65, 69-70 (2d Cir.

---

[15] Most of the alleged omissions/misrepresentations are variations on the theme that the Auclairs were not restrained or abducted during the July 16, 1999 meeting because they were not locked into the room and were sufficiently relaxed to be eating pizza.  The remainder of the alleged infirmities involve failures to include sufficient information in the affidavits to support necessary elements of the various charges.  See Amended Complaint at ¶ 24.  These are legal deficiencies, not factual misrepresentations or omissions.  In the absence of specific factual misrepresentations or omissions of facts known to the affiants, such legal insufficiency claims are not actionable under Franks.

2001)(citing Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) and Singer v. Fulton

County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995)).  When, as here, "an average citizen tenders

information to the police, the police should be permitted to assume that they are dealing with a

credible person in the absence of special circumstances suggesting that might not be the case."

Calderado v. Calabrese, 298 F.3d 156, 165 (2002).

 In this instance, the defendants relied upon the Auclairs, and the plaintiffs simply cannot

point to any facts to suggest that this reliance was unwarranted.  As discussed above in Section

II(F), supra, there was no reason for any objective observer to conclude that the Auclairs were

anything less than fully reliable witnesses at the time they gave their statements to the State

Police.  Certainly, none of the defendants was aware of any information that might undermine

the credibility of the Auclairs.  Neither Auclair brother had any known history of conduct

suggesting unreliability.  Indeed, the plaintiffs themselves were unable in their depositions to

point to any reason why the Auclairs should not have been perceived as anything less than fully

reliable or credible witnesses.  Simply put, the Auclairs compared extremely favorably to many

of the witnesses upon whom police are often forced rely.

 It is also worth noting that, had the Auclairs intentionally mislead the State Police in their

statements, they would have been subjected themselves to criminal liability.  See Conn. Gen.

Stat. § 53a-157b(providing criminal liability for making a false written statement intended to

mislead a public servant in the performance of his official function).  The Supreme Court has

recognized that "if an unquestionably honest citizen comes forward with a report of criminal

activity – which if fabricated would subject him to criminal liability –  . . . rigorous scrutiny of

the basis of his knowledge [is] unnecessary."  Illinois v. Gates, 462 U.S. 213, 233-34

(1983)(citing Adams v. Williams, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972)).

As Attorney Coe's affidavit makes clear, it was not until the issuance of the arrest warrants that *any* questions about the Auclairs' credibility arose. Thus, to the extent that anything in the affidavits attributed to either or both of Auclairs later proved to be false, the defendants were not, and should not have been, aware of such falsity and cannot, therefore, be liable under <u>Franks</u>. Otherwise stated, the defendants are not alleged to have known *at the time that they swore out their warrant affidavit*, that it contained materially false or incomplete information. The absence of such an allegation is fatal to plaintiffs' <u>Franks</u> claim.

Not only were the Auclairs evidently reliable, the warrant affidavits simply did not mislead Judge Mack in the manner alleged by the plaintiffs. With regard to the issue of the door to room where the Auclairs met with plaintiff Marion on July 16, 1999, the affidavits stated as follows:

- According to Aaron Auclair, "[i]n the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second ***unlocked*** door was behind us." <u>See</u> SMFNID at ¶ 155. (emphasis added).

- Adam's statement discusses the meeting in the lockup of the Valley Street courthouse on July 16, 1999 with himself, Aaron and Gloria Marion. Adam stated only that the door behind Marion locks automatically and that the keys were in Marion's desk drawer. <u>See</u> SMFNID at ¶ 155.

Clearly, therefore, the affiants in this case did not mislead Judge Mack into believing that the Auclairs were locked into a room with Gloria Marion. As discussed above in Section II(F), the statements in the affidavits concerning the door by the Auclairs are not mutually exclusive and, indeed, it is far from clear to this day that *either* is false. Thus, upon closer inspection, the central "falsehood" alleged by the plaintiffs is not a falsehood at all.

Nor is it actionable under <u>Franks</u> that the defendants failed to inform Judge Mack that the Auclairs were eating pizza at the time of their meeting with Gloria Marion or that Thomas White

may have urged the Auclairs not to resign.  An officer seeking a warrant need only advise the judicial authority of information within his knowledge.  See, e.g., Martinez v. City of Schenectedy, 115 F. 3d 111, 115, (2d Cir. 1997); Brown v. D'Amico, 35 F.3d 97, 99 (2d Cir. 1994).  As discussed above, at the time the affidavits were submitted to the Judge Mack, none of the defendants knew that the Auclairs were eating pizza during their meeting with Marion.  As to the resignation issue – assuming arguendo that it can even be considered material at all, which it cannot – the Auclairs' statements did not mention any effort by Thomas White to persuade them not to resign.  The affidavits faithfully reported to Judge Mack what the statements did state – that White accepted the Auclairs' resignations.

