# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS WHITE, ET AL.,                  :     CIVIL ACTION NO.
    Plaintiffs                         :     3:02CV1589 (WWE)

    V.                                 :

NORMAN NAULT, ET AL.,                  :
    Defendants                         :     August 9, 2004

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, Norman Nault et al., have moved for summary judgment, claiming that the plaintiffs fail to state a claim based on the submission of false and/or materially incomplete warrant affidavits, that the defendants are entitled to qualified immunity, and that the defendants lacked the requisite personal involvement to support a claim against them under 42 U.S.C. § 1983.[1]  For numerous reasons, the defendants' motion is meritless.  The defendants' arguments for granting summary judgment are based on numerous disputed (and therefore misleading) claims of fact.  For these reasons, and for those set forth in the plaintiffs' memorandum in support of summary judgment, the defendants' motion must be denied.

### STATEMENT OF FACTS

Most of the relevant facts were set forth in the plaintiffs' motion in support of summary judgment, dated June 3, 2004, and are incorporated by reference herein.  In addition, the plaintiffs set forth the following additional facts:

The missing records that were the subject of the internal investigation were never located

---

[1] It should be noted that the *defendants'* motion for summary judgment (dated May 27, 2004) and motion in opposition to the plaintiffs' motion for summary judgement (dated July 28, 2004) are substantially *identical*.

in Henry Bourgeois's garage, and, therefore, were not found therein. (Bourgeois Affidavit, Exhibit 1).

Also, despite the defendants' assertion to the contrary, both Henry Bourgeois and Gloria Marion were placed on administrative duty as a result of the criminal investigation. (Memo from Eileen Meehan to Thomas White, Exhibit 2.)

## STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *LaFond v. General Physics Service Corp.*, 50 F.3d 165, 171 (2d Cir. 1995) (Internal citations omitted). When deciding a motion for summary judgment, a court must "resolve all ambiguities and inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Shockley v. Vermont State Colleges*, 793 F.2d 478, 481 (2d Cir. 1986); *United States v. One Tintoretto Painting*, 691 F.2d 603, 606 (2d Cir. 1982); *Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir. 1981).

The moving party bears the initial burden of demonstrating that no factual issue exists and that it is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 330 (1986). In ruling on a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2

If one or more disputed facts might affect the outcome of the case, they are material and must be submitted to the jury. *Id.*

Motions for summary judgment must be denied if reasonable minds could differ as to the importance of the evidence, and if "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). In short, summary judgment is inappropriate when "a rational jury might well reach an opposite conclusion from that of the moving party." *Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988). The plaintiff is entitled to receive the benefit of any doubt when their assertions conflict with those of the defendant requesting summary judgement. *Bieluch v. Sullivan*, 999 F.2d 666, 670 (2d Cir. 1993).

## ARGUMENT

A.     SUMMARY JUDGMENT IS NOT APPROPRIATE AS AFFIDAVITS SUBMITTED BY THE DEFENDANTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT DIRECTLY CONTRADICT THEIR OWN PRIOR TESTIMONY

It is well established that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous, sworn statement. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 5 (1st Cir. 1994); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984); and other cases from every circuit court). A party, likewise, cannot attempt to *deny* an issue of fact by submitting an affidavit that directly contradicts his or her earlier testimony. *See Cleveland, supra,* 526 U.S. at 806.

3

In *Cleveland*, the Supreme Court held that parties cannot create issues of fact sufficient to survive summary judgment simply by contradicting their own previously sworn statements by, for example, filing a later affidavit that flatly contradicts that party's earlier sworn testimony, without explaining the contradiction or attempting to resolve the disparity.  *Id.*  As shown above, the Court cited circuit court decisions in every jurisdiction.  For example, the Second Circuit has held that:

> [A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony . . . Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial.

*Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (Internal citations omitted.).  Therefore, the court may ignore such affidavits.

The affidavits submitted by the defendants in support of summary judgment *directly contradict* their earlier testimony and show that there are several issues of material fact which are adverse to the defendants' that they simply ignore in order to claim that there is no issue in dispute.  Many of the claims made in the affidavits state that "the defendants lacked the requisite personal involvement to state a claim against them" are blatant and false attempts to deflect responsibility for the illegal arrests and detentions of the plaintiffs.  Indeed, the defendants would like the court to believe that the only defendant substantially involved in preparing the warrants was Norman Nault.[2]  The defendants' own prior testimony, however, flatly shows otherwise.

