## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS WHITE, ET AL.,        :     CIVIL ACTION NO.
    Plaintiffs                  3:02CV1589 (WWE)

                :

    V.               :

                :

NORMAN NAULT, ET AL.,        :
    Defendants           :     August 9, 2004

### PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Rule 56 of the Federal and Local Rules of Civil Procedure, the plaintiffs

hereby submit this statement in opposition to the defendants' motion for summary judgment.

Unless noted, evidence cited in support of denials is attached to Plaintiffs' Statement of Material

Facts Not in Dispute dated June 3, 2004.

**A.**     **The Plaintiffs**

    1.     Plaintiff Thomas White was hired as a deputy sheriff in Windham County in

1995. See White Depo. at 15 (Defendants' Exhibit A).

        ADMIT

    2.     White was elected to the position of High Sheriff for Windham County in

November of 1998, defeating incumbent James Kenney. See White Depo. at 15-16.

        ADMIT

    3.     Plaintiff White assumed his duties as High Sheriff on June 1, 1999, serving in that

position until the sheriffs system was abolished on December 1, 1999 in favor of the current

judicial marshal system. See White Depo. at 11.

        ADMIT (but Defendants' citation is inaccurate, See White Depo at 16).

    4.     Plaintiff White did not lose his position as High Sheriff as a result of the criminal

charges at issue in this case, but rather resigned when the sheriff's system was dismantled.  <u>See</u> White Depo. at 11.

        ADMIT

5.     He currently works as a representative for a public employees' union.  <u>See</u> White Depo. at 9.

        ADMIT

6.     Plaintiff Gloria Marion was first employed as a deputy sheriff by the Sheriff's Department in September of 1997.  <u>See</u> Marion Depo. at 10, 15 (Defendants' Exhibit B).

        DENY.  She was employed as a Special Deputy Sheriff.  <u>See</u>, Marion Depo. at 15.

7.     She served in that capacity until promoted to Lieutenant by plaintiff White immediately after he became High Sheriff in June of 1999.  <u>See</u> Marion Depo. at 15.

        ADMIT that Plaintiff Marion was promoted to lieutenant by Plaintiff White immediately after he became high sherif in June of 1999.  DENY that she served as deputy sheriff until promoted.  Plaintiff Marion served as special deputy sherif.  <u>See</u>, Marion Depo. at 15.

8.     Plaintiff Marion remained at that rank until the sheriff's system was abolished.  <u>See</u> Marion Depo. at 10, 15.

        ADMIT for the purposes of this motion.

9.     Plaintiff Marion's employment in the courts was not interrupted as a result of either her arrest or the transition to the current marshal system.  <u>See</u> Marion Depo. at 9.

        DENY.  After arrest, she was placed on administrative duty.  <u>See</u> Memo from Eileen Meehan to Thomas White dated 11/18/99, Exhibit A2.

        ADMIT.  Employment not interrupted as a result of the transition to the current

2

marshal system.

10.    Marion is currently employed by the Judicial Branch of the State of Connecticut as a Judicial Marshal II in Windham County.   See Marion Depo. at 6.

ADMIT

11.    Plaintiff Henry Bourgeois became employed as a full-time deputy sheriff in Windham County in July of 1995, having previously worked at various times in the sheriff's office on a per diem basis.  See Bourgeois Depo. at 23 (Defendants' Exhibit C).

ADMIT for the purpose of this motion.

12.    Bourgeois was promoted to Captain – a supervisory position above lieutenant in the chain of command – by plaintiff White in June of 1999.  See Bourgeois Depo. at 23.

ADMIT

13.    Like plaintiff Marion, Mr. Bourgeois' employment in the court system was not interrupted by his arrest or the abolishment of the sheriff's system.  See Bourgeois Depo. at 11.

DENY.  After the arrest  was placed on administrative duty due to charges against Plaintiff Bourgeois.  See Exhibit A2.

ADMIT that their employment was not interrupted due to the abolishment of the sheriff system.

14.    Bourgeois is currently employed as a supervisory judicial marshal.  See Bourgeois Depo. at 11.

ADMIT

15.    Prior to his employment in the sheriff's system, plaintiff Bourgeois served as an officer of the Connecticut State Police for 32 years, retiring in 1992.  See Bourgeois Depo. at 32.

3

ADMIT

## B. **The Defendants**

16.    Defendant Norman Nault is employed by the Connecticut State Police as a detective, having joined the State Police in 1988.  See Nault Aff. at ¶ 3. (Defendants' Exhibit D).

ADMIT

17.    At the time of the events at issue in this matter, Detective Nault was assigned to the Eastern District Major Crime Squad, where he specialized in the investigation of serious and/or complex crimes.  See Nault Aff. at ¶ 4 .

ADMIT

18.    Detective Nault lead the investigation into the charges at issue in this matter and prepared the affidavit for the warrants for the arrest of defendants Marion and Bourgeois on those charges.  See Nault Aff. at ¶¶ 5, 39; Affidavit Supporting Warrant For Arrest of Gloria Marion, Sept. 10, 1999 ("Marion Aff.")(Defendants' Exhibit E); Affidavit Supporting Warrant For Arrest of Henry Bourgeois, Sept. 10, 1999 ("Bourgeois Aff.")(Defendants' Exhibit F).

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

19.    Defendant Karen O'Connor joined the state police in June of 1995. See O'Connor Aff. at ¶ 3 (Defendants' Exhibit G).

ADMIT

20.    During the relevant time period, Detective O'Connor was assigned to the Eastern District Major Crime Squad as a Trooper.  See O'Connor Aff. at ¶ 3.

ADMIT, but the material cited by Defendants does not refer to the position as "Trooper."

4

21.     Detective O'Connor was responsible for investigating Plaintiff White's conduct relating his handling of funds held by him in his capacity as a deputy sheriff.  See O'Connor Aff. at ¶ 5.

ADMIT Detective O'Connor was responsible for the investigation of Plaintiff White. DENY the characterization of his handling of funds in O'Connor Aff. at ¶ 5.

22.     That investigation ultimately resulted in plaintiff White being placed on a special form of probation known as accelerated rehabilitation in connection with criminal charges of misuse of campaign contributions.  See O'Connor Aff. at ¶ 5.

ADMIT.  The charge of misuse of campaign contributions was not part of the arrest warrant affidavits.  Therefore, the fact that Plaintiff White was placed in the accelerated rehabilitation program for that offense is not material to the allegations in the amended complaint.

23.     Plaintiff White does not challenge in any way in this case the investigation of, and his arrest and prosecution on, financial and election practices charges.  See Amended Complaint.

ADMIT

24.     In light of her investigation into possible financial and election practices crimes by plaintiff White, Detective O'Conner also signed the warrant affidavit for his arrest on the charges that are at issue in this matter.  See O'Connor Aff. at ¶ 7; Affidavit Supporting Warrant For Arrest of Thomas White, Sept. 10, 1999 ("White Aff.")(Defendants' Exhibit H).

ADMIT that O'Connor signed the warrant affidavit.  As to the remainder of the paragraph, DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY.

25.     O'Connor did not, however, conduct the investigation underlying those charges.

See O'Connor Aff. at ¶ 6.

DENY.  See, O'Connor report dated 8/9/99 and cited in Plaintiff's Statement of Material Facts Not in Dispute paragraph 52 attached to Plaintiff's Motion for Summary Judgment, Dated 6/3/04.

26.    The portions of Trooper O'Connor's affidavit relating to those charges was drafted by Detective Nault and derived from Detective Nault's investigation.  See O'Connor Aff. at ¶ 7; Nault Aff. at 39.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

27.    In fact, her affidavit states explicitly that it is the result of "her own investigative efforts and those of fellow officers who reported their findings to her."  See White Aff. at ¶ 1.