The record is clear:  the defendants did not include any information in the arrest warrant affidavits that they knew to be false; nor did they omit from the affidavits any information in their possession that undermined the existence of probable cause.  Defendants' affidavits submitted herewith clearly so state, and no competent evidence remotely rebuts this conclusion. Indeed, Attorney Coe affirms that, even after a thorough investigation of this matter, he is aware of no evidence at all to suggest that the defendants falsified or omitted information from the affidavits.  To the contrary, Detective Nault simply put in the affidavits all the relevant information he possessed regarding possible witness tampering and obstruction of justice. Attorney Solak believed that evidence to be sufficient to sustain a probable cause finding, and Judge Mack, after careful review, agreed.  If there existed information of which Detective Nault was unaware that undermined probable cause, he cannot be liable for failing to include such information in the affidavits.

ii.   *Failure to interview the plaintiffs or otherwise further investigate this matter prior to seeking arrest warrants is not actionable.*

Plaintiffs suggest that further investigation by the defendants would have rebutted probable cause.  Even if true, the failure to conduct pre-arrest interviews of the plaintiffs cannot form the basis for liability.   If, as here, officers reasonable believe probable cause exists to support an arrest, there is simply no constitutional duty to further investigate before seeking an arrest warrant.  See, e.g., Franco-de Jerez v. Burgo*s*, 876 F.2d 1038, 1041 (1st  Cir. 1989).

It is entirely inconsequential that the defendants did not interview the plaintiffs prior to seeking warrants for their arrest.  As set forth above in Section II(M), Detective Nault had sound investigative reasons not to interview the plaintiffs prior to their arrest.   Moreover, the law simply does not require such pre-arrest interviews, and the fact that a person to be arrested, if asked, would deny the allegation of wrongdoing is of no significance in evaluating the constitutionality of an arresting officer's conduct:

> [There is no requirement] that an officer otherwise equipped with probable cause to arrest an individual has a duty to question and weigh the  suspect's version of the incident prior to making the arrest . . . .  Although police officers must exercise judgment in assessing the existence or non-existence of probable cause in a given situation, they are not required to arbitrate the matter with the suspect.

Baker v. McCollan*,*  443 U.S. 137, 145-46 (1979); Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).  Similarly, in Krause v. Bennett, 887 F.2d 362, 365-66 (2d Cir. 1989), the Second Circuit found that an investigating officer was entitled to qualified immunity notwithstanding that he had failed to consider possibly exculpatory evidence offered by the plaintiff.  See also Calderado, supra, at 167-78 ("The police are not required to explore and eliminate every technically plausible claim of innocence before making an arrest.")

At worst, the failure to conduct any further investigation prior to seeking arrest warrants represents negligence, which does not suffice to state a claim under <u>Franks</u>.  <u>See</u> <u>Franks</u>, <u>supra</u>, 438 U.S. at 171.

   iii. *Defendants' conduct was not improperly motivated.*

The defendants affirm, and the record clearly shows, that their conduct was not motivated by a desire to retaliate against or punish the plaintiffs or by any other improper motive.  <u>See</u> SMFNID at ¶ 261.  The only motive alleged in this case is that the defendants sought to punish the plaintiffs for complaining about their "friend" Debra and Charles Collins. As discussed in detail in Section II(E) above, that alleged motive is utterly rebutted by the evidence obtained through discovery, including the deposition of Debra Collins.  The defendants simply were not friends with the Collinses; nor did they have any other conceivable motivation to jeopardize their livelihoods by entering into unlawful conspiracies for the benefit of the Collinses.

However, even if the plaintiffs could establish some untoward motive, which they cannot, defendants would still be entitled to summary judgment.  An arresting officer's subjective feelings about the arrest are simply not relevant to the issue of whether the contested arrest was supported by probable cause, even if the officer subjectively believed that probable cause did not exist and if the arresting officer harbored personal ill feelings toward the person arrested.  <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989); <u>Peters v. New York</u>, 392 U.S. 40, 66-67 (1968), <u>cited</u> <u>with</u> <u>favor</u> <u>in</u> <u>Florida v. Royer</u>, 460 U.S. 491, 507 (1983).[16]  Thus, plaintiffs' effort – albeit ineffective – to establish improper motives on the part of the defendants is pointless.