Defendant John Szamocki states in his affidavit, for example, that he was not directly

---

[2] The defendants' pleading raises the question whether the other defendants in this case have an inherent legal conflict of interest with Norman Nault, despite all being represented by the same counsel.

4

involved in the investigation of the plaintiffs; that he did not participate in the drafting of the arrest affidavits; and that he did not make probable cause determinations. (*See* Defendants' Statement of Material Facts Not in Dispute in Support of Motion for Summary Judgment, dated May 27, 2004 (hereinafter "Defendants' SMFNID") at ¶¶ 29-31.) However, his own prior testimony and that of other defendants directly contradicts this statement. (*See* Plaintiffs' Statement of Material Facts Not in Dispute in Support of Motion for Summary Judgment, dated June 3, 2004 (hereinafter "Plaintiffs' SMFNID") at ¶¶ 19, 29, 30-31, 33-34, 36, 57-58, 75, 79, 80, 92, 97-100, 113-114, 120, 126.) Defendant John Turner's affidavit also states that he did not participate directly in the investigation of the plaintiffs and that he does not even recall reading the arrest affidavits. (*See* Defendants' SMFNID at ¶¶ 34-37.) He also claims that he merely supervised Norman Nault. (*See Id.* at ¶ 34.) However, this affidavit also directly contradicts earlier testimony given by him, Defendant Gibeault, and other defendants, and shows that he was actively involved in the investigation of the plaintiffs. (*See* Plaintiffs' SMFNID at ¶¶ 65, 75, 78, 80, 82, 97-101, 103, 108, 120, 131.) Lieutenant Gibeault also claims that his only involvement was to take Norman Nault's oath in support of the arrest warrant of Henry Bourgeois. (*See* Defendants' SMFNID at ¶¶ 39-41.) These claims are also contradicted by the prior testimony of both himself and other defendants. (*See* Plaintiffs' SMFNID at ¶¶ 78, 98-100, 102.)

The defendants also attempt to deflect responsibility onto Windham State's Attorney Mark Solak. They claim that he "played a central role in supervising and reviewing the drafting of the warrant affidavits, selecting appropriate criminal charges and advising the State Police on the existence of probable cause for plaintiffs' arrests." (Defendants' Motion for Summary Judgment at 35.) The defendants support these claims, once again, with affidavits that directly

contradict their own prior testimony and other evidence which shows they were the primary

investigators in charge of drafting the warrants and selecting charges.[3] (*See* Defendants'

SMFNID at ¶ 185; Plaintiffs' SMFNID at ¶¶ 19, 31, 32, 36, 76, 79, 80, 97, 98, 99, 100, 103, 110-

11, 120, 122.)

The defendants make an allegation that some of the records in question in the

investigation into the Kenney administration were discovered in Henry Bourgeois's garage.

(Defendants' motion for summary judgment at 12-13 n5.) The only evidence the defendants use

to support this claim is Defendant Norman Nault's affidavit which does not state that he, himself,

or others discovered these documents. (Defendants' SMFNID at ¶ 86.) No other evidence was

offered, and the source of this fabrication by Detective Nault is unknown. The defendants do not

attribute this claim to any other evidence or personal knowledge of Nault. Plaintiff Henry

Bourgeois, however, avers that no one ever searched his garage "to look for any records or other

evidence in this or any case." (Bourgeois Affidavit, Exhibit 1 at ¶ 4.) The affidavit also states

that no such records were ever in his possession. (*Id.* at ¶ 5.) This is yet another example of the

recklessness in which the defendants have fashioned their motion – using only self-serving

affidavits of the defendants without any other substantiation – and illustrates the

disingenuousness of these defendants.

The defendants make several other statements in their affidavits that directly contradict

their prior sworn testimony. For example, Defendants Nault, Gibeault, and Szamocki claim, in

their affidavits, that the investigation into Attorney Collins and others following Attorney

---

[3] It should further be noted that a prosecuting attorney's advice on the existence or absence of probable cause is dependent on a given set of facts presented to him or her by the police. *See* Affidavit of Pamala J. Favreau, attached as Exhibit 4 hereto.