ADMIT

28.    During all times relevant to this matter, defendant John Szamocki held the rank of Sergeant in the Connecticut State Police, performing supervisory functions in the Eastern District Major Crime Squad.  See Szamocki Aff. at ¶ 4 (Defendants' Exhibit I).

ADMIT

29.    Sergeant Szamocki was not directly involved in investigating any of the plaintiffs. Rather, he supervised the investigation of plaintiff White by Trooper O'Connor into possible financial and election practices crimes.  See Szamocki Aff. at ¶¶ 5, 6, 14-17 .

DENY See, Testimony Szamocki p 98, 104-05, 109, 141, 195, 196, 132-134, 166, 111-12, 108, 116, 124, 154, 157, 159-60, 180-81, 196-97, 198-99; and White Depo pp78-79; and Gibeault Memo Dated 7/19/99; and Szamocki Depo p. 107-08; Nault Testimony, pp 84,85,87-88, 90,66,139-142; and Inventory of Property seized dated July 20,1999;and testimony of Sgt. Turner

6

p.2-3,4,14-15,32-33,58 ; Testimony of Lt. Gibeault, p.55,56,58,59,60,67; Report of Det. Contre

dated 9/24/99, all attached to Plaintiffs Statement of Material Facts Not in Dispute cited in

paragraphs 15, 16, 17, 19, 18, 21, 28, 29, 30, 31, 33, 34, 57, 58, 76, 78, 79, 80, 86, 92, 97, 98, 99,

100, 102, 107, 113, 114, 126, 127, 129.

    30.    With regard to the investigation preceding the charges that are at issue in this case

– i.e., charges relating to witness tampering and obstruction of justice – Sergeant Szamocki's

involvement was extremely limited in both time and scope. See Szamocki Aff. ¶¶ 5, 14-17 .

    DENY. See, Testimony Szamocki p 98, 104-05, 109, 141, 195, 196, 132-134,

166, 111-12, 108, 116, 124, 154, 157, 159-60, 180-81, 196-97, 198-99; White Depo pp 78-79;

Gibeault Memo Dated 7/19/99; Szamocki Depo p 107-08; Nault Testimony, pp 84, 85, 87-88,

90, 66, 139-142; Inventory of Property seized dated July 20,1999; testimony of Sgt. Turner p 2-3,

4, 14-15, 32-33, 58 ; Testimony of Lt. Gibeault, p 55, 56, 58, 59, 60, 67; Report of Det. Contre

dated 9/24/99; all attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in

paragraphs 15, 16, 17, 19, 18, 21, 28, 29, 30, 31, 33, 34, 57, 58, 76, 78, 79, 80, 86, 92, 97, 98,

99, 100, 102, 107, 113, 114, 126, 127, 129.

    31.    In particular, Sgt. Szamocki did not participate in drafting or approving the

warrant affidavits, making probable cause determinations or submitting warrants to the court.

See Szamocki Aff. at ¶¶ 14-17.

    DENY. See, Testimony Szamocki p 98, 104-05, 109, 141, 195, 196, 132-134,

166, 111-12, 108, 116, 124, 154, 157, 159-60, 180-81, 196-97, 198-99; White Depo pp78-79;

Gibeault Memo Dated 7/19/99; Szamocki Depo p. 107-08; Nault Testimony pp 84, 85, 87-88,

90, 66, 139-142; Inventory of Property seized dated July 20,1999; Testimony of Sgt. Turner p.2-

3,4,14-15,32-33,58 ; Testimony of Lt. Gibeault, p.55, 56, 58, 59, 60, 67; and Report of Det.

Contre dated 9/24/99; all attached to Plaintiffs' Statement of Material Facts Not in Dispute cited

in paragraphs 15, 16, 17, 19, 18, 21, 28, 29, 30, 31, 33, 34, 57, 58, 76, 78, 79, 80, 86, 92, 97, 98,

99, 100, 102, 107, 113, 114, 126, 127, 129.

32.    Defendant John Turner holds the rank of Sergeant in the Connecticut State Police.

See Turner Aff. at ¶ 4 (Defendants' Exhibit J).

ADMIT

33.    At the time of the events at issue, Sgt. Turner was assigned to the Eastern District

Major Crime Squad, where he supervised the investigation of primarily major violent, complex,

or serious crime investigations. See Turner Aff. at ¶ 4.

ADMIT

34.    Sergeant Turner did not himself conduct the investigation of the plaintiffs for

crimes relating to witness tampering and obstruction of justice, but rather was Norman Nault's

supervisor during the relevant time period. See Turner Aff. at ¶¶ 5-9.

DENY. See Testimony of Sgt. Szamocki pp 124, 125, 126, 196-97, 198-99;Report

of Det. O'Connor dated 6/21/99; Testimony of Sgt. Turner pp 2-4, 6, 8-9,14-15, 32-33, 58;

Testimony of Det. Nault pp.7, 149; Testimony of Lt. Gibeault pp.56, 58, 67, 103, 34, 35; Report

of Det. Nault dated 9/13/00; all attached to Plaintiffs' Statement of Material Facts Not in Dispute

cited in paragraphs 36, 53, 75, 78, 82, 98, 99, 100, 101, 103, 104, 108, 131.

35.    Despite generally supervising the investigation, Sergeant Turner did not approve

the warrant affidavits. See Turner Aff. at ¶¶ 8-10.

DENY. See, Testimony of Sgt. Turner pp. 2, 3, 4, 6, 14, 15, 32, 33, 58, 89; Testimony

of Lt. Gibeault p.68; both attached to Plaintiffs' Statement of Material Facts Not in Dispute cited

in paragraphs 75, 98, 100, 101, 103.

36.    Nor did Sergeant Turner take the oath of the affiants.  See Turner Aff. at ¶ 8-10.

ADMIT

37.    Indeed, Sergeant Turner does not even recall reading the affidavits before they

were signed.  See Turner Aff. ¶ 9.

DENY. Testimony of Sgt. Turner pp 2-4, 6, 8-9, 14-15, 32-33, 58; and Testimony

of Lt. Gibeault p. 68; both attached to Plaintiffs' Statement of Material Facts Not in Dispute cited

in paragraphs 75, 98, 100, 101, 103.

38.    Defendant Lawrence Gibeault is a retired official of the Connecticut State Police.

At the time of the events at issue in this lawsuit, he held the rank of Lieutenant and was assigned

to the Eastern District office, where he supervised Sergeants, Detectives and Troopers.  See

Gibeault Aff. at ¶¶ 3-4 (Defendants' Exhibit K).

ADMIT

39.    While the investigation of the plaintiffs fell generally under Lt. Gibeault's area of

command, he was entirely uninvolved in conducting or specifically directing the investigation in

this matter.  See Gibeault Aff. at ¶ 5.

DENY. See, Gibeault memo; Szamocki Depo p.107-08, 142; Gibeault p.55;

Testimony of Sgt. Turner pp. 14-15, 58; all attached to Plaintiffs' Statement of Material Facts

Not in Dispute cited in paragraphs 27, 28, 99, 100.

40.    Nor did he review the affidavits for the arrest of the plaintiffs for substance.  See

Gibeault Aff. at ¶ 6.

DENY. <u>See</u>, Testimony of Gibeault pp. 56, 58, 59, 60, 67; and Testimony of Sgt. Turner pp. 14-15, 58; both attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 99, 100, 102.

41.     Rather, Lt. Gibeault's only involvement with the affidavits was to take detective Nault's oath on plaintiff Bourgeois' affidavit. <u>See</u> Gibeault Aff. at ¶ 7.

DENY. <u>See</u> Testimony of Gibeault pp. 56, 58, 59, 60, 67; and Testimony of Sgt. Turner pp. 14-15, 58; both attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 99, 100, 102.