---

[16] An additional reason exists to dismiss plaintiff White's claims.  As noted above, plaintiff White was charged with larceny and election practices charges, which were *not* nolled by Attorney Coe or dismissed by the Court.  Plaintiff White ultimately took accelerated rehabilitation on an election practices charge.  Where probable cause to arrest for *any* offense - even one with which the plaintiff was not ultimately charged - is sufficient to overcome the

It is clear in the record that Detective Nault believed in good faith that the warrant affidavits were true and complete and that probable cause existed to arrest the plaintiffs for witness tampering and obstruction of justice-related offenses.  That view was endorsed and advocated by Attorney Solak and affirmed first by Judge Mack and later by Attorney Coe.  None of the defendants possessed any information or belief, at the time the arrest warrant applications were submitted, that undermined this conclusion.

For the foregoing reasons, the State Police Defendants cannot be liable under <u>Franks</u> for deficiencies in the arrest warrant affidavits, and this claim should therefore be dismissed.[17]

B.    <u>DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY</u>.

Plaintiffs are not entitled to summary judgment for the additional reason that the Defendants are protected by the doctrine of qualified immunity from an award of money damages against them in their individual capacities.  The shield of qualified immunity generally protects government officials from liability for monetary damages on account of their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 73 (2d Cir. 1998).  The availability of the defense turns upon the "objective legal reasonableness" of the

---

charge of false arrest or imprisonment.  <u>See</u>, <u>e.g.</u>, <u>Avery v. King</u>, 110 F.3d 12 (6th Cir. 1997); <u>Biddle v. Martin</u>, 992 F.2d 673 (7th Cir. 1993); <u>Pfannstiel v. City of Marion</u>, 918 F.2d 1178 (5th Cir. 1990).

[17] Plaintiffs also assert state law constitutional claims based on alleged defects in the warrant affidavits.  <u>Franks</u>-type claims raised under Connecticut's constitution are analyzed in the same manner as those raised under the Fourth Amendment.  <u>See</u> <u>State v. Glenn</u>, 47 Conn. App. 706, 714-15 (1998)("[W]e conclude that the <u>Franks</u> analysis applies under our state constitution when a defendant challenges the veracity of statements made in a warrant affidavit.").

allegedly unlawful official action, "assessed in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow v. Fitzgerald, supra, 457 U.S. at 818-19). In this case, it is simply impossible to conclude that the defendants' conduct was objectively unreasonable.

The qualified immunity defense is intended to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Lee v. Sandberg, 136 F.3d 94, 100 (2d Cir. 1997) (citations omitted). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001), citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier, supra, 533 U.S. at 201.

Typically, the first inquiry under the qualified immunity analysis is whether the right purportedly violated was clearly established at the time of the challenged official action. Saucier, supra, 533 U.S. at 201. Here, the defendants do not question that the Fourth Amendment right to be free from unreasonable searches or searches supported by materially false or incomplete warrants was established at the time of the conduct at issue in this case. Rather, the defendants are shielded by the second prong of the qualified immunity doctrine, which provides immunity "even if the actions violated a clearly established law, [but] the official was objectively reasonable in believing in the lawfulness of his actions." Connecticut ex rel Blumenthal v. Crotty, 2003 U.S. App. Lexis 20041, * 46 (2d Cir. Sept. 30, 2003). As to this aspect of the doctrine, "[t]he presumption in favor of finding qualified immunity is

necessarily high, protecting '<u>all but the plainly incompetent or those who knowingly violate</u>

<u>the law</u>.'" <u>Id</u>. (<u>quoting</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)(emphasis added).

> With particular reference to cases of alleged police misconduct:

>> the U.S. Court of Appeals for the Second Circuit has held that even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act . . . . The objective reasonableness test is met - and the defendant is entitled to qualified immunity - if officers of reasonable competence could disagree on the legality of the defendant's actions . . . . In qualified immunity cases, [the courts] are not concerned with the correctness of the defendants' conduct, but rather with the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene . . . . The ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

<u>Lennon v. Miller</u>, 66 F.3d 416, 420-21 (2d Cir. 1995) (quotations and internal citations omitted).

    As discussed in detail above, the defendants are alleged to have relied on information provided by witnesses and victims, as they were entitled under law to do, and they neither falsified or omitted information from the affidavits. The record also shows that the defendants relied in good faith on the advice of Attorney Solak, who informed them that probable cause existed based on the facts set forth in the affidavits. After careful review, Judge Mack agreed that probable cause existed. Attorney Coe subsequently concluded that the defendants' conduct was proper and reasonable. Defendants are clearly, therefore, entitled to qualified immunity.