6

Meisler's complaint "did not *precede* the investigation into misconduct by the plaintiffs, but [was] formally requested by Attorney Solak." (Defendants' Motion for Summary Judgment at 13.) However, once again, the affidavits contradict testimony of Szamocki and a memo written by Defendant Gibeault which show that the investigation commence earlier when the defendants' became aware of Attorney Meisler's complaint. (*See* Plaintiffs' SMFNID at ¶ 13, 16, 17, 18, 19, 29, 30; *see also* Affidavit of Pamala J. Favreau at ¶ 16, attached as Exhibit A4 hereto.) The defendants also claim that "the Auclair brothers possessed inherently greater credibility than many witnesses upon whom criminal investigators must often rely and that the defendants could presume their credibility." (Defendants' Motion for Summary Judgment at 19.) This statement also contradicts the testimony given by these same affiants at an earlier date and is strongly contested by the plaintiffs. (*See* Plaintiffs SMFNID at ¶ 4, 5, 54, 69, 73, 78, 80, 82, 83, 84; *see also* Affidavit of Attorney Pamala J. Favreau ¶ 13, attached hereto as Exhibit A4.) Detective Nault further claims in his affidavit that there was no evidence to support the allegation that computer memory was improperly erased, a contention that also may contradict earlier statements. (*See* Defendants' SMFNID at ¶ 82; Plaintiffs' SMFNID at ¶¶ 93 and 94.)

Not surprisingly, the plaintiffs have found no case law where a party *seeking* summary judgment submitted an affidavit that was inconsistent with their prior testimony, depositions, and other evidence in an effort to argue that there are no facts in dispute. Indeed, it is odd that the defendants chose to ignore these contradictions in an attempt to show that there are no issues of material fact when the affiants' own prior testimony clearly demonstrates the contrary.[4] Such sworn contradictions display that the defendants either intended to mislead the court, or were

---

[4] "Facts do not cease to exist because they are ignored." Aldous Huxley, *Proper Studies* (Chatto & Windus 1927).

simply reckless in their representations. Therefore, the court must disregard these contradictory affidavits. The defendants cannot be permitted to deny issues of fact by submitting affidavits contradicting their own sworn testimony without explaining the contradiction or attempting to resolve the disparity. *Cleveland, supra,* 526 U.S. at 806. If movants were given such power, it would render summary judgment almost useless. *See Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969) ( "If a party . . . could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

The court should be highly critical of the movant's papers submitted in support of a motion for summary judgment and any doubt as to an issue of material fact should be resolved against the movant. *See Weisser v. Mursam Shoe Corp.,* 127 F.2d 344, 346 (2d Cir. 1942); *Wittlin v. Giacalone,* 154 F.2d 20, 22 (D.C. Cir. 1946). The court must also view the facts in the light most favorable to the non-movant and give that party the benefit of all reasonable inferences from the evidence that can be drawn in that party's favor. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000). These maxims are especially applicable here, where it is clear that the affidavits were written without any consideration of the truth. The defendants would like the court to believe that Detective Nault was the only defendant who was substantially involved in this conspiracy and that the rest of the fault lies with State's Attorney Solak. This claim is not credible at all, as the defendants' own prior testimony shows that they all were involved at the investigatory level, and had the "requisite personal involvement" to be liable under 42 U.S.C. § 1983. Therefore, this motion for summary judgment should be denied.

8

### B.    THE FINDING OF PROBABLE CAUSE BY A NEUTRAL MAGISTRATE DOES NOT SHIELD THE DEFENDANTS FROM LIABILITY

The defendants' incorrectly assert that they are shielded from liability because a neutral magistrate found probable cause by examining the warrants presented to him. (Defendants' Motion for Summary Judgment at 48, 50.) This argument is meritless. The Supreme Court has made clear that police are not entitled to rely on the fact that a magistrate signed the warrants as proof that applying for the warrants was *per se* reasonable. *United States v. Leon*, 468 U.S. 897, 923 (1984). To the contrary, an "officer can 'have no reasonable grounds for believing that [a] warrant was properly issued 'if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'" *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (*quoting Leon*, 468 U.S. at 923 (1984)).

Judicial scrutiny of warrants in section 1983 claims, therefore, is permitted. The reason for this is explained as follows:

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Malley v. Briggs*, 475 U.S. 335, 345-46 (1986); *See also, Greenstreet v. County of San Bernardino*, 41 F.3d 1306 (9th Cir. 1994). This maxim is particularly true here, where the defendants submitted three massive, virtually identical warrant affidavits, each totaling 67 pages of single-spaced typed material, without differentiating the separate warrants, except as to the name of the accused and the affiant. The defendants have failed to engage in any analysis to demonstrate where or how the warrants, in fact, set out probable cause for the elements of each

crime. The very notion of "one size fits all" warrants is anathema to individual determinations of probable cause, and is further illustrated by the utter lack of any facts pertaining to Henry Bourgeois therein, and only indirect, innocuous statements by Thomas White.