42.     That act, however, does not involve an attestation as to the truth of the matters contained in the affidavit. <u>See</u> Gibeault Aff. at ¶ 7; Nault Aff. at ¶ 40.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

43.     Rather, it simply consists of administering an oath that the affiant – in this case Detective Nault – swears the contents of the affidavit are true and accurate to the best of the affiant's knowledge. <u>See</u> Gibeault Aff. at ¶ 7, Nault Aff. at ¶ 40.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT

**C.    <u>The Investigation Into Plaintiff White's Mismanagement of Funds</u>**

44.     The charges at issue in this case involve alleged tampering with witnesses and obstruction of justice by the plaintiffs in a state police investigation of plaintiff White for mishandling monies he received in his capacity as a deputy sheriff. <u>See</u> Amended Complaint.

ADMIT

45.     On June 15, 1998, the Connecticut State Police received a complaint from Mark Solak, State's Attorney for Windham County, regarding a possible misuse or misappropriation of

10

funds by then-Deputy Sheriff Thomas White of the Windham County Sheriff's Department. <u>See</u> White Aff. at ¶¶ 2-4.

ADMIT that the Connecticut State Police received a complaint from Mark Solak, State's Attorney for Windham County, regarding a possible misuse or misappropriation of funds by then-Deputy Sheriff Thomas White of the Windham County Sheriff's Department. DENY that complaint received June 15, 1998. <u>See</u> White Aff. at ¶ 2.

46.    According to Mr. Solak, he had been contacted by then-Sheriff Jay Kenney, who relayed complaints from creditors that plaintiff White had wrongfully withheld funds collected on judgment executions and wage garnishments. <u>See</u> White Aff. ¶ 3.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

47.    At the time of the referral of the complaint, plaintiff White was challenging Sheriff Kenney for the democratic nomination for High Sheriff of Windham County. <u>See</u> White Aff. at ¶ 21.

ADMIT

48.    After receipt of the complaint, Trooper O'Connor was assigned to investigate whether plaintiff White had embezzled funds collected in his official capacity as a deputy sheriff. <u>See</u> O'Connor Aff. at ¶ 5.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

49.    That investigation and the resulting charges of larceny and election misconduct are not challenged in this lawsuit. Trooper O'Connor's investigation, however, forms part of the backdrop for the investigation and charges of witness tampering and obstruction of justice that are challenged in this case. <u>See</u> O'Connor Aff. at ¶ 5.

ADMIT that investigation and the resulting charges of larceny and election misconduct are not challenged in this lawsuit. DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY REMAINDER OF PARAGRAPH 49.

50.     Trooper O'Connor performed a number of investigative tasks in furtherance of her investigation of plaintiff White, including reviewing financial and administrative records, consulting with a forensic accountant, and interviewing witnesses.  See White Aff.

ADMIT

51.     Those witnesses included Sheriff Kenney, officials of the central office of the Sheriff's Department and the Department of Labor, a number of the complaining creditors, and plaintiff White himself.  See White Aff.

ADMIT

52.     Plaintiff White met with Trooper O'Connor twice and provided three written statements.  See White Aff. at ¶¶ 11, 12, 15, 16.

ADMIT that Plaintiff White met with Troop O'Connor regarding the investigation of his mishandling of campaign funds.

53.     Trooper O'Connor concluded that plaintiff White was not truthful in his dealings with State Police, and in particular that the evidence failed to support his statements and that his statements were inconsistent.  See White Aff. ¶ 19.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

**D.     The Investigation Into Possible Shredding Of Documents And/Or Other Misconduct By Debra Collins And Others Associated With Sheriff Kenney**

54.     During the pendency of the investigation into plaintiff White's management of

funds – White was elected High Sheriff of Windham County, defeating incumbent James

Kenney.  <u>See</u> Nault Aff. at ¶ 7.

       ADMIT

   55.     At some point (the record is not entirely clear when), plaintiff White retained the

late Arthur Meisler, Esq., to represent him in connection with the State Police Investigation.  <u>See</u>

Nault Aff. at ¶ 8.

       ADMIT

   56.     Shortly after plaintiff White's election, Attorney Meisler mailed a letter to the late

John M. Bailey, then-Chief State's Attorney, requesting that State's Attorney Solak be removed

from any involvement in the investigation of plaintiff White and that the matter be handled

directly by the Chief State's Attorney's office.  <u>See</u> Nault Aff. at ¶ 8.

       ADMIT

   57.     As one of the bases for removal, Attorney Meisler made the following accusation:

It is Mr. White's understanding that Deputy Assistant State's Attorney Debra Collins is assigned to this investigation.  You must understand that Mr. Charles Collins, was a    special Deputy Sheriff and very much involved in the losing primary campaign of High Sheriff James Kenney.  Mr. Collins resigned his position with the Windham County Sheriff's Department, and later sought employment with another country [sic.] sheriff stating that 'he did not want to work for a sheriff his wife was investigating.'

During the month preceding Mr White's assuming the office of High Sheriff Mr. Kenny [sic.] with the assistance of Mr. Charles Collins and Deputy Assistant State's Attorney Debra Collins destroyed, shredded and otherwise disposed of records of the Windham County Sheriff's Office.  A shredding machine, property of the Division of Criminal Justice was employed to destroy some of these records.  Mr. White was also informed that copies of personnel records were made and removed from the state office by Mr. Kenney without authorization.  Finally, the memory of one state owned computer was wiped clean and a second state owned computer was removed by Mr. Kenney from the Putnam Courthouse.

It is my understanding that Mr. Kenny [sic.] was informed by the administrative office for

the County Sheriffs that before removing or destroying any records from his office,          the
approval of the Public Records Administrator was necessary; and no request for such approval
was ever made.

It is my understanding Mr. Solak was made aware of Mrs. Collins' activities but left Mr.
White's file as part of her work assignment.

See Meisler Letter to Bailey, July 13, 1999 (Defendants' Exhibit L).

ADMIT

58.      Attorney Meisler copied his letter to State's Attorney Mark Solak. See Szamocki
Aff. at ¶ 9.

ADMIT

59.      On July 19, 1999, Attorney Solak delivered to defendant Lt. Larry Gibeault a copy
of Attorney Meisler's letter and requested that the State Police Major Crime Squad investigate
the allegations made by Attorney Meisler. See White Aff. at ¶ 31.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

60.      Lieutenant Gibeault agreed to conduct the investigation, assigning defendant
Sergeant John Szamocki of the Eastern District Major Crime Squad at Troop D in Danielson to
supervise it. See Gibeault Aff. at ¶ 5.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

61.      Sergeant Szamocki, in turn, assigned defendant Detective Norman Nault to lead
the investigation into whether any criminal activity by any party occurred during the closure of
Sheriff Kenney's administration.   See Szamocki Aff. at ¶ 9.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

62.      Detective Nault and others conducted a thorough investigation into this matter,

14

which included a number of investigatory interviews with officials of the State's Attorneys Office, the administrative offices of the Sheriff's Department, the Windham County Sheriff's department, including members of the office under both the Kenney and White Administrations. See Szamocki Aff. at ¶ 9; Nault Aff. at ¶ 10.

DENY. See White Depo p.69; Testimony of Szamocki pp. 109, 111-12, 157-58, 196-97, 198-99; Testimony of Sgt. Turner pp. 4, 6, 8-9; Testimony of Det. Nault p.7, 9-10, 16-17, 18-19, 21, 29, 38, 46-47, 50-53; Memorandum of Decision RE: Motion To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan,J 1/10/00) marked as Exhibit 39; all attached to Plaintiffs' Statement of Material Facts Not in Dispute and cited in paragraph 69, 73, 75, 76, 78, 79, 82, 84, 91, 93, 95, 96.