    Plaintiffs allege essentially that defendants' reliance on their legal counsel, the chief prosecutor in Windham County, Attorney Solak, and seemingly reliable witnesses, the Auclairs, was mistaken. Even if plaintiffs are ultimately shown to be correct in this assertion, qualified

immunity is grounded on the notion that a state official's good faith mistake will not subject him

to liability:

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on
> particular [governmental] conduct.  It is sometimes difficult for an
> [official] to determine how the relevant legal doctrine [...] will
> apply to the factual situation the [official] confronts.   If the
> [official's] mistake as to what the law requires is reasonable,
> however, the [official] is entitled to the immunity defense.

Saucier v. Katz, supra, 533 U.S. at 205;  see also, Malley v. Briggs, 475 U.S. 335, 343 (1986)

(qualified immunity leaves ample room for mistaken judgments).

An officer is protected by qualified immunity even when, as alleged here, he

"'mistakenly conclude[s] that probable cause is present,' i.e., when he reasonably believes that a

reasonably prudent police officer would have acted even though a reasonably prudent police

officer would not have acted."  Oliveira v. Mayer, 23 F.3d at 648 (quoting Anderson v.

Creighton, 483 U.S. 635, 641(1987)).  "Mere negligence" on the part of a search warrant affiant

will not support a Franks claim."  State v. Cobb, 251 Conn. 285, 317 (1999), cert. denied 121

S.Ct. 106 (2000); State v. Pappas, 256 Conn. 854, 864-65 (2001).

Where, as here, an arrest is based upon facially valid warrants, supported by the

information of seemingly reliable witnesses and issued by a judge of the Superior Court, the

overwhelming presumption is in favor of finding qualified immunity – it is only where the

warrant application so lacks indicia of probable cause as to render official belief in its existence

objectively unreasonable that the shield of immunity will be lost.  See, e.g., United States v.

Leon, 468 U.S. 897, 923 (1984).

The Second Circuit Court of Appeals recently confirmed that, in cases like this

challenging probable cause, the presumption in favor granting qualified immunity is strong:

> we have said that in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. This is because at its heart, the concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause and in those situations courts will not hold that they have violated the Constitution. Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials should not be held personally liable.

Calderado, supra, at 298 F.3d. at 162.

In this instance, there are simply no facts from which to conclude that the defendants, even if mistaken, acted so unreasonably as to take them outside the broad protections of qualified immunity. As set forth in detail above, the State Police relied upon information from trustworthy witnesses – the Auclairs. In addition, Detective Nault was advised by Attorney Solak that probable cause existed based on the facts set forth in the warrant affidavits. That advice was ratified by Judge Mack, who carefully reviewed the warrant affidavits. Furthermore, Attorney Coe affirms that the State Police acted properly, and any deficiencies in the warrants were due to the legal conclusions made by Attorney Solak. Plaintiffs make no effort to rebut or deal with this reliance on Attorney Solak's advice.

Plaintiffs would have this court hold that officers can neither rely on apparently reliable witnesses or heed the legal advice of the county's leading prosecutor. To the contrary, this is a paradigmatic case of police officers reasonably concluding, even if mistakenly, that probable cause existed. Thus, plaintiffs cannot surmount the high barriers necessary to defeat qualified immunity.

C.     THE DEFENDANTS LACKED THE REQUISITE PERSONAL INVOLVEMEN TO STATE A CLAIM AGAINST THEM UNDER 42 U.S.C. § 1983

The fact that the defendants did not have had any contemporaneous knowledge of the purported falsity or incompleteness of the warrant affidavits suggests another fundamental flaw in plaintiffs' constitutional claims.  Section 1983 imposes liability only for "conduct which 'subjects, or causes to be subjected,' the complainant to a deprivation of rights secured by the Constitution and laws."  Rizzo v. Goode, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).   Otherwise put, a "plaintiff must…allege a tangible connection between the acts of the defendants and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986).  Thus, in order to be held liable under 42 U.S.C. § 1983, a defendant must have had a role in subjecting the plaintiff to a deprivation of a federally guaranteed right.  That is to say, a showing of personal involvement is a necessary prerequisite for establishing liability under § 1983.  See, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987); Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033 (1973), rev'd on other grounds, Graham v. Connor, 490 U.S. 386 (1989); McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1977), cert. denied, 434 U.S. 1087 (1978).  In this instance, plaintiffs' alleged injury, to the extent it is actionable at all, was caused by acts of parties other than the defendants.