"A section 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978): the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (*citing Golino v. City of New Haven*, 950 F.2d 864, 870-71 (2d Cir. 1991)); *Franks, supra,* 438 U.S. at 171-72. *See also Rivera v. United States,* 928 F.2d 592, 604 (2d Cir. 1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367-68 (2d Cir. 1990); *United States v. Orozco-Prada,* 732 F.2d 1076, 1089 (2d Cir.), *cert. denied,* 469 U.S. 845 (1984); *United States v. Barnes,* 604 F.2d 121, 151-53 (2d Cir. 1979), *cert. denied,* 446 U.S. 907 (1980); *United States v. Campino,* 890 F.2d 588, 592 (2d Cir. 1989), *cert. denied,* 494 U.S. 1068 (1990). The plaintiff must also demonstrate that the judge would not have issued the warrant on the basis of 'corrected affidavits.'" *Velardi v. Walsh,* 40 F.3d 569, 574 (2d Cir. 1994). Finally, a plaintiff may prevail in this type of action if "a reasonably well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley, supra,* 475 U.S. at 344.

As demonstrated in the plaintiffs' motion for summary judgment, dated June 3, 2004, the defendants omitted several key facts which dramatically illuminate the obvious lack of probable cause. As a paramount issue, the warrant omits the fact -- known to the defendants -- that the

Windham County Sheriff's Department was a law enforcement agency, and that its head, Sheriff

Thomas White, had received authorization from its state-wide administrative office to conduct an

internal affairs investigation into the possible unauthorized shredding and destruction of

department documents, and the tampering with the department's computer. In this regard, Aaron

Auclair was a witness, if not a suspect, in that investigation, because of his admitted use of the

shredding machine on the evening of May 28, 1999. Adam Auclair was believed to have

information because of his close friendship with Charles Collins, Sheriff Kenney's supervisor,

and was familiar with the computer. Also, as special deputy sheriffs, the Auclairs could be

ordered to attend an interview session for an internal affairs investigation conducted by superiors.

(*See* Plaintiffs' Motion for Summary Judgment, dated June 3, 2004.)

All the defendants were aware of the concerns raised in June and early July by Sheriff

White and his attorney, Arthur Meisler, about the shredding. Indeed, all of the defendants

immediately dismissed the complaints as "unfounded," or a "smokescreen" orchestrated by

Sheriff White to deflect the investigation of his financial practices while a deputy sheriff. (*Id.*)

The defendants knew that Patricia Lempicki, of the sheriff's administration office in

Hartford, had authorized such an investigation, and that such investigations were permitted by

administrative regulations. Defendant O'Connor interviewed Lempicki regarding this fact,

obtained a copy of Sheriff White's written request to launch an internal investigation, and

documented it in a report, that was shared with her supervisor, Szamocki, as well as Defendant

Nault and his supervisor, Turner. Turner signed off on a report that referenced the conversation

with Lempicki. Szamocki admitted in testimony that he was aware that Marion and Bourgeois

informed the Auclairs that they were conducting an internal investigation, and that protocols

11

existed within the sheriff's departments statewide to conduct their own internal investigations. (*Id.*)

The tape of the conversation between Gloria Marion and Aaron Auclair, which the defendants obtained on July 20, 1999, also shows Marion stating that she is conducting an internal investigation that has nothing to do with Sheriff White's case. The defendants also possessed a copy of the Code of Ethics for County Sheriffs, which required that investigations remain confidential and that all employees were required to answer questions concerning such investigations. Yet the defendants chose to omit this material information from the warrants as well. (*Id.*)

White personally told O'Connor before the commencement of any investigation involving shredding or tampering, of his belief that Assistant State's Attorney Debra Collins had participated in some of the shredding in Sheriff Kenney's office, and that it was, in his opinion, improper that Collins should remain involved in the investigation of his activities. Attorney Meisler's letter also preceded the investigation, and expressed similar concerns. While all the defendants, including Gibeault, dismissed these concerns, a Superior Court judge specifically found that Collins' involvement in the shredding of documents created a conflict of interest requiring the disqualification of the entire Windham State's Attorney's Office. (*Id.*)