63.    Detective Nault determined that there was no probable to arrest anybody in connection with the closure of the Kenney administration. See Nault Aff. at ¶ 10.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

64.    Plaintiffs assign great significance to the fact that nobody was arrested following the allegations of misconduct by those associated with Sheriff Kenney, particularly Assistant State's Attorney Debra Collins or her husband Charles Collins, a deputy sheriff under Kenney. Indeed, plaintiffs claim that the motive for their own arrests was the defendants' friendship with the Collinses. Indeed, this perceived "friendship" forms the sole supporting theory for this case:

> The defendants originally commenced an investigation into the illegal shredding of public documents by Assistant State's Attorney Debra Collins, her husband, former Supervisory Sheriff Charles Collins[,] Aaron Auclair and others, that was initiated after a complaint by the plaintiffs. However[,] due to one or more of the defendants' personal friendship with the Collins' [sic], the defendants then conspired to turn the investigation into a criminal investigations of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing

15

by Debra and Charles Collins, and others both known and unknown to the plaintiffs.

<u>See</u> Complaint at 5, ¶ 20 (emphasis added).

DENY. Complaint was amended and this claim was removed. Also, this "statement" is argumentative and does not comply with the provisions of Rule 56(a)(1).

65.    The complaint was amended to remove the direct reference to a friendship between the defendants and Ms. Collins. Nevertheless, the Amended Complaint makes reference to that purported friendship and continues to allege that the defendants conspired on her behalf. <u>See</u> Amended Complaint at ¶ 20 ("Defendants conspired to turn the investigation into a criminal investigation of the plaintiffs to punish them for initiating the complaint and to cover up suspected wrongdoing.") and ¶ 27(d)(alleging deprivation of the "right to equal protection of the laws and to be treated the same as others who make complaints to police, but are presumed innocent under the law simply because the officers have personal relationships with the subjects of the complaint.").

DENY. The above statement is not a fact, but a legal conclusion of the defendants.

66.    Neither Detective Nault, the lead investigator in this matter, nor any of the other defendants has or had any sort of friendship with Debra or Charles Collins. <u>See</u> Nault Aff. at ¶ 11-13; Szamocki Aff. at ¶ 11-12; Turner Aff. at ¶ 11-12; Gibeault Aff. at ¶ 9-10; O'Connor Aff. at ¶ 12.

DENY. <u>See</u> Testimony of Debra Collins dated 10/19/99 at pp 98; attached to Plaintiffs' Motion for Summary Judgment at paragraph 15.

67.    Attorney Collins confirmed this in her Deposition. <u>See</u> Collins Depo. at 41

16

(Defendants' Exhibit M.).

DENY. See, p.17, Finding of Facts, Memorandum of Decision RE: Motion To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan,J 1/10/00) marked as Exhibit 39 attached to Plaintiffs' Statement of Material Facts Not in Dispute.

68.     She testified that neither she nor her husband ever socialized with any of the defendants. See Collins Depo. at 37-41.

ADMIT for purposes of summary judgment, but is immaterial to any of the claims in support of defendants' motion for summary judgment.

69.     Indeed, according to her testimony, she does not even know defendant Turner and never met defendant Gibeault. See Collins Depo. at 38-39, 92.

ADMIT for purposes of summary judgment, but is immaterial to any of the claims in support of defendants' motion for summary judgment.

70.     Attorney Collins testified that she knew defendant Trooper O'Connor professionally, and considered her arrest warrants to be of very good quality, but that she did not particularly like her. See Collins Depo. at 37-41, 90-91.

ADMIT for purposes of summary judgment, but is immaterial to any of the claims in support of defendants' motion for summary judgment.

71.     Similarly, although she did not opine that defendant Sergeant Szamocki's work quality was poor, Attorney Collins testified that she disliked him both professionally and personally. See Collins Depo. at 88-90.

ADMIT for purposes of summary judgment, but is immaterial to any of the claims in support of defendants' motion for summary judgment.

72.    With regard to defendant Nault, the lead investigator in this matter, Debra Collins testified as follows:

Q: Did you ever socialize with Norman Nault?

A: No.

Q: Did Norman Nault have any association or relation with your husband?

A: No.

Q: Did you have any negative experiences with any of the other people being sued in this case?

A: Detective Nault during this was quite – I didn't know Detective Nault but I had a case coming up with him. All he said was something to the effect that he was in charge of investigating me and he wouldn't think twice about putting the cuffs on me if he found anything against me.

Q: And you mentioned Nault, you mentioned the personal comment he made about you. What about professionally in relation to other warrant that may have been submitted?

A: He was – I will give him credit, he was an excellent detective. So, he did a very thorough job as far as that.

See Collins Depo. at 37, 90-91.

ADMIT for purposes of summary judgment, but is immaterial to any of the claims in support of defendants' motion for summary judgment.

73.    Detective Nault agrees that he did inform Debra Collins that, if the evidence warranted it, he would not hesitate to arrest her. See Nault Aff. at ¶ 12.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

74.    Attorney Collins offered the following refutation of the allegation that the defendants conspired to investigate and arrest the plaintiffs as a means of assisting her or her husband:

18

Q: Did any of the defendants in this lawsuit ever offer to do you any favor in connection with that investigation?

A: Absolutely not.

Q: Are you aware that in this lawsuit there is an allegation that one or more defendants then conspired to turn the investigation into a criminal investigation of the plaintiffs, punishing them for initiating the complaint and to cover up suspected wrongdoing by Debra and Charles Collins and others, both known and unknown to the plaintiff? Are you aware that that allegation has been made?

A: I'm aware of that allegation.

Q: Is that allegation true, to your knowledge?

A: It couldn't be farther from the truth.

Q: And why do you say that?

A: The state police – basically you can't find a trooper that likes me. They hate me. I can give you the example that I am the only prosecutor in the State of Connecticut that has prosecuted three state troopers, which is, I believe, the record. They have, in my opinion, have never liked me, will never like and I had always hoped it was just Troop D and everywhere I go it seems to be that everyone knows that I've prosecuted those troopers. I also charged another trooper with perjury who, you know – they just hate me and they are never going to let it go, as far as I'm concerned. So, it's laughable, that paragraph.

Q: So, the general sense you have, you're not popular with the state police, would apply to the defendants in this lawsuit''

A: Absolutely.

Q: And would it make sense to you that the defendants in this lawsuit would enter into any conspiracy for your benefit?

A: Absolutely not.

Q: And the statement you made about being generally unpopular with the state police, would that be true before July of 1999?

A: Absolutely

Q: Would it make sense to you if the defendants in this lawsuit entered into conspiracy for the benefit of your husband?

A: It would shock me.

Q: And why is that?

A: Again, they hate me, they hate him associated with me. There is probably such a deep hate that they will hate my children.
See Collins Depo. at ¶ 117-119, 124.

ADMIT that is what she testified to but DO NOT HAVE SUFFICIENT INFORMATION OR KNOWLEDGE TO ADMIT OR DENY the truth of matters asserted.

75.    While the State Police Defendants disagree with the characterization of their relationship with the Collinses as hateful or somehow soured by prior prosecutions of their colleagues, they agree that they were not friends with the Collinses and would and did not enter into any conspiracies for the their benefit. See Nault Aff. at ¶ 11-13; Szamocki Aff. at ¶ 11-12; Turner Aff. at ¶ 11-12; Gibeault Aff. at ¶ 9-10; O'Connor Aff. at ¶ 12 .

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY.

76.    Attorney Collins "absolutely did not assist" the state police or otherwise do any work related to the investigation of the criminal charges that are at issue in this case.    See Collins Depo. at 116-117; Nault Aff. at ¶ 13.