As set forth above in Section II(J), none of the defendants except Detective Nault had any substantive role in preparing or approving the warrant affidavits at issue in this case.  Nor did they have any meaningful participation in the investigation of the plaintiffs for crimes relating to witness tampering and obstruction of justice.  Thus, defendants Szamocki, Turner, Gibeault and O'Connor clearly lack sufficient personal involvement to sustain claims against them.[18]

---

[18] As noted above, defendant O'Connor did not draft the sections of the White affidavit relating to witness tampering and obstruction of justice-related crimes.  See SMFNID at ¶ 166-174.

Even Detective Nault, who did prepare the warrant affidavits at issue, is not responsible for any harm the plaintiffs might have suffered.  Detective Nault received seemingly reliable information from outwardly trustworthy witnesses and seemingly valid legal advice from the State's Attorney for Windham County regarding the existence of probable cause.  Detective Nault should not be held responsible if either the Auclairs' evidence or Attorney Solak's advice ultimately proved unreliable.

D.     PLAINTIFFS' OTHER CLAIMS FAIL AS A MATTER OF LAW

While the thrust of plaintiffs' complaint is clearly a Fourth Amendment <u>Franks</u> claim, they also assert claims based on alleged false arrest/malicious prosecution, violation of the Fourteenth Amendment's guarantees of equal protection, and violation of the First Amendment. Those claims are all deficient for a variety of reasons, including the following:

- For the reasons discussed above, all Fourth Amendment-based claims are baseless and defendants are entitled to qualified immunity from liability on any such claims, whether those claims are framed as Franks claims or false arrest/malicious prosecution.

- Plaintiffs have not alleged, and cannot prove, that the defendants' conduct was motivated by a desire to retaliate against them for complaining about misconduct by the Collinses or anybody else.  As discussed above, defendants' conduct was not improperly motivated. Moreover, the suggestion that the defendants acted to assist the Collinses is clearly rebutted by the evidence.  Finally, it should be noted that the complaint referenced by the plaintiffs was issued by Attorney Meisler on behalf of Thomas White alone.  Attorney Meisler did not represent the other plaintiffs when he sent his letter of July 13, 1999 to Chief State's Attorney Jack Bailey.  Thus, plaintiffs Marion and Bourgeois do not even allege any speech upon which purported retaliation could be based.  Finally, as discussed above, if a warrant is supported by probable cause, the arresting officers' subjective motivations are irrelevant.

- Plaintiffs "equal protection" claim is also entirely baseless.  That claim alleges that plaintiff were treated differently and worse than those who do not have personal relationships with investigating officers.  This is evidently a repackaging of the assertion that the plaintiffs were arrested because the defendants were

friendly with the Collinses.  As demonstrated in detail above, no such friendships existed.

- If the court dismisses plaintiffs' federal law causes of action but leaves pending one or more state law claims, the defendants would respectfully request that the court decline to retain jurisdiction over those remaining state law claims.  If "the only subject matter jurisdictional basis for this lawsuit . . . [is] properly dismissed, it [is] well within the discretion of the district court to dismiss the pendent state law claims".  Albany Insurance Co. v. Esses, 831 F.2d 41, 45 (2d Cir. 1987). "[C]ertainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); see also Spear v. Town of West Hartford, 771 F. Supp. 521, 530 (D. Conn. 1991) ("Absent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of . . ."), aff'd., 954 F.2d 63 (2d Cir.), cert. denied, 506 U.S. 819 (1992).

- Plaintiffs' claims of equal protection, First Amendment and any other constitutional violations should be analyzed under the Fourth Amendment.  See Albright v. Oliver, 510 U.S. 266,  273 (1994).  As discussed above, plaintiffs' Fourth Amendment claims fail as a matter of law.


## IV.    CONCLUSION

For the foregoing reasons, the defendants respectfully request that plaintiffs' summary judgment motion be denied and that defendants be granted summary judgment  on all claims.

DEFENDANTS, NORMAN NAULT, ET AL.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    _____
       Perry Zinn Rowthorn
       Assistant Attorney General
       Federal Bar No. ct
       55 Elm Street
       P.O. Box 120
       Hartford, CT  06141-0120
       Tel: (860) 808-5020
       Fax: (860) 808-5347
       Perry.Zinn-Rowthorn@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 29th day of July, 2004 to:

Jon Schoenhorn, Esq.
97 Oak St.
Hartford, CT 06106

_____

Perry Zinn Rowthorn
Assistant Attorney General