The defendants also omitted from the warrant that Collins, one of those named in the initial complaint about destruction of Sheriff's Department records, had listened to the Auclair tape with her friend, Aaron Auclair, and then drove him to the barracks the next morning to deliver the tape, and introduced him to the investigators. Aaron's July 21, 1999 statement also discloses that he worked on former Sheriff Kenney's re-election campaign in the fall of 1998 –

12

the election that Kenney lost to White. The omission of this information precluded the magistrate from considering any bias and personal animosity that either Auclair might harbor against Tom White. (*Id.*)

The warrant affidavits also notably omit the fact that the names of Aaron and Adam Auclair never came up during the course of the investigation of Thomas White's financial dealings. During his supervision of the investigation into White's financial affairs, Szamocki admitted that he never heard of the Auclair, nor did he believe that they had any significance as witnesses to the White investigation. However, the warrants notably ignore this material fact, which was critical to the determination of probable cause on such charges of hindering prosecution, witness bribery, racketeering and witness tampering. (*Id.*)

The defendants also expressly excluded the material fact that although White and his attorney were the complainants in the investigation of the disappearance of documents and computer files, no one in the Sheriff's Office after Kenney vacated the premises was ever interviewed and no determination was ever made as to whether any materials were improperly destroyed. Indeed, only the alleged suspects and perpetrators were interviewed, and their self-serving denials of wrongdoing were accepted by the defendants as true without any further investigation. As a result, as Nault conceeded, the investigators never determined what, if anything, was missing from the Putnam Sheriff's Office, what had been removed from the computer, and whether any items were shredded in violation of state law. This, of course, flatly contradicts much of the self-serving affidavits proffered by the defendants. (*Id.*)

With regard to the July 16, 1999 and July 19, 1999 meetings between the Auclairs and Gloria Marion, Nault admitted in his testimony that he was familiar with the "lockup area" at the

13

Willimantic Courthouse, although he did not go down there after his assignment to the case on July 20. Therefore, Nault necessarily knew that there were no locks on the door behind where the Auclairs were sitting, allowing them free egress from the building at any time, this was a reckless omission, and its inclusion would not support a reasonable belief that the Auclairs were subjected to unlawful restraint, kidnapping, or any other offense that suggested they were abducted or "locked up." Furthermore, Adam Auclair admitted that he told one of the State Police investigators that on July 16, 1999 he, his brother, and Gloria Marion were sitting around eating pizza for lunch while talking in the "lockup", further undermining the police allegations. (*Id.*)

The defendants submit the testimony of Russell Downer in support of the proposition that both doors in the lockup area could be locked, but it is unclear whether he is talking about the same place. (*See* Downer Depo. at pp. 55-66, attached as Exhibit P in Defendants' SMFNID.) Moreover, Mr. Downer, who was never interviewed by the defendants, testified that the door leading from the lockup area to the courtroom was *always open* when inmates were not present. (*Id.* at p. 64.) The question of whether the doors had lockes is, as the defendants claim, "ambiguous", and is an issue in dispute that a finder of fact must consider in determining whether the defendants could have reasonably found probable cause.

It is apparent from the manner in which the warrants describe the area where the meetings took place, that the defendants wished to leave the false impression in the affidavits that this area was as defined: a "lockup" – i.e. a locked, secured area which required a key to exit. Since Nault knew, or should have known, that any suggestion of restraint in the "lockup" area was false and misleading, his failure to note that in the warrant was a reckless omission of material fact.

14

Furthermore, Nault admits that although he noticed the discrepancy between Adam Auclair's statement that both doors were locked, with Aaron's statement that the door leading into the courthouse was open, he did nothing to resolve this highly material disputed fact. Of course, if he had, it would have led to the conclusion that Adam Auclair, at the very least, was not credible and there was no probable cause for any charge involving restraint. Yet both Nault and O'Connor ignored this discrepancy in the affidavit. (*Id.*)

The defendants argue that there was some ambiguity as to whether the doors to the lockup area were capable of being locked. (Defendants' Motion for Summary Judgment at 29-31.) The plaintiffs disagree with this assertion, and believe that the facts show it was impossible to lock one of the doors. Aaron Auclair's statement provides that at least one of the doors was open at the time of the questioning, while Adam Auclair's statement provides that both were locked. (Plaintiffs SMFNID at ¶¶ 67, 96.) Later, Adam Auclair admitted that at least one of the doors was, in fact, unlocked. (*Id.* at ¶ 74.) While it is questionable if the doors were locked – or even capable of being locked – the police failed to investigate the matter further and buried these statements within a 67 page document. (*See* Arrest Warrants/Affidavits in Support of the Arrest of Thomas White, Henry Bourgeois, and Gloria Marion., attached to Plaintiffs' SMFNID, Exhibits 1, 2, 3.)