DENY. See Testimony Debra Collins dated 10/19/99 pp 85-90 marked as Exhibit 31 attached to Plaintiff's Statement of Material Facts Not In Dispute; and Memorandum of Decision RE: Motion To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan,J 1/10/00) at pp 11-12 and marked as Exhibit 39 attached to Plaintiffs' Statement of Material Facts Not in Dispute.

20

77.    Indeed, she never even read materials relating to the investigation or discussed it with anyone. See Collins Depo. at 102.

DENY. See Testimony Debra Collins dated 10/19/99 pp 85-90 marked as Exhibit 31 attached to Plaintiff's Statement of Material Facts Not In Dispute; and Memorandum of Decision RE: Motion To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan,J 1/10/00) at pp 11-12 and marked as Exhibit 39 attached to Plaintiffs' Statement of Material Facts Not in Dispute.

78.    The conclusion of the state police's investigation into the closing of the Kenney administration was not influenced by conspiracies and non-existent friendships with the Collinses, but by a much more mundane reason: lack of evidence of wrongdoing. See Nault Aff. at ¶ 10; Szamocki Aff. at 10.

DENY. See White Depo p.69; Testimony of Szamocki pp. 109, 111-12, 157-58, 196-97, 198-99; Testimony of Sgt. Turner pp. 4, 6, 8-9; Testimony of Det. Nault p. 7, 9-10, 16-17, 18-19, 21, 29, 38, 46-47, 50-53; Memorandum of Decision RE: Motion To Disqualify The Office of the State's Attorney for the Windham Judicial District (Kaplan,J 1/10/00) marked as Exhibit 39; all attached to Plaintiffs' Statement of Material Facts Not in Dispute and cited in paragraph 69, 73, 75, 76, 78, 79, 82, 84, 91, 93, 95, 96.

79.    In particular, the State Police interviewed Pat Lempecki, the personnel officer for the State of Connecticut Office of the County Sheriffs. See Nault Aff. at ¶ 14.

ADMIT

80.    Ms. Lempecki confirmed that the personnel documents destroyed at the close of the Kenney administration were properly destroyed at her direction. See Nault Aff. at ¶ 14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

81.     Investigators also interviewed Robert Heilbrun, fiscal/administrative manager for the County Sheriff's central office, who confirmed that the computer allegedly destroyed was actually returned to the sheriff's central office.   See Nault Aff. at ¶ 14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

82.     Also, based on interviews, Detective Nault concluded that there was no evidence to support the allegation that computer memory was improperly erased. See Nault Aff. at ¶ 14.

DENY.  See Testimony of Det. Nault, 11/15/99, pp. 18, 19, 21, 46, 47, 50-53 attached to Plaintiffs' Statement of Material Facts Not in Dispute and cited in paragraphs 93 and 94.

83.   Finally, another allegation not mentioned specifically in Attorney Meisler's letter concerning the closure of Kenney's office were investigated and found to be baseless. See Nault Aff. at ¶ 15.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

84.     Plaintiff Henry Bourgeois alleged that Charles Collins shredded Sheriff's Office telephone records.  See Nault Aff. at ¶ .5.

DENY.  See Depo. of Henry Bourgeois marked as Exhibit 6 and attached to Plaintiffs' Statement of Material Facts Not in Dispute.

85.     In fact, these telephone records were the same records seized by Trooper O'Connor in connection with her investigation of plaintiff White.  See Nault Aff. at ¶ 15.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

86.     Also, some records alleged by plaintiff Bourgeois to have been destroyed were

22

later located – in plaintiff's Bourgeois' own garage.  See Nault Aff. at ¶ 15.

DENY. Affidavit of Herry Bourgeois, attached as Exhibit A1 hereto.

87.    State Superior Court Judge Jonathan Kaplan later ordered the State's Attorneys office to investigate whether anybody it appropriately or unlawfully shredded or removed documents or computer programs in Sheriff Kenney's office on May 28, 1999. See Nault Aff. at ¶ 14; Coe Affidavit at ¶ 8 (Defendants' Exhibit N).

ADMIT

88.    Special Assistant State's Attorney Glenn Coe conducted an investigation and concluded that there existed "no credible evidence that any documents were shredded that should not have been shredded." See Coe Report (Defendants' Exhibit O) at 67.

ADMIT that Attorney Coe came to this conclusion in his report.  DO NOT HAVE SUFFICIENT KNOWLEDGE OR INFORMATION TO ADMIT OR DENY the truth of matters asserted.

89.    Attorney Coe also no credible evidence supported the conclusion that "any items belonging to the Sheriff's office or departments was wrongfully removed by Aaron or by anyone else on or about that date." See Coe Report at 69.

ADMIT that Attorney Coe came to this conclusion in his report.  DO NOT HAVE SUFFICIENT KNOWLEDGE OR INFORMATION TO ADMIT OR DENY the truth of matters asserted.

E.    **The Initiation Of An Investigation Into Witness Tampering And Related Crimes**

90.    It should be noted also that the investigation into Attorney Collins and others

23

following Attorney Meisler's complaint did not *precede* the investigation into misconduct by the plaintiffs – an allegation that is central to plaintiffs' theory of this case. See Amended Complaint at ¶ 20 ("The defendants originally commenced an investigation into the shredding of public documents that was initiated after a complaint was made by the plaintiffs.")

DENY. See White Depo pp 22-25, 78-79, 81; Transcript of Szamocki pp. 104-05, 112, 132-134, 166, 195; Gibeault memo dated 7/19/99; all attached to Plaintiffs' Statement of Material Facts Not in Dispute and cited in Paragraphs 13, 16, 17, 18, 19, 29, 30.

91.    To the contrary, those investigations were both formally requested by Attorney Solak, and commenced by the State Police, at the July 19, 1999 meeting discussed above. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DENY. See White Depo pp 22-25, 78-79, 81; Transcript of Szamocki pp. 104-05, 112, 132-134, 166, 195; Gibeault memo dated 7/19/99; all attached to Plaintiffs' Statement of Material Facts Not in Dispute and cited in Paragraphs 13, 16, 17, 18, 19, 29, 30.

92.    The exact chronology of the commencement of the investigation into the plaintiffs for possible witness tampering and obstruction of justice is as follows. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

93.    On Friday, July 16, 1999, Windham County State's Attorney Mark Solak called Sergeant Szamocki, the supervisor of the White investigation, indicating that there was a possible problem of witness tampering in that investigation. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

24

94.    On July 19, 1999, a meeting was held at the headquarters of the Eastern District Major Crime Squad. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

95.    Present were Attorney Solak, Lt. Gibeault, Sergeant Szamocki and Detective David LeBlanc. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

96.    At the meeting, Attorney Solak requested that the State Police investigate two matters relating to the Windham County Sheriff's Department. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

97.    One matter involved the complaint by Attorney Meisler discussed above concerning possible illegal shredding and other misconduct by individuals associated with Sheriff James Kenney, including an Assistant State's Attorney, Debra Collins, and her husband, Charles Collins.   See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

98.    Lieutenant Gibeault agreed to commence an investigation, assigning it to Sergeant Szamocki. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

99.    Attorney Solak also informed those present at the meeting that he had received information suggesting that two Special Deputy Sheriffs, Aaron and Adam Auclair, had been interrogated and intimidated by their supervisor, Lieutenant Gloria Marion, a close associate of Sheriff White. See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

100.    According to Attorney Solak, the Auclairs were interrogated by Marion about what they knew of the State Police investigation of Thomas White and were subjected to threats concerning their employment if they imparted any information to outside authorities that would be damaging to White.  See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

101.    Attorney Solak requested a State Police Investigation.  See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.  Lieutenant Gibeault agreed, assigning this investigation as well to Sergeant Szamocki.  See Nault Aff at ¶¶ 17-18; Gibeault Aff. at ¶ 5; Szamocki Aff. at ¶¶ 13-14.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

102.    Having assigned it to a sergeant (and later reassigning it to Sergeant Turner, as discussed below), Lt. Gibeault had no further substantive role in the investigation of the plaintiffs relating to witness tampering and obstruction of justice.  See Gibeault Aff at ¶ 5.