The admissions and actions of the defendants demonstrate that there was no objective investigation here, but an all-out effort to "get" the plaintiffs, and to cover up wrongdoing that might have implicated a prosecutor in unprofessional conduct, and which ultimately led to the disqualification of her entire office. The issue, then, under the corrected affidavit analysis is whether, if Nault, O'Connor, Turner and Szamocki had included all they learned from their

investigation, the warrant applications would have "supported a reasonable officer's [or

magistrate's] belief that probable cause existed." *Cartier v. Lussier,* 955 F.2d 841, 845 (1992)

(citation omitted). The answer is an unequivocal no.

### C. DEFENDANTS ARE NOT PROTECTED BY QUALIFIED IMMUNITY BECAUSE THEY ACTED WITH THE INTENT TO DEPRIVE THE PLAINTIFFS OF THEIR CONSTITUTIONAL RIGHTS

Qualified immunity is an affirmative defense for which the defendants bear the burden of

proof. *Gomez v. Toledo,* 446 U.S. 635, 640, (1980). "To establish the [qualified immunity]

defense at the summary judgment stage, the officers must show upon facts that are undisputed

either that [their] conduct did not violate clearly established rights of which a reasonable person

would have known, or that it was objectively reasonable to believe that [their] acts did not violate

these clearly established rights." *Soares v. State of Connecticut,* 8 F.3d 917, 920 (2d Cir. 1993)

(*quoting Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir. 1990); *citing Harlow v. Fitzgerald,*

457 U.S. 800, 818-19 (1982)). *See also Posr v. Court Officer Shield 207,* 180 F.3d 409, 416 (2d

Cir. 1999).

The defendants do not contest the right to be free from unreasonable searches or seizures

under the Fourth Amendment. (Defendants' motion for summary judgment at 58.) Instead, they

claim that they are shielded from liability because they were "objectively reasonable" in their

belief that they were acting lawfully. (*Id.*) However, the defendants acted with the *intent* to

deprive the plaintiffs of their constitutional rights and, additionally, their assertions were not

reasonable. This malicious intent is evident in that the defendants' applied for the arrest of the

plaintiffs without probable cause. (*See* Section B., *supra.*)

The defendants are correct when they state that an officer is protected by qualified

immunity when "he *mistakenly* concludes that probable cause is present, i.e., when he reasonably

believes that a reasonable prudent police officer would have acted even though a reasonably

prudent officer would not have acted." (Defendants' motion for summary judgment at 60, *citing*

*Oliveira v. Mayer,* 23 F.3d 642, 648 (D. Conn. 1994) (Emphasis added; internal quotations

16

omitted.)).  Their discussion of this issue in their memorandum, however, is wholly irrelevant to the claims made by the plaintiffs.  The plaintiffs do not allege that the defendants made mistakes.  The amended complaint clearly states that "[t]he defendants acted either individually, jointly or severally, and in a conspiracy with one another, to deprive the plaintiffs of their clearly established federal constitutional rights, in violation of 42 U.S.C. §§1983 and 1988 . . ." (Amended Compl. ¶ 27.)  Further, it states that "[t]he actions of the defendants constituted violations of 42 U.S.C. § 1983 and the First Amendment of the United States Constitution as the defendants took adverse action against the plaintiffs as acts of retaliation, after the plaintiffs brought allegations of misconduct against public officials."  (Amended Compl. ¶ 30.)

The plaintiffs contend that the defendants acted unreasonably – that as a direct consequence, the plaintiffs were subjected to false arrests and malicious prosecution because they complained about and investigated the  possible destruction of government documents.  The defendants admit they immediately dismissed concerns raised about the destruction of evidence and only interviewed – and relied upon – the suspects in that crime.  Their reckless omission of material facts from the arrest affidavits resulted in the magistrate finding probable cause when none existed.  (*See* Section B., *supra*).  This allegation is well supported by the affidavits, testimony, depositions, and other documents which are part of the record to date.  The defendants were not negligent; their actions, instead, violated the constitutional and civil rights of the plaintiffs.  The defendants are not entitled to qualified immunity for their unconstitutional conduct.