DENY.  See, Gibeault memo; Szamocki Depo p.107-08, 142; Gibeault p. 55, 56, 58, 59, 60, 67; Testimony of Sgt. Turner pp. 14-15, 58 attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 27, 28, 99, 100, 102.

103.    On July 20, 1999, Sergeant Szamocki assigned Detective Norman to conduct both investigations requested by Attorney Solak.  See Nault Aff. at ¶ 18; Szamocki Aff. at ¶ 9, 15.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

104.    Sergeant Szamocki did not personally conduct the investigation, but rather

26

assisted Detective Nault in defining the initial direction of the investigation and assigned detectives to conduct a series of initial investigatory interviews. <u>See</u> Szamocki Aff. at ¶ 15-16.

DENY <u>See</u> Testimony Szamocki p 98, 104-05, 109, 141, 195, 196, 132-134, 166, 111-12, 108, 116, 124, 154, 157, 159-60, 180-81, 196-97, 198-99; White Depo pp 78-79; Gibeault Memo Dated 7/19/99; Szamocki Depo p. 107-08; Nault Testimony, pp 84, 85, 87-88, 90, 66, 139-142; Inventory of Property seized dated July 20,1999; testimony of Sgt. Turner p.2-3, 4, 14-15, 32-33, 58; Testimony of Lt. Gibeault, p.55, 56, 58, 59, 60, 67; and Report of Det. Contre dated 9/24/99 all attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 15, 16, 17, 19, 18, 21, 28, 29, 30, 31, 33, 34, 57, 58, 76, 78, 79, 80, 86, 92, 97, 98, 99, 100, 102, 107, 113, 114, 126, 127, 129.

105.   After just three days, however, supervision of the investigation was transferred to Sergeant John Turner, who assumed control of the investigation upon his return from vacation on or about July 22, 1999. <u>See</u> Szamocki Aff. at ¶ 15; Turner Aff. at ¶ 6.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

106.   After July 22, 1999, Sergeant Szamocki had no further substantive responsibility for, or active role in, the investigation. <u>See</u> Szamocki Aff. at ¶ 15-16.

DENY <u>See</u> Testimony Szamocki p 98, 104-05, 109, 141, 195, 196, 132-134, 166, 111-12, 108, 116, 124, 154, 157, 159-60, 180-81, 196-97, 198-99; White Depo pp 78-79; Gibeault Memo Dated 7/19/99; Szamocki Depo p. 107-08; Nault Testimony, pp 84, 85, 87-88, 90, 66, 139-142; Inventory of Property seized dated July 20,1999; Testimony of Sgt. Turner p.2-3, 4, 14-15, 32-33, 58; Testimony of Lt Gibeault, p.55, 56, 58, 59, 60, 67; Report of Det. Contre dated 9/24/99 attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in

27

paragraphs 15, 16, 17, 19, 18, 21, 28, 29, 30, 31,  33, 34, 57, 58, 76, 78, 79, 80, 86, 92, 97, 98, 99, 100, 102, 107, 113, 114, 126, 127, 129.

107.    Sergeant Turner was no directly involved in investigating Thomas White, Gloria Marion and Henry Bourgeois for any crime, including crimes relating to witness tampering and obstruction of justice.  See Turner Aff. at ¶ 5-9.

DENY. See Testimony of Sgt. Szamocki pp 124, 125, 126, 196-97, 198-99; Report of Det. O'Connor dated 6/21/99; Testimony of Sgt. Turner pp 2-3, 4, 6, 8-9, 14-15, 32-33, 58, 89; Testimony of Det. Nault pp.7, 149; and Testimony of Lt. Gibeault pp.56, 58, 67, 68, 103, 134, 135; and Report of Det. Nault dated 9/13/00; all attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 36, 53, 75, 78, 82, 98, 99, 100, 101, 103, 104, 108, 131.

108.    The detectives assigned to the Major Crime Squads are of the highest competence and caliber and typically require minimal supervision in conducting investigations once those investigations are underway, which was the case with the investigation at issue in this case.  See Turner Aff. at ¶ 5-9.  By the time Sergeant Turner assumed supervision of the investigation, the investigation was well under way.  See Turner Aff. at ¶ 5-9.  Thus, Sergeant Turner's actual supervisory role in the investigation was extremely limited.  See Turner Aff. at ¶ 5-9.  He did not, for example, direct that any particular witnesses be interviewed or not interviewed.  See Turner Aff. at ¶ 5-9.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

109.    Defendant O'Connor played almost no role in the investigation of the plaintiffs for possible witness tampering and obstruction of justice.  See O'Connor Aff. at 6.

DENY . See O'Connor report dated 8/9/99 and cited in Plaintiff's Statement of

Material Facts Not in Dispute paragraph 52 attached to Plaintiff's Motion for Summary

Judgment dated 6/3/04.

110.    Apart from three interviews on one day with representatives of the central office

of the sheriff's system relating to administrative procedures, she had no involvement whatsoever

in conducting the investigation.  See O'Connor Aff. at ¶ 6.

DENY .  See O'Connor report dated 8/9/99 and cited in Plaintiff's Statement of

Material Facts Not in Dispute paragraph 52 attached to Plaintiff's Motion for Summary

Judgment dated 6/3/04.

### F.    The Victims/Witnesses:  Adam and Aaron Auclair

111.    The primary witnesses in the State Police investigation into witness tampering and

the related crimes were believed to be the victims of those crimes:  Adam and Aaron Auclair.

See Nault Aff. at ¶ 19.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

112.    Adam and Aaron Auclair were employed in the Windham County Sheriff's

Department as Special Deputy Sheriffs in both the Kenney and White administrations.  See Nault

Aff. at ¶ 19.

ADMIT

113.    The thrust of the plaintiffs' case is that statements made by the Auclairs and

incorporated into the State Police's arrest warrant affidavits were false.  See Amended

Complaint.

DENY. See Amended Complaint.

114.    At the time the Auclairs made their statements to the State Police, however, there

was no reason for any objective observer to conclude that they were anything less than fully credible and reliable witnesses. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

Deny. See Testimony of Adam Auclair p 40; Testimony of Sgt. Turner pp. 10-11; Testimony of Det. Nault p.29; all attached to Plaintiffs' Statement of Material Facts Not in Dispute cited in paragraphs 74, 77, 96.

115.    Neither had been convicted of a crime. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

116.    Neither had any history of known lying or other dishonest behavior. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

117.    Both were known as reliable employees of the Sheriff's Department. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szamocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

118.    Plaintiff Marion testified at her Deposition as follows concerning the apparent trustworthiness of the Auclairs at her Deposition:

Q:  Now, prior to this investigation into the criminal charges against you, did you have an opinion about whether the Auclairs were trustworthy or no?

A:  The came into my house. I fed them. My kids thought that they were trustworthy and I respect the opinion of my kids.

Q: Did you have any reason to believe that they were dishonest prior to all this occurring?

A: No.

<u>See</u> Marion Depo. at 44.

ADMIT

119.    Plaintiff Bourgeois also testified that he had no information suggesting that either

Auclair was dishonest at the time of the State Police investigation:

Q: When did you first meet the Auclair boys?

A: When I started working, when we got sworn in that night. I knew of them, but I didn't know them.

Q: I see. So you were their supervisor for a short period of time?

A: Yes. Very short. I guess they quit after six weeks. From June 1st to July 10th, I think it was.

Q: Had you heard anything about their reputation for honesty or dishonesty by the time you met them?

A: No.

Q: And as far as how they conducted their job, filling out time sheets, or that sort of thing, did you have any indication that they were dishonest?