D.     SUMMARY JUDGMENT IS NOT APPROPRIATE AS THE STATE OF
        MIND OF THE DEFENDANTS IS AT ISSUE

"[W]here a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." *Rosen v. Thornburch,* 928 F.2d 528, 533 (2d. Cir. 1991). "[S]ummary procedures should be used sparingly [] where motive and intent play leading roles and proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broadcasting System,* 368

17

U.S. 464, 473 (1962). *Also see Burns v. Rovaldi,* 477 F.Supp. 270, 280 (D.Conn. 1979).

In *Rosen,* a Title VII case, the plaintiff claimed that he was fired because he was Jewish. *Id.* at 529. The defendant argued that the plaintiff was fired because he had failed a driving test – a legitimate, non-discriminatory reason for discharge. *Id.* There was an issue, however, as to whether the evaluation methods used by his supervisors were legitimate or whether the evaluation was conducted in a manner to create a pretext for the firing. *Id.* at 534. Many other factual issues also needed to be explored to determine whether the plaintiff was fired because of improper religious discrimination. *Id.* The court held that summary judgment was not appropriate as the judge could not determine such factual issues as a matter of law. *Id.*

The defendants claim that "an arresting officer's subjective feelings about the arrest are not relevant to the issue of whether the contested arrest was supported by probable cause, even if the officer subjectively believed that probable cause did not exist and if the arresting officer harbored personal ill feelings toward the person arrested." (Defendants' motion for summary judgment at 56, *citing Graham v. Connor,* 490 U.S. 386, 396 (1989)). *Graham,* however, involved the use of excessive force by police officers, and held that a section 1983 plaintiff must prove that the conduct was objectively unreasonable. *Graham, supra,* 490 U.S. at 396. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . ." *Id.* The *Graham* Court did not hold that an officer's intent is wholly irrelevant, but instead, held that a lawful arrest cannot be made unlawful merely because of an improper motive. Here, the arrest of the plaintiffs was not supported by probable cause (*See* Section B., *supra*) and, therefore, the defendants' conduct *was not objectively reasonable.* The intent of these defendants is relevant, especially since plaintiffs "must establish the state of mind required to prove" a section 1983 violation. *Bd. of County Comm.'rs v. Brown,* 520 U.S. 397, 405 (1997). The issue of "malice" is, in any event, relevant to the plaintiffs' allegation of malicious prosecution.

18

The plaintiffs' primary claim in this matter is that the "defendants acted either individually, jointly or severally, and in a conspiracy with one another, to deprive the plaintiffs of their clearly established federal constitutional rights." (Amended Compl. ¶ 27.)  Plaintiffs also claim that "[t]he actions of the defendants constituted violations of 42 U.S.C. § 1983 and the First Amendment of the United States Constitution as the defendants took adverse action against the plaintiffs as acts of retaliation . . ." (Amended Compl. ¶ 30.)  Both of these claims require detailed findings of fact to determine whether the defendants had the intent to deprive the plaintiffs of their constitutional rights.  As stated earlier, such a detailed inquiry is inappropriate for summary judgment.  *Poller, supra*, 368 U.S. at 473.

The defendants further make the self-serving claim that their conduct was not influenced by any improper motive.  (Defendants' Motion for Summary Judgement at p.56.)  The defendants' support for this, and other claims, is the report and affidavit submitted by Special Prosecutor Glenn Coe.  (*See* Coe Report, attached to Plaintiffs' SMFND, Exhibit 15; *see also* Affidavit of Glen Coe, attached to Defendants' SMFND, Exhibit N.)  Attorney Coe, however, failed to thoroughly investigate the matter, and his report and affidavit should be dismissed.

First, Coe's affidavit is inaccurate when it provides that Judge Kaplan ordered an "investigation into whether any person, including Assistant States's Attorney Debra Collins, had committed criminal misconduct in connection with the reported shredding of state documents, and destruction of computer records in the Windham County Sheriff's Department." (Coe Affidavit at ¶ 6.)  The court actually requested that the "Chief State's Attorney's office . . . conduct a *thorough* investigation into the activities related to the closing of the Office of High Sheriff James Kenney with respect to destruction of records, removal of property, and possible tampering with computer programs." (*See* Exhibit 9, attached to Plaintiffs' SMFNID, *See also* Affidavit of Attorney Pamala J. Favreau ¶¶ 10-11, attached hereto Exhibit A4.)  Second, Attorney Coe was not present at the hearing to disqualify the Windham State's Attorney and did

not read the related testimony, and, therefore, was not able to observe their demeanor while testifying. (Affidavit of Attorney Pamala J. Favreau ¶¶ 12, 14, attached hereto Exhibit A4.)