A: Then or now?

Q: Then.

A: No.

Q: Did anyone ever tell you words to the effect, look out for those Auclair boys. They are bad news. They are dishonest?

A.: I never heard anybody say they were dishonest, then.

<u>See</u> Bourgeois Depo at 79-80.

ADMIT

31

120.    Similarly, plaintiff White conceded in his Deposition that the Auclairs were apparently trustworthy:

Q: Okay. Who hired the Auclairs originally by the Sheriffs Department? Was it Kenney?

A: I believe it was James Kenney. I don't think they were working underneath Sheriff Green. That was the one before Mr. Kenney.

Q: Did you reappoint them after you were elected.

A: Yes, I did
Q: Okay. At the time that you reappointed them, did you believe that they were honest individuals?

A: Yes.

Q: Okay. And you had had no previous indications that they were dishonest in any way?

A: No. I had with them in an out of going into the office, and stuff, and up until that point, no

Q: Okay. Do you have any knowledge as to whether the Auclairs have criminal records?

A: No. No knowledge at all.

Q: Okay. It's kind of a difficult question to phrase, but putting aside anything that occurred in the investigation, was there anything from other areas of the Auclairs' life, before that, or unconnected with the investigation, that should have put the state police on notice that these guys may have some honesty problems?

A: I didn't know the Auclairs outside of work, for the couple of years that I knew them. I never had a drink with them. I never went out with them. I did not know them personally, except for work. I have no idea. They didn't live in the town that I came from. I never went to Putnam or Thompson, really, before I started working with the Sheriff's Department.

Q: Sir, have you become aware that the Auclairs had a reputation in the community for being dishonest?

A: No.

Q: Okay. Or any conduct –

A: Not even up to this day, no.

Q: Okay. So any indication of dishonesty with regard to the Auclairs, would simply be limited to this investigation, and subsequent testimony by the Auclairs?

A: It was never brought to my attention, even when I was high sheriff, that they had problems in the community, if that is what you are asking me. And I would believe, because one of them became a correction officer and one became a state trooper, I think, in New Jersey, I would tend to believe that there wouldn't be any problems back in that area.
See White Depo. at 71-77

   ADMIT

121. Certainly, none of the defendants knew or had even heard of any information that would suggest that the Auclairs were anything other than perfectly reliable witnesses. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szarnocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

   DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

122. Indeed, as individuals serving in a quasi-law enforcement accused or suspected of no present or past crime or dishonest behavior, the Auclair brothers possessed inherently greater credibility than many witnesses upon whom criminal investigators must often rely. See Nault Aff at ¶ 21; O'Connor Aff. at ¶ 15; Szarnocki Aff. at 18-19; Turner Aff. at ¶ 13-14; Gibeault Aff. at ¶ 11-12.

   DENY. See Bourgeois Depo pp. 14-18, 22, 25,; Marion Depo pp. 34-35; Testimony Sgt. Turner p12; Depo Tom White p. 69; Testimony of Szamocki pp. 111-112, 157-58, 196-97, 198-99; Testimony Det. Nault p. 7, 9, 10; all attached to Plaintiffs' Statement of

Material Facts Not in Dispute cited in paragraphs 4, 5, 54, 69, 73, 78, 80, 82, 83, 84.

123.    The seemingly unanimous view of the Auclairs' apparent trustworthiness is

confirmed by Russell Downer, a non-party and an employee of the Windham County Sheriff's

Department, who testified at his Deposition as follows:

> Q: Did you ever have occasion to supervise the Auclair boys, either of them?
> A: As far as training goes, yes.  In any other capacity other than being a more senior
> sheriff, no.
> Q: So, you were involved in their training?
> A: Yes.
> Q: Was that during the Kenney administration or White administration?
> A: That was during the Kenney administration.
> Q: Did you ever have occasion to discipline them or reprimand them?
> A: No.
> Q: And as far as just your involvement with them through training, did you ever have
> cause to believe that they were untrustworthy?
> A: No.

See Downer Depo. (Defendants' Exhibit P) .at 53.

<u>DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY</u>

### G.    The Evidence Provided By The Auclairs And Included In the Arrest Warrant Affidavits Concerning Obstruction Of Justice And Witness Tampering.

124.    Aaron Auclair gave Detective Nault a one-paragraph statement on July 20, 1999

indicating that he had been interrogated by Gloria Marion.  <u>See</u> Nault Aff. at ¶ 22; Aaron Auclair

Statement of July 20, 1999 (Defendants' Exhibit U)

ADMIT

125.    He returned to Troop D barracks the next day, July 21, 1999, and gave Detective

Nault and Mike Contre a much more detailed eleven-page statement.  That statement included

the following assertions, which were included in the arrest warrant affidavits:

- Aaron was present in Kenney's office when documents were shredded and participated in the shredding. Those documents were earmarked by Laurie Parent of the Central Office of the Sheriff's Department for shredding. More generally, Aaron stated that neither he nor anybody else destroyed papers or computer files that should not have been destroyed.

- On July 16, 1999, plaintiff Marion approached him and Adam Auclair and ordered them to a meeting in the lock up of the Valley Street courthouse in Willimantic.

- In Aaron's words, the physical layout for the meeting was as follows: "In the lock up area Lt. Marion sat behind a desk and we sat in front of her and there are two doors leading to the area. One locked door was directly behind Lt. Marion and the second unlocked door was behind us."

- At that meeting, Marion "reminded both Adam and [Aaron] that we were now under the direction of the current High Sheriff Thomas White and that anything pertaining to Mr. White during Mr. Kenney's administration should be brought to her attention per order of Sheriff White." Aaron took this to mean that, if he did not talk to Marion, he might lose his job.

- Marion also stated to the Auclairs, "you work for Tom White now. You have to be on his side." Marion also stated the Auclairs "couldn't get 'unjammed' (referring to [their] schedules) unless [they] cooperated." Aaron understood Marion to mean that he would continue to get the worst assignments in the county and have to drive furthest to work unless he cooperated with her.

- Marion stated, "we all know there is an investigation going on," and that the Auclairs needed to tell her what they did in the High Sheriff's office during the prior administration. Aaron understood her to be referring to the investigation of Thomas White for mishandling wage executions. Aaron felt "very threatened" because he felt she was "inferring that if [he] did not speak with her and answer her questions [he] would never work again."

- Marion asked the Aaron if he had any knowledge about complaints against Sheriff White as a deputy sheriff and if he knew the procedures relating to wage executions. Aaron told Marion about answering calls from people wishing to complaint about White's handling of wage executions.

- Marion asked if Aaron knew of the White investigation regarding wage executions while Kenney was in office. She also asked if either Auclair was ever present when that investigation was discussed with Charles or Debra Collins or with Jay Kenney.

35

- Lt. Marion strongly recommended that Aaron meet with White the following day because he "knew too much." Aaron thought she was referring to the criminal investigation into White for mishandling wage executions.

- Aaron felt that the entire conversation with Marion made him feel "like [he] was going to be accused of destroying property if [he] didn't answer the questions the way Lt. Marion wanted [him] to."

- On July 19, 1999, Aaron encountered Sheriff White at the Juvenile Courthouse in Willimantic. White asked Aaron to step outside because he had something for Aaron to sign. There was nothing to be signed. Rather, White told Aaron that he (Aaron) had no right to access personnel files. White also stated that he did not know how much Aaron knew "about the investigation, but people make mistakes." Aaron believed White was referring to the criminal investigation of regarding wage executions.

- White told Aaron that nothing from Kenney's office should have been shredded, and that he had unnamed witnesses of what happened on the evening that shredding occurred.