The defendants also argue that the plaintiffs "claim that the motive for their own arrests was the defendants' friendship with the Collinses." (Defendants' SMFNID at ¶ 64.) The plaintiffs', however, do not rely on such a claim, as the alleged friendship between the Collinses and the defendants was removed from the amended complaint. (*See* Amended Compl.) In any event, friendship is not relevant in the determination of whether the defendants conspired to cover up wrongdoing by a prosecutor. Such a motive is not relevant to a civil rights action.

The defendants apparently wish the court to make a decision by determining the credibility of witnesses. Respectfully, this court cannot make such determinations when much of the defendants' proof in support of their motion for summary judgment conflicts with earlier testimony (*see section* A., *supra*) and with other evidence, including depositions, police documents, and other affidavits. As stated earlier, such a question of credibility is generally a question for the finder of fact and is inappropriate for summary judgment. *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944). A reasonable jury could evaluate this evidence and determine that the defendants' version of the facts is not believable, and that the defendants did conspire to retaliate against the plaintiffs to deprive them of their federal and state constitutional rights.

For example, the defendants offer the self-serving contention that their "conduct in connection with the investigation and arrest of the plaintiffs was entirely proper and was not motivated by malice, a desire to harm or retaliate against the plaintiffs or by any other improper motives." (Defendants' Motion for Summary Judgment at 45.) This claim is strongly contested, and the conduct of the defendants in both the criminal investigation and in the submission of this motion establish that this is a material fact in dispute. It is apparent that the defendants failed to conduct a thorough investigation and relied solely on the statements of questionable and contradictory witnesses. (*See* Plaintiffs' SMFNID at ¶¶ 74, 77, 96.) It is also clear, contrary to

20

the defendants' motion for summary judgment and the affidavits in support thereof, that Debra
Collins was involved in the criminal investigation. (*See* Memorandum of Decision RE: Motion
To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan, J
1/10/00) at pp 11-12, marked as Exhibit 39 to Plaintiffs' SMFNID.)

The defendants forget that the standard is what a *reasonable* officer would do – not what
a foolish, unreasonable, poorly trained or uninformed officer does. Ignorance is no defense to a
civil rights violation. *See Oliveira, supra,* 23 F.3d at 648.

The inappropriateness of granting summary judgment based on self-serving protestations
of good faith is further bolstered by the fact that the so-called uncontested "evidence" is
contained in affidavits by the very defendants seeking summary judgment, which, as noted
above, contradicts their sworn testimony. "[T]he mere fact that the witness is interested in the
result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to
the jury as a question of fact." *Sonnentheil v. Christian Moerlein Brewing Co.,* 172 U.S. 401,
408 (1899). *See also Sartor, supra,* 321 U.S. at 627-28; and *Dewy v. Clark,* 120 F.2d 766, 770-
71 (D.C. Cir. 1950) (both holding that summary judgment was not appropriate where the
credibility of the witnesses was an issue). Cross examination is the best method for determining
the trustworthiness of testimony. *Sartor, supra,* 321 U.S. at 628.

It is clear that the arrests of the plaintiffs occurred without probable cause and were,
therefore, objectively unreasonable. In light of this, the intent of the conspirators is relevant and
a finder of fact may consider this in determining whether they are liable. The defendants rely
solely on their own inconsistent affidavits to support this motion; and their very credibility is an
issue which must be examined by a jury. *See Poller, supra,* 368 U.S. at 473.

21

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment should be denied in its entirety.

THE PLAINTIFFS – THOMAS WHITE,
HENRY BOURGEOIS, AND GLORIA MARION

BY: _____

Jon L. Schoenhorn, Their Attorney
Federal Bar No. ct00119
Jon L. Schoenhorn & Associates
97 Oak Street
Hartford, CT 06106
Tel: (860)278-3500
Fax: (860)278-6393

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, first class postage prepaid, or hand delivered in accordance with the Federal Rules of Civil Procedure on this 9th day of August, 2004, to the following counsel of record:

Perry Zinn Rowthorn, Esq.
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

_____
Jon L. Schoenhorn

22