- White stated several times that "if they would just leave it alone, this would never have to happen." Aaron understood "it" as referring to the criminal investigation into White for mishandling wage executions. White added that "Mr. Solak and his office should never pursuit it [sic] this far and that he, High Sheriff White, talked with other prosecutors from around the state and they couldn't believe what was happening."

- White then stated that he had hired five attorneys, including Attorney Meisler, and that he would not go down without a fight." This comment was followed by a remark that an internal investigation into shredding was to continue and that Aaron and Adam would be contacted by a supervisor for further interviews. Aaron felt White's comments meant that "if he was going down for the wage execution investigation against him than he would take my brother and I down [Aaron and Adam]."

- That same day, July 19, 1999, Aaron received a telephone call from Marion, ordering him to attend a meeting that afternoon at the Valley Street Courthouse in Willimantic. Prior to the meeting, Aaron purchased a small tape recorder. Marion met Aaron in the parking lot and led him to a small room off of the lockup area. Aaron activated the tape recorder.

- Marion kicked the peg out of the door, allowing the door to close. Marion then

36

placed her own tape recorder on the table and told Aaron that she wanted to take a statement about what they had discussed at their previous meeting.  Aaron understood this to me that she wanted to discuss the wage execution investigation.  Marion told Aaron that making a statement was for his benefit.

· Marion told Aaron that White and Bourgeois had ordered her to have this meeting with Aaron.  Marion went on to say that "there are people in this department that feel that [Aaron] is in fact still passing on information outside this department.  If that is not the case that's fine, if that [is] the case, [k]now that we do know, or we will find out and you're n jeopardy of losing [sic] your position."

· Aaron told Marion that White should not be asking questions about the wage execution investigation, to which Marion replied that White had a right to know and, conversely, Aaron had no right to go into personnel files, an allusion to the breaking down of the Kenney office.

· As the meeting ended, Marion ordered Aaron not to discuss their conversation with anybody.

See Nault Aff. at ¶ 23; Aaron Auclair Statement (Defendants' Exhibit V).

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

126.    On July 20, 1999, Aaron Auclair gave Detective Nault the tape he made of his meeting with Gloria Marion on July 19, 1999.  See Nault Aff. at 25.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

127.    In addition, Detective Nault reviewed a transcript of that tape that was prepared by a secretary in the State's Attorney's office, which he found to be generally accurate.  See Nault Aff. at 25; Transcript (Defendants' Exhibit Q).

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

128.    Detective Nault included relevant parts of that tape in the affidavits he drafted to support the application for warrants for the arrest of the plaintiffs on the charges at issue in this case.  See Nault Aff. at 26.

37

DENY. See Exhibit 37 attached to Plaintiffs' Statement of Material Facts Not in Dispute and Plaintiffs Memorandum of Law In Support of Summary Judgment.

129.    In particular, the warrants included what Detective Nault heard on the tape as Gloria Marion making the following comments to Aaron Auclair:

- "We want to know what you know or what you don't know."

- "Basically, what we want to know at the bottom, who, what, where, when, what you knew, who told you, what your involvement was, what other people's involvement was that you are aware of, those kinds of things."

- "This is an internal investigation for work, Aaron. This has nothing to do with the State Police, the federal level. This is an internal investigation forum, you work for Tom, correct?"

- "So, anything you were told about him [Thomas White], investigation, anything that's ongoing, any conversations that you have or had, um, because when we talked about what I said to you Friday, information about how we were trying to say that you did these things based on what you were told to by your boss."

- "Okay, now we're trying to prove that to build you a case, you understand what I'm saying, because if you did something that wasn't legal, such as because you thought your position was administrative"

- "Be careful, you now work for Tom."

- "But I know and this comes from Captain Bourgeois and this comes from Tom White that there are people in the department that feel that you are still passing information to people outside the department. That we do know or we will find out and you're in jeopardy of losing your position."

- "Do not carry this conversation out of this department with anyone."

- "You do not discuss this with anyone."

See Nault Aff. at 26; Transcript.

DO NOT HAVE SUFFICIENT KNOWLEDGE TO ADMIT OR DENY

130.    Adam Auclair, Aaron's brother, was interviewed by Detective Charles Sarant at

the State Police Troop D barracks in Danielson, Connecticut.  His six-page statement contained

the following assertions, all of which Detective Nault included in the arrest warrant affidavits:

- On May 28, 1999, Gloria Marion called Adam at home.  During the conversation,
  Marion brought up Adam's schedule and assignments.  Marion stated that she and
  Bourgeois had disagreements over Adam's schedule, and that Marion did not
  believe it should matter whom Adam supported in the Sheriff election or whom he
  associated with outside of work.

- Marion also made the comment that she hoped he would still be a Special Deputy
  Sheriff in six months.  Adam understood this to mean that he was at risk of being
  fired.

- Adam's statement discusses the meeting in the lockup of the Valley Street
  courthouse on July 16, 1999 with himself, Aaron and Gloria Marion.  Adam stated
  only that the door behind Marion locks automatically and that the keys were in
  Marion's desk drawer.  Adam did not state, as his brother had done, that there was
  a second door behind the brothers.

- Marion stated that "we all know what's going on.  There's an investigation going
  on."  She stated further that they needed to talk about shredding documents and
  wiping out information on computers.  Adam stated that he "felt threatened and
  also was concerned that the only way out of the room was a door down the
  corridor, up the stairs."

- Marion stated that "you work for Tom White now.  You should be on his side.
  Tom White does not want people working for him who are against him."

- Marion asked the brothers a series of questions, many of which involved their
  duties under Sheriff Kenney.

- Marion also asked, however, whether they had been present when any discussion
  occurred about an investigation concerning White, especially any discussion
  between Kenney and Debra or Charles Collins.

- Marion asked Aaron about whether he knew about how to conduct wage
  executions and whether he had received complaints about White's handling of
  such matters.

- Marion also asked whether Aaron had deleted files or shredded documents.

39

- Marion asked the Aaron Auclair to go talk to White and noted that White had hired attorneys and "needed to go on the offensive." Marion noted that the Auclairs were likely to be subpoenaed by White's attorneys relating to the White criminal investigation.

- Marion ended the conversation by asking about Adam's schedule and noting that his assignment may change "once Tom [White] gets word about [their] conversation today."

- On July 19, 1999, Adam was approached by White at the Valley Street courthouse in Willimantic. White asked to speak to Adam in a conference room.

- White told Adam that he should expect to be contacted by Henry Bourgeois and "the Feds." White mentioned that he had witnesses to what occurred in Kenney's office and that Aaron had no right to be in personnel files. Adam understood this to mean that his brother was to be investigated.

- White stated that he wanted what occurred in the Sheriff's Department to be kept internal. He stated further that he had three lawyers and that the investigation of him was because Kenney lost the election.

- White stated that he did not care who Adam associated with outside of work, but that anything about this must be kept internal, which Adam took to mean that he could not talk to the State's Attorneys Office or the State Police.

- After the meeting with White, Marion approached Adam and requested a one on one meeting. Marion asked Adam to follow her to a small room inside the lockup area, the same room in which she met with Aaron. Marion and Adam sat across a table from each other. Marion placed two tape recorders and a red notebook on the table. Marion then kicked out the doorstop, allowing the door to close. Adam was "really nervous and felt that [he] was not free to leave the room."

- Marion stated that she was going to conduct an internal investigation and asked Adam "who, what, where, when and how [Adam] knew about the Thomas White investigation."

- Adam refused to be tape-recorded, but agreed to write a statement. He started to write about how he heard of the investigation into White from Kenney, but Marion attempted to dictate to Adam him how the statement should read. Adam then stopped writing, causing Marion to state, "you better talk to me because otherwise your going to have to talk to Captain Bourgeois and you know what he was, a State Trooper." At that point, Adam indicated that he wanted a legal representative to speak for him, to which Marion replied, "you can't have an